**Nos. 2024-2281, -2282**

# United States Court of Appeals for the Federal Circuit

**MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC.,**

*Plaintiffs-Appellees*

v.

**NETLIST, INC.,**

*Defendant-Appellant*

On Appeal from the United States District Court for the District of Idaho, Nos. 1:24-cv-00081-DCN, 1:24-cv-00001-DCN, Hon. David C. Nye

_____

**PRINCIPAL BRIEF OF
DEFENDANT-APPELLANT NETLIST, INC.**

_____

<table>
<tr>
<td align="center">Michael Harbour<br>IRELL & MANELLA LLP<br>1800 Avenue of the Stars, Suite 900<br>Los Angeles, CA 90067<br>(310) 277-1010</td>
<td align="center">Philip Warrick<br>IRELL & MANELLA LLP<br>750 17th Street NW, Suite 850<br>Washington, DC 20006<br>(202) 777-6500</td>
</tr>
</table>

*Counsel for Defendant-Appellant Netlist, Inc.*

January 28, 2025

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Netlist, Inc. certifies the following:

1.    **Represented Entities**.  Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Netlist, Inc.

2.    **Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None

3.    **Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None

4.    **Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

Irell & Manella LLP: Andrew Henderson

Hawley Troxell Ennis & Hawley LLP: James L. Martin, Landon Scott Brown

**5.** **Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes (*see* ECF No. 22)

**6.** **Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None

Dated:  January 28, 2025                    Respectfully Submitted,

 */s/ Michael Harbour*
Michael Harbour
*Counsel for Defendant-Appellant*
*Netlist, Inc.*

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ....................................................................... i

STATEMENT OF RELATED CASES .............................................................. 1

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE ISSUES ....................................................................... 4

STATEMENT OF THE CASE .......................................................................... 5

    I.     The Idaho Bad-Faith Patent Assertion Statute ...................................... 5

    II.    Netlist's Good-Faith Assertion of Patent Infringement Claims ........... 6

         A.    The Western District of Texas and PTAB Cases
              Involving the '833 Patent ................................................................ 7

         B.    The Eastern District of Texas and PTAB Cases Involving
              the '054 and '918 Patents ............................................................... 8

    III.    The Idaho State and District Court Actions ........................................ 10

         A.    Cases Involving the '833 Patent .................................................... 12

         B.    Cases Involving the '054 and '918 Patents .................................. 12

    IV.  Netlist's Consolidated Appeals and Micron's Motion to
         Dismiss ................................................................................................ 13

SUMMARY OF THE ARGUMENT ................................................................ 13

STANDARD OF REVIEW ............................................................................. 16

ARGUMENT ................................................................................................... 17

    I.     Jurisdiction Is Proper in This Court for the Same Reasons That
         the District Court Had Subject-Matter Jurisdiction ........................... 17

    II.    Federal Courts Have Exclusive Jurisdiction Under Sections
         1331 and 1338 Because Micron's Bad-Faith Patent Assertion
         Claims Arise Under Federal Patent Law ............................................ 19

**Page**

A.    These Cases Necessarily Raise Federal Patent-Law Issues Related to Whether Netlist's Patent Assertions Were Objectively Baseless ....................................................... 20

B.    These Federal Patent-Law Issues Are Actually Disputed ......... 26

C.    The Federal Patent-Law Issues Raised by Micron's Bad-Faith Patent Assertion Claims Are Substantial.......................... 27

    1.    Risks of Inconsistent Federal and State Decisions Affecting the '833 Patent ..................................................... 28

    2.    Risks of Inconsistent Federal and State Decisions Affecting the '054 and '918 Patents .................................. 30

    3.    State-Court Resolution of Micron's Bad-Faith Claim Could Adversely Affect the Federal Patent System .......... 32

D.    Remanding These Cases to Idaho State Court—Not Removal Therefrom—Upsets the Federal-State Balance.......... 34

III.    Section 1442(a)(2) Also Provides Federal Jurisdiction ...................... 37

CONCLUSION ....................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
986 F.2d 476 (Fed. Cir. 1993) ...................................................................21

*Am. Home Prod. Corp. v. Johnson & Johnson*,
60 F.3d 843 (Fed. Cir. 1995) .....................................................................22

*Arizona v. Manypenny*,
451 U.S. 232 (1981)...............................................................................16, 39

*BP P.L.C. v. Mayor & City Council of Baltimore*,
141 S. Ct. 1532 (2021).................................................................................19

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
157 F.3d 1340 (Fed. Cir. 1998) .................................................................23

*Carney v. Washington*,
551 F. Supp. 3d 1042 (W.D. Wash. 2021) .............................................16, 39

*Chandler v. Phoenix Servs. LLC*,
1 F.4th 1013 (Fed. Cir. 2021) ....................................................................18

*Chemlawn Servs. Corp. v. GNC Pumps, Inc.*,
823 F.2d 515 (Fed. Cir. 1987) ...................................................................12

*Christiansburg Garment Co. v. EEOC*,
434 U.S. 412 (1978)...............................................................................23, 40

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988)...............................................................................19, 20

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
527 U.S. 627 (1999).....................................................................................38

*Forrester Env't Servs., Inc. v. Wheelabrator Techs., Inc.*,
715 F.3d 1329 (Fed. Cir. 2013) .............................................................28, 31

*Forro Precision, Inc. v. Int'l Bus. Machines Corp.*,
673 F.2d 1045 (9th Cir. 1982) ...................................................................41

*Franchi v. Manbeck*,
    972 F.2d 1283 (Fed. Cir. 1992) ...........................................................17

*Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. California*,
    463 U.S. 1 (1983) ................................................................................40

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
    721 F.3d 1330 (Fed. Cir. 2013) .............................................................9

*Gant v. United States*,
    417 F.3d 1328 (Fed. Cir. 2005) ...........................................................38

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
    362 F.3d 1367 (Fed. Cir. 2004) ....................................................*passim*

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*,
    545 U.S. 308 (2005) .............................................................................33

*Gunn v. Minton*,
    568 U.S. 251 (2013) ....................................................................*passim*

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
    153 F.3d 1318 (Fed. Cir. 1998) .....................................................36, 37

*Hunter v. United Van Lines*,
    746 F.2d 635 (9th Cir. 1984) ...............................................................34

*Inspired Dev. Grp., LLC v. Inspired Prod. Grp., LLC*,
    938 F.3d 1355 (Fed. Cir. 2019) ...........................................................36

*Jang v. Bos. Sci. Corp.*,
    767 F.3d 1334 (Fed. Cir. 2014) .....................................................20, 33

*Jefferson Cty., Ala. v. Acker*,
    527 U.S. 423 (1999) .............................................................................39

*Katana Silicon Techs. LLC v. Micron Tech., Inc.*,
    671 F. Supp. 3d 1138 (D. Idaho 2023) ...........................................11, 42

*Kircher v. Putnam Funds Tr.*,
    547 U.S. 633 (2006) ...............................................................16, 40, 42

*Lite-Netics, LLC v. Nu Tsai Cap. LLC*,
   60 F.4th 1335 (Fed. Cir. 2023) ........................................................................22

*Litecubes, LLC v. N. Light Prods., Inc.*,
   523 F.3d 1353 (Fed. Cir. 2008) .......................................................................16

*Lucia v. S.E.C.*,
   585 U.S. 237 (2018).........................................................................................38

*Madstad Eng'g, Inc. v. USPTO*,
   756 F.3d 1366 (Fed. Cir. 2014) ..................................................................20, 35

*Maxchief Invs. Ltd. v. Wok & Pan, Ind., Inc.*,
   909 F.3d 1134 (Fed. Cir. 2018) ............................................................20, 27, 31

*In re Micron Tech., Inc.*,
   No. 24-107 (Fed. Cir. Jan 12. 2024) ..................................................................9

*Microsoft Corp. v. GeoTag, Inc.*,
   817 F.3d 1305 (Fed. Cir. 2016) ........................................................................17

*Netlist, Inc. v. Micron Tech., Inc.*,
   No. 2:22-cv-00294, ECF No. 135 (Jury Verdict) (E.D. Tex. May
   23, 2024) ............................................................................................................7

*Netlist, Inc. v. Samsung Elecs. Co.*,
   No. 2:21-cv-00463, ECF No. 479 (Jury Verdict) (E.D. Tex. Apr.
   28, 2023) ............................................................................................................7

*Netlist, Inc. v. Samsung Elecs. Co.*,
   No. 2:22-cv-00293, ECF No. 847 (Jury Verdict) (E.D. Tex. Nov.
   22, 2024) ............................................................................................................7

*New Life Ventures, Inc. v. Locke Lord LLP*,
   No. 2:19-CV-00162, 2019 WL 13212632 (E.D. Tex. Sept. 27,
   2019) ........................................................................................................*passim*

*Nippon Steel Corp. v. United States*,
   219 F.3d 1348 (Fed. Cir. 2000) ...................................................................13, 18

*Norton v. Mathews*,
   427 U.S. 524 (1976).........................................................................................18

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
    696 F. App'x 1014 (Fed. Cir. 2017) ....................................................28

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)....................................................................*passim*

*Samsung Elecs. Co. v. Netlist, Inc.*,
    IPR2022-00996, Paper 49 (PTAB Dec. 6, 2023) .................................9

*Samsung Elecs. Co. v. Netlist, Inc.*,
    IPR2022-00999, Paper 51 (PTAB Dec. 5, 2023) .................................9

*SanDisk Corp. v. Netlist, Inc.*,
    IPR2014-00994, Paper 8 (PTAB Dec. 16, 2014) .................................7

*Sk Hynix Inc. v. Netlist, Inc.*,
    No. IPR2017-00649, Paper 7 (PTAB July 24, 2017) ...........................7

*Smart Modular Techs. Inc. v. Netlist, Inc.*,
    No. IPR2014-01370, Paper 13 (PTAB Mar. 13, 2015) .........................7

*State of Colorado v. Symes*,
    286 U.S. 510 (1932)...........................................................................39

*Stirling v. Minasian*,
    955 F.3d 795 (9th Cir. 2020) .............................................................39

*Town of Davis v. W. Va. Power & Transmission Co.*,
    647 F. Supp. 2d 622 (N.D.W. Va. 2007).............................................40

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
    No. 2011-1424, 2011 WL 5116904 (Fed. Cir. Oct. 28, 2011) ...........13

*Tyco Healthcare v. Mut. Pharm. Co.*,
    762 F.3d 1338 (Fed. Cir. 2014) .........................................................27

*United States v. Ruiz*,
    536 U.S. 622 (2002)...........................................................................17

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
    74 F.4th 1360 (Fed. Cir. 2023) ..........................................................23

*Vermont v. MPHJ Tech. Invs., LLC,*
803 F.3d 635 (Fed. Cir. 2018) .................................................................18, 35, 37

*Watson v. Philip Morris Cos.,*
551 U.S. 142 (2007).................................................................................................39

**Statutes**

28 U.S.C. § 1295 .................................................................................................5, 17, 18

28 U.S.C. § 1331 ..............................................................................................2, 10, 19, 31

28 U.S.C. § 1338 .................................................................................................*passim*

28 U.S.C. § 1442 .................................................................................................*passim*

28 U.S.C. § 1447(d) ....................................................................................................19

28 U.S.C. § 1631 ...........................................................................................................19

35 U.S.C. § 3(a)(2)(A) .................................................................................................38

35 U.S.C. § 31 ................................................................................................................38

35 U.S.C. § 151 ..............................................................................................................37

35 U.S.C. § 261 ..............................................................................................................38

35 U.S.C. § 271 ..............................................................................................................37

35 U.S.C. § 281 ..............................................................................................................37

35 U.S.C. § 282 ..............................................................................................................37

35 U.S.C. § 285 .................................................................................................*passim*

35 U.S.C. § 287 ..............................................................................................................37

35 U.S.C. § 318(b) .........................................................................................................9

Idaho Code § 48-1701, *et seq.* ...............................................................................5

Idaho Code § 48-1703.................................................................................5, 6, 21, 22

**Rule**

Fed. Cir. R. 8(c) ................................................................................12

Fed. R. Civ. Proc. 11 .................................................................*passim*

*All emphases added throughout unless otherwise noted.*

**STATEMENT OF RELATED CASES**

No appeal from these actions was previously before this or any other appellate court. Defendant-Appellant Netlist, Inc. ("Netlist") identifies the following pending cases that may directly affect or be directly affected by a decision in this appeal: *Netlist, Inc. v. Micron Tech., Inc.*, No. 1:22-cv-134 (W.D. Tex.), involving U.S. Patent No. 8,301,833 ("the '833 Patent"); *Netlist, Inc. v. Micron Tech., Inc.*, No. 22-cv-203 (E.D. Tex.), involving U.S. Patent Nos. 11,232,054 ("the '054 Patent") and 11,016,918 ("the '918 Patent"); *Micron Tech., Inc. v. Netlist, Inc.*, No. CV01-23-19920 (Idaho 4th Judicial District, Ada County), involving the '833 Patent; and *Micron Tech., Inc. v. Netlist, Inc.*, No. CV01-24-01032 (Idaho 4th Judicial District, Ada County), involving the '054 and '918 Patents.

**INTRODUCTION**

This Court should reverse the district court's orders remanding lawsuits to Idaho state court to determine whether Netlist asserted its federally granted patent rights in bad faith. *See* Appx1-18 & Appx19-38 ("Remand Orders"). Giving state courts exclusive jurisdiction to adjudicate these issues risks inconsistency with co-pending federal infringement litigation determinations and threatens to chill legitimate patent-enforcement efforts.

Specifically, this appeal involves claims that Netlist asserted claims of patent infringement in bad faith against Plaintiffs-Appellees Micron Technology Inc. and

- 1 -

Micron Semiconductor Products Inc.'s (collectively, "Micron"). The merits of those claims are not at issue in this appeal, but a court will need to determine whether Micron can prove that Netlist's patent assertions were "objectively baseless," such that "no reasonable litigant could realistically expect success on the merits." *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1376 (Fed. Cir. 2004). This appeal requires the Court to determine whether state or federal courts should adjudicate these claims, which will also resolve the inextricably intertwined question of this Court's jurisdiction over these consolidated appeals.

Despite the fact that the underlying patent infringement cases were pending in federal district courts (where they remain pending), Micron sued Netlist in Idaho state court, alleging that Netlist had brought these suits in bad faith. Netlist properly removed both cases to the United States District Court for the District of Idaho pursuant to 28 U.S.C. §§ 1331, 1338, and § 1442(a)(2). The district court's Remand Orders were improper, as it had at least two bases for subject-matter jurisdiction.

First, Micron's bad-faith patent assertion claims necessarily raise substantial questions of federal law. 28 U.S.C. § 1331 (federal question jurisdiction); § 1338 (patent law jurisdiction). Under federal law, a state bad-faith statute can only impose liability if the court first finds that the patent holder's suit was objectively baseless. *Globetrotter Software*, 362 F.3d at 1376. This in turn requires the court to assess whether the patent holder had a plausible basis for believing the patent-in-suit was

valid and infringed when it brought the lawsuit. There can be no doubt that issues involving patent validity and infringement raise questions governed by federal law. Moreover, these questions are substantial because they create a risk of inconsistent federal and state court decisions. Indeed, as explained further below, the patent suits that Micron claims Netlist brought in bad faith are still pending, and Netlist may still prevail in one of them. A "winning lawsuit is by definition a reasonable effort at petitioning for redress" and therefore not objectively baseless. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 60 n.5 (1993) ("*PRE*"). Thus, a state court finding that Netlist brought its infringement suit in bad faith would directly contradict a federal court finding that Netlist's patents were valid and infringed by Micron. And Micron is actively seeking attorneys' fees in the other infringement action based on Netlist's alleged bad faith in bringing suit, which could also result in inconsistent findings in state and federal court. Moreover, Micron's attempts to collaterally attack past or future decisions in the district court litigation actions negatively impact the entire patent system by deterring patent holders from pursuing lawful enforcement activities related to their federally granted patent rights. For at least these reasons, § 1338(a) requires federal courts to adjudicate Micron's claims.

Second, the district court alternatively has jurisdiction under 28 U.S.C. § 1442(a)(2). That provision permits the holder of a federally derived property right

to remove a case to federal court when the plaintiff challenges that right in a way that affects the validity of related federal laws. Here, Micron contends that the Court can impose liability against Netlist without making any findings relating to validity or infringement. But that is flatly contrary to federal law and Netlist's First Amendment rights, which require a finding that Netlist's suit was objectively baseless before Netlist can be liable for bad-faith patent enforcement. Micron's attempt to use the Idaho statute to limit Netlist's ability to enforce its federally granted property rights raises preemption concerns and is exactly the type of scenario that § 1442(a)(2) was designed to address.

### STATEMENT OF THE ISSUES

1.      Whether the district court legally erred by determining that it lacked subject-matter jurisdiction under § 1338(a) based on its erroneous conclusions that: a) the "objective baselessness" patent-law issues necessarily raised and actually disputed in these cases are not "substantial" despite concrete risks of inconsistent judgments and eroding federally granted patent rights; and b) removal would upset the federal-state balance.

2.      Whether the district court legally erred by determining that it lacked subject-matter jurisdiction under § 1442(a)(2) based on its erroneous conclusion that Micron's assertion of the Idaho bad-faith statute does not frustrate the aims of federal patent laws.

- 4 -

3. Whether this Court has jurisdiction over these consolidated appeals under § 1295(a)(1), which is inextricably intertwined with the questions above regarding the district court's subject-matter jurisdiction.

## STATEMENT OF THE CASE

These cases reflect Micron's apparent strategy of forcing Netlist to divert resources from pending infringement litigation in Texas, PTAB trials, and related appeals to this Court in order to defend itself against retaliatory state-law claims in a forum to which Netlist has no relationship. These Idaho actions present genuine risks of inconsistent judgments on issues related to allegations of bad faith, as Micron can and has pursued similar bad-faith claims in at least one of the district court infringement actions, and Netlist could still prevail on validity and infringement for two of the three patents at issue on appeal.

### I. The Idaho Bad-Faith Patent Assertion Statute

In response to patent infringement actions brought in good faith by Netlist as detailed below, Micron brought retaliatory suits in Idaho state court for bad-faith patent assertion under Idaho Code § 48-1701, *et seq*. (Addendum1-4, the "Idaho bad-faith statute"), which prohibits "bad faith assertions of patent infringement." Idaho Code § 48-1703. The Idaho bad-faith statute targets so-called "patent trolls" that acquire patents to file meritless nuisance suits designed solely to extract settlements. *See* Idaho Code § 48-1701(1)(d) ("[T]he threat of expensive and protracted

litigation" may cause a company to "feel that it has no choice but to settle and to pay a licensing fee, even if the claim is meritless."). According to Micron, no patent-law issue is dispositive under the Idaho bad-faith statute because it "instructs the court to consider a long, non-exclusive list of contextual factors to determine bad faith." ECF 7-1 (Micron Motion to Dismiss), at 18-19 (citing Idaho Code § 48-1703).

## II.    Netlist's Good-Faith Assertion of Patent Infringement Claims

Netlist is a publicly traded Delaware corporation based in Irvine, California that has been a leading innovator in high-performance memory module technologies for over 20 years. Netlist designs and manufactures a wide variety of products for the cloud computing, virtualization, and high-performance computing markets. This technology enables users to derive useful information from vast amounts of data in shorter periods of time. Netlist has no offices or employees in the state of Idaho.

Contrary to Micron's inflammatory rhetoric, Netlist does not bring patent-infringement lawsuits in bad faith to extract quick settlements for nuisance value, forcing companies like Micron "to pay what is effectively a tax to avoid meritless lawsuits." ECF No. 7-1, at 3. Netlist has acquired a valuable patent portfolio, which it has been willing to license to other companies that make memory products. Where companies have used Netlist's patented technology while refusing to take a license, however, Netlist has been forced to bring suits to enforce its federally granted patents. Notably, Netlist recently secured a $445 million verdict ***against Micron*** for

willful infringement, *Netlist, Inc. v. Micron Tech., Inc.*, No. 2:22-cv-00294, ECF No. 135 (Jury Verdict) (E.D. Tex. May 23, 2024); a $118 million verdict against Samsung for willful infringement, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-00293, ECF No. 847 (Jury Verdict) (E.D. Tex. Nov. 22, 2024); and a $300 million verdict against Samsung on two of ***the very same patents*** that Micron now alleges were asserted in bad faith here. *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-00463, ECF No. 479 (Jury Verdict) (E.D. Tex. Apr. 28, 2023).

### A.   The Western District of Texas and PTAB Cases Involving the '833 Patent

Netlist filed suit against Micron in the Western District of Texas for infringement of the '833 Patent in April 2021. *Netlist, Inc. v. Micron Tech., Inc.*, No. 1:22-cv-134 (W.D. Tex.). When Netlist filed its lawsuit, the '833 Patent had ***survived three previous challenges*** brought by other parties at the Patent Trial and Appeal Board ("PTAB"). *SanDisk Corp. v. Netlist, Inc.*, IPR2014-00994, Paper 8 (PTAB Dec. 16, 2014) (denying institution of petition challenging all claims of the '833 Patent after finding no reasonable likelihood that petitioner would prevail with respect to at least one of the 30 challenged claims); *Smart Modular Techs. Inc. v. Netlist, Inc.*, No. IPR2014-01370, Paper 13 (PTAB Mar. 13, 2015) (same); *Sk Hynix Inc. v. Netlist, Inc.*, No. IPR2017-00649, Paper 7 (PTAB July 24, 2017) (same).

Micron petitioned the PTAB for inter partes review ("IPR") of the '833 Patent on January 14, 2022. Micron's subsequent Idaho complaint, however, pled bad faith

based on what "Netlist had to know" or "any reasonable person would have known" about the validity of "claim 15 of the '833 patent … *before* Netlist filed its lawsuit." Appx181-182, ¶ 4. Micron subsequently prevailed in its IPR, and the USPTO has now cancelled claim 15 of the '833 Patent. *See Micron Tech., Inc. v. Netlist, Inc.*, IPR2022-00418, Paper 30 (PTAB Aug. 28, 2023).

Throughout this time, the district court infringement case has remained *stayed at Micron's request*. Recently, however, Micron moved to lift the stay, dismiss the case, and request attorneys' fees under 35 U.S.C. § 285 on the ground that Netlist's suit was unreasonable and frivolous. *See Netlist*, No. 1:22-cv-134, ECF No. 91 (W.D. Tex. Oct. 11, 2024). As of the filing of this brief, Micron's motion remains pending, and the case remains stayed. Micron's state-law claim raises this same theory and seeks similar relief. *See id.* at 15 n.3 ("Micron also brought suit in Idaho asserting that Netlist's frivolous case alleging infringement of the '833 patent violated the Idaho Bad Faith Assertions of Patent Infringement Act …. Micron will update the Idaho court should the Court award fees in the present case to avoid any potential concern of double counting." (internal citations omitted)).

**B.     The Eastern District of Texas and PTAB Cases Involving the '054 and '918 Patents**

Netlist filed suit against Micron in the Eastern District of Texas for infringement of multiple patents, including the '054 and '918 Patents, in June 2022.

*Netlist, Inc. v. Micron Tech., Inc.*, No. 22-cv-203 (E.D. Tex.). As noted above, a jury found these patents valid and infringed by Samsung as part of a $300 million verdict.

In May 2022, Samsung (later joined by Micron in June 2023) petitioned for IPR of the '054 and '918 Patents, and the PTAB has issued decisions finding the challenged claims unpatentable. *Samsung Elecs. Co. v. Netlist, Inc.*, IPR2022-00999, Paper 51 (PTAB Dec. 5, 2023) (addressing '054 Patent); *Samsung Elecs. Co. v. Netlist, Inc.*, IPR2022-00996, Paper 49 (PTAB Dec. 6, 2023) (addressing '918 Patent). Netlist has appealed these decisions, and those consolidated appeals are currently pending in this Court. *See Netlist, Inc. v. Samsung Elecs. Co.*, Nos. 24-1859, -1863 (Fed. Cir.). Accordingly, neither of these patents has been rendered "invalid," as the patentability of all claims remains subject to appeal. *See* 35 U.S.C. § 318(b) (a "certificate canceling any claim of the patent finally determined to be unpatentable" may be issued only after "any appeal has terminated").

As Micron has implicitly acknowledged, Netlist still has a cause of action for patent infringement unless and until it loses those appeals and the USPTO cancels the claims. *See* ECF 7-1, at 4-5 (citing *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1332 (Fed. Cir. 2013)). And although the case against Micron is currently stayed, the district court initially denied the stay, and Micron filed an unsuccessful mandamus petition to this Court challenging that decision. *See In re Micron Tech., Inc.*, No. 24-107 (Fed. Cir. Jan 12. 2024).

### III.    The Idaho State and District Court Actions

As further detailed below, Netlist removed both of the Idaho suits to federal court pursuant to: (1) 28 U.S.C. § 1331, which gives federal courts jurisdiction over all "actions arising under the Constitution, laws, or treaties of the United States"; (2) 28 U.S.C. § 1338, which gives federal courts jurisdiction over any action "arising under any Act of Congress relating to patents"; and (3) 28 U.S.C. § 1442(a)(2), which gives federal courts jurisdiction over any suit directed at "[a] property holder whose title is derived from [a federal] officer, where such action or prosecution affects the validity of any law of the United States." Appx171-172; Appx1083-1084.

Netlist then moved for dismissal (or in the alternative, transfer) for lack of personal jurisdiction, failure to state a claim, and because Micron's claims for bad-faith patent enforcement are compulsory counterclaims in the underlying infringement actions. Appx580-581; Appx1803-1804. Meanwhile, Micron moved to remand the cases to state court for lack of subject matter jurisdiction. The district court agreed with Micron, remanding both cases to Idaho state court and dismissing Netlist's motion to dismiss or transfer as moot. Appx17-18; Appx38.

Applying the framework articulated in *Gunn v. Minton*, 568 U.S. 251 (2013), the district court agreed that Netlist had met the first two prongs. Appx6-8; Appx26-28. It disagreed, however, that the necessarily raised and actually disputed patent-law issues related to objective baselessness were "substantial" based on its view of

the issues as "run-of-the-mill," the potential inconsistencies with federal court determinations too speculative, and the potential impact on the patent law as likewise too speculative. Appx8-11; Appx28-32. For similar reasons, the district court also found that removal would upset the federal-state balance. Appx12; Appx32.

Relying on a prior district-court decision addressing the same Idaho statute, the district court also declined jurisdiction under § 1442(a)(2), concluding that the statute did not conflict with the federal patent laws. Appx13-14 (citing *Katana Silicon Techs. LLC v. Micron Tech., Inc.*, 671 F. Supp. 3d 1138, 1154-55 (D. Idaho 2023)); Appx33-34 (same). That non-binding decision, however, is on appeal before this Court, and those appellants are challenging on preemption and constitutional grounds the same Idaho statute at issue in these cases. *See Micron Tech., Inc. v. Longhorn IP LLC*, No. 23-2007 (Fed. Cir.) (pending).

The district court declined to award Micron attorneys' fees, however, because Netlist's basis for removal was not "objectively unreasonable." Appx16; Appx36-37. The district court acknowledged that it "would be hard-pressed to find that the relevant case law clearly foreclosed Netlist's basis for removal" because "[c]aselaw interpreting the Act is relatively sparse," and to the district court's knowledge, these two cases are "the first time a party has attempted to remove a claim for violation of the Act from state court to federal court." Appx16; Appx36.

## A.    Cases Involving the '833 Patent

Micron filed its first Idaho lawsuit targeting Netlist's assertion of the '833 Patent in December 2023. *Micron Tech., Inc. v. Netlist, Inc.*, No. CV01-23-19920 (Idaho 4th Judicial District, Ada County). Netlist promptly removed the case to federal court on January 2, 2024. *Micron Tech., Inc. v. Netlist, Inc.*, No. 1:24-cv-00001 (D. Idaho). The district court granted Micron's remand motion on August 13, 2024. Discovery is moving forward in the Idaho state court, which denied Netlist's motion to dismiss on December 5, 2024, and which has scheduled trial for October 27, 2025. Appx2593.[1]

## B.    Cases Involving the '054 and '918 Patents

Micron filed its second Idaho lawsuit targeting Netlist's assertion of the '054 and '918 Patents in January 2024. *Micron Tech., Inc. v. Netlist, Inc.*, No. CV01-24-01032 (Idaho 4th Judicial District, Ada County). Netlist promptly removed the case to federal court on February 9, 2024. *Micron Tech., Inc. v. Netlist, Inc.*, No. 1:24-cv-00081 (D. Idaho). The district court granted Micron's remand motion on August 13,

---

[1] Netlist filed motions in district court to stay both of the Remand Orders pending appeal. *See* Appx0981; Appx2485. Because the district court has taken no action on these motions for several months, Netlist intends to file a motion for a stay of the Remand Orders in this Court. *See* Fed. Cir. R. 8(c); *Chemlawn Servs. Corp. v. GNC Pumps, Inc.*, 823 F.2d 515, 516-17 (Fed. Cir. 1987) (recognizing that "it was no longer practicable for GNC to seek relief from the District Court in light of the two-and-one-half month delay on appellants' District Court motion for stay").

2024. Discovery is moving forward in the Idaho state court, which has scheduled trial for July 20, 2026. Appx2607.

**IV.    Netlist's Consolidated Appeals and Micron's Motion to Dismiss**

In these consolidated appeals, Netlist challenges the district court's Remand Orders. Micron moved to dismiss or transfer the appeals for lack of jurisdiction. ECF No. 7 (Micron Motion). The Court denied Micron's motion "in favor of the parties addressing this court's jurisdiction in their merits briefs" (ECF No. 21) after Netlist explained that "the jurisdictional issue and the merits are inextricably intertwined," ECF 19 (Netlist Opposition), at 8 (quoting *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1353 (Fed. Cir. 2000)), and "respectfully urge[d] this Court to 'deny the motion to dismiss without prejudice to the parties addressing the jurisdictional and merits issues in their briefs,'" *id.* (quoting *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 2011-1424, 2011 WL 5116904, at *1 (Fed. Cir. Oct. 28, 2011)); *see also* ECF No. 20 (Micron Reply), at 1 (agreeing that "whether this Court has jurisdiction is analytically coextensive with whether the district court correctly remanded").

**SUMMARY OF THE ARGUMENT**

The district court erred by remanding the underlying cases to Idaho state court. Netlist properly removed these cases to federal court for at least two reasons: 1) Micron's claims of bad-faith patent assertion arose under federal patent law,

§ 1338(a); and 2) Micron's claims affect the validity of federal laws related to Netlist's patent rights, § 1442(a)(2).

Micron's claims for bad-faith assertion of patent infringement "arise under" federal patent law under the four-prong framework articulated in *Gunn*. That analysis controls not only this Court's review of the subject-matter jurisdiction analysis at issue in the district court's Remand Orders, but also this Court's determination of its own jurisdiction on appeal.

While Micron's suits ostensibly raise state law claims, these claims turn entirely on dispositive questions of federal patent law. A state bad-faith statute can only impose liability if the Court first finds that Netlist's infringement suits were objectively baseless, *Globetrotter Software*, 362 F.3d at 1376, which in turn requires an assessment of whether Netlist had a plausible basis for believing the patents-in-suit were valid and infringed by Micron when it brought the suits. Parallel validity litigation does not resolve this question, which the parties plainly dispute.

These questions are also "substantial" under *Gunn* because they create a risk of inconsistent federal and state court decisions and could have a severe chilling effect on patent holders' constitutionally protected right to seek redress for infringement in federal Court. In *Gunn,* the Supreme Court held that such risks were minimal where the patent law questions raised in a state-law malpractice suit were purely "hypothetical," "fact-bound and situation-specific," and would affect other

cases. *Gunn*, 586 U.S. at 262-63. In contrast, determining objective baselessness is the central inquiry in any state law case alleging bad faith patent enforcement, which creates an obvious and pervasive risk of inconsistent federal and state decisions. For example, a federal court could determine that a suit was not objectively baseless under Rule 11 of the Federal Rules of Civil Procedure or the fee shifting provision of 35 U.S.C. § 285, whereas a state court could reach the exact opposite conclusion under a state-law bad-faith statute. And where, as here, Micron brought bad faith claims based on patent litigation that is ***still pending*** in federal court, the risk of inconsistent judgments is even more acute. Even if the patent holder ultimately prevails on the merits (as Netlist could in the suit involving the '054 and '918 Patents) or on an attorneys' fees motion (as Netlist could in the suit involving the '833 Patent), a state court could conclude that it brought its suits in bad faith before the federal litigation is resolved. These risks are not merely "hypothetical" or remote. They will be extant in virtually every case brought under a state bad faith statute, including the suits at issue here. For that reason, removal of such claims to federal court does not upset the appropriate federal-state balance. To the contrary, the district court's Remand Orders upset that balance by failing to exercise exclusive jurisdiction over claims arising under the federal patent laws.

The district court also erred in rejecting Netlist's arguments under § 1442(a)(2), which provides jurisdiction over suits that affect the validity of federal

laws. A suit affects the validity of federal laws where "it would evade them or otherwise frustrate their aims." *Carney v. Washington*, 551 F. Supp. 3d 1042, 1054 (W.D. Wash. 2021). That is precisely the situation here. Micron's bad faith suits seek to limit Netlist's right to "assert[] infringement of its patent[s] and warn[] about potential litigation." *Globetrotter Software*, 362 F.3d at 1377. Section 1442(a)(2) was meant to address these types of scenarios in which a plaintiff attempts to leverage state courts to frustrate parallel federal litigation involving rights granted under federal law. "The purpose of this removal statute is, in part, to provide a neutral forum, 'free from local interests or prejudice,' so that federal rights such as these receive a fair hearing." *Carney*, 551 F. Supp. 3d at 1054 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981)). In addition, to the extent Micron attempts to impose liability on Netlist without a finding that Netlist's patent suits were objectively baseless, at least this application of the Idaho statute is preempted by federal patent law, thereby giving Netlist a federal defense supporting jurisdiction under § 1442. *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006).

## STANDARD OF REVIEW

"Subject matter jurisdiction is a question of law that [this Court] review[s] de novo." *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1360 (Fed. Cir. 2008). "Whether a civil action arises under an act of Congress related to patents necessarily presents an issue that is unique to patent law," and therefore Federal Circuit law

controls. *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1311 (Fed. Cir. 2016).

While the § 1338(a) district-court jurisdictional analysis overlaps significantly with

that for this Court's own jurisdiction under § 1295(a)(1), a "district court's

determination whether the claims before it arise under the patent laws is not

determinative of this court's appellate jurisdiction." *Franchi v. Manbeck*, 972 F.2d

1283, 1287 (Fed. Cir. 1992). Additionally, "a federal court always has jurisdiction

to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002).

## ARGUMENT

### I.    Jurisdiction Is Proper in This Court for the Same Reasons That the District Court Had Subject-Matter Jurisdiction

Both parties agree that the merits of Netlist's appeal and the jurisdictional

challenges raised in Micron's motion to dismiss are inextricably intertwined. *See*

ECF No. 19 (Netlist Opposition to Micron's Motion), at 7-9; ECF No. 20 (Reply in

Support of Micron's Motion), at 1 (asserting that these inquiries are "analytically

coextensive"). For example, this Court must determine whether it has appellate

jurisdiction under § 1295(a)(1), which provides exclusive jurisdiction over appeals

from "any civil action arising under … any Act of Congress relating to patents." On

the merits, this Court must address the ***nearly identical*** question of whether the

district court erred in concluding that it did not have subject matter jurisdiction under

28 U.S.C. § 1338(a) (providing federal jurisdiction over "any civil action arising

under any Act of Congress relating to patents") and thus remanding to Idaho state

court. Moreover, the district court's Remand Orders turn in part on *Gunn*'s interpretation of § 1338, and this Court applies *Gunn* to determine its own jurisdiction under § 1295(a)(1). *See Vermont v. MPHJ Tech. Invs., LLC*, 803 F.3d 635, 645-46 (Fed. Cir. 2018) ("[I]nterpretation of § 1338(a) necessarily implicates interpretation of § 1295(a)(1), and vice versa."); *Chandler v. Phoenix Servs. LLC*, 1 F.4th 1013, 1015 (Fed. Cir. 2021) ("To aid our interpretation of the words 'arising under' in 28 U.S.C. § 1295(a)(1), we drew from the Supreme Court's decision in *Gunn v. Minton*, where the Court interpreted those same words in 28 U.S.C. § 1338.").

Thus, as in *Nippon Steel*, "the jurisdictional issue and the merits are inextricably intertwined, and the former cannot be resolved without considering and deciding (at least in part) the latter," and therefore "both the merits and the jurisdictional inquiry turn, at least in part, upon the same question." 219 F.3d at 1353. As such, "there is no need to decide the theoretical question of jurisdiction in this case," and this Court may "reserve[] difficult questions of [its] jurisdiction when the case alternatively could be resolved on the merits in favor of the same party." *Norton v. Mathews*, 427 U.S. 524, 532 (1976). Accordingly, this Court has jurisdiction for the same reasons the district court had jurisdiction as explained below, and no separate analysis is required.

Should the Court determine that it lacks jurisdiction, it should transfer the

appeal to the Ninth Circuit. 28 U.S.C. § 1631. Micron has conceded that the Remand Orders are subject to jurisdiction in federal appellate court. *See* ECF No. 7-1, at 2; *see also* § 1447(d) (providing a jurisdictional exception for cases removed pursuant to § 1442). That jurisdiction extends to the entire scope of the Remand Orders. *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021) (when a district court rejects all grounds for removal, § 1447(d) authorizes … review of each and every one of them"). Therefore, it would be "in the interest of justice" to transfer these consolidated appeals to the Ninth Circuit, preserving Netlist's undisputed right to appeal. § 1631; *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988). But again, jurisdiction is proper both here and in the district court for the reasons below.

## II.    Federal Courts Have Exclusive Jurisdiction Under Sections 1331 and 1338 Because Micron's Bad-Faith Patent Assertion Claims Arise Under Federal Patent Law

By statute, federal district courts may exercise original jurisdiction in "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. And federal courts have ***exclusive*** jurisdiction over cases "arising under any Act of Congress relating to patents." § 1338(a). Indeed, "Congress has not only provided for federal jurisdiction but also eliminated state jurisdiction, decreeing that '[n]o State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents.'" *Gunn*, 568 U.S. at 257 (quoting § 1338(a)).

As Micron has admitted (*e.g.*, ECF 7-1, at 9-10), subject-matter jurisdiction under § 1338 is not limited to cases in which federal law creates the cause of action. *See Christianson*, 486 U.S. at 808-09. A state law claim can be said to arise under patent law "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Madstad Eng'g, Inc. v. USPTO*, 756 F.3d 1366, 1370 (Fed. Cir. 2014) (quoting *Gunn*, 568 U.S. at 258). Micron's assertion of Idaho's bad-faith statute meets all four prongs of the *Gunn* framework.

### A. These Cases Necessarily Raise Federal Patent-Law Issues Related to Whether Netlist's Patent Assertions Were Objectively Baseless

As the district court correctly determined, to avoid preemption, the underlying cases require Micron to establish that Netlist's patent assertions were "objectively baseless," meaning that "no reasonable litigant could realistically expect success on the merits." Appx6-7 (quoting *Globetrotter Software*, 362 F.3d at 1376-77); Appx26 (same). Questions of objective baselessness, in turn, revolve around patent validity and infringement, and necessarily raise patent law issues. *E.g.*, *Maxchief Invs. Ltd. v. Wok & Pan, Ind., Inc.*, 909 F.3d 1134, 1140 n.3 (Fed. Cir. 2018) ("[T]o prevail on its tortious interference claim, Maxchief would have to prove that Wok engaged in 'unfounded litigation,' … which in turn would require Maxchief to prove noninfringement or invalidity of Wok's patents."); *Jang v. Bos. Sci. Corp.*, 767 F.3d

1334, 1337-38 (Fed. Cir. 2014) (state law contract dispute regarding royalties under patent license met *Gunn* test because analysis required determination of infringement and validity of underlying patents); *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 478 (Fed. Cir. 1993) (concluding that plaintiff's state law business disparagement claims arose under patent law because it required the plaintiff to prove the falsity of the defendant's allegedly disparaging statement, which was an accusation of patent infringement).

Micron has asserted that "[a] court need not decide any patent-law question to rule for Micron." ECF 7-1, at 12. That is incorrect. Idaho Code § 48-1703 prohibits "bad faith assertion of patent infringement." As the Federal Circuit has explained, a showing of "bad faith" under a state law statute must, at the very least, require the plaintiff to prove that the defendant's claims were "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Globetrotter Software*, 362 F.3d at 1376. Otherwise, the statute is preempted by the Supremacy Clause and violates the First Amendment. *Id.* at 1377 ("Our decision to permit state-law tort liability for only objectively baseless allegations of infringement rests on both federal preemption and the First Amendment."). This standard is derived from the Supreme Court's *Noerr-Pennington* line of cases. *Id.*

Micron has suggested that no patent-law issue is dispositive under the Idaho bad-faith statute because it "instructs the court to consider a long, non-exclusive list

- 21 -

of contextual factors to determine bad faith." ECF 7-1 (Micron Motion to Dismiss), at 18-19 (citing Idaho Code § 48-1703). That too is incorrect. These factors alone cannot support a finding of bad faith absent a court determination that Netlist's suits were objectively baseless at the time they were brought. *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 60 F.4th 1335, 1343 (Fed. Cir. 2023) ("[A] bad faith standard cannot be satisfied in the absence of a showing that the claims asserted were objectively baseless."). Indeed, a finding of objective baselessness is a "threshold" requirement that must first be satisfied before a court can even consider other factors, such as the patent holder's "subjective" motivation. *Id.; Am. Home Prod. Corp. v. Johnson & Johnson*, 60 F.3d 843 (Fed. Cir. 1995) ("The litigant's subjective motivation in bringing suit comes into play only after this first, objective, prong is met."). Otherwise, the Idaho statute would be preempted under the Supremacy Clause. *Lite-Netics*, 60 F.4th at 1343.

Micron has also relied heavily on the PTAB decisions finding the claims unpatentable to argue that no patent-law issues remain. *See* ECF 7-1, at 11 ("The PTO has already conclusively resolved the only relevant patent-law question …"). But as the district court correctly explained, "a finding of ***invalidity*** is not equivalent to a finding of ***objective baselessness***." Appx7 (emphases in original); Appx27 (same). For example, a court "will need to determine whether a reasonable litigator could ***realistically believe*** the '833 Patent ***was*** valid and could ***realistically believe***

that Micron infringed thereon." Appx7 (emphases in original). The same applies to Micron's lawsuit involving the '054 and '918 Patents.[2] Moreover, those "PTAB decisions have no binding effect," as they remain subject to pending appeals. Appx27; *see also* 35 U.S.C. § 318(b); *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1372 (Fed. Cir. 2023) ("[W]e have previously held that an IPR decision does not have collateral estoppel effect until that decision is affirmed or the parties waive their appeal rights.").

The Court should reject Micron's attempt to "engage in *post hoc* reasoning by concluding that, because [Netlist] did not ultimately prevail, [its] action must have been unreasonable or without foundation." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978); *accord C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) ("Neither the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to ... liability."). Rather, Micron must show that Netlist's claim was "so baseless that no reasonable litigant could realistically expect to secure favorable relief." *PRE*, 508 U.S. at 62. This is essentially equivalent to the bad faith standard under Rule 11 of

---

[2] Micron has also argued that "the objective-baselessness standard's roots lie outside of patent law" and "derives from the *Noerr*-*Pennington* antitrust doctrine." ECF 7-1, at 15. That is irrelevant. As this Court has held "[t]he federal patent laws" prohibit a finding of state law tort liability absent a showing of objective baselessness, *Globetrotter Software*, 362 F.3d at 1377, an inquiry that necessarily depends on the underlying substantive patent law issues.

the Federal Rules of Civil Procedure. *Id.* at 65. For example, in *New Life Ventures, Inc. v. Locke Lord LLP*, No. 2:19-CV-00162, 2019 WL 13212632 (E.D. Tex. Sept. 27, 2019), a court had previously found that "the asserted patents were invalid and grant[ed] summary judgment" for the defendant. *Id.* at *1. The defendant then brought a separate suit for malicious prosecution, which under the relevant state law required a showing of "probable cause." *Id.* at *2. As the court held, "whether there existed 'probable cause for the prosecution' of patent infringement necessarily implicates federal issues addressed under FRCP 11 or 35 U.S.C. § 285." *Id.* The same is true here. Micron's bad-faith patent assertion claims implicate not only patent infringement and validity issues, but also federal issues related to Rule 11 or exceptional case determinations should it pursue those avenues in the underlying patent infringement litigations.

Further, even if Micron's *post hoc* reasoning were appropriate (it is not), a jury determined that two of these same patents were valid and infringed by Samsung, awarding $300 million in damages to Netlist.[3] And the '833 Patent had been upheld by the PTAB three times when Netlist asserted it against Micron. *See* Statement of the Case, Section II.A, *supra*.

---

[3] Micron has argued that the Samsung jury evaluated different invalidity theories, but the fact remains that the jury considered and decided issues of validity. *See Netlist*, No. 2:21-cv-00463, ECF No. 479 (Jury Verdict) (E.D. Tex. Apr. 28, 2023).

Micron recently has advanced a new argument regarding the '833 Patent. In its motion to dismiss, Micron argued that "Netlist's original filing of suit against Micron … need not be addressed," because the court could find bad faith based on "Netlist's pursuit of litigation after its failure to appeal the PTAB's directly on-point unpatentability determination." ECF No. 7-1, at 14. But that does not reflect a fair reading of what its Complaint actually alleges. Instead, Micron pled bad faith based on what "Netlist had to know" or "any reasonable person would have known" about the validity of "claim 15 of the '833 patent … ***before*** Netlist filed its lawsuit against Micron." Appx179, ¶ 4. While its Complaint mentioned that the infringement case remained pending, Micron never alleged bad faith based on Netlist "continuing to pursue its patent-infringement lawsuit" post-cancellation, nor can it. Netlist could not have dismissed the case because it was stayed at Micron's request. *See Netlist*, No. 1:22-cv-134, ECF No. 58 (Micron Motion to Stay) (W.D. Tex. Apr. 1, 2022). Then, when Micron moved to lift the stay and dismiss the case so that it could seek attorneys' fees, Netlist opposed Micron's fee request, but not dismissal. *See id*., ECF No. 92 (Netlist Response), at 1 (W.D. Tex. Nov. 12, 2024) ("Netlist does not oppose lifting the stay in this case so that the Court can address Micron's meritless fee request. Nor does Netlist oppose dismissing and finally resolving this dispute."). Thus, Netlist has in no sense "continued" to pursue the '833 Patent infringement case (other than to oppose Micron's fee request).

Micron's Complaint instead focused on a prior IPR involving a different but allegedly similar patent based on a theory expressly rejected by the PTAB. *See* Appx189-190, ¶¶ 23-25 (alleging that Netlist should have known the '833 Patent was invalid based on a prior IPR involving U.S. Patent No. 8,874,831); *see also Micron Tech., Inc. v. Netlist, Inc.*, IPR2022-00418, Paper 14, at 22-24 (PTAB Sept. 1, 2022) (identifying differences between the patents and proceedings); *Id.*, Paper 30, at 5-6 n.1 (PTAB Aug. 28, 2023) (declining to apply collateral estoppel). In any event, Micron's new argument is wrong on the facts. As noted above, the case has remained stayed at Micron's request. The only party attempting to continue litigating the infringement action involving the '833 Patent is Micron—both by seeking fees in that case and by filing a separate bad-faith claim in Idaho.

### B.    These Federal Patent-Law Issues Are Actually Disputed

The district court also correctly determined that Netlist satisfied the second prong of *Gunn*. Appx7-8; Appx27-28. Although Micron has attempted to argue that patent-law issues are not actually disputed (*see* ECF 7-1, at 15-16), that contention is premised on Micron's incorrect framing of the patent law issues necessarily raised in these cases. Specifically Micron has again focused heavily on PTAB decisions addressing the patentability of the asserted claims. But whether Netlist ultimately prevails in validity disputes is not the question. As explained above, "a finding of invalidity is not equivalent to a finding of objective baselessness." Appx7; Appx27.

Indeed, Micron must overcome a much higher bar: "Given the presumption of patent validity and the burden on the patent challenger to prove invalidity by clear and convincing evidence, it will be a rare case in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Tyco Healthcare v. Mut. Pharm. Co.*, 762 F.3d 1338, 1345 (Fed. Cir. 2014). Micron cannot seriously contend that the parties do not dispute the relevant question of objective baselessness.

### C.    The Federal Patent-Law Issues Raised by Micron's Bad-Faith Patent Assertion Claims Are Substantial

These cases present "substantial" questions that create genuine risks of changing real-world results in parallel federal litigation. *See Gunn*, 568 U.S. at 261. As this Court discussed in *Maxchief*, a federal question is "substantial" when "there is potential for 'inconsistent judgments between state and federal courts,' a circumstance that *Gunn* itself indicated could support federal jurisdiction." *Maxchief*, 909 F.3d at 1140 n.3 (internal citation omitted) (citing *Gunn*, 568 U.S. at 261-62). Such is the case here.

For example, in any state-law bad-faith claim, a federal court could determine that the patent suit was not objectively baseless under Rule 11 of the Federal Rules of Civil Procedure or the fee-shifting provision of 35 U.S.C. § 285, whereas a state court could reach the exact opposite conclusion. *See New Life Ventures*, 2019 WL 13212632, at *3 (A substantial federal question was raised because the complaint

"expressly seeks to overturn a result of the prior federal patent litigation—denial of its attorney's fees."). That very risk is present here.

### 1. Risks of Inconsistent Federal and State Decisions Affecting the '833 Patent

With respect to the '833 Patent, the district court incorrectly concluded that there was no risk of inconsistency because the Western District of Texas infringement case was "stayed without any ruling on Micron's motion for attorneys' fees" and thus there was "no real-world result that an Idaho court could contradict a prior ruling in a federal case." Appx9. This was error.

First, as noted above, Netlist previously prevailed in defeating three prior validity challenges to the '833 Patent. *See* Statement of the Case, Section II.A, *supra*. These decisions alone are at the very least potentially inconsistent with a state court finding that Netlist acted in bad faith in asserting the '833 Patent against Micron. *See Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1018-19 (Fed. Cir. 2017) (affirming that case was not exceptional under § 285 because "when previously asserting these patents, Prism prevailed twice against T-Mobile's competitors, withstanding non-infringement and validity defenses").

Second, the district court's premise that a substantial question requires a risk of a conflict with a ***prior*** federal court decision is wrong. This Court has acknowledged that ***future*** conflicts with federal court determinations also raise

concerns. *See Forrester Env't Servs., Inc. v. Wheelabrator Techs., Inc.*, 715 F.3d 1329, 1334 (Fed. Cir. 2013).

Third, Micron's fee motion in the Western District of Texas is fully briefed, making it not only possible but also likely that the court will adjudicate the fee issue first, which is exactly what Micron has requested. Thus, this case is unlike *Gunn*, which involved a run-of-the-mill "state court case-within-a-case inquiry" that "asks what would have happened in the prior federal proceeding if a particular argument had been made." *Gunn*, 568 U.S. at 261-62. There is nothing "hypothetical" about the inquiry here, and there is a "realistic risk of inconsistency" with the Idaho state court deciding an issue substantially overlapping one before the Western District of Texas that Congress has placed within the exclusive jurisdiction of the federal courts. *See New Life Ventures*, 2019 WL 13212632, at *5. As such, Micron's prior statement that "Netlist's lawsuits against Micron are stayed, and the courts there have not ruled on any pertinent issue" (ECF 7-1, at 17) is disingenuous and of little comfort.

Micron has argued that the differences in the standards governing the Idaho statute versus 35 U.S.C. § 285 means that "there is no realistic risk of inconsistency." ECF 7-1, at 20. The substantial overlap demonstrates a risk of conflict. The district court emphasized what it described as consistency between the two statutes (Appx11; Appx31), but when two courts attempt to address similar conduct in

different ways, opportunities for inconsistent findings and results are inevitable, not to mention the inefficiency of duplicative proceedings. And while Micron has also argued that the discretionary nature of the remedies involved mitigates concerns about inconsistency (ECF 7-1, at 20), it does not deny the potential for inconsistency.

Like *Longhorn IP,* this case raises significant issues of preemption and constitutional law. While Micron has suggested that it "expressly disavowed" the position that its suits attempt to impose liability without showing objective baselessness (ECF No. 7-1, at 27), Micron has elsewhere contended that the Idaho bad-faith statute provides other factors to establish violations and that "[a] court need not decide any patent-law question to rule for Micron" on these factors. *Id.* at 12; *see also id.* at 14 (referencing "numerous other factors showing bad faith"). If this were true, it would mean that the Idaho bad-faith statute is preempted under *Globetrotter Software*. This clearly presents a "substantial" question of federal patent law. That is particularly true should Micron bring a Rule 11 motion in any of the underlying cases, as the Supreme Court has held that the objectively baselessness standard— while not identical—is essentially equivalent to the Rule 11 bad-faith standard. *PRE*, 508 U.S. at 65.

### 2. Risks of Inconsistent Federal and State Decisions Affecting the '054 and '918 Patents

The risk of conflict is even more acute with respect to the Eastern District of Texas case involving the '054 and '918 Patents. That infringement case remains

pending, as are the appeals of the adverse PTAB decisions regarding the '054 and '918 Patents. Micron's state complaint alleges that Netlist asserted these patents in bad faith because "Netlist knew, and any reasonable litigant should have known, that the '054 and '918 patents were invalid." Appx1092, ¶ 5. But Netlist may still prevail on these claims if, for example, the Federal Circuit reverses the PTAB's rulings on the validity of the '918 and '054 Patents. This would mean, as a matter law, that Netlist did not bring these claims in bad faith. *PRE*, 508 U.S. at 58 (a "successful lawsuit" is not objectively baseless regardless of the patent owner's reason for bringing it). Yet Micron is asking a state court to hold the opposite before any of these cases are resolved. This clearly presents a "potential for 'inconsistent judgments between state and federal courts.'" *Maxchief*, 909 F.3d at 1140 n.3 (quoting *Forrester*, 715 F.3d at 1334).

Micron essentially conceded this in its motion to dismiss when it argued that there is "no risk of inconsistency because a court resolving Micron's state-law claims can account for the appeals' ultimate results." ECF No. 7-1, at 21. But Micron is vigorously pursuing its state law claims while these appeals remain pending. It has not asked that they be stayed pending resolution of the case involving the '054 and '918 Patents, nor has it cited any Idaho authority that would prohibit a state court from adjudicating Micron's bad faith claim before the appeals are resolved. This is precisely what Congress meant to prevent by providing federal question jurisdiction

under §§ 1331 and 1338. *See New Life Ventures*, 2019 WL 13212632, at \*4 ("[A] finding that malicious prosecution claims stemming from patent infringement actions are maintainable in state court would be an open invitation to patent defendants to seek to overturn an adverse § 285 ruling in any state court that has jurisdiction over the patent plaintiff."). The risk of interference with co-pending federal infringement litigation is illustrated by *Longhorn IP*, No. 23-2007 (Fed. Cir.), a case involving the same Idaho bad-faith statute that is also pending in this Court. There, the defendants have appealed an order requiring them to post a bond before proceeding with their patent suits on the ground that this "risks chilling speech and blocking the federal courthouse doors." *Id.*, ECF No. 26, at 43. While Micron has not *yet* sought a bond in its cases against Netlist, this same exact risk applies here.

### 3.   State-Court Resolution of Micron's Bad-Faith Claim Could Adversely Affect the Federal Patent System

Independently, a state-court determination that Netlist asserted patents in bad faith in either infringement case could adversely impact "the federal [patent] system as a whole." *Gunn*, 568 U.S. at 260. The Idaho claim asserted by Micron and other "various state laws have the potential to add additional, divergent, and potentially more stringent requirements to bring a federal lawsuit for patent infringement than those already imposed by federal law." *New Life Ventures*, 2019 WL 13212632, at \*4. This could result in inconsistent state-court standards that may "impose a more strict 'probable cause' standard under its relevant authorities than would be required

to maintain a lawsuit under Rule 11 or § 285," and "litigants in that state or subject to its jurisdiction will inevitably be forced to consider those standards and may defer bringing certain patent actions that federal law would have allowed for fear of similar prosecution in state court." *Id.* (citing *Gunn*, 568 U.S. at 260); *cf. Jang*, 767 F.3d at 1338 ("Maintaining Federal Circuit jurisdiction over such contractual disputes to avoid such conflicting rulings is important to 'the federal system as a whole' and not merely 'to the particular parties in the immediate suit.'" (quoting *Gunn*, 568 U.S. at 260)). Therefore, the patent law issues necessarily raised by Micron's bad-faith assertion claim are also "substantial" because they could impact not only litigations involving Netlist, but also the broader federal patent system.

The Idaho bad-faith statute as applied to Netlist could chill the exercise of constitutionally enshrined patent rights and the first amendment right to petition courts for redress of grievances. Remanding such actions to state court sets up a scenario where, under federal precedent, patent owners could clear the objective baselessness standard required for *Noerr-Pennington* protection (along with the requirements of Rule 11 on which the objective baseless standard is based), and yet, under Idaho precedent, still be liable for bad faith patent litigation. That risk exists whether Idaho courts ignore the objective baselessness requirement or interpret and apply it differently than federal courts. This would defeat the entire purpose of federal subject matter jurisdiction, which is to provide "uniformity that a federal

forum offers on federal issues" G*rable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005), and give litigants "a sympathetic, knowledgeable forum for the vindication of their federal rights" in the first instance. *Hunter v. United Van Lines*, 746 F.2d 635, 639 (9th Cir. 1984). The potentially disparate outcomes of state courts applying the Idaho statute and federal courts applying either Federal Rule of Procedure 11 or the objective baselessness *Noerr-Pennington* standard pose a very real risk of discouraging patent owners from exercising their rights in ***every single case*** in which an accused infringer could bring a bad-faith patent litigation claim in Idaho state court. Thus, this case is nothing like *Gunn*, where the state court may have had to decide fact specific issues of patent infringement as part of a state law claim that would have no bearing on other patent disputes. *Gunn*, 568 U.S. at 263-64.

> **D.    Remanding These Cases to Idaho State Court—Not Removal Therefrom—Upsets the Federal-State Balance**

The district court incorrectly concluded that removal would upset the federal-state balance based on its prior characterization of the disputed patent issues as allegedly "run-of-the-mill" and "impact[ing] Micron and Netlist alone." Appx12; Appx32. These assertions are wrong for the reasons discussed above. Moreover, unlike the malpractice law at issue in *Gunn*, "states do not have a 'special responsibility' to determine whether patent infringement suits have been properly brought in federal court. These questions are typically decided under Federal Rule

of Civil Procedure 11 and 35 U.S.C. § 285, and Congress has placed the determination of such questions within the *exclusive* jurisdiction of the federal courts." *New Life Ventures*, 2019 WL 13212632, at *5 (emphasis in original).

Permitting Idaho state courts to determine the measure of "bad faith" precluding a patent owner from otherwise exercising its right to assert presumptively valid patents would interfere with Congress's attempt to centralize such determinations in the federal courts with exclusive appeals to this Court to ensure the uniform application of the patent laws. *See Madstad*, 756 F.3d at 1371. Not only could this approach raise material barriers to bringing patent infringement suits, but those barriers may, and invariably will, differ from state-to-state, resulting in a patchwork of state-specific "bad-faith" interpretations that could deter the legitimate enforcement of patent rights against willful infringers. As one district court observed, "[t]he issues of inconsistency and forum shopping that such a holding would precipitate are at odds with the uniform federal patent system Congress sought to establish under the Federal Courts Improvement Act." *New Life Ventures*, 2019 WL 13212632, at *5 (citing *Vermont*, 803 F.3d at 646-47 ("A hypothetical finding that [a state consumer protection law] is not invalid or preempted in state court would affect the development of a uniform body of patent law, as such a decision would be binding in Vermont, but would not be in other states with similar laws or in federal court.")). For at least these reasons, it is the district court's Remand Orders—not the

removals—that upset the federal-state balance regarding the federal patent law.

Micron has argued that plaintiffs could manipulate "any case involving almost any state law claim by doing little more than pleading allegations that involved an embedded … validity analysis." ECF No. 7-1, at 24 (quoting *Inspired Dev. Grp., LLC v. Inspired Prod. Grp., LLC*, 938 F.3d 1355, 1369 (Fed. Cir. 2019)). But unlike standard state law claims—e.g., unfair competition, breach of contract, or unjust enrichment—which have numerous non-patent related elements, and in which infringement or validity may present but one non-dispositive issue, *see Inspired Dev.*, 938 F.3d at 1364, Micron's claims here turn entirely on the dispositive patent-law issues related to objective baselessness. The risk of gamesmanship is exactly the opposite. As discussed above in connection with the pending *Longhorn IP* appeal, any federal defendant in Idaho accused of patent infringement can attempt to leverage the Idaho bad-faith statute to prematurely terminate litigation in federal court (which has exclusive jurisdiction over patent infringement and validity) and shift otherwise federal issues to state court under the guise of unfair competition.

Micron has also argued that states enjoy well-established powers to deter unfair competition regardless of whether the underlying conduct implicates questions of patent law. ECF No. 7-1, at 23. But this conflates the question of preemption with the question of federal subject matter jurisdiction. Indeed, *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998), the very

case on which Micron relied, found that the claim at issue in that case gave rise to federal jurisdiction even though the state law was not preempted. *Id.* at 1330.

## III.    Section 1442(a)(2) Also Provides Federal Jurisdiction

The district court alternatively had jurisdiction under 28 U.S.C. § 1442(a)(2). This section "expands the circumstances in which removal is authorized to allow owners of federally-derived property rights to remove a cause of action to federal court … if the action 'affects the validity of any law of the United States.'" *Vermont*, 803 F.3d at 647. Micron's claims would affect the validity of various United States laws providing for the granting and enforcement of patent rights, including, for example, 35 U.S.C. §§ 151, 271, 281, 282, and 287, by seeking to restrain Netlist from exercising rights to which it is entitled to under the Patent Act.

Removal under § 1442(a)(2) requires that "(1) an action be instituted in state court; (2) the action be against or directed to the holder of a property right; (3) the property right be derived from a federal officer; and (4) the action would 'affect' the validity of a federal law." *Vermont*, 803 F.3d at 647 (quoting § 1442(a)(2)). As the district court correctly observed, Micron did not dispute that the first three elements are satisfied. *See* Appx13 ("The parties do not dispute that this action was instituted in state court, that it is directed against the holder of a property right, or that the

property in question derives from a federal officer."); Appx33 (same).[4] First, Micron

brought its action in Idaho state court. Second, Netlist holds title to the '833, '054,

and '918 Patents, which are property rights. 35 U.S.C. § 261 ("patents shall have the

attributes of personal property"); *Fla. Prepaid Postsecondary Educ. Expense Bd. v.*

*Coll. Sav. Bank*, 527 U.S. 627, 642 (1999) ("Patents … have long been considered a

species of property."). Third, those property rights derive from the Director of the

United States Patent and Trademark Office—an officer of the United States,

appointed by the President, with advice and consent of the U.S. Senate. 35 U.S.C.

§ 31; *see also Lucia v. S.E.C.*, 585 U.S. 237, 245 (2018) (confirming that "officers"

must "exercise significant authority pursuant to the laws of the United States"

(cleaned up)). And the Director's statutory duties include "the issuance of patents."

35 U.S.C. § 3(a)(2)(A).

Thus, the only "disagreement centers on whether the action[s] affect[] the

validity of any federal law." Appx13; Appx33. For all the same reasons as explained

above, Micron's lawsuits threaten to impose undue burdens on Netlist's exercise of

its federally granted patent rights. If states impose more stringent requirements than

---

[4] Micron's motion to dismiss asserted—for the first time—arguments regarding the definition of property rights, suggesting patents owned by assignment do not qualify. *See* ECF 7-1, at 24-25. Micron has waived any such arguments by not presenting them to the district court. *See, e.g.*, *Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005) ("Arguments not made in the court or tribunal whose order is under review are normally considered waived.").

required under federal precedents to bring suit, this would clearly "would evade …

or otherwise frustrate [the patent law's] aims." *Carney,* 551 F. Supp. 3d at 1053-54.

Micron has argued that a suit only "affects" the validity of a federal if it would render

the federal right "void." ECF 7-1 (Motion to Dismiss), at 24. But none of Micron's

cited authorities support that proposition. Nor does the plain language of the statute,

which provides jurisdiction over an action that "affects" the validity of a federal law.

§ 1442(a)(2). Moreover, Micron's argument is inconsistent with the very purpose of

that section which is "to provide a neutral forum, 'free from local interests or

prejudice,' so that federal rights such as these receive a fair hearing." *Carney*, 551

F. Supp. 3d at 1054 (quoting *Arizona v. Manypenny*, 451 U.S. at 242). That is

particularly true in view of longstanding precedent requiring § 1442 to be "liberally

construed in favor of removal." *Stirling v. Minasian*, 955 F.3d 795, 800 (9th Cir.

2020) (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007)) (internal

quotation marks omitted); *see also State of Colorado v. Symes*, 286 U.S. 510, 517

(1932) ("It scarcely need be said that such measures are to be liberally construed to

give full effect to the purposes for which they were enacted.").

Furthermore, unlike other removal statutes, the presence of an anticipated or

actual federal defense, such as preemption, is sufficient to establish federal

jurisdiction under Section 1442(a). *See Jefferson Cty., Ala. v. Acker*, 527 U.S. 423,

431 (1999) ("Under the federal officer removal statute … the federal-question

element is met if the defense depends on federal law."). Thus, "Section 1442(a) is an exception to the 'well-pleaded complaint' rule, under which (absent diversity) 'a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case "arises under" federal law.'" *Kircher*, 547 U.S. at 644 n.12 (quoting *Franchise Tax Bd. of Cal.* v. *Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 10 (1983)). And courts have held that this exception applies to § 1442(a)(2) specifically. *E.g.*, *Town of Davis v. W. Va. Power & Transmission Co.*, 647 F. Supp. 2d 622, 627 (N.D.W. Va. 2007).

Netlist has precisely such a preemption defense in these cases. As explained above, a court may not impose liability for bad-faith patent enforcement without finding not only that the patents were invalid or not infringed, but also that no reasonable litigant could have thought otherwise at the time the suit was brought. *See Globetrotter Software*, 362 F.3d at 1376. A mere prior finding of invalidity or noninfringement is plainly insufficient to satisfy this demanding standard. *See PRE*, 508 U.S. at 60 n.5 ("[A] court must 'resist the understandable temptation to engage in *post hoc* reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'" (quoting *Christiansburg Garment,* 434 U.S. at 421-22)). Likewise, an allegation that a claim of infringement was "deceptive" is similarly insufficient. Indeed, "[i]n *Noerr*, the [Supreme Court] held that even deliberately deceptive advertising aimed at influencing legislative

decisions was immune from the antitrust laws" under the First Amendment. *Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d 1045, 1060 (9th Cir. 1982).

The district court dismissed Netlist's preemption concerns based on its characterization of the objective baselessness standard as "essentially baked-in to any state law imposing liability on a patentholder for communications asserting infringement," as well as Micron's purported disavowal of any lesser standard. *See* Appx14 (citing Micron's statement that it "is not attempting to hold Netlist liable without showing objective baselessness"); Appx34 (same). But the Idaho bad-faith statute does not expressly require such a showing, and Micron has not been consistent on this point. For example, in its motion to dismiss in this Court, Micron cited specific factors in the Idaho law and argued that "[a] court need not decide any patent-law question to rule for Micron." ECF 7-1, at 12. And Micron argued to the district court that the Idaho bad-faith statute's factors "do not require Micron to prove—or the court to make any finding with respect to—the non-infringement or invalidity of Netlist's asserted patents." Appx558; Appx2163 (same). And even if the requirement is "essentially baked-in" to the state law, state courts may impose interpretations of "objective baselessness" at odds with federal precedent. To the extent that Micron attempts to impose liability on Netlist without a finding that Netlist's patent suits were objectively baseless according to federal precedent, Micron's claims are preempted by federal patent law, thereby giving Netlist a federal

defense. This also gives rise to jurisdiction under § 1442. *Kircher*, 547 U.S. at 644 n.12.

The district court also relied heavily on an earlier district court decision finding no conflict between the Idaho bad-faith statute and the federal patent laws, but failed to address the specific risks identified by Netlist. *See* Appx13-14 (citing *Katana*, 671 F. Supp. 3d at 1154-55); Appx33-34 (same).[5] Furthermore, as previously discussed, that non-binding decision is currently pending on appeal before this Court, where appellants challenge the very same statute on preemption grounds. *See Longhorn IP*, No. 23-2007 (Fed. Cir.). In sum, the district court failed to consider the full spectrum of risk associated with Micron's assertion of the Idaho statute, which led to its erroneous conclusion that § 1442(a)(2) does not apply.

## CONCLUSION

For the foregoing reasons, Netlist respectfully asks the Court to reverse the district court's Remand Orders.

Dated:  January 28, 2025                    Respectfully submitted,

By:  */s/ Michael Harbour*

Michael Harbour
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900

---

[5] The district court also relied on this prior decision when evaluating substantiality and the federal-state balance under the *Gunn* framework. Appx9; Appx11; Appx12; Appx29-30; Appx31; Appx32.

Los Angeles, California 90067
Telephone: (310) 277-1010

Philip Warrick
IRELL & MANELLA LLP
750 17th Street NW, Suite 850
Washington, DC 20006
Telephone: (202) 777-6500

*Counsel for Defendant-Appellant*
*Netlist, Inc.*

# ADDENDUM

**ADDENDUM TABLE OF CONTENTS**

| ECF | Date Filed | Description | Page Numbers |
|---|---|---|---|
| | | Idaho Code § 48-1701 | Addendum1-4 |
| 25 | 8/13/2024 | U.S. District of Idaho Memorandum Decision Order Granting Micron's Motion to Remand (1:24-cv-00001-DCN) | Appx1-18 |
| 23 | 8/13/2024 | U.S. District of Idaho Memorandum Decision Order Granting Micron's Motion to Remand (1:24-cv-00081-DCN) | Appx19-38 |
| | | U.S. Patent No. 8,301,833 | Appx39-62 |
| | | U.S. Patent No. 11,016,918 | Appx63-110 |
| | | U.S. Patent No. 11,232,054 | Appx111-158 |

TITLE 48
MONOPOLIES AND TRADE PRACTICES

CHAPTER 17
BAD FAITH ASSERTIONS OF PATENT INFRINGEMENT

48-1701.  LEGISLATIVE FINDINGS AND INTENT. (1) The legislature of the state of Idaho finds that:

(a)  Idaho is striving to build an entrepreneurial and knowledge-based economy.  Attracting and nurturing information technology (IT) and other knowledge-based companies are important parts of this effort and will be beneficial to Idaho's future.

(b)  Patents are essential to encouraging innovation, especially in the IT and knowledge-based fields.  The protections afforded by the federal patent system create an incentive to invest in research and innovation, which spurs economic growth.  Patent holders have every right to enforce their patents when they are valid and infringed, to solicit interest from prospective licensees and to initiate patent enforcement litigation as necessary to protect intellectual property.

(c)  The legislature does not wish to interfere with the good faith enforcement of patents or good faith patent litigation.  The legislature also recognizes that Idaho is preempted from passing any law that conflicts with federal patent law.

(d)  Abusive patent litigation, and especially the assertion of bad faith infringement claims, can harm Idaho companies.  A business that receives a letter or other communication asserting such claims faces the threat of expensive and protracted litigation and may feel that it has no choice but to settle and to pay a licensing fee, even if the claim is meritless.

(e)  Not only do bad faith patent infringement claims impose a significant burden on individual Idaho businesses, they also undermine Idaho's efforts to attract and nurture IT and other knowledge-based companies.  Funds used to avoid the threat of bad faith litigation are no longer available to invest, produce new products, expand or hire new workers, thereby harming Idaho's economy.

(2)  Through this narrowly focused chapter, the legislature seeks to facilitate the efficient and prompt resolution of patent infringement claims, protect Idaho businesses from abusive and bad faith assertions of patent infringement and build Idaho's economy, while at the same time carefully not interfering with legitimate patent enforcement actions.

[48-1701, added 2014, ch. 277, sec. 1, p. 699.]

48-1702.  DEFINITIONS. As used in this chapter:

(1)  "Demand letter" means a letter, e-mail or other communication asserting or claiming that the target has engaged in patent infringement, or that the actions of the target would benefit from the grant of a license to any patent, or any similar assertion.

(2)  "Idaho person" means a person as defined in section 48-602, Idaho Code.

(3)  "Target" means an Idaho person:

(a)  Who has received a demand letter or against whom an assertion or allegation of patent infringement has been made;

(b)  Who has been threatened with litigation or against whom a lawsuit has been filed alleging patent infringement; or

(c)  Whose customers have received a demand letter asserting that the person's product, service or technology has infringed a patent.

[48-1702, added 2014, ch. 277, sec. 1, p. 700.]

48-1703.  BAD FAITH ASSERTIONS OF PATENT INFRINGEMENT. (1) It is unlawful for a person to make a bad faith assertion of patent infringement in a demand letter, a complaint or any other communication.

(2)  A court may consider the following factors as evidence that a person has made a bad faith assertion of patent infringement:

(a)  The person sends a demand letter to a target without first conducting an analysis comparing the claims in the patent to the target's products, services or technology.

(b)  The demand letter does not contain the following information:

(i)  The patent number;

(ii)  The name and address of the patent owner or owners and assignee or assignees, if any; and

(iii)  The factual allegations concerning the specific areas in which the target's products, services and technology infringe the patent or are covered by the claims in the patent.

(c)  The demand letter does not identify specific areas in which the products, services and technology are covered by the claims in the patent.

(d)  The demand letter demands payment of a license fee or response within an unreasonably short period of time.

(e)  The person offers to license the patent for an amount that is not reasonably based on the value of a license to the patent.

(f)  The person asserting a claim or allegation of patent infringement acts in subjective bad faith, or a reasonable actor in the person's position would know or reasonably should know that such assertion is meritless.

(g)  The claim or assertion of patent infringement is deceptive.

(h)  The person or its subsidiaries or affiliates have previously filed or threatened to file one (1) or more lawsuits alleging patent infringement based on the same or similar claim, the person attempted to enforce the claim of patent infringement in litigation and a court found the claim to be meritless.

(i)  Any other factor the court finds relevant.

(3)  A court may consider the following factors as evidence that a person has not made a bad faith assertion of patent infringement:

(a)  The person engages in a good faith effort to establish that the target has infringed the patent and to negotiate an appropriate remedy.

(b)  The person makes a substantial investment in the use of the patent or in the production or sale of a product or item covered by the patent.

(c)  The person has:

(i)  Demonstrated good faith in previous efforts to enforce the patent, or a substantially similar patent; or

(ii)  Successfully enforced the patent, or a substantially similar patent, through litigation.

(d)  Any other factor the court finds relevant.

3

(4) Any violation of the provisions of this chapter is an unlawful, unfair and deceptive act or practice in trade or commerce for the purpose of applying the Idaho consumer protection act, chapter 6, title 48, Idaho Code.

[48-1703, added 2014, ch. 277, sec. 1, p. 700.]

48-1704.  PERSONAL JURISDICTION. Any person outside this state sending a demand letter to an Idaho person shall be deemed to be transacting business within this state within the meaning of section 5-514(a), Idaho Code, and shall thereby be subject to the jurisdiction of the courts of this state.

[48-1704, added 2014, ch. 277, sec. 1, p. 701.]

48-1705.  AUTHORITY OF THE ATTORNEY GENERAL AND DISTRICT COURTS. The attorney general and the district court shall have the same authority in enforcing and carrying out the provisions of this chapter as is granted the attorney general and district courts under the Idaho consumer protection act, chapter 6, title 48, Idaho Code.

[48-1705, added 2014, ch. 277, sec. 1, p. 701.]

48-1706.  PRIVATE CAUSE OF ACTION, REMEDIES AND DAMAGES -- LIMITATION OF ACTION. (1) A target of conduct involving assertions of patent infringement, or a person aggrieved by a violation of this chapter or by a violation of rules promulgated under chapter 6, title 48, Idaho Code, may bring an action in district court. A court may award the following remedies to a plaintiff who prevails in an action brought pursuant to this subsection:
(a) Equitable relief;
(b) Damages;
(c) Costs and fees, including reasonable attorney's fees; and
(d)  Exemplary damages in an amount equal to fifty thousand dollars ($50,000) or three (3) times the total of damages, costs and fees, whichever is greater.
(2)  The remedies provided for in this chapter are not exclusive and shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other statute.
(3)  No private action may be brought under the provisions of this chapter more than three (3) years after the cause of action accrues. A cause of action shall be deemed to have accrued when the party bringing an action under the provisions of this chapter knows, or in the exercise of reasonable care should have known, about the violation of the provisions of this chapter. Each bad faith assertion of patent infringement constitutes a separate violation under this chapter.

[48-1706, added 2014, ch. 277, sec. 1, p. 701.]

48-1707.  BOND. Upon motion by a target and a finding by the court that a target has established a reasonable likelihood that a person has made a bad faith assertion of patent infringement in violation of this chapter, the court shall require the person to post a bond in an amount equal to a good faith estimate of the target's costs to litigate the claim and amounts reasonably likely to be recovered under this chapter, conditioned upon payment of any amounts finally determined to be due to the target. A hearing shall be held if either party so requests. The court may waive the bond requirement if

4

it finds the person has available assets equal to the amount of the proposed bond or for other good cause shown.

[48-1707, added 2014, ch. 277, sec. 1, p. 701.]

48-1708.  EXEMPTIONS. A demand letter or assertion of patent infringement that includes a claim for relief arising under 35 U.S.C. section 271(e)(2) shall not be subject to the provisions of this chapter.

[48-1708, added 2014, ch. 277, sec. 1, p. 702.]

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC., a Delaware corporation; and MICRON SEMICONDUCTOR PRODUCTS, INC., an Idaho corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NETLIST, INC., a Delaware corporation,<br><br>Defendant. | Case No. 1:24-cv-00001-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are a Motion to Remand (Dkt. 14) and a Motion to Seal (Dkt. 21) filed by Plaintiffs Micron Technology, Inc., and Micron Semiconductor Products, Inc. (together, "Micron"), and a Motion to Dismiss or Transfer (Dkt. 17) filed by Defendant Netlist, Inc. Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will address the motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). For the reasons outlined below, the Court GRANTS Micron's Motion to Remand and Motion to Seal and, accordingly, deems Netlist's Motion to Dismiss MOOT.

MEMORANDUM DECISION AND ORDER – 1

## II. BACKGROUND

### A. Factual Background

Micron is a manufacturer of semiconductors headquartered in Boise, Idaho. Netlist designs and manufactures a wide variety of computing products and possesses an extensive patent portfolio. It is headquartered in Irvine, California.

In or around 2018, Netlist sued Micron for violating U.S. Pat. No. 8,874,831 (the "'831 Patent"). The Patent Trial and Appeal Board (the "PTAB") conducted *inter partes* review of the patent and found it to be invalid.[1]

Roughly three years later, Netlist sued Micron for violation of another patent—U.S. Pat. No. 8,301,833 (the "'833 Patent").[2] At another administrative trial, the PTAB determined that, like the '831 Patent, the '833 Patent was invalid.

### B. Procedural Background

On December 11, 2023, Micron filed suit against Netlist in Idaho state court, alleging that Netlist's attempted assertion of the '833 Patent was brought in bad faith, violating the Idaho Bad Faith Assertions of Patent Infringement Act (the "Act"). Idaho Code § 48-1701 *et seq*. Specifically, Micron asserted that Netlist knew the '833 Patent was

---

[1] *Inter partes* review "begins when a person other than the patent owner files a petition with the [USPTO], which is ultimately reviewed by the [PTAB]." 152 Am. Jr. Trials 349, § 3 (Originally published in 2017). *Inter partes* review typically involves a party who has been sued for patent infringement. *Id.* That party petitions the PTAB, requesting a finding that the patent asserted against them be canceled "as being not novel under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103 based on prior art . . . ." *Id.* The duty of the PTAB in an *inter partes* review is to decide whether a contested patent is valid. *Id.* at § 15.

[2] Netlist filed its suit against Micron for violation of the '833 patent in the United States District Court for the Western District of Texas. *Netlist, Inc. v. Micron Technology, Inc. et al.*, Case No. 1:22-cv-00134-DII (W.D. Tex). The Western District of Texas litigation is currently stayed. Dkt. 17-1, at 11.

MEMORANDUM DECISION AND ORDER – 2

invalid because of its similarities to the '831 Patent—the patent the PTAB had previously found invalid.

Shortly thereafter, Netlist removed the action, claiming this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338, or alternatively under 28 U.S.C. § 1442(a)(2). Dkt. 1. Micron subsequently moved the Court to remand the case back to state court, contending that neither of Netlist's asserted grounds, nor any other grounds, afford the Court subject matter jurisdiction. Dkt. 14. Micron also requested an award of the attorney's fees and costs it has incurred due to Netlist's improper removal. Dkt. 14-1, at 24.

Less than a month after Micron filed its Motion to Remand, Netlist filed its Motion to Dismiss, asking the Court to either dismiss this case, or to transfer it to the Western District of Texas, where Netlist's attempt to enforce its '833 patent is currently pending. Dkt. 17-1. Micron responded, and simultaneously moved the Court to seal various portions of its response and other exhibits because they contain sensitive business information and information about settlement negotiations. Dkt. 21.

### III. LEGAL STANDARDS

**A. Jurisdiction Under 28 U.S.C. §§ 1331 and 1338**

Under 28 U.S.C. § 1331, federal district courts have subject matter jurisdiction over all civil actions "arising under the Constitution, laws, or treaties of the United States." Pursuant to 28 U.S.C. § 1338(a), this jurisdiction extends to "any civil action arising under any Act of Congress relating to patents[.]" Further, § 1338(a) makes clear that federal subject matter jurisdiction over actions arising from acts relating to patents is exclusive. *Id.*

"For statutory purposes, a case can arise under [patent] law in two ways. Most

MEMORANDUM DECISION AND ORDER – 3

directly, a case arises under [patent] law when [patent] law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). However, in certain circumstances, "a claim may arise under patent laws even where patent law did not create the cause of action . . . ." *Forrester Env't Servs., Inc. v. Wheelabrator Techs., Inc.*, 715 F.3d 1329, 1333 (Fed. Cir. 2013) (cleaned up).[3] Such circumstances exist where the action involves a patent law issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Notably, the Supreme Court describes this category of cases as "special and small." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006).

**B. Jurisdiction Under 28 U.S.C. § 1442(a)(2)**

Section 1442(a) allows "owners of federally derived property rights to remove a cause of action to federal court—even where a federal officer is not a defendant—if the action 'affects the validity of any law of the United States.'" *Vermont v. MPHJ Tech. Invs., LLC*, 803 F.3d 635, 647 (Fed. Cir. 2015) (quoting § 1442(a)(2)). Proper removal under § 1442(a)(2) requires that "(1) an action be instituted in state court; (2) the action be against or directed to the holder of a property right; (3) the property right be derived from a federal officer; and (4) the action would 'affect' the validity of a federal law." *Id.*

---

[3] Whether an action arises under the scope of § 1338 "presents an issue that is unique to patent law." *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1311 (Fed. Cir. 2016). Courts should rely on Federal Circuit law, and not state or regional circuit law, when evaluating such issues. *See, e.g., id.*

MEMORANDUM DECISION AND ORDER – 4

## C. Sealing

The public has a general right to "inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This right, however, is not absolute. *Id.* at 598. Certain public records—like grand jury transcripts and warrant materials related to pre-indictment investigations—are "traditionally kept secret," and are entirely exempt from the public's right to access. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (cleaned up). When dealing with documents that fall outside of the "traditionally kept secret" category, Courts strongly presume accessibility. *Id.*

A party seeking to seal non-secret documents must proffer "compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure[.]" *Id.* at 1178–79 (cleaned up). A court that decides to seal typically accessible documents "must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.* at 1179.

Courts have typically found it appropriate to seal documents that may serve as "sources of business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 598. It is also common for courts to seal documents that disclose settlement discussions. *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1212 (9th Cir. 2002) ("[C]ourts have granted protective orders to protect confidential settlement agreements."). This is because "[c]onfidential settlements benefit society and the parties involved by resolving disputes relatively quickly, with slight judicial intervention, and

MEMORANDUM DECISION AND ORDER – 5

presumably result in greater satisfaction to the parties." *Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993). Thus, "[s]ound judicial policy fosters and protects this form of alternative dispute resolution." *Id.*; *see also* Fed. R. Evid. 408 (protecting settlements and settlement offers from use to prove liability).

## IV. ANALYSIS

The Court will first analyze whether it has jurisdiction under 28 U.S.C. §§ 1331 and 1338. Next, it will discuss whether it has jurisdiction under 28 U.S.C. § 1442(a)(2). Then, the Court will turn to Micron's Motion to Seal. Finally, the Court will briefly address Micron's request for attorney's fees and Netlist's Motion to Dismiss or Transfer.

### A. Jurisdiction Under 28 U.S.C. §§ 1331 and 1338

Netlist's primary removal argument is that this case falls into the "special and small" category of cases wherein a claim arises under patent law even though patent law does not create the cause of action. Dkt. 18, at 8–10. As already noted, to agree with Netlist, the Court must find that a patent law issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258 (hereinafter "*Gunn* Prongs"). The Court considers each of the *Gunn* Prongs in turn.

*1. Whether a Patent Law Issue is Necessarily Raised*

In *Globetrotter Software, Inc. v. Elan Comput. Group, Inc.*, 362 F.3d 1367, 1376–77 (Fed. Cir. 2004), the Federal Circuit made clear that success under a state bad-faith statute requires a plaintiff to show that the challenged assertion was "objectively baseless." This means "no reasonable litigant could realistically expect success on the merits." *Id.*

MEMORANDUM DECISION AND ORDER – 6

(cleaned up). Further, a plaintiff bringing a state-law bad-faith claim must make this showing even if objective baselessness is not otherwise an element of the state-law tort claim. *Id.* at 1374. Otherwise, the claim is subject to federal preemption. *Id.* Questions of objective baselessness, in turn, revolve around patent validity and infringement, and clearly raise patent law issues. *See Maxchief Invs. Ltd. v. Wok & Pan, Ind., Inc.*, 909 F.3d 1134, 1140 n.3 (Fed. Cir. 2018).

Here, Micron claims that because the PTAB has already found the '833 Patent to be invalid, there is no issue of patent law remaining. Dkt. 19, at 7–10. However, a finding of *invalidity* is not equivalent to a finding of *objective baselessness*. In this case, the reviewing court will not need to rehash the PTAB's finding that the '833 Patent is invalid. But it will need to determine whether a reasonable litigant could *realistically believe* the '833 Patent *was* valid and could *realistically believe* that Micron infringed thereon. The PTAB's decision answered neither of those questions, and assessing them will require the reviewing court, at least peripherally, to consider the validity of the '833 Patent (an issue of patent law). Accordingly, this case necessarily raises a patent law issue.

### 2. Whether a Patent Law Issue is Actually Disputed

The parties dispute whether a reasonable litigant could realistically believe the '833 patent was valid. As elucidated in *Globetrotter*, Micron *must* allege and ultimately prove a reasonable litigant could not realistically believe the '833 patent was valid to assert a claim under the Act. 362 F.3d at 1374. And, in its briefing, Netlist affirms that its assertion of the '833 Patent was brought in good faith.

Micron again raises its argument that because the PTAB found the '833 Patent to

MEMORANDUM DECISION AND ORDER – 7

be invalid, no issue of patent law is or can be actually disputed here. But as the Court stated above, the PTAB's invalidity determination is necessary, but not sufficient, to establish objective baselessness. Thus, Micron's argument fails.

Because the parties dispute an issue of patent law, this second requirement for jurisdiction under 28 U.S.C. § 1338 is satisfied.

### 3. Whether the Patent Law Issue is Substantial

For an issue to be sufficiently substantial under the test from *Gunn*, "it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim necessarily raises a disputed federal issue . . . ." 568 U.S. at 260. Instead, courts are to look "to the importance of the issue to the federal system as a whole." *Id.* An issue is important to the federal system as a whole where it presents "potential for inconsistent judgments between state and federal courts." *Maxchief*, 909 F.3d at 1140 n.3. This potential must be based on real-world patent litigation results, not hypothetical inconsistencies. *Gunn*, 568 U.S. at 261–62.

Here, Netlist argues that allowing a state court to preside in this case creates a risk of inconsistent judgments between state and federal courts. Dkt. 18, at 20–22. Specifically, Netlist notes that in the underlying patent case regarding the validity and infringement of the '833 Patent in the Western District of Texas, Micron is seeking attorney's fees and costs pursuant to 35 U.S.C. § 285. *Id.* It then cites to *New Life Ventures, Inc. v. Locke Lord LLP*, 2019 WL 13212632 (E.D. Tex. Sept. 27, 2019), wherein New Life Ventures, Inc. ("New Life") was denied attorney's fees after successfully defending an infringement allegation, then subsequently asserted a claim of malicious prosecution under Florida law. *Id.* at *1. The

MEMORANDUM DECISION AND ORDER – 8

case was removed to federal court, then transferred to the Eastern District of Texas—the court that presided over the underlying patent infringement suit. The Eastern District of Texas found that the malicious prosecution claim raised substantial federal issues in part because the standard governing New Life's malicious prosecution claim mirrored the standard for attorney's fees under § 285 *and* because the Eastern District of Texas had already determined that New Life fell short of that standard. *Id.* at *3. Thus, "[r]esolution of New Life's claim would require a reopening of the issues already decided under § 285." *Id.*

The applicability of *New Life* to the facts at hand is limited in two significant ways. First, the burden imposed by the fee-shifting provision in § 285 is *not* the same as the standard imposed under Idaho's bad-faith assertion law—it is lower. *See Katana Silicon Techs. LLC v. Micron Tech., Inc.*, 671 F. Supp. 3d 1138, 1153–54 (D. Idaho 2023); *see also* 35 U.S.C. § 285 (allowing fee-shifting in "exceptional cases"); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555 (2014) (stating that establishing the exceptionality of a case for purposes of fee shifting requires "something less than bad faith") (cleaned up). Second, and more importantly, the underlying patent case between Micron and Netlist has been stayed without any ruling on Micron's motion for attorney's fees. Dkt. 19, at 11. Thus, as it stands, there is no real-world result that an Idaho court could contradict a prior ruling in a federal case by ruling on Micron's bad-faith claim.

Netlist urges the Court to take a softer approach in this analysis. It argues that the possibility of inconsistent judgments is sufficient to establish a substantial federal issue worthy of jurisdiction under § 1338. Dkt. 18, at 16–17. For example, it is hypothetically possible that the Western District of Texas denies attorney's fees while an Idaho state court

MEMORANDUM DECISION AND ORDER – 9

finds Netlist liable under the Act. But possibilities are not enough. The court in *New Life* made this clear when it distinguished the facts there from the facts in *Gunn*, stating: "In *Gunn*, the Supreme Court found that a malpractice claim stemming from a patent infringement suit did not raise a significant federal issue in part because resolution of the claim would 'not change the real-world result of the prior federal patent litigation.'" *New Life*, 2019 WL 13212632, at \*3 (quoting *Gunn*, 568 U.S. at 261). "By contrast," the court continued, "New Life expressly seeks to overturn a result of the prior federal patent litigation—denial of its attorney's fees." *New Life*, 2019 WL 13212632, at \*3. This case is more like *Gunn* than *New Life* for the simple reason that there is no prior federal patent decision relevant to the inquiry at hand. Further, adopting Netlist's approach would mean finding a substantial federal issue to be present in *any instance* where a state court and a federal court are ruling on similar, but distinct, questions, and the federal court has yet to rule. It is the opinion of the Court that such a course would stretch the Supreme Court's standard from *Gunn* a bridge too far.

Next, Netlist contends that Micron's assertion of bad faith directly contradicts the findings of the PTAB. Dkt. 18, at 16. It invokes language from the PTAB's decision on the validity of the '833 Patent wherein the PTAB stated that the '833 Patent is not identical to the '831 Patent (though it ultimately found the '831 patent invalid). *Id.* Netlist relies on this language to assert that if an Idaho court were to decide in favor of Micron, its decision would conflict with the PTAB. However, this argument falls flat because the '833 Patent need not be identical to the '831 Patent for Netlist's assertion of the '833 Patent to be deemed objectively baseless. It is entirely plausible that one patent can be distinct from

MEMORANDUM DECISION AND ORDER – 10

another while still being similar enough that invalidation of the one should inform the asserting party that the other is also likely invalid.

Finally, Netlist raises generalized fears that state laws like the Act are incompatible with federal patent law and may "add additional, divergent, and potentially more stringent requirements to bring a federal lawsuit for patent infringement than those already imposed by federal law." Dkt. 18, at 17 (quoting *New Life*, 2019 WL 13212632, at *4). But Netlist's speculative fears were adequately addressed in *Gunn*. There, the Supreme Court noted that federal courts are not bound by state-court resolution of patent-adjacent questions. 568 U.S. at 262. It also opined that if a particular question of patent law that first arises in a state court is truly substantial, it will arise with enough frequency to eventually be settled by the Federal Circuit. *Id.*; *see also Inspired Dev. Grp., LLC v. Inspired Prod. Grp., LLC*, 938 F.3d 1355, 1364–69 (Fed. Cir. 2019). Further, in *Katana*, this Court addressed the consistency of the Act with federal patent law *ad nauseum*. 671 F. Supp. 3d at 1153–61. For reasons outlined both in *Katana* and herein, the Court does not share Netlist's fears.

Whether Netlist's assertion of the '833 Patent was objectively baseless is not an issue of importance to the federal system as a whole. It raises no potential for inconsistent judgments between state and federal courts and, contrary to Netlist's assertions, allowing a state court to decide the issue will not cast federal patent law into disarray. Netlist has failed to satisfy this third requirement for the exercise of jurisdiction under 28 U.S.C. § 1338. Thus, under *Gunn*, jurisdiction does not lie. 568 U.S. at 258 (explaining federal jurisdiction over a state law claim will lie only if "all four" of the *Gunn* Prongs are met).

MEMORANDUM DECISION AND ORDER – 11

*4. Whether Removal Would Disrupt the Federal-State Balance*

Finally, even if Netlist had satisfied the substantiality prong, its removal attempt would buckle under the final, federal-state balance prong. States have a legitimate interest in protecting their citizens from unsavory business practices. Like the Federal Circuit, the Court notes that finding a federal question simply because a dispute "implicates a run-of-the-mill question of infringement or validity would undoubtedly impact the wider balance between state and federal courts." *Inspired Dev. Grp.*, 938 F.3d at 1369. The Federal Circuit elaborated that adoption of such a course would mean "a plaintiff could create a federal jurisdictional hook to avoid state court in any case involving almost any state law claim by doing little more than pleading allegations that involve an embedded infringement or validity analysis." *Id.* This would clearly upset the existing balance between state and federal courts. *See Katana*, 671 F. Supp. 3d at 1150 (noting that more than half of states have adopted statutes outlawing bad-faith patent assertion). It is for this reason that courts regularly decline "to find federal question jurisdiction notwithstanding the presence of an underlying issue of patent law." *NeuroRepair, Inc. v. The Nath Law Grp.*, 781 F.3d 1340, 1348 (Fed. Cir. 2015) (collecting cases).

The logic from *Inspired Dev. Grp.* readily applies here. 938 F.3d at 1364–70. The patent issues disputed by Micron and Netlist are run-of-the-mill and they impact Micron and Netlist alone. Allowing federal jurisdiction over such issues would disrupt the federal-state balance that currently prevails.

*5. Conclusion*

Micron's bad faith claim necessarily raises an issue of patent law—whether Netlist's

MEMORANDUM DECISION AND ORDER – 12

assertion of the '833 Patent was objectively baseless. Here, the parties dispute that issue. However, because the issue is neither substantial, nor capable of resolution in federal court without disrupting the currently prevailing federal-state balance, the Court cannot exercise jurisdiction under 28 U.S.C. §§ 1331 and 1338.

**B. Jurisdiction Under 28 U.S.C. § 1442(a)(2)**

The Court turns next to whether it can exercise subject matter jurisdiction under 28 U.S.C. § 1442(a)(2). The parties do not dispute that this action was instituted in state court, that it is directed against the holder of a property right, or that the property in question derives from a federal officer. Their disagreement centers on whether the action affects the validity of any federal law.

A lawsuit affects the validity of a federal law where it "would evade . . . or otherwise frustrate [the law's] aims." *Carney v. Washington*, 551 F. Supp. 3d 1042, 1053–54 (W.D. Wash. 2021). Netlist claims that Micron's suit "directly conflicts with federal law concerning what patent holders can do with their intellectual property." Dkt. 18, at 21 (cleaned up). It argues further that by bringing suit under the Act, Micron is attempting to impose liability upon Netlist without making the objective baselessness showing required by *Globetrotter*. *Id.*

Regarding the alleged conflict between the Act and federal patent law, the Court addressed this exact contention in *Katana*, ultimately holding that "[t]he Act has the same essential purposes as the Patent Act and goes no further than its federal counterpart in pursuing them." *Katana*, 671 F. Supp. 3d at 1154. The Court then stated conclusively, "[t]here is no conflict of purpose or objective here." *Id.* Later, the Court stated "[t]he Act

MEMORANDUM DECISION AND ORDER – 13

does not intrude on Congress' exclusive right to grant patents. Nor does it alter any policy line that congress has expressly drawn . . . . Because the Act is not inconsistent with Congress' express policies, the Court finds that it is not an obstacle to them." *Id.* at 1155. Netlist has not offered any argument to cause the Court to reconsider its prior reasoning.

With respect to Netlist's claim that Micron is attempting to impose liability without first making the showing required by *Globetrotter*, the Court begins by noting that Micron has expressly disavowed this allegation. Dkt. 19, at 13 n.7 ("Micron is not attempting to hold Netlist liable without showing objective baselessness."). More importantly, in *Globetrotter*, the Federal Circuit made clear that a bad-faith requirement—which is satisfied by a showing of objective baselessness—is essentially baked-in to any state law imposing liability on a patentholder for communications asserting infringement. 362 F.3d at 1374. Thus, even if the Act does not use the words "objectively baseless," Micron's burden under the statute is no lighter than required under *Globetrotter*.

Because the Act is consistent with federal patent law and is not somehow allowing Micron to skirt the rules, the Court finds that Micron's claim does not affect the validity of any federal law. Accordingly, the Court does not have subject matter jurisdiction under 28 U.S.C. § 1442(a)(2).

**C. Sealing**

In Netlist's Motion to Dismiss or Transfer (Dkt. 17), it argues, among other things, that Netlist's contacts with the state of Idaho are insufficient to justify the Court's exercise of personal jurisdiction. Dkt. 17-1, at 12–18. In response, Micron—which is headquartered in Idaho—contends that its extensive settlement discussions with Netlist and the parties'

MEMORANDUM DECISION AND ORDER – 14

negotiations over a potential license of a Netlist patent portfolio constitute sufficient grounds from which an Idaho federal court could exercise personal jurisdiction. Dkt. 20, at 8.

Because the Court has determined it lacks subject matter jurisdiction, it need not wade into these questions of personal jurisdiction. *See, e.g.*, *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017) ("A court must have the power to decide the claim before it (subject-matter jurisdiction) *and* power over the parties before it (personal jurisdiction) before it can resolve a case.") (emphasis added). However, Micron has asked the Court to seal portions of its response and the attachments thereto that contain sensitive business information and information about settlement discussions. Dkt. 21. Specifically, it asks the Court to seal portions of its Response, Portions of the Declaration of Rebecca Carrizosa in support of its Response (the "Carrizosa Declaration"), and Exhibits B–Y to the Carrizosa Declaration (the "Carrizosa Exhibits"). Dkt. 21-1, at 3–4.

The Court has reviewed Micron's Response, the Carrizosa Declaration, and the Carrizosa Exhibits. The Court finds that the documents and portions of documents that Micron seeks to seal contain sensitive business information about both parties and discuss settlement negotiations in detail. Disclosure of such information could negatively impact the competitive standing of both parties. *See Nixon*, 435 U.S. at 598. Further, the Court notes the public's significant interest in preserving the confidentiality of settlement discussions. *See, e.g.*, *Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993). Maintaining the confidentiality of settlement negotiations promotes timely and satisfactory conflict resolution. *Id.* Here, that interest outweighs the public interest in document inspection.

For the foregoing reasons, the Court finds that Micron has asserted compelling, fact-

MEMORANDUM DECISION AND ORDER – 15

supported reasons for sealing the specified documents. Accordingly, Micron's Motion (Dkt. 21) is GRANTED.

### D. Attorney's Fees

In its Motion to Remand, Micron requested attorney's fees. Dkt. 14-1, at 24. Pursuant to 28 U.S.C. § 1447(c), when a federal court remands a case back to state court after removal, an award of attorney's fees may be appropriate. In *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005), the Supreme Court stated fees should be awarded "only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." The Ninth Circuit has elaborated on this standard, stating, "removal is not objectively unreasonable solely because the removing party's arguments lack merit, or else attorney's fees would always be awarded whenever remand is granted." *Lussier v. Dollar Tree Stores, Inc.*, 518 F.3d 1062, 1065 (9th Cir. 2008). Instead, courts are to consider whether "relevant case law clearly foreclosed the defendant's basis of removal." *Id.* at 1066.

Caselaw interpreting the Act is relatively sparse; and as far is the Court is aware, this is the first time a party has attempted to remove a claim for violation of the Act from state court to federal court. Thus, the Court would be hard-pressed to find that relevant case law clearly foreclosed Netlist's basis for removal. *See id.* While the Court ultimately found that basis to be unsound, it cannot say that it was objectively unreasonable. Accordingly, the Court DENIES Micron's request for attorney's fees.

### E. Netlist's Motion to Dismiss or Transfer

Because the Court has determined that it does not have jurisdiction over this case,

MEMORANDUM DECISION AND ORDER – 16

it must remand this case back to state court. 28 U.S.C. § 1447(c). Accordingly, it DENIES Netlist's pending Motion to Dismiss or Transfer (Dkt. 17) as MOOT. Netlist is free to raise its arguments regarding personal jurisdiction and/or transfer before the state court.

## V. CONCLUSION

Regarding Micron's Motion to Remand (Dkt. 14), the Court finds that Micron's bad faith claim necessarily raises an issue of patent law, and that issue is actually disputed by the parties. However, the issue is not substantial, nor capable of resolution without disrupting the federal-state balance. Accordingly, the Court does not have subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338. Further, because the Act does not affect the validity of federal patent law, the Court does not have subject matter jurisdiction under 28 U.S.C. § 1442(a)(2). Thus, Micron's Motion to Remand is GRANTED.

Regarding Micron's Motion to Seal (Dkt. 21), the Court finds that Micron has shown compelling, fact-supported reasons to justify sealing the materials specified herein. Accordingly, Micron's Motion to Seal is GRANTED.

Additionally, the Court finds that because relevant caselaw (to the extent any existed) did not clearly foreclose Netlist's removal of this case, an award of attorney's fees is inappropriate.

Finally, because the Court lacks subject matter jurisdiction over this case, it DENIES Netlist's pending Motion to Dismiss or Transfer (Dkt. 17) as MOOT.

## VI. ORDER

The Court **HEREBY ORDERS**:

    a.  Micron's Motion to Remand (Dkt. 14) is **GRANTED**.

MEMORANDUM DECISION AND ORDER – 17

> i. This case is remanded to the District Court for the Fourth Judicial District of the State of Idaho, County of Ada.

b. Netlist's Motion to Dismiss or Transfer (Dkt. 17) is **DENIED AS MOOT**.

c. Micron's Motion to Seal (Dkt. 21) is **GRANTED**.

d. This case is **CLOSED**.

DATED: August 13, 2024

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER – 18

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICRON TECHNOLOGY, INC., a Delaware corporation; and MICRON SEMICONDUCTOR PRODUCTS, INC., an Idaho corporation<br><br>       Plaintiffs,<br><br>v.<br><br>NETLIST, INC., a Delaware corporation,<br><br>       Defendant. | Case No. 1:24-cv-00081-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are a Motion to Remand (Dkt. 19) and a Motion to Seal (Dkt. 17) filed by Plaintiffs Micron Technology, Inc., and Micron Semiconductor Products, Inc. (together, "Micron"), and a Motion to Dismiss or Transfer (Dkt. 12) filed by Defendant Netlist, Inc. Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by oral argument, the Court will address the motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). For the reasons outlined below, the Court GRANTS Micron's Motion to Remand and Motion to Seal and DENIES Netlist's Motion to Dismiss or to Transfer as MOOT.

MEMORANDUM DECISION AND ORDER – 1

## II. BACKGROUND

### A. Factual Background

Micron is a manufacturer of semiconductors headquartered in Boise, Idaho. Netlist designs and manufactures a wide variety of computing products and possesses an extensive patent portfolio. It is headquartered in Irvine, California.

In June of 2022, Netlist sued Micron in the Eastern District of Texas for infringement of multiple patents, including U.S. Patent Nos. 11,232,054 (the "'054 Patent") and 11,016,918 (the "'918 Patent"). Micron asserts that, prior to the initiation of the suit, Samsung—a nonparty—had filed persuasive petitions at the Patent Trial and Appeal Board (the "PTAB") of the United States Patent and Trademark Office (the "USPTO") challenging the validity of the two patents. *See, e.g.*, Dkt. 19-1, at 7. Netlist, apparently, did not find the petitions persuasive.

In any case, at Micron's request, the PTAB initiated *inter partes* review of the patents in December 2022.[1] In May 2023, Micron asked Netlist to stay the district court proceedings pending the outcome of the PTAB's review. Netlist refused. Then, in December 2023, the PTAB issued decisions finding the '054 Patent and the '918 Patent obvious, and therefore invalid. In response, Micron asked Netlist to drop the patents from its case. Again, Netlist refused, insisting on taking the patents to trial.

---

[1] *Inter partes* review "begins when a person other than the patent owner files a petition with the [USPTO], which is ultimately reviewed by the [PTAB]." 152 Am. Jr. Trials 349, § 3 (Originally published in 2017). *Inter partes* review typically involves a party who has been sued for patent infringement. *Id.* That party petitions the PTAB, requesting a finding that the patent asserted against them be canceled "as being not novel under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103 based on prior art . . . ." *Id.* The duty of the PTAB in an *inter partes* review is to decide whether a contested patent is valid. *Id.* at § 15.

MEMORANDUM DECISION AND ORDER – 2



MEMORANDUM DECISION AND ORDER – 3

**B. Procedural Background**

Believing Netlist's actions to be taken in bad faith, Micron sued Netlist in Idaho state court in January 2024, alleging violation of the Idaho Bad Faith Assertions of Patent Infringement Act (the "Act"). Idaho Code § 48-1701 *et seq.* Specifically, Micron claims that Netlist knew the '054 Patent and the '918 Patent were invalid, but chose to litigate them anyway, thereby costing Micron time and resources.

Shortly after Micron initiated its suit, Netlist removed the action, claiming this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338, or alternatively under 28 U.S.C. § 1442(a)(2). Dkt. 1. Then, Netlist moved the Court to dismiss this case or transfer it to the Eastern District of Texas—the location of the underlying patent litigation. Dkt. 12. Micron responded to Netlist's motion, and simultaneously moved the Court to seal various portions of its response and the exhibits filed therewith on the basis that they contain sensitive business information and information about settlement negotiations. Dkt. 17. Three days later, Micron filed a Motion to Remand, asking the Court to send this case back to state court because neither of Netlist's asserted grounds, nor any other grounds, afford the Court subject matter jurisdiction. Dkt. 19.[2] Micron also requests attorney's fees. Dkt. 19-1, at 26.

---

[2] The Court notes that the parties had another case before this Court that followed a very similar trajectory. *See Micron Technology, Inc. et al. v. Netlist, Inc.*, 1:24-cv-00001-DCN (the "First Case"). There, Netlist sued Micron for patent infringement of two other patents in the Western District of Texas. Micron believed Netlist to be acting in bad faith, so it sued Netlist in Idaho state court, claiming violation of the Act. Netlist removed to this Court and requested dismissal or transfer to Texas. Micron responded and also requested that the Court seal portions of its response. Micron also moved for remand to Idaho state court. There, the Court granted Micron's Motion to Remand and Motion to Seal and denied Netlist's Motion to Dismiss or Transfer as moot. Here, for the reasons explained below, the Court takes the same course.

MEMORANDUM DECISION AND ORDER – 4

### III. LEGAL STANDARDS

**A. Jurisdiction Under 28 U.S.C. §§ 1331 and 1338**

Under 28 U.S.C. § 1331, federal district courts have subject matter jurisdiction over all civil actions "arising under the Constitution, laws, or treaties of the United States." Pursuant to 28 U.S.C. § 1338(a), this jurisdiction extends to "any civil action arising under any Act of Congress relating to patents[.]" Further, § 1338(a) makes clear that federal subject matter jurisdiction over actions arising from acts relating to patents is exclusive. *Id.*

"For statutory purposes, a case can arise under [patent] law in two ways. Most directly, a case arises under [patent] law when [patent] law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). However, in certain circumstances, "a claim may arise under patent laws even where patent law did not create the cause of action . . . ." *Forrester Env't Servs., Inc. v. Wheelabrator Techs., Inc.*, 715 F.3d 1329, 1333 (Fed. Cir. 2013) (cleaned up).[3] Such circumstance exists where the action involves a patent law issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Notably, the Supreme Court describes this category of cases as "special and small." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006).

---

[3] Whether an action arises under the scope of § 1338 "presents an issue that is unique to patent law." Courts should rely on Federal Circuit law, and not regional law when evaluating such issues. *See, e.g., Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1311 (Fed. Cir. 2016).

MEMORANDUM DECISION AND ORDER – 5

**B. Jurisdiction Under 28 U.S.C. § 1442(a)(2)**

Section 1442(a) allows "owners of federally derived property rights to remove a cause of action to federal court—even where a federal officer is not a defendant—if the action 'affects the validity of any law of the United States.'" *Vermont v. MPHJ Tech. Invs., LLC*, 803 F.3d 635, 647 (Fed. Cir. 2015) (quoting § 1442(a)(2)). Proper removal under § 1442(a)(2) requires that "(1) an action be instituted in state court; (2) the action be against or directed to the holder of a property right; (3) the property right be derived from a federal officer; and (4) the action would 'affect' the validity of a federal law." *Id.*

**C. Sealing**

The public has a general right to "inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This right, however, is not absolute. *Id.* at 598. Certain public records—like grand jury transcripts and warrant materials related to pre-indictment investigations—are "traditionally kept secret," and are entirely exempt from the public's right to access. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (cleaned up). When dealing with documents that fall outside of the "traditionally-kept-secret" category, Courts strongly presume accessibility. *Id.*

A party seeking to seal non-secret documents must proffer "compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure[.]" *Id.* at 1178–79 (cleaned up). A court that decides to seal typically accessible documents "must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.*

MEMORANDUM DECISION AND ORDER – 6

at 1179.

Courts have typically found it appropriate to seal documents that may serve as "sources of business information that might harm a litigant's competitive standing." *Nixon*, 435 U.S. at 598. It is also common for Courts to seal documents that disclose settlement discussions. *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1212 (9th Cir. 2002) ("[C]ourts have granted protective orders to protect confidential settlement agreements."). This is because "[c]onfidential settlements benefit society and the parties involved by resolving disputes relatively quickly, with slight judicial intervention, and presumably result in greater satisfaction to the parties." *Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993). Thus, "[s]ound judicial policy fosters and protects this form of alternative dispute resolution." *Id.*; *see also* Fed. R. Evid. 408 (protecting settlements and settlement offers from use to prove liability).

## IV. ANALYSIS

The Court will first analyze whether it has jurisdiction under 28 U.S.C. §§ 1331 and 1338. Next, it will discuss whether it has jurisdiction under 28 U.S.C. § 1442(a)(2). Then, the Court will turn to Micron's Motion to Seal. Finally, the Court will briefly address Micron's request for attorney's fees and Netlist's Motion to Dismiss or Transfer.

### A. Jurisdiction Under 28 U.S.C. §§ 1331 and 1338

Netlist's primary removal argument is that this case falls into the "special and small" category of cases wherein a claim arises under patent law even though patent law does not create the cause of action. Dkt. 18, at 8–10. As already noted, to agree with Netlist, the Court must find that a patent law issue is "(1) necessarily raised, (2) actually disputed, (3)

MEMORANDUM DECISION AND ORDER – 7

substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258 (hereinafter "*Gunn* Prongs"). Federal jurisdiction is proper only where "all four of these requirements are met." *Id*.

The Court considers each of the *Gunn* Prongs in turn.

*1. Whether a Patent Law Issue is Necessarily Raised*

In *Globetrotter Software, Inc. v. Elan Comput. Group, Inc.*, 362 F.3d 1367, 1376–77 (Fed. Cir. 2004), the Federal Circuit made clear that success under a state bad-faith statute requires a plaintiff to show that the challenged assertion was "objectively baseless." This means "no reasonable litigant could realistically expect success on the merits." *Id.* (cleaned up). Further, a plaintiff bringing a state-law bad-faith claim must make this showing even if objective baselessness is not otherwise an element of the state-law tort claim. *Id.* at 1374. Otherwise, the claim is subject to federal preemption. *Id.* Questions of objective baselessness, in turn, revolve around patent validity and infringement, and clearly raise patent law issues. *See Maxchief Invs. Ltd. v. Wok & Pan, Ind., Inc.*, 909 F.3d 1134, 1140 n.3 (Fed. Cir. 2018).

Micron contends that because the Act does not require it to make any showing regarding validity or infringement, there is no patent issue necessarily raised here. Dkt. 19-1, at 16–17. Further, it argues that even if questions of validity were raised, because the PTAB has already found the '054 Patent and the '918 Patent to be invalid, there is no issue of patent law remaining. Dkt. 19, at 9–10.

Regarding the necessity of resolving validity and infringement questions, *Globetrotter* makes clear that to succeed on its bad-faith claim, Micron must establish that

MEMORANDUM DECISION AND ORDER – 8

Netlist's assertion was objectively baseless. 362 F.3d at 1376–77. And *Maxchief* makes clear that resolving questions of objective baselessness will require the reviewing court to consider questions of validity and infringement. *Maxchief*, 909 F.3d at 1140 n.3.

Regarding Micron's argument that the PTAB determination forecloses questions of validity, as noted by Netlist, PTAB decisions have no binding effect until they are either affirmed, or the adversely impacted party waives its appeal rights. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1372 (Fed. Cir. 2023). It does not appear that either of those outcomes has taken place here. What's more, and as the Court noted in the First Case, a finding of invalidity is not equivalent to a finding of objective baselessness. In this case, the reviewing court will not need to rehash the PTAB's finding that the '054 Patent and the '918 Patent are invalid. But it will need to determine whether a reasonable litigant could realistically believe the patents to be valid, knowing all that Netlist knew. Even if it were binding, the PTAB's decision did not answer that question, and assessing it will require the reviewing court, at least peripherally, to take up questions regarding the validity of the two patents at issue. Such questions are issues of patent law. Therefore, this case necessarily raises patent law issues and the first requirement for removal under 28 U.S.C. § 1338 is satisfied.

### 2. Whether a Patent Law Issue is Actually Disputed

The parties dispute whether a reasonable litigant could realistically believe the '054 Patent and the '918 Patent were valid. As elucidated in *Globetrotter*, Micron *must* argue a reasonable litigant could not realistically believe such patents were valid to assert a claim under a state bad-faith statute. 362 F.3d at 1374. And, in its briefing, Netlist attests that it

MEMORANDUM DECISION AND ORDER – 9

asserted the patents good faith. It also affirms its intent to appeal the findings of the PTAB. Dkt. 21, at 14–15. Thus, the patent law issues here are clearly disputed.

Micron again raises its argument that because the PTAB found the two patents to be invalid, no issue of patent law is or can be actually disputed. Dkt. 19-1, at 18. But as the Court stated above, even if the PTAB's invalidity determinations were binding, they would not be sufficient to establish objective baselessness. Micron's argument fails.

Because the parties dispute an issue of patent law, this second *Gunn* Prong is satisfied.

### 3. Whether the Patent Law Issue is Substantial

For an issue to be sufficiently substantial under the test from *Gunn*, "it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim necessarily raises a disputed federal issue . . . ." 568 U.S. at 260. Instead, courts are to look "to the importance of the issue to the federal system as a whole." *Id.* An issue is important to the federal system as a whole where it presents "potential for inconsistent judgments between state and federal courts." *Maxchief*, 909 F.3d at 1140 n.3. This potential must be based on real-world patent litigation results, not hypothetical inconsistencies. *Gunn*, 568 U.S. at 261–62.

Netlist argues that allowing a state court to preside in this case creates a risk of inconsistent judgments between state and federal courts. Dkt. 21, at 16–17. Specifically, Netlist notes that it has appealed (or plans to appeal) the PTAB's validity determinations. *Id.* at 16. It then states that if it prevails in its appeal and then again at a jury trial, its suit—by definition—could not have been brought in bad faith. *Id.* Netlist suggests "[i]n this case,

MEMORANDUM DECISION AND ORDER – 10

Micron is asking a reviewing court to find the exact opposite." *Id*. Netlist also raises concerns that in the underlying patent case, Micron is seeking attorney's fees pursuant to 35 U.S.C. § 285. *Id.* at 15–16. It then claims that the standard for recovering attorney's fees under § 285 mirrors the standard imposed by the Act. Thus, Netlist posits, because the Eastern District of Texas *could* still resolve the underlying patent suit in Netlist's favor and because it *could* decline to award attorney's fees to Micron, allowing the bad-faith claim to proceed before a state court creates a real risk of inconsistent judgments.

Netlist's argument relies heavily on *New Life Ventures v. Locke Lord LLP*, 2019 WL 13212632 (E.D. Tex. Sept. 27, 2019), wherein New Life Ventures, Inc. ("New Life") was denied attorney's fees after successfully defending an infringement allegation, then subsequently asserted a claim of malicious prosecution under Florida law. *Id.* at *1. The case was removed to federal court, then transferred to the Eastern District of Texas—the court that presided over the underlying patent infringement suit. The Eastern District of Texas found that the malicious prosecution claim raised substantial federal issues in part because the standard governing New Life's malicious prosecution claim mirrored the standard for attorney's fees under § 285 *and* because the Eastern District of Texas had already determined that New Life fell short of that standard. *Id.* at *3. Thus, "[r]esolution of New Life's claim would require a reopening of the issues already decided under § 285." *Id.*

The applicability of *New Life* to the facts at hand is limited in two significant ways. First, the burden imposed by the fee-shifting provision in § 285 is *not* the same as the standard imposed under Idaho's bad-faith assertion law—it is lower. *See Katana Silicon Techs. LLC v. Micron Tech., Inc.*, 671 F. Supp. 3d 1138, 1153–54 (D. Idaho 2023); *see*

MEMORANDUM DECISION AND ORDER – 11

*also* 35 U.S.C. § 285 (allowing fee-shifting in "exceptional cases"); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555 (2014) (stating that establishing the exceptionality of a case for purposes of fee shifting requires "something less than bad faith") (cleaned up). Second, and more importantly, in *New Life*, resolution of the state law claim would have required the Eastern District of Texas to address for a second time questions it had already conclusively resolved. 2019 WL 1321263, at *3. In other words, the claim sought to overturn the result of the prior patent litigation, creating a substantial federal question. *Id.* But here, to the knowledge of the Court, there has been no conclusive resolution of any issue in the underlying Texas litigation between the parties. Thus, as it stands, there is no real-world result that an Idaho court could contradict a prior ruling in the Texas case by ruling on Micron's bad faith claim.

Netlist urges the Court to take a softer approach in this analysis. It argues that the existence of a *possibility* of inconsistent judgments is sufficient to establish a substantial federal issue worthy of jurisdiction under § 1338. Dkt. 18, at 16. But possibilities are not enough. The court in *New Life* made this clear when it distinguished the facts there from those at issue in *Gunn*, stating: "In *Gunn*, the Supreme Court found that a malpractice claim stemming from a patent infringement suit did not raise a significant federal issue in part because resolution of the claim would 'not change the real-world result of the prior federal patent litigation.'" *New Life*, 2019 WL 13212632, at *3 (quoting *Gunn*, 568 U.S. at 261). "By contrast," the court continued, "New Life expressly seeks to overturn a result of the prior federal patent litigation—denial of its attorney's fees." *New Life*, 2019 WL 13212632, at *3. This case is more like *Gunn* than *New Life* for the simple reason that there is no prior

MEMORANDUM DECISION AND ORDER – 12

federal patent decision relevant to the inquiry at hand. Further, adopting Netlist's approach would mean finding a substantial federal issue to be present in *any instance* where a state court and a federal court are ruling on similar, but distinct, questions, and the federal court has yet to rule. It is the opinion of the Court that such a course would stretch the Supreme Court's standard from *Gunn* a bridge too far.

Beyond its case-specific concerns, Netlist raises generalized fears that state laws like the Act are incompatible with federal patent law and may "add potential, divergent, and potentially more stringent requirements to bring a federal lawsuit for patent infringement than those already imposed by federal law." Dkt. 21, at 17 (quoting *New Life*, 2019 WL 13212632, at *4). But Netlist's speculative fears were adequately addressed in *Gunn*. There, the Supreme Court noted that federal courts are not bound by state-court resolutions of patent-adjacent questions. 568 U.S. at 262. It also opined that if a particular question of patent law that first arises in a state court is truly substantial, it will arise with enough frequency to eventually be settled by the Federal Circuit. *Id.*; *see also Inspired Dev. Grp., LLC v. Inspired Prod. Grp., LLC*, 938 F.3d 1355, 1364–69 (Fed. Cir. 2019). Further, in *Katana*, this Court addressed the consistency of the Act with federal patent law *ad nauseum*. 671 F. Supp. 3d at 1153–61. For reasons outlined both in *Katana* and herein, the Court does not share Netlist's fears.

Whether Netlist's assertions of the '051 Patent and the '918 Patent were objectively baseless is not an issue of importance to the federal system as a whole. It raises no potential for inconsistent judgments between state and federal courts and, contrary to Netlist's assertions, allowing a state court to decide the issue will not cast federal patent law into

MEMORANDUM DECISION AND ORDER – 13

disarray. Netlist has failed to satisfy this third requirement for the exercise of jurisdiction under 28 U.S.C. § 1338. Thus, under *Gunn*, jurisdiction does not lie. 568 U.S. at 258.

### 4. Whether Removal Would Disrupt the Federal-State Balance

Finally, even if Netlist had satisfied the substantiality prong, its removal attempt would buckle under the final, federal-state balance prong. States have a legitimate interest in protecting their citizens from unsavory business practices. Like the Federal Circuit, the Court notes that finding a federal question simply because a dispute "implicates a run-of-the-mill question of infringement or validity would undoubtedly impact the wider balance between state and federal courts." *Inspired Dev. Grp.*, 938 F.3d at 1369. The Federal Circuit elaborated that adoption of such a course would mean "a plaintiff could create a federal jurisdictional hook to avoid state court in any case involving almost any state law claim by doing little more than pleading allegations that involve an embedded infringement or validity analysis." *Id.* This would clearly upset the existing balance between state and federal courts. *See Katana*, 671 F. Supp. 3d at 1150 (noting that more than half of states have adopted statutes outlawing bad-faith patent assertion). It is for this reason that courts regularly decline "to find federal question jurisdiction notwithstanding the presence of an underlying issue of patent law." *NeuroRepair, Inc. v. The Nath Law Grp.*, 781 F.3d 1340, 1348 (Fed. Cir. 2015) (collecting cases).

The logic from *Inspired Dev. Grp.* readily applies here. 938 F.3d at 1364–70. The patent issues disputed by Micron and Netlist are run-of-the-mill and they impact Micron and Netlist alone. Allowing federal jurisdiction over such issues would disrupt the federal-state balance that currently prevails.

MEMORANDUM DECISION AND ORDER – 14

*5. Conclusion*

Micron's bad faith claim necessarily raises an issue of patent law—whether Netlist's assertions of the '051 Patent and the '918 Patent were objectively baseless. The parties dispute this issue. However, because the issue is neither substantial, nor capable of resolution in federal court without disrupting the currently prevailing federal-state balance, the Court cannot exercise jurisdiction under 28 U.S.C. §§ 1331 and 1338.

**B. Jurisdiction Under 28 U.S.C. § 1442(a)(2)**

The Court turns next to whether it has subject matter jurisdiction under 28 U.S.C. § 1442(a)(2). The parties do not dispute that this action was instituted in state court, that it is directed against the holder of a property right, or that the property in question derives from a federal officer. Their disagreement centers on whether the action affects the validity of any federal law.

A lawsuit affects the validity of a federal law where it "would evade . . . or otherwise frustrate [the law's] aims." *Carney v. Washington*, 551 F. Supp. 3d 1042, 1053–54 (W.D. Wash. 2021). Netlist claims that Micron's suit "directly conflicts with federal law concerning what patent holders can do with their intellectual property." Dkt. 21, at 21 (cleaned up). It argues further that by bringing suit under the Act, Micron is attempting to impose liability upon Netlist without making the objective baselessness showing required by *Globetrotter*. *Id.*

Regarding the alleged conflict between the Act and federal patent law, the Court addressed this exact contention in *Katana*, ultimately holding that "[t]he Act has the same essential purposes as the Patent Act and goes no further than its federal counterpart in

MEMORANDUM DECISION AND ORDER – 15

pursuing them." *Katana*, 671 F. Supp. 3d at 1154. The Court then stated conclusively, "[t]here is no conflict of purpose or objective here." *Id.* Later, the Court stated "[t]he Act does not intrude on Congress' exclusive right to grant patents. Nor does it alter any policy line that congress has expressly drawn . . . . Because the Act is not inconsistent with Congress' express policies, the Court finds that it is not an obstacle to them." *Id.* at 1155. Netlist has offered any argument to cause the Court to reconsider its prior reasoning.

With respect to Netlist's claim that Micron is attempting to impose liability without first making the showing required by *Globetrotter*, the Court begins by noting that Micron has expressly disavowed this allegation. Dkt. 22, at 14 n.6 ("Micron is not attempting to hold Netlist liable without showing objective baselessness."). More importantly, in *Globetrotter*, the Federal Circuit made clear that a bad-faith requirement—which is satisfied by a showing of objective baselessness—is essentially baked-in to any state law imposing liability on a patentholder for communications asserting infringement. 362 F.3d at 1374. Thus, even if the Act does not use the words "objectively baseless," Micron's burden under the statute is no lighter than required under *Globetrotter*.

Because the Act is consistent with federal patent law and is not somehow allowing Micron to skirt the rules, the Court finds that Micron's claim does not affect the validity of any federal law. Accordingly, the Court does not have subject matter jurisdiction under 28 U.S.C. § 1442(a)(2).

### C. Sealing

In Netlist's Motion to Dismiss or Transfer (Dkt. 12), it argues, among other things, that Netlist's contacts with the state of Idaho are insufficient to justify the Court's exercise

MEMORANDUM DECISION AND ORDER – 16

of personal jurisdiction. Dkt. 12-1, at 12–19. In response, Micron—which is headquartered in Idaho—contends that its extensive settlement discussions with Netlist and the parties' negotiations over a potential license of a Netlist patent portfolio constitute sufficient grounds from which an Idaho federal court could exercise personal jurisdiction. Dkt. 16, at 9–16.

Because the Court has determined it lacks subject matter jurisdiction, it need not wade into these questions of personal jurisdiction. *See, e.g.*, *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017) ("A court must have the power to decide the claim before it (subject-matter jurisdiction) *and* power over the parties before it (personal jurisdiction) before it can resolve a case.") (emphasis added). However, Micron has asked the Court to seal portions of its response and the attachments thereto that contain sensitive business information and information about settlement discussions. Dkt. 17. Specifically, it asks the Court to seal portions of its Response, Portions of the Declaration of Rebecca Carrizosa in support of its Response (the "Carrizosa Declaration"), and Exhibits B–W to the Carrizosa Declaration (the "Carrizosa Exhibits"). Dkt. 17-1, at 2.

The Court has reviewed Micron's Response, the Carrizosa Declaration, and the Carrizosa Exhibits. The Court finds that the documents and portions of documents that Micron seeks to seal contain sensitive business information about both parties and discuss settlement negotiations in detail. Disclosure of such information could negatively impact the competitive standing of both parties. *See Nixon*, 435 U.S. at 598. Further, the Court notes the public's significant interest in preserving the confidentiality of settlement discussions. *See, e.g.*, *Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993). Maintaining the

MEMORANDUM DECISION AND ORDER – 17

confidentiality of settlement negotiations promotes timely and satisfactory conflict resolution. *Id.* Here, that interest outweighs the public interest in document inspection.

For the foregoing reasons, the Court finds that Micron has asserted compelling, fact-supported reasons for sealing the specified documents. Accordingly, Micron's Motion (Dkt. 17) is GRANTED.

### D. Attorney's Fees

In its Motion to Remand, Micron requested attorney's fees. Dkt. 19-1, at 26. Pursuant to 28 U.S.C. § 1447(c), when a federal court remands a case back to state court after removal, an award of attorney's fees may be appropriate. In *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005), the Supreme Court stated fees should be awarded "only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." The Ninth Circuit has elaborated on this standard, stating, "removal is not objectively unreasonable solely because the removing party's arguments lack merit, or else attorney's fees would always be awarded whenever remand is granted." *Lussier v. Dollar Tree Stores, Inc.*, 518 F.3d 1062, 1065 (9th Cir. 2008). Instead, courts are to consider whether "relevant case law clearly foreclosed the defendant's basis of removal." *Id.* at 1066.

Caselaw interpreting the Act is relatively sparse; and as far is the Court is aware, this case and the First Case constitute the first two times a party has attempted to remove a claim for violation of the Act from state court to federal court. Thus, the Court would be hard-pressed to find that relevant case law clearly foreclosed Netlist's basis for removal. *See id.* While the Court ultimately found that basis to be unsound, it cannot say that it was

MEMORANDUM DECISION AND ORDER – 18

objectively unreasonable. Accordingly, the Court DENIES Micron's request for attorney's fees.

### E. Netlist's Motion to Dismiss or Transfer

Because the Court has determined that it does not have jurisdiction over this case, it must remand this case back to state court. 28 U.S.C. § 1447(c). Accordingly, it DENIES Netlist's pending Motion to Dismiss or Transfer (Dkt. 12) as MOOT. Netlist is free to raise its arguments regarding personal jurisdiction and/or transfer before the state court.

### V. CONCLUSION

Regarding Micron's Motion to Remand (Dkt. 19), the Court finds that Micron's bad faith claim necessarily raises an issue of patent law, and that issue is actually disputed by the parties. However, the issue is not substantial, nor capable of resolution without disrupting the federal-state balance. Accordingly, the Court does not have subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338. Further, because the Act does not affect the validity of federal patent law, the Court does not have subject matter jurisdiction under 28 U.S.C. § 1442(a)(2). Thus, Micron's Motion to Remand is GRANTED.

Regarding Micron's Motion to Seal (Dkt. 17), the Court finds that Micron has shown compelling, fact-supported reasons to justify sealing the materials specified herein. Accordingly, Micron's Motion to Seal is GRANTED.

Additionally, the Court finds that because relevant caselaw (to the extent any existed) did not clearly foreclose Netlist's removal of this case, an award of attorney's fees is inappropriate.

MEMORANDUM DECISION AND ORDER – 19

Finally, because the Court lacks subject matter jurisdiction over this case, it DENIES Netlist's pending Motion to Dismiss or Transfer (Dkt. 12) as MOOT.

## VI. ORDER

The Court **HEREBY ORDERS**:

    a.  Micron's Motion to Remand (Dkt. 19) is **GRANTED**.

        i.  This case is remanded to the District Court for the Fourth Judicial District of the State of Idaho, County of Ada.

    b.  Netlist's Motion to Dismiss or Transfer (Dkt. 12) is **DENIED** as **MOOT**.

    c.  Micron's Motion to Seal (Dkt. 17) is **GRANTED**.

    d.  This case is **CLOSED**.

DATED: August 13, 2024

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER – 20

US008301833B1

(12) **United States Patent**

Chen et al.

(10) **Patent No.:** **US 8,301,833 B1**

(45) **Date of Patent:** **Oct. 30, 2012**

(54) **NON-VOLATILE MEMORY MODULE**

(75) Inventors: **Chi-She Chen**, Walnut, CA (US);
**Jeffrey C. Solomon**, Irvine, CA (US);
**Scott Milton**, Irvine, CA (US); **Jayesh
Bhakta**, Cerritos, CA (US)

(73) Assignee: **Netlist, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 638 days.

(21) Appl. No.: **12/240,916**

(22) Filed: **Sep. 29, 2008**

**Related U.S. Application Data**

(63) Continuation of application No. 12/131,873, filed on
Jun. 2, 2008, now abandoned.

(60) Provisional application No. 60/941,586, filed on Jun.
1, 2007.

(51) **Int. Cl.**
**G06F 12/00** (2006.01)

(52) **U.S. Cl.** ........ **711/104**; 711/160; 711/161; 711/162;
710/10

(58) **Field of Classification Search** .................. 711/160,
711/161, 162, 104; 710/10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,420,821 A | 12/1983 | Hoffman | |
| 4,449,205 A | 5/1984 | Hoffman | |
| 5,519,663 A | 5/1996 | Harper, Jr. et al. | |
| 6,158,015 A | 12/2000 | Klein | |
| 6,336,174 B1 | 1/2002 | Li et al. | |
| 6,336,176 B1 | 1/2002 | Leyda et al. | |
| 6,487,623 B1 | 11/2002 | Emerson et al. | |
| 6,658,507 B1 | 12/2003 | Chan | |
| 6,799,244 B2 | 9/2004 | Tanaka et al. | |
| 7,409,590 B2 | 8/2008 | Moshayedi et al. | |
| 2002/0083368 A1 | 6/2002 | Abe et al. | |
| 2004/0190210 A1 | 9/2004 | Leete | |
| 2007/0192627 A1* | 8/2007 | Oshikiri | 713/191 |
| 2008/0195806 A1* | 8/2008 | Cope | 711/111 |

* cited by examiner

*Primary Examiner* — Midys Rojas

(74) *Attorney, Agent, or Firm* — Nixon Peabody LLP;
Khaled Shami

(57) **ABSTRACT**

Certain embodiments described herein include a memory
system which can communicate with a host system such as a
disk controller of a computer system. The memory system
can include volatile and non-volatile memory and a controller
which are configured such that the controller backs up the
volatile memory using the non-volatile memory in the event
of a trigger condition. In order to power the system in the
event of a power failure or reduction, the memory system can
include a secondary power source which is not a battery and
may include, for example, a capacitor or capacitor array. The
memory system can be configured such that the operation of
the volatile memory is not adversely affected by the non-
volatile memory or the controller when the volatile memory is
interacting with the host system.

**30 Claims, 12 Drawing Sheets**



Case: 24-2281     Document: 23     Page: 100     Filed: 01/28/2025



FIG. 1



FIG. 2

Case: 24-2281     Document: 23     Page: 102     Filed: 01/28/2025



*FIG. 3*

Case: 24-2281     Document: 23     Page: 103     Filed: 01/28/2025



*FIG. 4A*

*FIG. 4B*

Appx0043

**U.S. Patent**     Oct. 30, 2012     **Sheet 5 of 12**     **US 8,301,833 B1**



FIG. 4C

Case: 24-2281   Document: 23   Page: 105   Filed: 01/28/2025



*FIG. 5*



FIG. 6



FIG. 7

Case: 24-2281  Document: 23  Page: 108  Filed: 01/28/2025



*FIG. 8*

Case: 24-2281    Document: 23    Page: 109    Filed: 01/28/2025



FIG. 9



*FIG. 10*

Appx0050



*600*

Communicate data words between volatile memory and host system in first mode — *610*

Transfer data words from volatile memory system to non-volatile memory system — *620*

*622* — Store first slice of data word in buffer

*624* — Store second slice of data word in buffer

*626* — Write entire data word from buffer to non-volatile memory

*FIG. 11*

US 8,301,833 B1

# 1

# NON-VOLATILE MEMORY MODULE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, which claims the benefit of U.S. Provisional Application No. 60/941,586, filed Jun. 1, 2007. Each of these applications is incorporated in its entirety by reference herein.

## BACKGROUND

Certain types of memory modules comprise a plurality of dynamic random-access memory (DRAM) devices mounted on a printed circuit board (PCB). These memory modules are typically mounted in a memory slot or socket of a computer system (e.g., a server system or a personal computer) and are accessed by the computer system to provide volatile memory to the computer system.

Volatile memory generally maintains stored information only when it is powered. Batteries have been used to provide power to volatile memory during power failures or interruptions. However, batteries may require maintenance, may need to be replaced, are not environmentally friendly, and the status of batteries can be difficult to monitor.

Non-volatile memory can generally maintain stored information while power is not applied to the non-volatile memory. In certain circumstances, it can therefore be useful to backup volatile memory using non-volatile memory.

## SUMMARY

In certain embodiments, a memory system coupled to a computer system is provided which includes a volatile memory subsystem, a non-volatile memory subsystem, and a controller operatively coupled to the non-volatile memory subsystem. The memory system can also include at least one circuit configured to selectively operatively decouple the controller from the volatile memory subsystem.

In some embodiments, a power module for providing a plurality of voltages to a memory system is described. The power module includes non-volatile and volatile memory, and the plurality of voltages include at least a first voltage and a second voltage. The power module of certain embodiments includes an input providing a third voltage to the power module and a voltage conversion element configured to provide the second voltage to the memory system. The power module also includes a first power element configured to selectively provide a fourth voltage to the conversion element. The power module further includes a second power element configured to selectively provide a fifth voltage to the conversion element. The power module can be configured to selectively provide the first voltage to the memory system either from the conversion element or from the input.

The power module can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage is provided to the memory system from the input and the fourth voltage is provided to the conversion element from the first power element. In a second, state the fourth voltage is provided to the conversion element from the first power element and the first voltage is provided to the memory system from the conversion element. In a third state, the fifth voltage is provided to the conversion element from the second power element and the first voltage is provided to the memory system from the conversion element.

# 2

A method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems is provided in certain embodiments. The method includes, during a first condition, providing the first voltage to the memory system from an input power supply and providing the second voltage to the memory system from a first power subsystem. The method further includes detecting a second condition and, during the second condition, providing the first voltage and the second voltage to the memory system from the first power subsystem. The method also includes charging a second power subsystem and detecting a third condition. During the third condition, the method includes providing the first voltage and the second voltage to the memory system from the second power subsystem.

In certain embodiments, a method is provided for controlling a memory system operatively coupled to a host system and which includes a volatile memory subsystem and a non-volatile memory subsystem. The method can include operating the volatile memory subsystem at a first frequency when the memory system is in a first mode of operation in which data is communicated between the volatile memory subsystem and the host system. In certain embodiments, the method further includes operating the non-volatile memory subsystem at a second frequency when the memory system is in a second mode of operation in which data is communicated between the volatile memory subsystem and the non-volatile memory subsystem. The method can also include operating the volatile memory subsystem at a third frequency when the memory system is in the second mode of operation, the third frequency less than the first frequency.

In certain embodiments, a method is provided for controlling a memory system operatively coupled to a host system. The memory system includes a volatile memory subsystem and a non-volatile memory subsystem. In certain embodiments, the method includes communicating data words between the volatile memory subsystem and the host system when the memory system is in a first mode of operation. The method can further include transferring data words from the volatile memory subsystem to the non-volatile memory subsystem when the memory system is in a second mode of operation. Transferring each data word can include storing a first portion of the data word in a buffer, storing a second portion of the data word in the buffer, and writing the entire data word from the buffer to the non-volatile memory subsystem.

A memory system operatively coupled to a host system is provided in certain embodiments. The memory system can include a volatile memory subsystem and a non-volatile memory subsystem comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system includes a controller operatively coupled to the volatile memory subsystem and operatively coupled to the non-volatile memory subsystem, the controller configured to allow data to be communicated between the volatile memory subsystem and the host system when the memory system is operating in a first state and to allow data to be communicated between the volatile memory subsystem and the non-volatile memory subsystem when the memory system is operating in a second state.

A method of controlling a memory system operatively coupled to a host system is provided in certain embodiments. The memory system includes a volatile memory subsystem and a non-volatile memory subsystem. The method can include communicating data between the volatile memory subsystem and the host system when the memory system is in a first mode of operation. The method of certain embodiments further includes storing a first copy of data from the volatile

US 8,301,833 B1

3

memory subsystem to the non-volatile memory subsystem at a first time when the memory system is in a second mode of operation. The method may further include restoring the first copy of data from the non-volatile memory subsystem to the volatile memory subsystem and erasing the first copy of data from the non-volatile memory subsystem. In certain embodiments, the method also includes storing a second copy of data from the volatile memory subsystem to the non-volatile memory subsystem at a second time when the memory system is in the second mode of operation, wherein storing the second copy begins before the first copy is completely erased from the non-volatile memory subsystem.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an example memory system compatible with certain embodiments described herein.

FIG. **2** is a block diagram of an example memory module with ECC (error-correcting code) having a volatile memory subsystem with nine volatile memory elements and a non-volatile memory subsystem with five non-volatile memory elements in accordance with certain embodiments described herein.

FIG. **3** is a block diagram of an example memory module having a microcontroller unit and logic element integrated into a single device in accordance with certain embodiments described herein.

FIGS. **4A-4C** schematically illustrate example embodiments of memory systems having volatile memory subsystems comprising registered dual in-line memory modules in accordance with certain embodiments described herein.

FIG. **5** schematically illustrates an example power module of a memory system in accordance with certain embodiments described herein.

FIG. **6** is a flowchart of an example method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems.

FIG. **7** is a flowchart of an example method of controlling a memory system operatively coupled to a host system and which includes at least 100 percent more storage capacity in non-volatile memory than in volatile memory.

FIG. **8** schematically illustrates an example clock distribution topology of a memory system in accordance with certain embodiments described herein.

FIG. **9** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including operating a volatile memory subsystem at a reduced rate in a back-up mode.

FIG. **10** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments of a volatile memory subsystem of a memory system to a controller of the memory system.

FIG. **11** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including backing up and/or restoring a volatile memory subsystem in slices.

### DETAILED DESCRIPTION

Certain embodiments described herein include a memory system which can communicate with a host system such as a disk controller of a computer system. The memory system can include volatile and non-volatile memory, and a controller. The controller backs up the volatile memory using the non-volatile memory in the event of a trigger condition. Trigger conditions can include, for example, a power failure, power reduction, request by the host system, etc. In order to

4

power the system in the event of a power failure or reduction, the memory system can include a secondary power source which does not comprise a battery and may include, for example, a capacitor or capacitor array.

In certain embodiments, the memory system can be configured such that the operation of the volatile memory is not adversely affected by the non-volatile memory or by the controller when the volatile memory is interacting with the host system. For example, one or more isolation devices may isolate the non-volatile memory and the controller from the volatile memory when the volatile memory is interacting with the host system and may allow communication between the volatile memory and the non-volatile memory when the data of the volatile memory is being restored or backed-up. This configuration generally protects the operation of the volatile memory when isolated while providing backup and restore capability in the event of a trigger condition, such as a power failure.

In certain embodiments described herein, the memory system includes a power module which provides power to the various components of the memory system from different sources based on a state of the memory system in relation to a trigger condition (e.g., a power failure). The power module may switch the source of the power to the various components in order to efficiently provide power in the event of the power failure. For example, when no power failure is detected, the power module may provide power to certain components, such as the volatile memory, from system power while charging a secondary power source (e.g., a capacitor array). In the event of a power failure or other trigger condition, the power module may power the volatile memory elements using the previously charged secondary power source.

In certain embodiments, the power module transitions relatively smoothly from powering the volatile memory with system power to powering it with the secondary power source. For example, the memory system may power volatile memory with a third power source from the time the memory system detects that power failure is likely to occur until the time the memory system detects that the power failure has actually occurred.

In certain embodiments, the volatile memory system can be operated at a reduced frequency during backup and/or restore operations which can improve the efficiency of the system and save power. In some embodiments, during backup and/or restore operations, the volatile memory communicates with the non-volatile memory by writing and/or reading data words in bit-wise slices instead of by writing entire words at once. In certain embodiments, when each slice is being written to or read from the volatile memory the unused slice(s) of volatile memory is not active, which can reduce the power consumption of the system.

In yet other embodiments, the non-volatile memory can include at least 100 percent more storage capacity than the volatile memory. This configuration can allow the memory system to efficiently handle subsequent trigger conditions.

FIG. **1** is a block diagram of an example memory system **10** compatible with certain embodiments described herein. The memory system **10** can be coupled to a host computer system and can include a volatile memory subsystem **30**, a non-volatile memory subsystem **40**, and a controller **62** operatively coupled to the non-volatile memory subsystem **40**. In certain embodiments, the memory system **10** includes at least one circuit **52** configured to selectively operatively decouple the controller **62** from the volatile memory subsystem **30**.

In certain embodiments, the memory system **10** comprises a memory module. The memory system **10** may comprise a printed-circuit board (PCB) **20**. In certain embodiments, the

US 8,301,833 B1

5

memory system **10** has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other volatile memory capacities are also compatible with certain embodiments described herein. In certain embodiments, the memory system **10** has a non-volatile memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or 32-GB. Other non-volatile memory capacities are also compatible with certain embodiments described herein. In addition, memory systems **10** having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, the PCB **20** has an industry-standard form factor. For example, the PCB **20** can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB **20** has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB **20** has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain preferred embodiments, the memory system **10** is in electrical communication with the host system. In other embodiments, the memory system **10** may communicate with a host system using some other type of communication, such as, for example, optical communication. Examples of host systems include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The memory system **10** can be in communication with a disk controller of a computer system, for example. The PCB **20** can comprise an interface **22** that is configured to be in electrical communication with the host system (not shown). For example, the interface **22** can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system. The interface **22** of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory system **10** and the host system. For example, the interface **22** can comprise a standard 240-pin DDR2 edge connector.

The volatile memory subsystem **30** comprises a plurality of volatile memory elements **32** and the non-volatile memory subsystem **40** comprises a plurality of non-volatile memory elements **42**. Certain embodiments described herein advantageously provide non-volatile storage via the non-volatile memory subsystem **40** in addition to high-performance (e.g., high speed) storage via the volatile memory subsystem **30**. In certain embodiments, the first plurality of volatile memory elements **32** comprises two or more dynamic random-access memory (DRAM) elements. Types of DRAM elements **32** compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). For example, in the block diagram of FIG. **1**, the first memory bank **30** comprises eight 64Mx8 DDR2 SDRAM elements **32**. The volatile memory elements **32** may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory elements **32** having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Volatile memory elements **32**

6

compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (μBGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

In certain embodiments, the second plurality of non-volatile memory elements **42** comprises one or more flash memory elements. Types of flash memory elements **42** compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC). For example, in the block diagram of FIG. **1**, the second memory bank **40** comprises 512 MB of flash memory organized as four 128 Mbx8 NAND flash memory elements **42**. In addition, non-volatile memory elements **42** having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Non-volatile memory elements **42** compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (μBGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

FIG. 2 is a block diagram of an example memory module **10** with ECC (error-correcting code) having a volatile memory subsystem **30** with nine volatile memory elements **32** and a non-volatile memory subsystem **40** with five non-volatile memory elements **42** in accordance with certain embodiments described herein. The additional memory element **32** of the first memory bank **30** and the additional memory element **42** of the second memory bank **40** provide the ECC capability. In certain other embodiments, the volatile memory subsystem **30** comprises other numbers of volatile memory elements **32** (e.g., 2, 3, 4, 5, 6, 7, more than 9). In certain embodiments, the non-volatile memory subsystem **40** comprises other numbers of non-volatile memory elements **42** (e.g., 2, 3, more than 5).

Referring to FIG. **1**, in certain embodiments, the logic element **70** comprises a field-programmable gate array (FPGA). In certain embodiments, the logic element **70** comprises an FPGA available from Lattice Semiconductor Corporation which includes an internal flash. In certain other embodiments, the logic element **70** comprises an FPGA available from another vendor. The internal flash can improve the speed of the memory system **10** and save physical space. Other types of logic elements **70** compatible with certain embodiments described herein include, but are not limited to, a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, a complex programmable logic device (CPLD). In certain embodiments, the logic element **70** is a custom device. In certain embodiments, the logic element **70** comprises various discrete electrical elements, while in certain other embodiments, the logic element **70** comprises one or more integrated circuits. FIG. **3** is a block diagram of an example memory module **10** having a microcontroller unit **60** and logic element **70** integrated into a single controller **62** in accordance with certain embodiments described herein. In certain embodiments, the controller **62** includes one or more other components. For example, in one embodiment, an FPGA without an internal flash is used and the controller **62** includes a separate flash memory component which stores configuration information to program the FPGA.

In certain embodiments, the at least one circuit **52** comprises one or more switches coupled to the volatile memory subsystem **30**, to the controller **62**, and to the host computer (e.g., via the interface **22**, as schematically illustrated by FIGS. **1-3**). The one or more switches are responsive to sig-

US 8,301,833 B1

nals (e.g., from the controller 62) to selectively operatively decouple the controller 62 from the volatile memory subsystem 30 and to selectively operatively couple the controller 62 to the volatile memory subsystem 30. In addition, in certain embodiments, the at least one circuit 52 selectively operatively couples and decouples the volatile memory subsystem 30 and the host system.

In certain embodiments, the volatile memory subsystem 30 can comprise a registered DIMM subsystem comprising one or more registers 160 and a plurality of DRAM elements 180, as schematically illustrated by FIG. 4A. In certain such embodiments, the at least one circuit 52 can comprise one or more switches 172 coupled to the controller 62 (e.g., logic element 70) and to the volatile memory subsystem 30 which can be actuated to couple and decouple the controller 62 to and from the volatile memory subsystem 30, respectively. The memory system 10 further comprises one or more switches 170 coupled to the one or more registers 160 and to the plurality of DRAM elements 180 as schematically illustrated by FIG. 4A. The one or more switches 170 can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem 30 to the host system 150. In certain other embodiments, as schematically illustrated by FIG. 4B, the one or more switches 174 are also coupled to the one or more registers 160 and to a power source 162 for the one or more registers 160. The one or more switches 174 can be selectively switched to turn power on or off to the one or more registers 160, thereby selectively operatively coupling the volatile memory subsystem 30 to the host system 150. As schematically illustrated by FIG. 4C, in certain embodiments the at least one circuit 52 comprises a dynamic on-die termination (ODT) 176 circuit of the logic element 70. For example, the logic element 70 can comprise a dynamic ODT circuit 176 which selectively operatively couples and decouples the logic element 70 to and from the volatile memory subsystem 30, respectively. In addition, and similar to the example embodiment of FIG. 4A described above, the one or more switches 170 can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem 30 to the host system 150.

Certain embodiments described herein utilize the non-volatile memory subsystem 40 as a flash "mirror" to provide backup of the volatile memory subsystem 30 in the event of certain system conditions. For example, the non-volatile memory subsystem 40 may backup the volatile memory subsystem 30 in the event of a trigger condition, such as, for example, a power failure or power reduction or a request from the host system. In one embodiment, the non-volatile memory subsystem 40 holds intermediate data results in a noisy system environment when the host computer system is engaged in a long computation. In certain embodiments, a backup may be performed on a regular basis. For example, in one embodiment, the backup may occur every millisecond in response to a trigger condition. In certain embodiments, the trigger condition occurs when the memory system 10 detects that the system voltage is below a certain threshold voltage. For example, in one embodiment, the threshold voltage is 10 percent below a specified operating voltage. In certain embodiments, a trigger condition occurs when the voltage goes above a certain threshold value, such as, for example, 10 percent above a specified operating voltage. In some embodiments, a trigger condition occurs when the voltage goes below a threshold or above another threshold. In various embodiments, a backup and/or restore operation may occur in reboot and/or non-reboot trigger conditions.

As schematically illustrated by FIGS. 1 and 2, in certain embodiments, the controller 62 may comprise a microcon-troller unit (MCU) 60 and a logic element 70. In certain embodiments, the MCU 60 provides memory management for the non-volatile memory subsystem 40 and controls data transfer between the volatile memory subsystem 30 and the non-volatile memory subsystem 40. The MCU 60 of certain embodiments comprises a 16-bit microcontroller, although other types of microcontrollers are also compatible with certain embodiments described herein. As schematically illustrated by FIGS. 1 and 2, the logic element 70 of certain embodiments is in electrical communication with the non-volatile memory subsystem 40 and the MCU 60. The logic element 70 can provide signal level translation between the volatile memory elements 32 (e.g., 1.8V SSTL-2 for DDR2 SDRAM elements) and the non-volatile memory elements 42 (e.g., 3V TTL for NAND flash memory elements). In certain embodiments, the logic element 70 is also programmed to perform address/address translation between the volatile memory subsystem 30 and the non-volatile memory subsystem 40. In certain preferred embodiments, 1-NAND type flash are used for the non-volatile memory elements 42 because of their superior read speed and compact structure.

The memory system 10 of certain embodiments is configured to be operated in at least two states. The at least two states can comprise a first state in which the controller 62 and the non-volatile memory subsystem 40 are operatively decoupled (e.g., isolated) from the volatile memory subsystem 30 by the at least one circuit 52 and a second state in which the volatile memory subsystem 30 is operatively coupled to the controller 62 to allow data to be communicated between the volatile memory subsystem 30 and the non-volatile memory subsystem 40 via the controller 62. The memory system 10 may transition from the first state to the second state in response to a trigger condition, such as when the memory system 10 detects that there is a power interruption (e.g., power failure or reduction) or a system hang-up.

The memory system 10 may further comprise a voltage monitor 50. The voltage monitor circuit 50 monitors the voltage supplied by the host system via the interface 22. Upon detecting a low voltage condition (e.g., due to a power interruption to the host system), the voltage monitor circuit 50 may transmit a signal to the controller 62 indicative of the detected condition. The controller 62 of certain embodiments responds to the signal from the voltage monitor circuit 50 by transmitting a signal to the at least one circuit 52 to operatively couple the controller to the volatile memory system 30, such that the memory system 10 enters the second state. For example, the voltage monitor 50 may send a signal to the MCU 60 which responds by accessing the data on the volatile memory system 30 and by executing a write cycle on the non-volatile memory subsystem 40. During this write cycle, data is read from the volatile memory subsystem 30 and is transferred to the non-volatile memory subsystem 40 via the MCU 60. In certain embodiments, the voltage monitor circuit 50 is part of the controller 62 (e.g., part of the MCU 60) and the voltage monitor circuit 50 transmits a signal to the other portions of the controller 62 upon detecting a power threshold condition.

The isolation or operational decoupling of the volatile memory subsystem 30 from the non-volatile memory subsystem in the first state can preserve the integrity of the operation of the memory system 10 during periods of operation in which signals (e.g., data) are transmitted between the host system and the volatile memory subsystem 30. For example, in one embodiment during such periods of operation, the controller 62 and the non-volatile memory subsystem 40 do not add a significant capacitive load to the volatile memory system 30 when the memory system 10 is in the first state. In certain such embodiments, the capacitive

US 8,301,833 B1

load of the controller 62 and the non-volatile memory subsystem 40 do not significantly affect the signals propagating between the volatile memory subsystem 30 and the host system. This can be particularly advantageous in relatively high-speed memory systems where loading effects can be significant. In one preferred embodiment, the at least one circuit 52 comprises an FSA1208 Low-Power, Eight-Port, Hi-Speed Isolation Switch from Fairchild Semiconductor. In other embodiments, the at least one circuit 52 comprises other types of isolation devices.

Power may be supplied to the volatile memory subsystem 30 from a first power supply (e.g., a system power supply) when the memory system 10 is in the first state and from a second power supply 80 when the memory system 10 is in the second state. In certain embodiments, the memory system 10 is in the first state when no trigger condition (e.g., a power failure) is present and the memory system 10 enters the second state in response to a trigger condition. In certain embodiments, the memory system 10 has a third state in which the controller 62 is operatively decoupled from the volatile memory subsystem 30 and power is supplied to the volatile memory subsystem 30 from a third power supply (not shown). For example, in one embodiment the third power supply may provide power to the volatile memory subsystem 30 when the memory system 10 detects that a trigger condition is likely to occur but has not yet occurred.

In certain embodiments, the second power supply 80 does not comprise a battery. Because a battery is not used, the second power supply 80 of certain embodiments may be relatively easy to maintain, does not generally need to be replaced, and is relatively environmentally friendly. In certain embodiments, as schematically illustrated by FIGS. 1-3, the second power supply 80 comprises a step-up transformer 82, a step-down transformer 84, and a capacitor bank 86 comprising one or more capacitors (e.g., double-layer capacitors). In one example embodiment, capacitors may take about three to four minutes to charge and about two minutes to discharge. In other embodiments, the one or more capacitors may take a longer time or a shorter time to charge and/or discharge. For example, in certain embodiments, the second power supply 80 is configured to power the volatile memory subsystem 30 for less than thirty minutes. In certain embodiments, the second power supply 80 may comprise a battery. For example, in certain embodiments, the second power supply 80 comprises a battery and one or more capacitors and is configured to power the volatile memory subsystem 30 for no more than thirty minutes.

In certain embodiments, the capacitor bank 86 of the second power supply 80 is charged by the first power supply while the memory system 10 is in the first state. As a result, the second power supply 80 is fully charged when the memory system 10 enters the second state. The memory system 10 and the second power supply 80 may be located on the same printed circuit board 20. In other embodiments, the second power supply 80 may not be on the same printed circuit board 20 and may be tethered to the printed circuit board 20, for example.

When operating in the first state, in certain embodiments, the step-up transformer 82 keeps the capacitor bank 86 charged at a peak value. In certain embodiments, the step-down transformer 84 acts as a voltage regulator to ensure that regulated voltages are supplied to the memory elements (e.g., 1.8V to the volatile DRAM elements 32 and 3.0V to the non-volatile flash memory elements 42) when operating in the second state (e.g., during power down). In certain embodiments, as schematically illustrated by FIGS. 1-3, the memory module 10 further comprises a switch 90 (e.g., FET switch)

that switches power provided to the controller 62, the volatile memory subsystem 30, and the non-volatile memory subsystem 40, between the power from the second power supply 80 and the power from the first power supply (e.g., system power) received via the interface 22. For example, the switch 90 may switch from the first power supply to the second power supply 80 when the voltage monitor 50 detects a low voltage condition. The switch 90 of certain embodiments advantageously ensures that the volatile memory elements 32 and non-volatile memory elements 42 are powered long enough for the data to be transferred from the volatile memory elements 32 and stored in the non-volatile memory elements 42. In certain embodiments, after the data transfer is complete, the switch 90 then switches back to the first power supply and the controller 62 transmits a signal to the at least one circuit 52 to operatively decouple the controller 62 from the volatile memory subsystem 30, such that the memory system 10 re-enters the first state.

When the memory system 10 re-enters the first state, data may be transferred back from the non-volatile memory subsystem 40 to the volatile memory subsystem 30 via the controller 62. The host system can then resume accessing the volatile memory subsystem 30 of the memory module 10. In certain embodiments, after the memory system 10 enters or re-enters the first state (e.g., after power is restored), the host system accesses the volatile memory subsystem 30 rather than the non-volatile memory subsystem 40 because the volatile memory elements 32 have superior read/write characteristics. In certain embodiments, the transfer of data from the volatile memory bank 30 to the non-volatile memory bank 40, or from the non-volatile memory bank 40 to the volatile memory bank 30, takes less than one minute per GB.

In certain embodiments, the memory system 10 protects the operation of the volatile memory when communicating with the host-system and provides backup and restore capability in the event of a trigger condition such as a power failure. In certain embodiments, the memory system 10 copies the entire contents of the volatile memory subsystem 30 into the non-volatile memory subsystem 40 on each backup operation. Moreover, in certain embodiments, the entire contents of the non-volatile memory subsystem 40 are copied back into the volatile memory subsystem 30 on each restore operation. In certain embodiments, the entire contents of the non-volatile memory subsystem 40 are accessed for each backup and/or restore operation, such that the non-volatile memory subsystem 40 (e.g., flash memory subsystem) is used generally uniformly across its memory space and wear-leveling is not performed by the memory system 10. In certain embodiments, avoiding wear-leveling can decrease cost and complexity of the memory system 10 and can improve the performance of the memory system 10. In certain other embodiments, the entire contents of the volatile memory subsystem 30 are not copied into the non-volatile memory subsystem 40 on each backup operation, but only a partial copy is performed. In certain embodiments, other management capabilities such as bad-block management and error management for the flash memory elements of the non-volatile memory subsystem 40 are performed in the controller 62.

The memory system 10 generally operates as a write-back cache in certain embodiments. For example, in one embodiment, the host system (e.g., a disk controller) writes data to the volatile memory subsystem 30 which then writes the data to non-volatile storage which is not part of the memory system 10, such as, for example, a hard disk. The disk controller may wait for an acknowledgment signal from the memory system 10 indicating that the data has been written to the hard disk or is otherwise secure. The memory system 10 of certain

US 8,301,833 B1

11

embodiments can decrease delays in the system operation by indicating that the data has been written to the hard disk before it has actually done so. In certain embodiments, the memory system 10 will still be able to recover the data efficiently in the event of a power outage because of the backup and restore capabilities described herein. In certain other embodiments, the memory system 10 may be operated as a write-through cache or as some other type of cache.

FIG. 5 schematically illustrates an example power module 100 of the memory system 10 in accordance with certain embodiments described herein. The power module 100 provides power to the various components of the memory system 10 using different elements based on a state of the memory system 10 in relation to a trigger condition. In certain embodiments, the power module 100 comprises one or more of the components described above with respect to FIG. 1. For example, in certain embodiments, the power module 100 includes the second power supply 80 and the switch 90.

The power module 100 provides a plurality of voltages to the memory system 10 comprising non-volatile and volatile memory subsystems 30, 40. The plurality of voltages comprises at least a first voltage 102 and a second voltage 104. The power module 100 comprises an input 106 providing a third voltage 108 to the power module 100 and a voltage conversion element 120 configured to provide the second voltage 104 to the memory system 10. The power module 100 further comprises a first power element 130 configured to selectively provide a fourth voltage 110 to the conversion element 120. In certain embodiments, the first power element 130 comprises a pulse-width modulation power controller. For example, in one example embodiment, the first power element 130 is configured to receive a 1.8V input system voltage as the third voltage 108 and to output a modulated 5V output as the fourth voltage 110.

The power module 100 further comprises a second power element 140 can be configured to selectively provide a fifth voltage 112 to the conversion element 120. The power module 100 can be configured to selectively provide the first voltage 102 to the memory system 10 either from the conversion element 120 or from the input 106.

The power module 100 can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage 102 is provided to the memory system 10 from the input 106 and the fourth voltage 110 is provided to the conversion element 120 from the first power element 130. In a second state, the fourth voltage 110 is provided to the conversion element 120 from the first power element 130 and the first voltage 102 is provided to the memory system 10 from the conversion element 120. In the third state, the fifth voltage 112 is provided to the conversion element 120 from the second power element 140 and the first voltage 104 is provided to the memory system 10 from the conversion element 120.

In certain embodiments, the power module 100 transitions from the first state to the second state upon detecting that a trigger condition is likely to occur and transitions from the second state to the third state upon detecting that the trigger condition has occurred. For example, the power module 100 may transition to the second state when it detects that a power failure is about to occur and transitions to the third state when it detects that the power failure has occurred. In certain embodiments, providing the first voltage 102 in the second state from the first power element 130 rather than from the input 106 allows a smoother transition from the first state to the third state. For example, in certain embodiments, providing the first voltage 102 from the first power element 130 has capacitive and other smoothing effects. In addition, switching

12

the point of power transition to be between the conversion element 120 and the first and second power elements 130, 140 (e.g., the sources of the pre-regulated fourth voltage 110 in the second state and the pre-regulated fifth voltage 112 in the third state) can smooth out potential voltage spikes.

In certain embodiments, the second power element 140 does not comprise a battery and may comprise one or more capacitors. For example, as schematically illustrated in FIG. 4, the second power element 140 comprises a capacitor array 142, a buck-boost converter 144 which adjusts the voltage for charging the capacitor array and a voltage/current limiter 146 which limits the charge current to the capacitor array 142 and stops charging the capacitor array 142 when it has reached a certain charge voltage. In one example embodiment, the capacitor array 142 comprises two 50 farad capacitors capable of holding a total charge of 4.6V. For example, in one example embodiment, the buck-boost converter 144 receives a 1.8V system voltage (first voltage 108) and boosts the voltage to 4.3V which is outputted to the voltage current limiter 146. The voltage/current limiter 146 limits the current going to the capacitor array 142 to 1A and stops charging the array 142 when it is charged to 4.3V. Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the second power element 140 may include alternative embodiments. For example, different components and/or different value components may be used. For example, in other embodiments, a pure boost converter may be used instead of a buck-boost converter. In another embodiment, only one capacitor may be used instead of a capacitor array 142.

The conversion element 120 can comprise one or more buck converters and/or one or more buck-boost converters. The conversion element 120 may comprise a plurality of sub-blocks 122, 124, 126 as schematically illustrated by FIG. 4, which can provide more voltages in addition to the second voltage 104 to the memory system 10. The sub-blocks may comprise various converter circuits such as buck-converters, boost converters, and buck-boost converter circuits for providing various voltage values to the memory system 10. For example, in one embodiment, sub-block 122 comprises a buck converter, sub-block 124 comprises a dual buck converter, and sub-block 126 comprises a buck-boost converter as schematically illustrated by FIG. 4. Various other components for the sub-blocks 122, 124, 126 of the conversion element 120 are also compatible with certain embodiments described herein. In certain embodiments, the conversion element 120 receives as input either the fourth voltage 110 from the first power element 130 or the fifth voltage 112 from the second power element 140, depending on the state of the power module 100, and reduces the input to an appropriate amount for powering various components of the memory system. For example, the buck-converter of sub-block 122 can provide 1.8V at 2 A for about 60 seconds to the volatile memory elements 32 (e.g., DRAM), the non-volatile memory elements 42 (e.g., flash), and the controller 62 (e.g., an FPGA) in one embodiment. The sub-block 124 can provide the second voltage 104 as well as another reduced voltage 105 to the memory system 10. In one example embodiment, the second voltage 104 is 2.5V and is used to power the at least one circuit 52 (e.g., isolation device) and the other reduced voltage 105 is 1.2V and is used to power the controller 62 (e.g., FPGA). The sub-block 126 can provide yet another voltage 107 to the memory system 10. For example, the voltage 107 may be 3.3V and may be used to power both the controller 62 and the at least one circuit 52.

Although described with respect to certain example embodiments, one of ordinary skill will recognize from the

US 8,301,833 B1

13                                                    14

disclosure herein that the conversion element 120 may include alternative embodiments. For example, there may be more or less sub-blocks which may comprise other types of converters (e.g., pure boost converters) or which may produce different voltage values. In one embodiment, the volatile memory elements 32 and non-volatile memory elements 42 are powered using independent voltages and are not both powered using the first voltage 102.

FIG. 6 is a flowchart of an example method 200 of providing a first voltage 102 and a second voltage 104 to a memory system 10 including volatile and nonvolatile memory subsystems 30, 40. While the method 200 is described herein by reference to the memory system 10 schematically illustrated by FIGS. 1-4, other memory systems are also compatible with embodiments of the method 200. During a first condition, the method 200 comprises providing the first voltage 102 to the memory system 10 from an input power supply 106 and providing the second voltage 104 to the memory system 10 from a first power subsystem in operational block 210. For example, in one embodiment, the first power subsystem comprises the first power element 130 and the voltage conversion element 120 described above with respect to FIG. 4. In other embodiments, other first power subsystems are used.

The method 200 further comprises detecting a second condition in operational block 220. In certain embodiments, detecting the second condition comprises detecting that a trigger condition is likely to occur. During the second condition, the method 200 comprises providing the first voltage 102 and the second voltage 104 to the memory system 10 from the first power subsystem in an operational block 230. For example, referring to FIG. 4, a switch 148 can be toggled to provide the first voltage 102 from the conversion element 120 rather than from the input power supply.

The method 200 further comprises charging a second power subsystem in operational block 240. In certain embodiments, the second power subsystem comprises the second power element 140 or another power supply that does not comprise a battery. For example, in one embodiment, the second power subsystem comprises the second power element 140 and the voltage conversion element 120 described above with respect to FIG. 4. In other embodiments, some other second power subsystem is used.

The method 200 further comprises detecting a third condition in an operational block 250 and during the third condition, providing the first voltage 102 and the second voltage 104 to the memory system 10 from the second power subsystem 140 in an operational block 250. In certain embodiments, detecting the third condition comprises detecting that the trigger condition has occurred. The trigger condition may comprise various conditions described herein. In various embodiments, for example, the trigger condition comprises a power reduction, power failure, or system hang-up. The operational blocks of the method 200 may be performed in different orders in various embodiments. For example, in certain embodiments, the second power subsystem 140 is charged before detecting the second condition.

In certain embodiments, the memory system 10 comprises a volatile memory subsystem 30 and a non-volatile memory subsystem 40 comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system 10 also comprises a controller 62 operatively coupled to the volatile memory subsystem 30 and operatively coupled to the non-volatile memory subsystem 40. The controller 62 can be configured to allow data to be communicated between the volatile memory subsystem 30 and the host system when the memory system 10 is operating in a first state and to allow data to be communicated between the volatile memory subsystem 30 and the non-volatile memory subsystem 40 when the memory system 10 is operating in a second state.

Although the memory system 10 having extra storage capacity of the non-volatile memory subsystem 40 has been described with respect to certain embodiments, alternative configurations exist. For example, in certain embodiments, there may be more than 100 percent more storage capacity in the non-volatile memory subsystem 40 than in the volatile memory subsystem 30. In various embodiments, there may be at least 200, 300, or 400 percent more storage capacity in the non-volatile memory subsystem 40 than in the volatile memory subsystem 30. In other embodiments, the non-volatile memory subsystem 40 includes at least some other integer multiples of the storage capacity of the volatile memory subsystem 30. In some embodiments, the non-volatile memory subsystem 40 includes a non-integer multiple of the storage capacity of the volatile memory subsystem 30. In one embodiment, the non-volatile memory subsystem 40 includes less than 100 percent more storage capacity than does the volatile memory subsystem 30.

The extra storage capacity of the non-volatile memory subsystem 40 can be used to improve the backup capability of the memory system 10. In certain embodiments in which data can only be written to portions of the non-volatile memory subsystem 40 which do not contain data (e.g., portions which have been erased), the extra storage capacity of the non-volatile memory subsystem 40 allows the volatile memory subsystem 30 to be backed up in the event of a subsequent power failure or other trigger event. For example, the extra storage capacity of the non-volatile memory subsystem 40 may allow the memory system 10 to backup the volatile memory subsystem 30 efficiently in the event of multiple trigger conditions (e.g., power failures). In the event of a first power failure, for example, the data in the volatile memory system 30 is copied to a first, previously erased portion of the non-volatile memory subsystem 40 via the controller 62. Since the non-volatile memory subsystem 40 has more storage capacity than does the volatile memory subsystem 30, there is a second portion of the non-volatile memory subsystem 40 which does not have data from the volatile memory subsystem 30 copied to it and which remains free of data (e.g., erased). Once system power is restored, the controller 62 of the memory system 10 restores the data to the volatile memory subsystem 30 by copying the backed-up data from the non-volatile memory subsystem 40 back to the volatile memory subsystem 30. After the data is restored, the memory system 10 erases the non-volatile memory subsystem 40. While the first portion of the non-volatile memory subsystem 40 is being erased, it may be temporarily un-accessible.

If a subsequent power failure occurs before the first portion of the non-volatile memory subsystem 40 is completely erased, the volatile memory subsystem 30 can be backed-up or stored again in the second portion of the non-volatile memory subsystem 40 as described herein. In certain embodiments, the extra storage capacity of the non-volatile memory subsystem 40 may allow the memory system 10 to operate more efficiently. For example, because of the extra storage capacity of the non-volatile memory subsystem 40, the memory system 10 can handle a higher frequency of trigger events that is not limited by the erase time of the non-volatile memory subsystem 40.

FIG. 7 is a flowchart of an example method 300 of controlling a memory system 10 operatively coupled to a host system and which includes a volatile memory subsystem 30 and a non-volatile memory subsystem 40. In certain embodiments, the non-volatile memory subsystem 40 comprises at least 100

US 8,301,833 B1

15

percent more storage capacity than does the volatile memory subsystem 30 as described herein. While the method 300 is described herein by reference to the memory system 10 schematically illustrated by FIGS. 1-3, the method 300 can be practiced using other memory systems in accordance with certain embodiments described herein. In an operational block 310, the method 300 comprises communicating data between the volatile memory subsystem 30 and the host system when the memory system 10 is in a first mode of operation. The method 300 further comprises storing a first copy of data from the volatile memory subsystem 30 to the non-volatile memory subsystem 40 at a first time when the memory system 10 is in a second mode of operation in an operational block 320.

In an operational block 330, the method 300 comprises restoring the first copy of data from the non-volatile memory subsystem 40 to the volatile memory subsystem 30. The method 300 further comprises erasing the first copy of data from the non-volatile memory subsystem 40 in an operational block 340. The method further comprises storing a second copy of data from the volatile memory subsystem 30 to the non-volatile memory subsystem 40 at a second time when the memory system 10 is in the second mode of operation in an operational block 350. Storing the second copy begins before the first copy is completely erased from the non-volatile memory subsystem 40.

In some embodiments, the memory system 10 enters the second mode of operation in response to a trigger condition, such as a power failure. In certain embodiments, the first copy of data and the second copy of data are stored in separate portions of the nonvolatile memory subsystem 40. The method 300 can also include restoring the second copy of data from the non-volatile memory subsystem 40 to the volatile memory subsystem 30 in an operational block 360. The operational blocks of method 300 referred to herein may be performed in different orders in various embodiments. For example, in some embodiments, the second copy of data is restored to the volatile memory subsystem 30 at operational block 360 before the first copy of data is completely erased in the operational block 340.

FIG. 8 schematically illustrates an example clock distribution topology 400 of a memory system 10 in accordance with certain embodiments described herein. The clock distribution topology 400 generally illustrates the creation and routing of the clock signals provided to the various components of the memory system 10. A clock source 402 such as, for example, a 25 MHz oscillator, generates a clock signal. The clock source 402 may feed a clock generator 404 which provides a clock signal 406 to the controller 62, which may be an FPGA. In one embodiment, the clock generator 404 generates a 125 MHz clock signal 406. The controller 62 receives the clock signal 406 and uses it to clock the controller 62 master state control logic. For example, the master state control logic may control the general operation of an FPGA controller 62.

The clock signal 406 can also be input into a clock divider 410 which produces a frequency-divided version of the clock signal 406. In an example embodiment, the clock divider 410 is a divide by two clock divider and produces a 62.5 MHz clock signal in response to the 125 MHz clock signal 406. A non-volatile memory phase-locked loop (PLL) block 412 can be included (e.g., in the controller 62) which distributes a series of clock signals to the non-volatile memory subsystem 40 and to associated control logic. For example, a series of clock signals 414 can be sent from the controller 62 to the non-volatile memory subsystem 40. Another clock signal 416 can be used by the controller logic which is dedicated to controlling the non-volatile memory subsystem 40. For

16

example, the clock signal 416 may clock the portion of the controller 62 which is dedicated to generating address and/or control lines for the non-volatile memory subsystem 40. A feedback clock signal 418 is fed back into the non-volatile memory PLL block 412. In one embodiment, the PLL block 412 compares the feedback clock 418 to the reference clock 411 and varies the phase and frequency of its output until the reference 411 and feedback 418 clocks are phase and frequency matched.

A version of the clock signal 406 such as the backup clock signal 408 may be sent from the controller to the volatile memory subsystem 30. The clock signal 408 may be, for example, a differential version of the clock signal 406. As described herein, the backup clock signal 408 may be used to clock the volatile memory subsystem 30 when the memory system 10 is backing up the data from the volatile memory subsystem 30 into the non-volatile memory subsystem 40. In certain embodiments, the backup clock signal 408 may also be used to clock the volatile memory subsystem 30 when the memory system 10 is copying the backed-up data back into the volatile memory subsystem 30 from the non-volatile memory subsystem 40 (also referred to as restoring the volatile memory subsystem 30). The volatile memory subsystem 30 may normally be run at a higher frequency (e.g., DRAM running at 400 MHz) than the non-volatile memory subsystem 40 (e.g., flash memory running at 62.5 MHz) when communicating with the host system (e.g., when no trigger condition is present). However, in certain embodiments the volatile memory subsystem 30 may be operated at a reduced frequency (e.g., at twice the frequency of the non-volatile memory subsystem 40) without introducing significant delay into the system during backup operation and/or restore operations. Running the volatile memory subsystem 30 at the reduced frequency during a backup and/or restore operation may advantageously reduce overall power consumption of the memory system 10.

In one embodiment, the backup clock 408 and the volatile memory system clock signal 420 are received by a multiplexer 422, as schematically illustrated by FIG. 8. The multiplexer 422 can output either the volatile memory system clock signal 420 or the backup clock signal 408 depending on the backup state of the memory system 10. For example, when the memory system 10 is not performing a backup or restore operation and is communicating with the host system (e.g., normal operation), the volatile memory system clock signal 420 may be provided by the multiplexer 422 to the volatile memory PLL block 424. When the memory system 10 is performing a backup (or restore) operation, the backup clock signal 408 may be provided.

The volatile memory PLL block 424 receives the volatile memory reference clock signal 423 from the multiplexer 422 and can generate a series of clock signals which are distributed to the volatile memory subsystem 30 and associated control logic. For example, in one embodiment, the PLL block 424 generates a series of clock signals 426 which clock the volatile memory elements 32. A clock signal 428 may be used to clock control logic associated with the volatile memory elements, such as one or more registers (e.g., the one or more registers of a registered DIMM). Another clock signal 430 may be sent to the controller 62. A feedback clock signal 432 is fed back into the volatile memory PLL block 424. In one embodiment, the PLL block 424 compares the feedback clock signal 432 to the reference clock signal 423 and varies the phase and frequency of its output until the reference clock signal 423 and the feedback clock signal 432 clocks are phase and frequency matched.

US 8,301,833 B1

17 18

The clock signal 430 may be used by the controller 62 to generate and distribute clock signals which will be used by controller logic which is configured to control the volatile memory subsystem 30. For example, control logic in the controller 62 may be used to control the volatile memory subsystem 30 during a backup or restore operation. The clock signal 430 may be used as a reference clock signal for the PLL block 434 which can generate one or more clocks 438 used by logic in the controller 62. For example, the PLL block 434 may generate one or more clock signals 438 used to drive logic circuitry associated with controlling the volatile memory subsystem 30. In certain embodiments, the PLL block 434 includes a feedback clock signal 436 and operates in a similar manner to other PLL blocks described herein.

The clock signal 430 may be used as a reference clock signal for the PLL block 440 which may generate one or more clock signals used by a sub-block 442 to generate one or more other clock signals 444. In one embodiment, for example, the volatile memory subsystem 30 comprises DDR2 SDRAM elements and the sub-block 442 generates one or more DDR2 compatible clock signals 444. A feedback clock signal 446 is fed back into the PLL block 440. In certain embodiments, the PLL block 440 operates in a similar manner to other PLL blocks described herein.

While described with respect to the example embodiment of FIG. 8, various alternative clock distribution topologies are possible. For example, one or more of the clock signals have a different frequency in various other embodiments. In some embodiments, one or more of the clocks shown as differential signals are single ended signals. In one embodiment, the volatile memory subsystem 30 operates on the volatile memory clock signal 420 and there is no backup clock signal 408. In some embodiments, the volatile memory subsystem 30 is operated at a reduced frequency during a backup operation and not during a restore operation. In other embodiments, the volatile memory subsystem 30 is operated at a reduced frequency during a restore operation and not during a backup operation.

FIG. 9 is a flowchart of an example method 500 of controlling a memory system 10 operatively coupled to a host system. Although described with respect to the memory system 10 described herein, the method 500 is compatible with other memory systems. The memory system 10 may include a clock distribution topology 400 similar to the one described above with respect to FIG. 8 or another clock distribution topology. The memory system 10 can include a volatile memory subsystem 30 and a non-volatile memory subsystem 40.

In an operational block 510, the method 500 comprises operating the volatile memory subsystem 30 at a first frequency when the memory system 10 is in a first mode of operation in which data is communicated between the volatile memory subsystem 30 and the host system. In an operational block 520, the method 500 comprises operating the non-volatile memory subsystem 40 at a second frequency when the memory system 10 is in a second mode of operation in which data is communicated between the volatile memory subsystem 30 and the non-volatile memory subsystem 40. The method 500 further comprises operating the volatile memory subsystem 30 at a third frequency in an operational block 530 when the memory system 10 is in the second mode of operation. In certain embodiments, the memory system 10 is not powered by a battery when it is in the second mode of operation. The memory system 10 may switch from the first mode of operation to the second mode of operation in response to a trigger condition. The trigger condition may be any trigger condition described herein such as, for example, a

power failure condition. In certain embodiments, the second mode of operation includes both backup and restore operations as described herein. In other embodiments, the second mode of operation includes backup operations but not restore operations. In yet other embodiments, the second mode of operation includes restore operations but not backup operations.

The third frequency can be less than the first frequency. For example, the third frequency can be approximately equal to the second frequency. In certain embodiments, the reduced frequency operation is an optional mode. In yet other embodiments, the first, second and/or third frequencies are configurable by a user or by the memory system 10.

FIG. 10 schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments 630, 640 of a volatile memory subsystem 30 of a memory system 10 to a controller 62 of the memory system 10. While the example of FIG. 10 shows a topology including two DRAM segments 630, 640 for the purposes of illustration, each address location of the volatile memory subsystem 30 comprises more than the two segments in certain embodiments. The data lines 632, 642 from the first DRAM segment 630 and the second DRAM segment 640 of the volatile memory subsystem 30 are coupled to switches 650, 652 which are coupled to the controller 62 (e.g., logic element 70) of the memory system 10. The chip select lines 634, 644 and the self-refresh lines 636, 646 (e.g., CKe signals) of the first and second DRAM segments 630, 640, respectively, are coupled to the controller 62. In certain embodiments, the controller 62 comprises a buffer (not shown) which is configured to store data from the volatile memory subsystem 30. In certain embodiments, the buffer is a first-in, first out buffer (FIFO). In certain embodiments, data slices from each DRAM segment 630, 640 comprise a portion of the volatile memory subsystem data bus. In one embodiment, for example, the volatile memory subsystem 30 comprises a 72-bit data bus (e.g., each data word at each addressable location is 72 bits wide and includes, for example, 64 bits of accessible SDRAM and 8 bits of ECC), the first data slice from the first DRAM segment 630 may comprise 40 bits of the data word, and the second data slice from the second DRAM segment 640 may comprise the remaining 32 bits of the data word. Certain other embodiments comprise data buses and/or data slices of different sizes.

In certain embodiments, the switches 650, 652 can each be selectively switched to selectively operatively couple the data lines 632, 642, respectively from the first and second DRAM segments 630, 640 to the controller 62. The chip select lines 634, 644 enable the first and second DRAM segments 630, 640, respectively, of the volatile memory subsystem 30, and the self-refresh lines 636, 646 toggle the first and second DRAM segments 630, 640, respectively, from self-refresh mode to active mode. In certain embodiments, the first and second DRAM segments 630, 640 maintain stored information but are not accessible when they are in self-refresh mode, and maintain stored information and are accessible when they are in active mode.

In certain embodiments, when the memory system 10 is backing up the volatile memory system 30, data slices from only one of the two DRAM segments 630, 640 at a time are sent to the controller 62. For example, when the first slice is being written to the controller 62 during a back-up, the controller 62 sends a signal via the CKe line 636 to the first DRAM segment 630 to put the first DRAM segment 630 in active mode. In certain embodiments, the data slice from the first DRAM segment 630 for multiple words (e.g., a block of words) is written to the controller 62 before writing the sec-

US 8,301,833 B1

19

ond data slice from the second DRAM segment **640** to the controller **62**. While the first data slice is being written to the controller **62**, the controller **62** also sends a signal via the CKe line **646** to put the second DRAM segment **640** in self-refresh mode. Once the first data slice for one word or for a block of words is written to the controller **62**, the controller **62** puts the first DRAM segment **630** into self-refresh mode by sending a signal via the CKe line **636** to the first DRAM segment **640**. The controller **62** also puts the second DRAM segment **640** into active mode by sending a signal via the CKe line **646** to the DRAM segment **640**. The second slice for a word or for a block of words is written to the controller **62**. In certain embodiments, when the first and second data slices are written to the buffer in the controller **62**, the controller **62** combines the first and second data slices **630**, **640** into complete words or blocks of words and then writes each complete word or block of words to the non-volatile memory subsystem **40**. In certain embodiments, this process is called "slicing" the volatile memory subsystem **30**.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the non-volatile memory elements **42** write each backed-up data word to the controller **62** which writes a first slice of the data word to the volatile memory subsystem **30** and then a second slice of the data word to the volatile memory subsystem **30**. In certain embodiments, slicing the volatile memory subsystem **30** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **30** during a backup operation.

FIG. **11** is a flowchart of an example method **600** of controlling a memory system **10** operatively coupled to a host system and which includes a volatile memory subsystem **30** and a non-volatile memory subsystem **40**. Although described with respect to the memory system **10** described herein with respect to FIGS. **1-3** and **10**, the method **600** is compatible with other memory systems. The method **600** comprises communicating data words between the volatile memory subsystem **40** and the host system when the memory system **10** is in a first mode of operation in an operational block **610**. For example, the memory system **10** may be in the first mode of operation when no trigger condition has occurred and the memory system is not performing a backup and/or restore operation or is not being powered by a secondary power supply.

In an operational block **620**, the method further comprises transferring data words from the volatile memory subsystem **30** to the non-volatile memory subsystem **40** when the memory system **10** is in a second mode of operation. In certain embodiments, each data word comprises the data stored in a particular address of the memory system **10**. The memory system **10** may enter the second mode of operation, for example, when a trigger condition (e.g., a power failure) occurs. In certain embodiments, transferring each data word comprises storing a first portion (also referred to as a slice) of the data word in a buffer in an operational block **622**, storing a second portion of the data word in the buffer in an operational block **624**, and writing the entire data word from the buffer to the non-volatile memory subsystem **40** in an operational block **626**.

In one example embodiment, the data word may be a 72 bit data word (e.g., 64 bits of accessible SDRAM and 8 bits of ECC), the first portion (or "slice") may comprise 40 bits of the data word, and the second portion (or "slice") may comprise the remaining 32 bits of the data word. In certain embodiments, the buffer is included in the controller **62**. For example, in one embodiment, the buffer is a first-in, first-out

20

buffer implemented in the controller **62** which comprises an FPGA. The method **600** may generally be referred to as "slicing" the volatile memory during a backup operation. In the example embodiment, the process of "slicing" the volatile memory during a backup includes bringing the 32-bit slice out of self refresh, reading a 32-bit block from the slice into the buffer, and putting the 32-bit slice back into self-refresh. The 40-bit slice is then brought out of self-refresh and a 40-bit block from the slice is read into a buffer. Each block may comprise a portion of multiple words. For example, each 32-bit block may comprise 32-bit portions of multiple 72-bit words. In other embodiments, each block comprises a portion of a single word. The 40-bit slice is then put back into self-refresh in the example embodiment. The 32-bit and 40-bit slices are then combined into a 72-bit block by the controller **62** and ECC detection/correction is performed on each 72-bit word as it is read from the buffer and written into the non-volatile memory subsystem (e.g., flash).

In some embodiments, the entire data word may comprise more than two portions. For example, the entire data word may comprise three portions instead of two and transferring each data word further comprises storing a third portion of each data word in the buffer. In certain other embodiments, the data word may comprise more than three portions.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the non-volatile memory elements **40** write each backed-up data word to the controller **62** which writes a first portion of the data word to the volatile memory subsystem **30** and then a second portion of the data word to the volatile memory **30**. In certain embodiments, slicing the volatile memory subsystem **30** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **30** during a backup operation.

The method **600** can advantageously provide significant power savings and can lead to other advantages. For example, in one embodiment where the volatile memory subsystem **30** comprises DRAM elements, only the slice of the DRAM which is currently being accessed (e.g., written to the buffer) during a backup is configured in full-operational mode. The slice or slices that are not being accessed may be put in self-refresh mode. Because DRAM in self-refresh mode uses significantly less power than DRAM in full-operational mode, the method **600** can allow significant power savings. In certain embodiments, each slice of the DRAM includes a separate self-refresh enable (e.g., CKe) signal which allows each slice to be accessed independently.

In addition, the connection between the DRAM elements and the controller **62** may be as large as the largest slice instead of as large as the data bus. In the example embodiment, the connection between the controller **62** and the DRAM may be 40 bits instead of 72 bits. As a result, pins on the controller **62** may be used for other purposes or a smaller controller may be used due to the relatively low number of pin-outs used to connect to the volatile memory subsystem **30**. In certain other embodiments, the full width of the data bus is connected between the volatile memory subsystem **30** and the controller **62** but only a portion of it is used during slicing operations. For example, in some embodiments, memory slicing is an optional mode.

Various embodiments of the present invention have been described above. Although this invention has been described with reference to these specific embodiments, the descriptions are intended to be illustrative of the invention and are not intended to be limiting. Various modifications and applica-

US 8,301,833 B1

21

tions may occur to those skilled in the art without departing from the true spirit and scope of the invention as defined in the appended claims.

What is claimed is:

1. A method for controlling a memory system operatively coupled to a host system, the memory system including a volatile memory subsystem and a non-volatile memory subsystem, the method comprising:

operating the volatile memory subsystem at a first clock frequency when the memory system is in a first mode of operation in which data is communicated between the volatile memory subsystem and the host system;

operating the non-volatile memory subsystem at a second clock frequency when the memory system is in a second mode of operation in which data is communicated between the volatile memory subsystem and the non-volatile memory subsystem; and

operating the volatile memory subsystem at a third clock frequency when the memory system is in the second mode of operation, the third clock frequency being less than the first clock frequency.

2. The method of claim 1, wherein the third clock frequency is substantially equal to the second clock frequency.

3. The method of claim 1, wherein the memory system is not powered by a battery when it is in the second mode of operation.

4. The method of claim 1, wherein the memory system switches from the first mode of operation to the second mode of operation in response to a trigger condition.

5. The method of claim 4, wherein the trigger condition comprises a power failure condition.

6. The method of claim 1, wherein the memory system further comprises a printed circuit board and the volatile memory subsystem and the non-volatile memory subsystem are located on the printed circuit board.

7. The method of claim 1, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is intermediate data from a host computer system computation.

8. The method of claim 1, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is backup data from a backup operation.

9. The method of claim 8, wherein the backup operation is conducted at repeating time intervals.

10. The method of claim 9, wherein the backup operation is initiated in response to a trigger event.

11. The method of claim 1, wherein the second mode of operation comprises a backup operation in which data is communicated from the volatile memory subsystem to the non-volatile memory subsystem.

12. The method of claim 1, wherein the second mode of operation comprises a restore operation in which data is communicated from the non-volatile memory subsystem to the volatile memory subsystem.

13. The method of claim 1, wherein one or more of the first, second or third clock frequencies is configurable by the memory system.

14. The method of claim 1, wherein one or more of the first, second or third clock frequencies is configurable by a user.

15. A memory system operatively coupled to a host system, the memory system comprising:

a volatile memory subsystem operable at a first clock frequency when the memory system is in a first mode of

22

operation in which data is communicated between the volatile memory subsystem and the host system; and

a non-volatile memory subsystem operable at a second clock frequency when the memory system is in a second mode of operation in which data is communicated between the volatile memory subsystem and the non-volatile memory subsystem,

the volatile memory subsystem further being operable at a third clock frequency when the memory system is in the second mode of operation, the third clock frequency being less than the clock first frequency.

16. The memory system of claim 15, further comprising:

a controller configured to decouple the non-volatile memory subsystem from the volatile memory subsystem in the first mode of operation and to couple the non-volatile memory subsystem to the volatile memory subsystem in the second mode of operation.

17. The memory system of claim 15, further comprising a plurality of power supplies and a switch configured to selectively deliver power from the plurality of power supplies to the volatile memory subsystem and the non-volatile memory subsystem as a function of the mode of operation.

18. The memory system of claim 15, wherein the third clock frequency is substantially equal to the second clock frequency.

19. The memory system of claim 15, wherein the memory system is not powered by a battery when it is in the second mode of operation.

20. The memory system of claim 15, wherein the memory system switches from the first mode of operation to the second mode of operation in response to a trigger condition.

21. The memory system of claim 20, wherein the trigger condition comprises a power failure condition.

22. The memory system of claim 15, wherein the memory system further comprises a printed circuit board and the volatile memory subsystem and the non-volatile memory subsystem are located on the printed circuit board.

23. The memory system of claim 15, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is intermediate data from a host computer system computation.

24. The memory system of claim 15, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is backup data from a backup operation.

25. The memory system of claim 24, wherein the backup operation is conducted at repeating time intervals.

26. The memory system of claim 25, wherein the backup operation is initiated in response to a trigger event.

27. The memory system of claim 15, wherein the second mode of operation comprises a backup operation in which data is communicated from the volatile memory subsystem to the non-volatile memory subsystem.

28. The memory system of claim 15, wherein the second mode of operation comprises a restore operation in which data is communicated from the non-volatile memory subsystem to the volatile memory subsystem.

29. The memory system of claim 15, wherein one or more of the first, second or third clock frequencies is configurable by the memory system.

30. The memory system of claim 15, wherein one or more of the first, second or third clock frequencies is configurable by a user.

*    *    *    *    *

US011016918B2

(12) **United States Patent**
Chen et al.

(10) **Patent No.:    US 11,016,918 B2**
(45) **Date of Patent:         May 25, 2021**

(54) **FLASH-DRAM HYBRID MEMORY MODULE**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventors: **Chi-She Chen**, Walnut, CA (US);
**Jeffrey C. Solomon**, Irvine, CA (US);
**Scott H. Milton**, Irvine, CA (US);
**Jayesh Bhakta**, Cerritos, CA (US)

(73) Assignee: **Netlist, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/138,766**

(22) Filed: **Dec. 30, 2020**

(65) **Prior Publication Data**

US 2021/0124701 A1      Apr. 29, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 15/934,416, filed on Mar. 23, 2018, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*G06F 13/36*          (2006.01)
*G06F 13/28*          (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *G06F 13/28* (2013.01); *G06F 1/185* (2013.01); *G06F 3/0613* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. G06F 13/28; G06F 13/4027; G06F 13/1694; G06F 13/4223; G06F 12/0638;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,043,099 A | 6/1936 | Hanna | |
| 3,562,555 A | 2/1971 | Ahrons | |
| | (Continued) | | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 2737383 A2 | 6/2014 | |
| KR | 0130873 B1 | 4/1999 | |
| | (Continued) | | |

OTHER PUBLICATIONS

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-3, filed Mar. 17, 2015, 23 pages.
(Continued)

*Primary Examiner* — Hashem Farrokh
(74) *Attorney, Agent, or Firm* — Shami Messinger PLLC

(57)          **ABSTRACT**

In certain embodiments, a memory module includes a printed circuit board (PCB) having an interface that couples it to a host system for provision of power, data, address and control signals. First, second, and third buck converters receive a pre-regulated input voltage and produce first, second and third regulated voltages. A converter circuit reduces the pre-regulated input voltage to provide a fourth regulated voltage. Synchronous dynamic random access memory (SDRAM) devices are coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, and a voltage monitor circuit monitors an input voltage and produces a signal in response to the input voltage having a voltage amplitude that is greater than a threshold voltage.

**30 Claims, 22 Drawing Sheets**



US 11,016,918 B2

Page 2

### Related U.S. Application Data

No. 14/840,865, filed on Aug. 31, 2015, now Pat. No. 9,928,186, which is a continuation of application No. 14/489,269, filed on Sep. 17, 2014, now Pat. No. 9,158,684, which is a continuation of application No. 13/559,476, filed on Jul. 26, 2012, now Pat. No. 8,874,831, which is a continuation-in-part of application No. 12/240,916, filed on Sep. 29, 2008, now Pat. No. 8,301,833, which is a continuation of application No. 12/131,873, filed on Jun. 2, 2008, now abandoned.

(60) Provisional application No. 60/941,586, filed on Jun. 1, 2007, provisional application No. 61/512,871, filed on Jul. 28, 2011.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 12/02* | (2006.01) |
| *G06F 13/16* | (2006.01) |
| *G06F 1/18* | (2006.01) |
| *G06F 12/06* | (2006.01) |
| *G06F 13/42* | (2006.01) |
| *G11C 7/10* | (2006.01) |
| *G11C 14/00* | (2006.01) |
| *G06F 3/06* | (2006.01) |
| *G06F 13/40* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 3/0659* (2013.01); *G06F 3/0685* (2013.01); *G06F 12/0246* (2013.01); *G06F 12/0638* (2013.01); *G06F 13/1694* (2013.01); *G06F 13/4027* (2013.01); *G06F 13/4243* (2013.01); *G11C 7/1072* (2013.01); *G11C 14/0018* (2013.01); *G06F 2212/205* (2013.01); *G06F 2212/7208* (2013.01)

(58) **Field of Classification Search**
CPC .... G06F 12/0246; G06F 1/185; G06F 3/0613; G06F 3/0685; G06F 3/0659; G06F 2212/7208; G06F 2212/205; G11C 7/1072; G11C 14/0018
USPC .......................... 711/103, 104, 105; 710/138
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,916,390 A | 10/1975 | Chang et al. |
|---|---|---|
| 4,234,920 A | 11/1980 | Ness et al. |
| 4,420,821 A | 12/1983 | Hoffman |
| 4,449,205 A | 5/1984 | Hoffman |
| 4,607,332 A | 8/1986 | Goldberg |
| 4,658,204 A | 4/1987 | Goodwin |
| 4,882,709 A | 11/1989 | Wyland |
| 4,884,242 A | 11/1989 | Lacy et al. |
| 4,965,828 A | 10/1990 | Ergott, Jr. et al. |
| 5,430,742 A | 7/1995 | Jeddeloh et al. |
| 5,444,664 A | 8/1995 | Kuroda et al. |
| 5,490,155 A | 2/1996 | Abdoo et al. |
| 5,519,663 A | 5/1996 | Harper, Jr. et al. |
| 5,519,831 A | 5/1996 | Holzhammer |
| 5,563,839 A | 10/1996 | Herdt et al. |
| 5,577,213 A | 11/1996 | Avery et al. |
| 5,619,644 A | 4/1997 | Crockett et al. |
| 5,630,096 A | 5/1997 | Zuravleff et al. |
| 5,675,725 A | 10/1997 | Malcolm |
| 5,757,712 A | 5/1998 | Nagel et al. |
| 5,799,200 A | 8/1998 | Brant et al. |
| 5,813,029 A | 9/1998 | Klein |
| 5,870,350 A | 2/1999 | Bertin et al. |
| 5,874,995 A | 2/1999 | Naimpally et al. |
| 5,890,192 A | 3/1999 | Lee et al. |
| 5,953,215 A | 9/1999 | Karabatsos |
| 5,991,885 A | 11/1999 | Chang et al. |
| 6,023,421 A | 2/2000 | Iadanza et al. |
| 6,026,465 A | 2/2000 | Mills et al. |
| 6,065,092 A | 5/2000 | Roy |
| 6,112,310 A | 8/2000 | Jun et al. |
| 6,145,068 A | 11/2000 | Lewis |
| 6,158,015 A | 12/2000 | Klein |
| 6,199,142 B1 | 3/2001 | Saulsbury et al. |
| 6,216,247 B1 | 4/2001 | Creta et al. |
| 6,269,382 B1 | 7/2001 | Cabrera et al. |
| 6,336,174 B1 | 1/2002 | Li et al. |
| 6,336,176 B1 | 1/2002 | Leyda et al. |
| 6,363,450 B1 | 3/2002 | Lash et al. |
| 6,421,279 B1 | 7/2002 | Tobita et al. |
| 6,459,647 B1 | 10/2002 | Kengeri |
| 6,487,102 B1 | 11/2002 | Halbert et al. |
| 6,487,623 B1 | 11/2002 | Emerson et al. |
| 6,571,244 B1 | 5/2003 | Larson |
| 6,614,685 B2 | 9/2003 | Wong |
| 6,658,507 B1 | 12/2003 | Chan |
| 6,691,209 B1 | 2/2004 | O'connell |
| 6,693,840 B2 | 2/2004 | Shimada et al. |
| 6,721,212 B2 | 4/2004 | Sasaki |
| 6,721,860 B2 | 4/2004 | Klein |
| 6,769,081 B1 | 7/2004 | Parulkar |
| 6,799,241 B2 | 9/2004 | Kahn et al. |
| 6,799,244 B2 | 9/2004 | Tanaka et al. |
| 6,810,513 B1 | 10/2004 | Vest |
| 6,816,982 B2 | 11/2004 | Ravid |
| 6,839,774 B1 | 1/2005 | Ahn et al. |
| 6,910,635 B1 | 6/2005 | Miks et al. |
| 6,944,042 B2 | 9/2005 | Komatsuzaki |
| 6,948,029 B2 | 9/2005 | Yano |
| 6,952,368 B2 | 10/2005 | Miura et al. |
| 7,053,470 B1 | 5/2006 | Sellers et al. |
| 7,062,618 B2 | 6/2006 | Tsunoda et al. |
| 7,089,412 B2 | 8/2006 | Chen |
| 7,102,391 B1 | 9/2006 | Sun et al. |
| 7,107,480 B1 | 9/2006 | Moshayedi et al. |
| 7,111,142 B2 | 9/2006 | Spencer et al. |
| 7,136,978 B2 | 11/2006 | Miura et al. |
| 7,155,627 B2 | 12/2006 | Matsui |
| 7,200,021 B2 | 4/2007 | Raghuram |
| 7,234,099 B2 | 6/2007 | Gower et al. |
| 7,353,325 B2 | 4/2008 | Lofgren et al. |
| 7,409,491 B2 | 8/2008 | Doblar et al. |
| 7,409,590 B2 | 8/2008 | Moshayedi et al. |
| 7,411,859 B2 | 8/2008 | Sohn et al. |
| 7,421,552 B2 | 9/2008 | Long |
| 7,467,251 B2 | 12/2008 | Park et al. |
| 7,519,754 B2 | 4/2009 | Wang et al. |
| 7,600,142 B2 | 10/2009 | Ichikawa |
| 7,613,877 B2 | 11/2009 | Shimozono et al. |
| 7,716,411 B2 | 5/2010 | Panabaker et al. |
| 7,818,488 B2 | 10/2010 | Park et al. |
| 7,873,750 B2 | 1/2011 | Yabuta et al. |
| 7,881,150 B2 | 2/2011 | Solomon et al. |
| 7,952,179 B2 | 5/2011 | Chiu et al. |
| 8,001,434 B1 | 8/2011 | Lee et al. |
| 8,081,536 B1 | 12/2011 | Solomon et al. |
| 8,086,955 B2 | 12/2011 | Zhou et al. |
| 8,102,614 B2 | 1/2012 | Song et al. |
| 8,214,616 B2 | 7/2012 | Ware et al. |
| 8,233,303 B2 | 7/2012 | Best et al. |
| 8,301,833 B1 | 10/2012 | Chen et al. |
| 8,407,395 B2 | 3/2013 | Kim et al. |
| 8,412,879 B2 | 4/2013 | Chang et al. |
| 8,516,187 B2 | 8/2013 | Chen et al. |
| 8,671,243 B2 | 3/2014 | Chen et al. |
| 8,677,060 B2 | 3/2014 | Chen et al. |
| 8,874,831 B2 | 10/2014 | Lee et al. |
| 8,880,791 B2 | 11/2014 | Chen et al. |
| 8,904,098 B2 | 12/2014 | Amidi et al. |
| 8,904,099 B2 | 12/2014 | Chen et al. |
| 9,043,677 B2 | 5/2015 | Kong et al. |
| 9,158,684 B2 | 10/2015 | Lee et al. |
| 9,361,250 B2 | 6/2016 | Shan et al. |

US 11,016,918 B2

Page 3

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,436,600 | B2 | 9/2016 | Lee |
| 9,921,762 | B2 | 3/2018 | Amidi et al. |
| 9,928,186 | B2 | 3/2018 | Lee et al. |
| 2002/0053944 | A1 | 5/2002 | Brass et al. |
| 2002/0083368 | A1 | 6/2002 | Abe et al. |
| 2002/0199061 | A1 | 12/2002 | Friedman et al. |
| 2003/0028733 | A1 | 2/2003 | Tsunoda et al. |
| 2003/0076726 | A1 | 4/2003 | Cowles et al. |
| 2003/0137881 | A1 | 7/2003 | Sasaki |
| 2003/0147297 | A1 | 8/2003 | Shiota et al. |
| 2003/0158995 | A1 | 8/2003 | Lee et al. |
| 2003/0204776 | A1 | 10/2003 | Testin |
| 2003/0206478 | A1 | 11/2003 | Ayukawa et al. |
| 2003/0210601 | A1 | 11/2003 | Lin et al. |
| 2004/0088508 | A1 | 5/2004 | Ballard et al. |
| 2004/0163027 | A1 | 8/2004 | MacLaren et al. |
| 2004/0190210 | A1 | 9/2004 | Leete |
| 2005/0044302 | A1 | 2/2005 | Pauley et al. |
| 2005/0060488 | A1 | 3/2005 | Poechmueller |
| 2005/0132250 | A1 | 6/2005 | Hansen et al. |
| 2005/0141273 | A1 | 6/2005 | Park et al. |
| 2005/0144418 | A1 | 6/2005 | Kita |
| 2005/0183472 | A1 | 8/2005 | Choi |
| 2005/0204091 | A1 | 9/2005 | Kilbuck et al. |
| 2005/0249011 | A1 | 11/2005 | Maeda |
| 2005/0273548 | A1 | 12/2005 | Roohparvar |
| 2006/0039197 | A1 | 2/2006 | Khouri et al. |
| 2006/0069896 | A1 | 3/2006 | Sanders |
| 2006/0080515 | A1 | 4/2006 | Spiers et al. |
| 2006/0126369 | A1 | 6/2006 | Raghuram |
| 2006/0212651 | A1 | 9/2006 | Ashmore |
| 2006/0294295 | A1 | 12/2006 | Fukuzo |
| 2007/0070669 | A1 | 3/2007 | Tsern |
| 2007/0136523 | A1* | 6/2007 | Bonella ................. G06F 9/4401 |
| | | | 711/113 |
| 2007/0147115 | A1 | 6/2007 | Lin et al. |
| 2007/0192627 | A1 | 8/2007 | Oshikiri |
| 2007/0255898 | A1 | 11/2007 | Nishide et al. |
| 2007/0276995 | A1 | 11/2007 | Caulkins et al. |
| 2007/0288683 | A1 | 12/2007 | Panabaker et al. |
| 2008/0104344 | A1 | 5/2008 | Shimozono et al. |
| 2008/0126624 | A1* | 5/2008 | Prete ...................... G11C 7/106 |
| | | | 710/53 |
| 2008/0126690 | A1 | 5/2008 | Rajan et al. |
| 2008/0147968 | A1 | 6/2008 | Lee et al. |
| 2008/0189479 | A1 | 8/2008 | Cope et al. |
| 2008/0195806 | A1 | 8/2008 | Cope |
| 2008/0235443 | A1 | 9/2008 | Chow et al. |
| 2008/0291727 | A1 | 11/2008 | Seo et al. |
| 2009/0031099 | A1 | 1/2009 | Sartore |
| 2009/0235038 | A1 | 9/2009 | Sartore |
| 2010/0110748 | A1 | 5/2010 | Best |
| 2010/0122200 | A1 | 5/2010 | Merry, Jr. et al. |
| 2010/0274953 | A1 | 10/2010 | Lee et al. |
| 2010/0322020 | A1 | 12/2010 | Kim |
| 2011/0078496 | A1 | 3/2011 | Jeddeloh |
| 2011/0161569 | A1 | 6/2011 | Shan et al. |
| 2011/0320804 | A1 | 12/2011 | Chan et al. |
| 2012/0110417 | A1 | 5/2012 | Abreu et al. |
| 2012/0117402 | A1 | 5/2012 | Machnicki et al. |
| 2012/0204079 | A1 | 8/2012 | Takefman et al. |
| 2012/0265952 | A1 | 10/2012 | Kurita |
| 2012/0271990 | A1* | 10/2012 | Chen ........................ G06F 12/00 |
| | | | 711/103 |
| 2012/0317433 | A1 | 12/2012 | Ellis et al. |
| 2013/0019076 | A1 | 1/2013 | Amidi et al. |
| 2013/0086309 | A1 | 4/2013 | Lee et al. |
| 2013/0254456 | A1 | 9/2013 | Chen et al. |
| 2013/0254497 | A1 | 9/2013 | Chen et al. |
| 2014/0032820 | A1 | 1/2014 | Harasawa et al. |
| 2014/0059170 | A1 | 2/2014 | Gasparakis et al. |
| 2014/0156919 | A1 | 6/2014 | Chen et al. |
| 2014/0156920 | A1 | 6/2014 | Chen et al. |
| 2015/0058701 | A1 | 2/2015 | Xing et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| KR | 100606242 | B1 | 7/2006 |
| WO | 2013016723 | A2 | 1/2013 |

OTHER PUBLICATIONS

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-4, filed Mar. 17, 2015, 20 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-5, filed Mar. 17, 2015, 28 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-9, filed Mar. 17, 2015,17 pages.

Exhibit, Institution of Inter Partes Review, *Sandisk Corporation* v. *Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 316-9, filed Mar. 24, 2015, 29 pages.

Exhibit, Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 309-1, filed Mar. 17, 2015, 22 pages.

JEDEC Standard, Double Data Rate (DDR) SDRAM Specification, JESD79, Jun. 2000, 77 pages.

Exhibit, Letter sent via email on Dec. 6, 2013, Case 4:13-cv-03901-YGR Document 53-2, filed Jan. 6, 2014.

Exhibit, Order Denying Defendant's Motion to Stay Pending Inter Partes Review (Doc.59), *The Procter and Gamble Company* v. *Team Technologies, Inc, et al.*, Case 4:13-cv-05889-YGR Document 316-6, filed Mar. 24, 2015, 10 pages.

Exhibit, Patent Public Advisory Committee Quarterly Meeting, Appeals Statistics USPTO, Case No. 4:13-cv-05889-YGR Document 309-8, filed Mar. 17, 2015, 23 pages.

Exhibit, Reporter's Transcript of Proceedings, *Netlist, Inc* v. *Smart Modular Technologies, Inc., et al.*, Case 4:13-cv-05889-YGR Document 316-3, filed Mar. 24, 2015, 15 pages.

Exhibit, Transcript of Official Electronic Sound Recording Proceeding, *Netlist* v. *Smart Modular Technologies, Inc, et al.*, Case 4:13-cv-05889-YGR Document 305-7, filed Mar. 10, 2015, 10 pages.

File History for U.S. Appl. No. 12/240,916, filed Sep. 29, 2008, 320 pages.

File History for U.S. Appl. No. 13/905,048, filed May 29, 2013, 181 pages.

File History for U.S. Appl. No. 60/941,586, filed Jun. 1, 2007, 23 pages.

File History U.S. Pat. No. 8,671,243.

Final Office Action, dated Jun. 15, 2016, issued in U.S. Appl. No. 14/489,281, 10 pages.

Final Office Action, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-0099-1007 (PTAB), dated Feb. 1, 2012, 13 pages.

Final Written Decision, U.S. Pat. No. 8,671,243, IPR2017-00587-34, Paper No. 34, entered Jun. 20, 2018, 53 pages.

Final Written Decision, U.S. Pat. No. 8,874,831, IPR2017-00692, Paper No. 25, entered Jul. 5, 2018, 42 pages.

Final Written Decision, U.S. Pat. No. 7,881,150, Case No. Case IPR2014-00882, (PTAB), Paper 33, filed Dec. 14, 2015, 51 pages.

Hasan, J. et al. Efficient Use of Memory Bandwidth to Improve Network Processor Throughput, Proceedings of the 30th Annual International Symposium on Computer Architecture (ISCA'03), IEEE, 2003, 12 pages.

Inter Partes Review No. IPR2017-00692 (PTAB), U.S. Pat. No. 8,874,831, filed Jul. 26, 2012, 78 pages.

Inter Partes Review of U.S. Pat. No. 8,874,831, Case IPR2017-00692 (PTAB), filed Jul. 26, 2012, Paper No. 1, 78 pages.

International Preliminary Report on Patentabillity in PCT/US12/48750, dated Apr. 3, 2014pp. 1-8.

International Search Report and Written Opinion in PCT/US12/48750, dated Oct. 10, 2012pp. 1-10.

ISSCC 2006 / Session 7 / Non-Volatile Memory / 7.7, IEEE International Solid-State Circuits Conference, 2006, 10 pages.

US 11,016,918 B2

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

Jacob, B., "Memory Systems Cache, DRAM, Disk", Morgan Kaufman Publishers, Burlington, MA, 2008, Preface and Ch. 7 pp. 315-322, 58 pages.

Jandhyala, S. et al., "Design-For-Test Analysis of a Buffered SDRAM DIMM", Semiconductor Group, Texas Instruments, Proceedings of International Workshop in Memory Technology, Design and Testing, Singapore, 13014, Aug. 1996,15 pages.

JEDEC Definition of DIMM, Exhibit 1029, IPR No. 2017-00587, Dec. 18, 2017, 2 pages.

JEDEC Global Standard for the Microelectronics Industry, Why JEDEC Standards Matter, 2014, 1 page.

JEDEC Standard No. 21-C (Release 17), Annex J: Serial Presence Detects for DDR2 SDRAM (Revision 1.3), 60 pages.

Petition for Inter Partes Review of U.S. Pat. No. 8,516,187 (on behalf of SMART Modular Technologies, Inc.), filed Aug. 22, 2014.

Petition for Inter Partes Review of U.S. Pat. No. 8,671,243, filed May 29, 2013.

Petition for Inter Partes Review of U.S. Pat. No. 8,874,831, filed Jul. 26, 2012.

Petition for Inter Partes Review of U.S. Pat. No. 8,301,833 (on behalf of SMART Modular Technologies, Inc.), filed Aug. 22, 2014.

U.S. Appl. No. 60/912,321, Case No. No. IPR2017-00692-1007 (PTAB), filed Apr. 17, 2017, 42 pages.

Petition for Inter Partes Review of U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), dated Jun. 19, 2014, 67 pages.

Petition for Inter Partes Review of U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-1(PTAB), May 29, 2013, 82 pages.

Petition for Inter Partes Review, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), filed Jun. 20, 2014, 69 pages.

Webster's II New College Dictionary, Houghton Mifflin Company, Boston, MA, 2001, pp. 259, 1115.

Videotaped Deposition of Russel Jacob Baker, U.S. Pat. No. 8,671,243, Case Nos. IPR2017-00587-1030 (PTAB), filed Dec. 18, 2017, 268 pages.

Petitioners Demonstratives, *SK hynix Inc., et al.,* v. *Netlist, Inc.,* U.S. Pat. No. 8,671,243, IPR2017-00587-1037, 89 pages.

Petitioners' Reply in Support of its Motion to Exclude, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692, filed Apr. 9, 2018, 8 pages.

Petitioners' Reply to Patent Owner's Response, Inter Partes Review No. IPR2017-00587-16, U.S. Pat. No. 8,671,243, filed Jan. 12, 2018, 38 pages.

Petitioners' Reply, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), Paper No. 15, filed Mar. 2, 2018, 35 pages.

Petitioners' Request for Hearing, U.S. Pat. No. 8,301,833, Case No. Case No. IPR2017-00649-2020 (PTAB), Paper No. 8, entered Aug. 23, 2017, 18 pages.

Prosecution History, U.S. Appl. No. 12/240,916, U.S. Pat. No. 8,301,833, *SK hynix Inc* v *Netlist Inc,* Case No. IPR2017-00649-1002 (PTAB), 320 pages.

Prosecution History, U.S. Appl. No. 13/559,476, U.S. Pat. No. 8,301,833, *SK hynix Inc* v *Netlist Inc,* Case No. IPR2017-00649-1002 (PTAB), 312 pages.

Prosecution History, U.S. Appl. No. 60/941,586, *SK hynix Inc* v *Netlist Inc,* Case No. IPR2017-00649-1005 (PTAB), 23 pages.

Provisional Application for Advance Dynamic Disk Memory Module, Specification, *SK hynix Inc.,* V. *Netlist, Inc.,* Case No. IPR2017-00649-1006 (PTAB), dated Dec. 8, 2005, 53 pages.

U.S. Appl. No. 60/912,321, filed Apr. 17, 2007.

U.S. Appl. No. 60/941,586, filed Jun. 1, 2007.

Requirement for Restriction Election, *SanDisk Corporation* v. *Netlist, Inc.,* U.S. Pat. No. 8,301,833, IPR2014-00994-1003 (PTAB), dated Mar. 31, 2019, 7 pages.

Restriction Requirement in U.S. Appl. No. 12/240,916, dated Mar. 31, 2011.

Search Report (Updated) Prior Art Search for U.S. Pat. No. 8,301,833, Global Patent Solutions, Nov. 24, 2020, 179 pages.

Search Report Prior Art Search for U.S. Pat. No. 8,301,833, Global Patent Solutions, Nov. 2, 2020, 38 pages.

Second Amended Answer and Counterclaims to Plaintiff's Complaint for Declaratory Judgment, *Diablo Technologies, Inc.* v. *Netlist, Inc.,* Case No. 4:13-CV-03901 (NDCA), YGR, filed Feb. 17, 2014, 21 pages.

Supplemental Declaration of Ronald H. Spuhler, *Netlist* v. *Smart Storage Systems, Inc. et. al.,* Case 4:13-cv-05889-YGR Document 305-1, filed Mar. 10, 2015, 2 pages.

U.S. Office Action in U.S. Appl. No. 13/536,173, dated Apr. 15, 2013, pp. 1-10.

U.S. Appl. No. 12/240,916, Case No. IPR2017-00692-2018 (PTAB), dated Sep. 29, 2008, 52 pages.

Third Amended Complaint for Patent Infringement, *Netlist* v. *Smart Storage Systems, Inc. et. al.,* Case 4:13-CV-05889-YGR (NDCA), filed Oct. 7, 2014, 21 pages.

Drawing by R. Jacob Bake regarding Address of DRAM and Flash, U.S. Pat. No. 8,671,243, Case IPR2017-00587-1023 (PTAB), filed Dec. 18, 2017, 1 page.

Advisory Action in U.S. Appl. No. 12/240,916, dated Mar. 13, 2012.

Amendment and Reply to Office Action, *SanDisk Corporation* v. *Netlist,* U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated May 21, 2013, 24 pages.

Amendment and Response to Election Restriction, *SanDisk Corporation* v. *Netlist, Inc.,* U.S. Pat. No. 8,301,833, IPR2014-00994-1004 (PTAB), dated May 20, 2011, 9 pages.

American Heritage Dictionary of the English Language, Third Ed., Houghton Mifflin Company, Boston, MA, 1996, 7 pages.

Appeals from the USPTO, PTAB in Nos. IPR2014-00882, IPR2014-00883, IPR2014-01011, US Court of Appeals for the Federal Circuit, decided Jul. 25, 2017, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1024, IPR No. 2017-00587-1024(PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1033, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1034, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1035, IPR No. 2017-00587-1035 (PTAB), 2003, 8 pages.

Corrected Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, Declaration of Michael F. Heafey, IPR2014-01370 (PTAB), filed Sep. 22, 2014, 4 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Sep. 22, 2014, 67 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, Declaration of Dr. Nader Bagherzadeh, IPR2014-01371 (PTAB), filed Sep. 22, 2014, 306 pages.

Decision Denying Institution of Inter Partes Review, U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Paper 12, entered Mar. 13, 2015, 22 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist, Inc.,* U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Dec. 16, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist,* U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), Paper 9, dated Dec. 22, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *Smart Modular Tech* v *Netlist Inc.,* U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), Paper 13, entered Mar. 13, 2015, 19 pages.

Decision Instituting Inter Partes Review, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-7(PTAB), Paper No. 7, entered Jun. 22, 2017, 40 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,874,831, Case IPR2017-00692-2016 (PTAB), filed Nov. 10, 2017, 72 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,671,243, Case IPR2017-00587-2016 (PTAB), filed Oct. 13, 2019, 109 pages.

Declaration of Jeff McMullen, *Netlist, Inc.* v. *Diablo Technologies, Inc.,* Case No. 4: I 3-CV-05889-YGR (NDCA), Document 362-1, filed Sep. 5, 2018, 3 pages.

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,301,833, IPR2014-00994-1020 (PTAB), filed Sep. 29, 2008, 215 pages.

**US 11,016,918 B2**

Page 5

(56)        **References Cited**

OTHER PUBLICATIONS

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,516,187, IPR2014-00982-1013 (PTAB), filed Jun. 28, 2012, pp. 240.
Declaration of Ron Maltiel, U.S. Pat. No. 8,671,243, No. IPR2017-00587-1003 (PTAB), filed May 29, 2013, 131 pages.
Declaration of Ron Maltiel, U.S. Pat. No. 8,874,831, No. IPR2017-00692-1003 (PTAB), filed Jul. 26, 2012 29, 172 pages.
Declaration of Steven J. Corr, *Netlist, Inc.* v. *SMART Storage Systems, Inc., et al.*, Case 4:13-cv-05889-YGR (NDCA), Document 305-8, filed Mar. 10, 2015, 3 pages.
Deposition of Baker, Exhibit 1030, p. 78, U.S. Pat. No. 8,671,243, *SK hynix Inc., et al.* v. *Netlist, Inc.*, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 268 pages.
Deposition of Ron Maltiel, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-2010 (PTAB), dated Sep. 27, 2017, 155 pages.
Joint Status Report Regarding Inter Partes Review, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case No. 4:13-CV-05889-YGR (NDCA), filed Aug. 17, 2018, 4 pages.
Material Science & Engineering, Department of Material Science and Engineering, Stanford University, Exhibit 2011, Case No. IPR2017-00692, 2 pages.
Merriam-Webster's Collegiate Dictionary, Eleventh Ed., Merriam Webster Corporation, Springfield, MA, 2003, 7 pages.
Microsoft Computer Dictionary Fifth Edition, 2002, 3 pages.
Microsoft Computer Dictionary Fifth Edition, 2002, 9 pages.
Microsoft Press, Computer Dictionary, Second Edition, 1994, 4 pages.
Microsoft Windows 2000 Professional Resource Kit, 76 pages.
Notice of Allowance in U.S. Appl. No. 12/240,916, dated Sep. 17, 2012.
Notice of Allowance in U.S. Appl. No. 13/536,173, dated Jul. 2, 2013.
Notice of Allowance in U.S. Appl. No. 13/559,476, dated May 6, 2014.
Notice of Allowance in U.S. Appl. No. 13/559,476, dated Sep. 29, 2014.
Notice of Allowance in U.S. Appl. No. 13/905,048, dated Dec. 19, 2013, 8 pages.
Notice of Allowance in U.S. Appl. No. 13/905,053, dated Dec. 11, 2013.
Notice of Allowance in U.S. Appl. No. 14/173,219 dated Jul. 7, 2014.
Notice of Allowance in U.S. Appl. No. 14/489,269, dated Oct. 8, 2015.
Notice of Allowance, *SanDisk Corporation* v. *Netlist*, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Jul. 2, 2013, 8 pages.
Office Action in U.S. Appl. No. 12/240,916, dated Apr. 3, 2012.
Office Action in U.S. Appl. No. 13/536,176, dated Apr. 15, 2013.
Office Action in U.S. Appl. No. 13/625,563, dated Aug. 5, 2013.
Office Action in U.S. Appl. No. 13/625,563, dated May 9, 2014.

Office Action in U.S. Appl. No. 13/905,048, dated Aug. 1, 2013.
Office Action in U.S. Appl. No. 13/905,053, dated Aug. 1, 2013.
Office Action in U.S. Appl. No. 14/173,219, dated Mar. 13, 2014.
Office Action in U.S. Appl. No. 14/302,292, dated Dec. 21, 2015.
Office Action in U.S. Appl. No. 12/240,916, dated Feb. 1, 2012, 14 pages.
Office Action in U.S. Appl. No. 14/173,242, dated Mar. 14, 2014, 7 pages.
Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1005 (PTAB), dated Jul. 29, 2011, 8 pages.
Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1010 (PTAB), dated Apr. 3, 2012, 11 pages.
Office Action, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Apr. 15, 2013, 9 pages.
Patent Owner's Demonstratives, U.S. Pat. No. 8,671,243, Case No. IPR 2017-00587-2023, (PTAB), 57 pages.
Patent Owner's Listing of New Arguments and Evidence in Petitioners' Reply, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587 (PTAB), filed Jan. 29, 2018, 6 pages.
Patent Owner's Opposition to Petitioners' Motion to Exclude, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed Apr. 2, 2018, 2017, 11 pages.
Patent Owner's Preliminary Response, U.S. Pat. No. 8,516,187, Case IPR2014-01371 (PTAB), filed Dec. 16, 2014, 66 pages.
Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Oct. 2, 2014, 60 pages.
Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist*, U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), dated Sep. 26, 2014, 57 pages.
Patent Owner's Preliminary Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,301,833, Case No. IPR2017-00649 (PTAB), filed May 1, 2017, 67 pages.
Patent Owner's Preliminary Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed May 1, 2017, 48 pages.
Patent Owner's Preliminary Response, *Smart Modular Tech* v *Netlist Inc.*, U.S. Pat. No. 8,301,833, Case IPR2014-01370 (PTAB), filed Dec. 16, 2014, 66 pages.
Patent Owner's Response, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-12 (PTAB), filed Oct. 13, 2017, 80 pages.
Patent Owner's Response, *SK hynix Inc., et al.*, v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-12 (PTAB), filed Nov. 10, 2017, 77 pages.
Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), filed Aug. 22, 2014, 68 pages.
Petition for Inter Partes Review of U.S. Pat. No. 8,301,833 (on behalf of SanDisk, Corp.), filed Jun. 20, 2014.
Petition for Inter Partes Review of U.S. Pat. No. 8,301,833, filed Sep. 29, 2008.
Petition for Inter Partes Review of U.S. Pat. No. 8,516,187 (on behalf of SanDisk, Corp.), filed Jun. 19, 2014.

* cited by examiner



## FIG. 1
## (PRIOR ART)



## FIG. 3A

Spansion EcoRAM Configurations

256GB Spansion EcoRAM Solution — Single Accelerator



256GB Single Accelerator Spansion EcoRAM Solution

256GB Spansion EcoRAM Solution — Dual Accelerator



256GB Single Accelerator Spansion EcoRAM Solution

# FIG. 2
# (PRIOR ART)



# FIG. 4B



**FIG. 3B**

**FIG. 4A**



**FIG. 5A**



**FIG. 6**



*FIG. 5B*



**FIG. 7**



**FIG. 8A**

Appx0073



FIG. 8B



**FIG. 9**



*Mapping MCH DDR DIMM page address to Flash memory*



## FIG. 10

| DRAM density (GB) | # of blocks per bank | Flash wr−time to rd−time ratio | Avg block use time (sec) | Flash write time (sec) | Max allowed Closed Blk in queue to be written back to Flash |
|---|---|---|---|---|---|
| 1 | 250 | 55 | 1.00E−03 | 2.00E−02 | 0 |
| 1 | 250 | 55 | 1.00E−02 | 2.00E−02 | 2 |
| 1 | 250 | 55 | 2.00E−02 | 2.00E−02 | 5 |
| 1 | 250 | 55 | 5.00E−02 | 2.00E−02 | 11 |
| 2 | 500 | 55 | 1.00E−03 | 2.00E−02 | 0 |
| 2 | 500 | 55 | 1.00E−02 | 2.00E−02 | 5 |
| 2 | 500 | 55 | 2.00E−02 | 2.00E−02 | 9 |
| 2 | 500 | 55 | 5.00E−02 | 2.00E−02 | 23 |
| 4 | 1000 | 55 | 1.00E−03 | 2.00E−02 | 1 |
| 4 | 1000 | 55 | 1.00E−02 | 2.00E−02 | 9 |
| 4 | 1000 | 55 | 2.00E−02 | 2.00E−02 | 18 |
| 4 | 1000 | 55 | 5.00E−02 | 2.00E−02 | 45 |

*FIG. 11*

Case: 24-2281 Document: 23 Page: 138 Filed: 01/28/2025



FIG. 12

Appx0078

Case: 24-2281    Document: 23    Page: 139    Filed: 01/28/2025



FIG. 13

Case: 24-2281        Document: 23        Page: 140        Filed: 01/28/2025



*FIG. 14*

Appx0080

Case: 24-2281 Document: 23 Page: 141 Filed: 01/28/2025



FIG. 15A

FIG. 15B



*FIG. 15C*

Appx0082

Case: 24-2281    Document: 23    Page: 143    Filed: 01/28/2025



*FIG. 16*

Case: 24-2281    Document: 23    Page: 144    Filed: 01/28/2025



FIG. 17

1200

1210 Provide first voltage from input power supply and second voltage from first power subsystem

1220 Second condition detected?

No

Yes

1230 Provide first voltage and second voltage from first power subsystem

1240 Charge second power subsystem

No

1250 Third condition detected?

Yes

1260 Provide first voltage and second voltage from second power subsystem

Case: 24-2281    Document: 23    Page: 145    Filed: 01/28/2025



FIG. 18

Case: 24-2281    Document: 23    Page: 146    Filed: 01/28/2025



*FIG. 19*

Case: 24-2281 Document: 23 Page: 147 Filed: 01/28/2025



FIG. 20

Case: 24-2281     Document: 23     Page: 148     Filed: 01/28/2025



FIG. 21

Case: 24-2281 Document: 23 Page: 149 Filed: 01/28/2025



*1600*

*1610*

Communicate data words between volatile memory and host system in first mode

*1620*

Transfer data words from volatile memory system to non-volatile memory system

*1622*

Store first slice of data word in buffer

*1624*

Store second slice of data word in buffer

*1626*

Write entire data word from buffer to non-volatile memory

*FIG. 22*

Appx0089

US 11,016,918 B2

# 1
## FLASH-DRAM HYBRID MEMORY MODULE

### PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 15/934,416, filed Mar. 23, 2018, titled "Flash-Dram Hybrid Memory Module," which is a continuation of U.S. patent application Ser. No. 14/840,865, filed Aug. 31, 2015, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,928,186, which is a continuation of U.S. patent application Ser. No. 14/489,269, filed Sep. 17, 2014, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,158,684, which is a continuation of U.S. patent application Ser. No. 13/559,476, filed Jul. 26, 2012, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 8,874,831, which claims the benefit of U.S. Provisional Patent Application No. 61/512,871, filed Jul. 28, 2011, and is a continuation-in-part of U.S. patent application Ser. No. 12/240,916, filed Sep. 29, 2008, titled "Non-Volatile Memory Module," now U.S. Pat. No. 8,301,833, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, which claims the benefit of U.S. Provisional Patent Application No. 60/941,586, filed Jun. 1, 2007, the contents of all of which are incorporated herein by reference in their entirety.

This application may be considered related to U.S. patent application Ser. No. 14/173,242, titled "Isolation Switching For Backup Of Registered Memory," filed Feb. 5, 2014, which is a continuation of U.S. patent application Ser. No. 13/905,053, titled "Isolation Switching For Backup Of Registered Memory," filed May 29, 2013, now U.S. Pat. No. 8,677,060, issued Mar. 18, 2014, which is a continuation of U.S. patent application Ser. No. 13/536,173, titled "Data Transfer Scheme For Non-Volatile Memory Module," filed Jun. 28, 2012, now U.S. Pat. No. 8,516,187, issued Aug. 20, 2013, which is a divisional of U.S. patent application Ser. No. 12/240,916, titled "Non-Volatile Memory Module," filed Sep. 29, 2008, now U.S. Pat. No. 8,301,833, issued Oct. 30, 2012, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, now abandoned, which claims the benefit of U.S. Provisional Application No. 60/941,586, filed Jun. 1, 2007, the contents of which are incorporated by reference herein in their entirety.

This application may also be considered related to U.S. patent application Ser. No. 15/000,834, filed Jan. 19, 2016, which is a continuation of U.S. patent application Ser. No. 14/489,332, filed Sep. 17, 2014, now U.S. Pat. No. 9,269,437, which is a continuation of U.S. patent application Ser. No. 14/173,219, filed Feb. 5, 2014, now U.S. Pat. No. 8,904,099, which is a continuation of U.S. patent application Ser. No. 13/905,048, filed May 29, 2013, now U.S. Pat. No. 6,671,243, which is a continuation U.S. patent application Ser. No. 13/536,173 above.

This application may also be considered related to U.S. patent application Ser. No. 15/924,866, which is a continuation of U.S. patent application Ser. No. 14/489,281, filed Sep. 17, 2014, now U.S. Pat. No. 9,921,762, which is a continuation of U.S. patent application Ser. No. 13/625,563, filed Sep. 24, 2012, now U.S. Pat. No. 8,904,098, which claims the benefit of U.S. Provisional Application No. 61/583,775, filed Sep. 23, 2011.

### TECHNICAL FIELD

The present disclosure relates generally to computer memory devices, and more particularly, to devices that

# 2

employ different types of memory devices such as combinations of Flash and random access memories.

### BACKGROUND

As technology advances and the usage of portable computing devices, such as tablet notebook computers, increases, more data needs to be transferred among data centers and to/from end users. In many cases, data centers are built by clustering multiple servers that are networked to increase performance.

Although there are many types of networked servers that are specific to the types applications envisioned, the basic concept is generally to increase server performance by dynamically allocating computing and storage resources. In recent years, server technology has evolved to be specific to particular applications such as 'finance transactions' (for example, point-of-service, inter-bank transaction, stock market transaction), 'scientific computation' (for example, fluid dynamic for automobile and ship design, weather prediction, oil and gas expeditions), 'medical diagnostics' (for example, diagnostics based on the fuzzy logic, medical data processing), 'simple information sharing and searching' (for example, web search, retail store website, company home page), 'email' (information distribution and archive), 'security service', 'entertainment' (for example, video-on-demand), and so on. However, all of these applications suffer from the same information transfer bottleneck due to the inability of a high speed CPU (central processing unit) to efficiently transfer data in and out of relatively slower speed storage or memory subsystems, particularly since data transfers typically pass through the CPU input/output (I/O) channels.

The data transfer limitations by the CPU are exemplified by the arrangement shown in FIG. **1**, and apply to data transfers between main storage (for example the hard disk (HD) or solid state drive (SSD) and the memory subsystems (for example DRAM DIMM (Dynamic Random Access Memory Dual In-line Memory Module) connected to the front side bus (FSB)). In arrangements such as that of FIG. **1**, the SSD/HD and DRAM DIMM of a conventional memory arrangement are connected to the CPU via separate memory control ports (not shown). FIG. **1** specifically shows, through the double-headed arrow, the data flow path between the computer or server main storage (SSD/HD) to the DRAM DIMMs. Since the SSD/HD data I/O and the DRAM DIMM data I/O are controlled by the CPU, the CPU needs to allocate its process cycles to control these I/Os, which may include the IRQ (Interrupt Request) service which the CPU performs periodically. As will be appreciated, the more time a CPU allocates to controlling the data transfer traffic, the less time the CPU has to perform other tasks. Therefore, the overall performance of a server will deteriorate with the increased amount of time the CPU has to expend in performing data transfer.

There have been various approaches to increase the data transfer throughput rates from/to the main storage, such as SSD/HD, to local storage, such as DRAM DIMM. In one example as illustrated in FIG. **2**, EcoRAM™ developed by Spansion provides a storage SSD based system that assumes a physical form factor of a DIMM. The EcoRAM™ is populated with Flash memories and a relatively small memory capacity using DRAMs which serve as a data buffer. This arrangement is capable of delivering higher throughput rate than a standard SSD based system since the EcoRAM™ is connected to the CPU (central processing unit) via a high speed interface, such as the HT (Hyper

US 11,016,918 B2

3

Transport) interface, while an SSD/HD is typically connected via SATA (serial AT attachment), USB (universal serial bus), or PCI Express (peripheral component interface express). For example, the read random access throughput rate of EcoRAM™ is near 3 GB/s compared with 400 MB/s for a NAND SSD memory subsystem using the standard PCI Express-based. This is a 7.5× performance improvement. However, the performance improvement for write random access throughput rate is less than 2×(197 MBs for the EcoRAM vs. 104 MBs for NAND SSD). This is mainly due to the fact that the write speed is cannot be faster than the NAND Flash write access time. FIG. 2 is an example of EcoRAM™ using SSD with the form factor of a standard DIMM such that it can be connected to the FSB (front side bus). However, due to the interface protocol difference between DRAM and Flash, an interface device, EcoRAM Accelerator™), which occupies one of the server's CPU sockets is used, and hence further reducing server's performance by reducing the number of available CPU sockets available, and in turn reducing the overall computation efficiency. The server's performance will further suffer due to the limited utilization of the CPU bus due to the large difference in the data transfer throughput rate between read and write operations.

The EcoRAM™ architecture enables the CPU to view the Flash DIMM controller chip as another processor with a large size of memory available for CPU access.

In general, the access speed of a Flash based system is limited by four items: the read/write speed of the Flash memory, the CPU's FSB bus speed and efficiency, the Flash DIMM controller's inherent latency, and the HT interconnect speed and efficiency which is dependent on the HT interface controller in the CPU and Flash DIMM controller chip.

The published results indicate that these shortcomings are evident in that the maximum throughput rate is 1.56 GBs for the read operation and 104 MBs for the write operation. These access rates are 25% of the DRAM read access speed, and 1.7% of the DRAM access speed at 400 MHz operation. The disparity in the access speed (15 to 1) between the read operation and write operation highlight a major disadvantage of this architecture. The discrepancy of the access speed between this type of architecture and JEDEC standard DRAM DIMM is expected to grow wider as the DRAM memory technology advances much faster than the Flash memory.

Certain types of memory modules comprise a plurality of dynamic random-access memory (DRAM) devices mounted on a printed circuit board (PCB). These memory modules are typically mounted in a memory slot or socket of a computer system (e.g., a server system or a personal computer) and are accessed by the computer system to provide volatile memory to the computer system.

Volatile memory generally maintains stored information only when it is powered. Batteries have been used to provide power to volatile memory during power failures or interruptions. However, batteries may require maintenance, may need to be replaced, are not environmentally friendly, and the status of batteries can be difficult to monitor.

Non-volatile memory can generally maintain stored information while power is not applied to the non-volatile memory. In certain circumstances, it can therefore be useful to backup volatile memory using non-volatile memory.

OVERVIEW

Described herein is a memory module couplable to a memory controller of a host system. The memory module

4

includes a non-volatile memory subsystem, a data manager coupled to the non-volatile memory subsystem, a volatile memory subsystem coupled to the data manager and operable to exchange data with the non-volatile memory subsystem by way of the data manager, and a controller operable to receive commands from the memory controller and to direct (i) operation of the non-volatile memory subsystem, (ii) operation of the volatile memory subsystem, and (iii) transfer of data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one received command from the memory controller.

Also described herein is a method for managing a memory module by a memory controller, the memory module including volatile and non-volatile memory subsystems. The method includes receiving control information from the memory controller, wherein the control information is received using a protocol of the volatile memory subsystem. The method further includes identifying a data path to be used for transferring data to or from the memory module using the received control information, and using a data manager and a controller of the memory module to transfer data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one of the received control information and the identified data path.

Also described herein is a memory module wherein the data manager is operable to control one or more of data flow rate, data transfer size, data buffer size, data error monitoring, and data error correction in response to receiving at least one of a control signal and control information from the controller.

Also described herein is a memory module wherein the data manager controls data traffic between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on instructions received from the controller.

Also described herein is a memory module wherein data traffic control relates to any one or more of data flow rate, data transfer size, data buffer size, data transfer bit width, formatting information, direction of data flow, and the starting time of data transfer.

Also described herein is a memory module wherein the controller configures at least one of a first memory address space of the volatile memory subsystem and a second memory address space of the non-volatile memory subsystem in response to at least one of a received command from the memory controller and memory address space initialization information of the memory module.

Also described herein is a memory module wherein the data manager is configured as a bi-directional data transfer fabric having two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a memory module wherein the non-volatile memory subsystem comprises flash memory.

Also described herein is a memory module wherein at least one set of data ports is operated by the data manager to

US 11,016,918 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a memory module wherein the data manager and controller are configured to effect data transfer between the memory controller and the non-volatile memory subsystem in response to memory access commands received by the controller from the memory controller.

Also described herein is a memory module wherein the volatile memory subsystem is operable as a buffer for the data transfer between the memory controller and non-volatile memory.

Also described herein is a memory module wherein the data manager further includes a data format module configured to format data to be transferred between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on control information received from the controller.

Also described herein is a memory module wherein the data manager further includes a data buffer for buffering data delivered to or from the non-volatile memory subsystem.

Also described herein is a memory module wherein the controller is operable to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein the controller is configured to effect operation with the host system in accordance with a prescribed protocol.

Also described herein is a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a memory module wherein the controller is operable to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a memory module wherein the controller is operable to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a memory module wherein the controller includes a volatile memory control module, a non-volatile memory control module, data manager control module, a command interpreter module, and a scheduler module.

Also described herein is a memory module wherein commands from the volatile memory control module to the volatile memory subsystem are subordinated to commands from the memory controller to the controller.

Also described herein is a memory module wherein the controller effects pre-fetching of data from the non-volatile to the volatile memory.

Also described herein is a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a memory module wherein the controller is operable to initiate a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a memory module wherein, if the closed block is re-opened, the controller is operable to abort the copy operation and to erase the target block from the non-volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the transfer of data includes a bidirectional transfer of data between the non-volatile and the volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising operating the data manager to control one or more of data flow rate, data transfer size, data width size, data buffer size, data error monitoring, data error correction, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module further comprising operating the data manager to control data traffic between the memory controller and at least one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein data traffic control relates to any one or more of data transfer size, formatting information, direction of data flow, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module wherein data traffic control by the data manager is based on instructions received from the controller.

Also described herein is a method for managing a memory module further comprising operating the data manager as a bi-directional data transfer fabric with two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a method for managing a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a method for managing a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a method for managing a memory module wherein the non-volatile memory subsystem comprises Flash memory.

Also described herein is a method for managing a memory module further comprising operating the data ports to independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising directing transfer of data bi-directionally between the volatile and non-volatile memory subsystems using the data manager and in response to memory access commands received by the controller from the memory controller.

US 11,016,918 B2

7

Also described herein is a method for managing a memory module further comprising buffering the data transferred between the memory controller and non-volatile memory subsystem using the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising using the controller to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising using the controller to effect communication with a host system by the volatile memory subsystem in accordance with a prescribed protocol.

Also described herein is a method for managing a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a method for managing a memory module further comprising using the controller to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a method for managing a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a method for managing a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a method for managing a memory module further comprising using the controller to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a method for managing a memory module wherein the controller includes a volatile memory control module, the method further comprising generating commands by the volatile memory control module in response to commands from the memory controller, and transmitting the generated commands to the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising pre-fetching of data from the non-volatile memory subsystem to the volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a method for managing a memory module further comprising initiating a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising aborting the copy operation when the closed block of the volatile memory subsystem is re-opened, and erasing the target block in the non-volatile memory subsystem.

8

Also described herein is a memory system having a volatile memory subsystem, a non-volatile memory subsystem, a controller coupled to the non-volatile memory subsystem, and a circuit coupled to the volatile memory subsystem, to the controller, and to a host system. In a first mode of operation, the circuit is operable to selectively isolate the controller from the volatile memory subsystem, and to selectively couple the volatile memory subsystem to the host system to allow data to be communicated between the volatile memory subsystem and the host system. In a second mode of operation, the circuit is operable to selectively couple the controller to the volatile memory subsystem to allow data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem using the controller, and the circuit is operable to selectively isolate the volatile memory subsystem from the host system.

Also described herein is a method for operating a memory system. The method includes coupling a circuit to a host system, a volatile memory subsystem, and a controller, wherein the controller is coupled to a non-volatile memory subsystem. In a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, the circuit is used to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, the circuit is used to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

Also described herein is a nontransitory computer readable storage medium storing one or more programs configured to be executed by one or more computing devices. The programs, when executing on the one or more computing devices, cause a circuit that is coupled to a host system, to a volatile memory subsystem, and to a controller that is coupled to a nonvolatile memory subsystem, to perform a method in which, in a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, operating the circuit to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, operating the circuit to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated into and constitute a part of this specification, illustrate one or more examples of embodiments and, together with the description of example embodiments, serve to explain the principles and implementations of the embodiments.

In the drawings:

FIG. 1 is a block diagram illustrating the path of data transfer, via a CPU, of a conventional memory arrangement;

FIG. 2 is a block diagram of a known EcoRAM™ architecture;

FIGS. 3A and 3B are block diagrams of a non-volatile memory DIMM or NVDIMM;

FIGS. 4A and 4B are block diagrams of a Flash-DRAM hybrid DIMM or FDHDIMM;

US 11,016,918 B2

9 | 10

FIG. **5**A is a block diagram of a memory module **500** in accordance with certain embodiments described herein;

FIG. **5**B is a block diagram showing some functionality of a memory module such as that shown in FIG. **5**A;

FIG. **6** is a block diagram showing some details of the data manager (DMgr);

FIG. **7** is a functional block diagram of the on-module controller (CDC);

FIG. **8**A is a block diagram showing more details of the prior art Flash-DRAM hybrid DIMM (FDHDIMM) of FIGS. **4**A and **4**B;

FIG. **8**B is a block diagram of a Flash-DRAM hybrid DIMM (FDHDIMM) in accordance with certain embodiments disclosed herein;

FIG. **9** is a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM;

FIG. **10** is a block diagram showing an example of mapping of DRAM address space to Flash memory address space; and

FIG. **11** is a table showing estimates of the maximum allowed closed blocks in a queue to be written back to Flash memory for different DRAM densities using various average block use time.

FIG. **12** is a block diagram of an example memory system compatible with certain embodiments described herein.

FIG. **13** is a block diagram of an example memory module with ECC (error-correcting code) having a volatile memory subsystem with nine volatile memory elements and a non-volatile memory subsystem with five non-volatile memory elements in accordance with certain embodiments described herein.

FIG. **14** is a block diagram of an example memory module having a microcontroller unit and logic element integrated into a single device in accordance with certain embodiments described herein.

FIGS. **15**A-**15**C schematically illustrate example embodiments of memory systems having volatile memory subsystems comprising registered dual in-line memory modules in accordance with certain embodiments described herein.

FIG. **16** schematically illustrates an example power module of a memory system in accordance with certain embodiments described herein.

FIG. **17** is a flowchart of an example method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems.

FIG. **18** is a flowchart of an example method of controlling a memory system operatively coupled to a host system and which includes at least 100 percent more storage capacity in non-volatile memory than in volatile memory.

FIG. **19** schematically illustrates an example clock distribution topology of a memory system in accordance with certain embodiments described herein.

FIG. **20** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including operating a volatile memory subsystem at a reduced rate in a back-up mode.

FIG. **21** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments of a volatile memory subsystem of a memory system to a controller of the memory system.

FIG. **22** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including backing up and/or restoring a volatile memory subsystem in slices.

## DESCRIPTION OF EXAMPLE EMBODIMENTS

Example embodiments are described herein in the context of a system of computers, servers, controllers, memory modules, hard disk drives and software. Those of ordinary skill in the art will realize that the following description is illustrative only and is not intended to be in any way limiting. Other embodiments will readily suggest themselves to such skilled persons having the benefit of this disclosure. Reference will now be made in detail to implementations of the example embodiments as illustrated in the accompanying drawings. The same reference indicators will be used to the extent possible throughout the drawings and the following description to refer to the same or like items.

In the interest of clarity, not all of the routine features of the implementations described herein are shown and described. It will, of course, be appreciated that in the development of any such actual implementation, numerous implementation-specific decisions must be made in order to achieve the developer's specific goals, such as compliance with application- and business-related constraints, and that these specific goals will vary from one implementation to another and from one developer to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking of engineering for those of ordinary skill in the art having the benefit of this disclosure.

In accordance with this disclosure, the components, process steps, and/or data structures described herein may be implemented using various types of operating systems, computing platforms, computer programs, and/or general purpose machines. In addition, those of ordinary skill in the art will recognize that devices of a less general purpose nature, such as hardwired devices, field programmable gate arrays (FPGAs), application specific integrated circuits (ASICs), or the like, may also be used without departing from the scope and spirit of the inventive concepts disclosed herein. Where a method comprising a series of process steps is implemented by a computer or a machine and those process steps can be stored as a series of instructions readable by the machine, they may be stored on a tangible medium such as a computer memory device (e.g., ROM (Read Only Memory), PROM (Programmable Read Only Memory), EEPROM (Electrically Eraseable Programmable Read Only Memory), Flash memory, Jump Drive, and the like), magnetic storage medium (e.g., tape, magnetic disk drive, and the like), optical storage medium (e.g., CD-ROM, DVD-ROM, paper card, paper tape and the like) and other types of program memory.

The term "exemplary" where used herein is intended to mean "serving as an example, instance or illustration." Any embodiment described herein as "exemplary" is not necessarily to be construed as preferred or advantageous over other embodiments.

Disclosed herein are arrangements for improving memory access rates and addressing the high disparity (15 to 1 ratio) between the read and write data throughput rates. In one arrangement, a Flash-DRAM-hybrid DIMM (FDHDIMM) with integrated Flash and DRAM is used. Methods for controlling such an arrangement are described.

In certain embodiments, the actual memory density (size or capacity) of the DIMM and/or the ratio of DRAM memory to Flash memory are configurable for optimal use with a particular application (for example, POS, inter-bank transaction, stock market transaction, scientific computation such as fluid dynamics for automobile and ship design, weather prediction, oil and gas expeditions, medical diagnostics such as diagnostics based on the fuzzy logic, medical data processing, simple information sharing and searching such as web search, retail store website, company home

11

page, email or information distribution and archive, security service, and entertainment such as video-on-demand).

In certain embodiments, the device contains a high density Flash memory with a low density DRAM, wherein the DRAM is used as a data buffer for read/write operation. The Flash serves as the main memory. Certain embodiments described herein overcome the needs of having a long separation period between an Activate command (may be referred to as RAS) and a corresponding read or write command (may be referred to as first CAS command).

In accordance with one embodiment, described with reference to FIGS. 3A and 3B, a memory system 300 includes a non-volatile (for example Flash) memory subsystem 302 and a volatile (for example DRAM) memory subsystem 304. The examples of FIGS. 3A and 3B are directed to architectures of a non-volatile DIMM (NVDIMM) NVDIMM system that may use a power subsystem (not shown) that can include a battery or a capacitor as a means for energy storage to copy DRAM memory data into Flash memory when power loss occurs, is detected, or is anticipated to occur during operation. When normal power is restored, a restore NVDIMM operation is initiated and the data stored in the Flash memory is properly restored to the DRAM memory. In this architecture, the density of the Flash is about the same as the DRAM memory size or within a few multiples, although in some applications it may be higher. This type of architecture may also be used to provide non-volatile storage that is connected to the FSB (front side bus) to support RAID (Redundant Array of Independent Disks) based systems or other type of operations. An NVDIMM controller 306 receives and interprets commands from the system memory controller hub (MCH). The NVDIMM controller 306 control the NVDIMM DRAM and Flash memory operations. In FIG. 3A, the DRAM 304 communicates data with the MCH, while an internal bus 308 is used for data transfer between the DRAM and Flash memory subsystems. In FIG. 3B, the NVDIMM controller 306' of NVDIMM 300' monitors events or commands and enables data transfer to occur in a first mode between the DRAM 304' and Flash 302' or in a second mode between the DRAM and the MCH.

In accordance with one embodiment, a general architecture for a Flash and DRAM hybrid DIMM (FDHDIMM) system 400 is shown in FIG. 4A. The FDHDIMM interfaces with an MCH (memory controller hub) to operate and behave as a high density DIMM, wherein the MCH interfaces with the non-volatile memory subsystem (for example Flash) 402 is controlled by an FDHDIMM controller 404. Although the MCH interfaces with the Flash via the FDHDIMM controller, the FDHDIMM overall performance is governed by the Flash access time. The volatile memory subsystem (for example DRAM) 406 is primarily used as a data buffer or a temporary storage location such that data from the Flash memory 402 is transferred to the DRAM 406 at the Flash access speed, and buffered or collected into the DRAM 406, which then transfers the buffered data to the MCH based on the access time of DRAM. Similarly, when the MCH transfers data to the DRAM 406, the FDHDIMM controller 404 manages the data transfer from the DRAM 406 to the Flash 402. Since the Flash memory access speed (both read and write) is relatively slower than DRAM, (e.g. for example a few hundred microseconds for read access), the average data throughput rate of FDHDIMM 400 is limited by the Flash access speed. The DRAM 406 serves as a data buffer stage that buffers the MCH read or write data. Thus, the DRAM 406 serves as a temporary storage for the data to be transferred from/to the Flash 402. Furthermore, in accordance with one embodiment, the MCH recognizes the

12

physical density of an FDHDIMM operating as a high density DIMM as the density of Flash alone.

In accordance with one embodiment, a read operation can be performed by the MCH by sending an activate command (may be simply referred to as RAS, or row address strobe) to the FDHDIMM 400 to conduct a pre-fetch read data operation from the Flash 402 to the DRAM 406, with the pre-fetch data size being for example a page (1 KB or 2 KB, or may be programmable to any size). The MCH then sends a read command (may be simply referred to as CAS, or column address strobe) to read the data out input of the DRAM. In this embodiment, the data transfer from Flash to DRAM occurs at Flash access speed rates, while data transfer from DRAM to MCH occurs at DRAM access speed rates. In this example, data latency and throughput rates are the same as any DRAM operation as long as the read operations are executed onto the pages that were opened with the activate command previously sent to prefetch data from the Flash to DRAM. Thus, a longer separation time period between the RAS (e.g. Activate command) and the first CAS (column address strobe e.g. read or write command) is required to account for the time it takes to pre-fetch data from the Flash to DRAM.

An example of FDHDIMM operating as a DDR DIMM with SSD is shown in FIG. 4B, wherein the FDHDIMM 400' supports two different interface interpretations to the MCH. In the first interface interpretation, the MCH views the FDHDIMM 400' as a combination of DRAM DIMM and SSD (not illustrated). In this mode the MCH needs to manage two address spaces, one for the DRAMs 402' and one for the Flash 404'. The MCH is coupled to, and controls, both of the DRAM and Flash memory subsystems. One advantage of this mode is that the CPU does not need to be in the data path when data is moved from DRAM to Flash or from Flash to DRAM. In the second interface interpretation, the MCH views the FDHDIMM 400' as an on-DIMM Flash with the SSD in an extended memory space that is behind the DRAM space. Thus, in this mode, the MCH physically fetches data from the SSD to the DDR DRAM and then the DRAM sends the data to the MCH. Since all data movement occurs on the FDHDIMM, this mode will provide better performance than if the data were to be moved through or via the CPU.

In accordance with one embodiment and as shown in FIG. 4B, the FDHDIMM 400' receives control signals 408 from the MCH, where the control signals may include one or more control signals specifically for the DRAM 402' operation and one or more control signals specifically for the Flash 404' operation. In this embodiment, the MCH or CPU is coupled to the FDHDIMM via a single data bus interface 410 which couples the MCH to the DRAM.

FIGS. 5A and 5B are block diagrams of a memory module 500 that is couplable to a host system (not shown). The host system may be a server or any other system comprising a memory system controller or an MCH for providing and controlling the read/write access to one or more memory systems, wherein each memory system may include a plurality of memory subsystems, a plurality of memory devices, or at least one memory module. The term "read/write access" means the ability of the MCH to interface with a memory system or subsystem in order to write data into it or read data from it, depending on the particular requirement at a particular time.

In certain embodiments, memory module 500 is a Flash-DRAM hybrid memory subsystem which may be integrated with other components of a host system. In certain embodiments, memory module 500 is a Flash-DRAM hybrid

US 11,016,918 B2

13

memory module that has the DIMM (dual-inline memory module) form factor, and may be referred to as a FDHDIMM, although it is to be understood that in both structure and operation it may be different from the FDHDIMM discussed above and described with reference to FIGS. 4A and 4B. Memory module 500 includes two on-module intermediary components: a controller and a data manager. These on-module intermediary components may be physically separate components, circuits, or modules, or they may be integrated onto a single integrated circuit or device, or integrated with other memory devices, for example in a three dimensional stack, or in any one of several other possible expedients for integration known to those skilled in the art to achieve a specific design, application, or economic goal. In the case of a DIMM, these on-module intermediary components are an on-DIMM Controller (CDC) 502 and an on-DIMM data manager (DMgr) 504. While the DIMM form factor will predominate the discussion herein, it should be understood that this is for illustrative purposes only and memory systems using other form factors are contemplated as well. CDC 502 and data manager DMgr 504 are operative to manage the interface between a non-volatile memory subsystem such as a Flash 506, a volatile memory subsystem such as a DRAM 508, and a host system represented by MCH 510.

In certain embodiments, CDC 502 controls the read/write access to/from Flash memory 506 from/to DRAM memory 508, and to/from DRAM memory from/to MCH 510.

Read/write access between DRAM 508, Flash 506 and MCH 510 may be referred to herein generally as communication, wherein control and address information C/A 560 is sent from MCH 510 to CDC 502, and possible data transfers follow as indicated by Data 550, Data 555, and/or Data 556. In certain embodiments, the CDC 502 performs specific functions for memory address transformation, such as address translation, mapping, or address domain conversion, Flash access control, data error correction, manipulation of data width or data formatting or data modulation between the Flash memory and DRAM, and so on. In certain embodiments, the CDC 502 ensures that memory module 500 provides transparent operation to the MCH in accordance with certain industry standards, such as DDR, DDR2, DDR3, DDR4 protocols. In the arrangement shown in FIGS. 5A and 5B, there is no direct access from the MCH 510 to the Flash 506 memory subsystem. Thus in accordance with certain embodiments, the Flash access speed has minimal impact on the overall FDHDIMM access speed. In the schematic illustration of FIG. 5B and in accordance with one embodiment, the CDC controller 502 receives standard DDR commands from the MCH, interprets, and produces commands and/or control signals to control the operation of the Data manager (DMgr), the Flash memory and the DRAM memory. The DMgr controls the data path routing amongst DRAMs, Flash and MCH, as detailed below. The data path routing control signals are independently operated without any exclusivity.

An exemplary role of DMgr 504 is described with reference to FIG. 6. In certain embodiments and in response to communication from CDC 502, DMgr 504 provides a variety of functions to control data flow rate, data transfer size, data buffer size, data error monitoring or data error correction. For example, these functions or operations can be performed on-the-fly (while data is being transferred via the DMgr 504) or performed on buffered or stored data in DRAM or a buffer. In addition, one role of DMgr 504 is to provide interoperability among various memory subsystems or components and/or MCH 510.

14

In one embodiment, an exemplary host system operation begins with initialization. The CDC 502 receives a first command from the MCH 510 to initialize FDHDIMM 500 using a certain memory space. The memory space as would be controlled by MCH 510 can be configured or programmed during initialization or after initialization has completed. The MCH 510 can partition or parse the memory space in various ways that are optimized for a particular application that the host system needs to run or execute. In one embodiment, the CDC 502 maps the actual physical Flash 506 and DRAM 508 memory space using the information sent by MCH 510 via the first command. In one embodiment, the CDC 502 maps the memory address space of any one of the Flash 506 and DRAM 508 memory subsystems using memory address space information that is received from the host system, stored in a register within FDHDIMM 500, or stored in a memory location of a non-volatile memory subsystem, for example a portion of Flash 506 or a separate non-volatile memory subsystem. In one embodiment, the memory address space information corresponds to a portion of initialization information of the FDHDIMM 500.

In one embodiment, MCH 510 may send a command to restore a certain amount of data information from Flash 506 to DRAM 508. The CDC 502 provides control information to DMgr 504 to appropriately copy the necessary information from Flash 506 to the DRAM 508. This operation can provide support for various host system booting operations and/or a special host system power up operation.

In one embodiment, MCH 510 sends a command which may include various fields comprising control information regarding data transfer size, data format options, and/or startup time. CDC 502 receives and interprets the command and provides control signals to DMgr 504 to control the data traffic between the Flash 506, the DRAM 508, and the MCH 510. For example, DMgr 504 receives the data transfer size, formatting information, direction of data flow (via one or more multiplexers such as 611, 612, 621, 622 as detailed below), and the starting time of the actual data transfer from CDC 502. DMgr 504 may also receive additional control information from the CDC 502 to establish a data flow path and/or to correctly establish the data transfer fabric. In certain embodiments, DMgr 504 also functions as a bi-directional data transfer fabric. For example, DMgr 504 may have more than 2 sets of data ports facing the Flash 506 and the DRAM 508. Multiplexers 611 and 612 provide controllable data paths from any one of the DRAMs 508(1) and 508(2) (DRAM-A and DRAM-B) to any one of the MCH 510 and the Flash 506. Similarly multiplexers 621 and 622 provide controllable data paths from any one of the MCH and the Flash memory to any one of the DRAMs 508(1) and 508(2) (DRAM-A and DRAM-B). In one embodiment, DRAM 508(1) is a segment of DRAM 508, while in other embodiments, DRAM 508(1) is a separate DRAM memory subsystem. It will be understood that each memory segment can comprise one or more memory circuits, a memory devices, and/or memory integrated circuits. Of course other configurations for DRAM 508 are possible, and other data transfer fabrics using complex data paths and suitable types of multiplexing logic are contemplated.

In accordance with one embodiment, the two sets of multiplexors 611, 612 and 621, 622 allow independent data transfer to Flash 506 from DRAM-A 508(1) and DRAM-B 508(2). For example, in response to one or more control signals or a command from CDC 502, DMgr 504 can transfer data from DRAM-A 508(1) to MCH 510, via multiplexer 611, at the same time as from DRAM-B 508(2)

US 11,016,918 B2

15                                                                                    16

to the Flash 506, via multiplexer 612; or data is transferred from DRAM-B 508(2) to MCH 510, via multiplexer 611, and simultaneously data is transferred from the Flash 506 to DRAM-A 508(1), via multiplexer 621. Further, in the same way that data can be transferred to or from the DRAM in both device-wide or segment-by-segment fashion, data can be transferred to or from the flash memory in device-wide or segment-by-segment fashion, and the flash memory can be addressed and accessed accordingly.

In accordance with one embodiment the illustrated arrangement of data transfer fabric of DMgr 504 also allows the CDC 502 to control data transfer from the Flash memory to the MCH by buffering the data from the Flash 506 using a buffer 602, and matching the data rate and/or data format of MCH 510. The buffer 602 is shown in FIG. 6 as a portion of a data format module 604; however, buffer 602 may also be a distributed buffer such that one buffer is used for each one of the set of multiplexer logic elements shown as multiplexers 611, 612, 621, and 622. Various buffer arrangements may be used, such as a programmable size buffer to meet the requirement of a given system design requirement, for example the disparity between read/write access time; or overall system performance, for example latency. In certain embodiments, the buffer 604 may introduce one or more clock cycle delays into a data communication path between MCH 510, DRAM 508, and Flash 506.

In certain embodiments, data format module 604 contains a data formatting subsystem (not shown) to enable DMgr 504 to format and perform data transfer in accordance with control information received from CDC 502. Data buffer 604 of data format module 602, discussed above, also supports a wide data bus 606 coupled to the Flash memory 506 operating at a first frequency, while receiving data from DRAM 508 using a relatively smaller width data bus 608 operating at a second frequency, the second frequency being larger than the first frequency in certain embodiments. The buffer 602 is designed to match the data flow rate between the DRAM 508 and the Flash 506.

A register 690 provides the ability to register commands received from MCH 510 via C/A 560 (FIG. 5A). The register 690 may communicate these commands to CDC 502 and/or to the DRAM 508 and/or Flash 506. The register 690 communicates these registered commands to CDC 502 for processing. The register 690 may also include multiple registers (not shown), such that it can provide the ability to register multiple commands, a sequence of commands, or provide a pipeline delay stage for buffering and providing a controlled execution of certain commands received form MCH 510.

In certain embodiments, the register 690 may register commands from MCH 510 and transmit the registered commands to DRAM 508 and/or Flash 506 memory subsystems. In certain embodiments, the CDC 502 monitors commands received from MCH 510, via control and address bus C/A 560, and provides appropriate control information to DMgr 504, DRAM 508, or Flash 506 to execute these commands and perform data transfer operations between MCH 510 and FDHDIMM 500 via MCH data bus 610.

FIG. 7 illustrates a functional block diagram of the CDC 502. In certain embodiments, the major functional blocks of the CDC 502 are a DRAM control block DRAMCtrl 702, Flash control block FlashCtrl 704, MCH command interpreter Cmdlnt 706, DRAM-Flash interface scheduler Scheduler 708, and DMgr control block (DMgrCtrl) 710.

In accordance with one embodiment, DRAMCtrl 702 generates DRAM commands that are independent from the commands issued by the MCH 510. In accordance with one embodiment, when the MCH 510 initiates a read/write operation from/to the same DRAM 508 that is currently executing a command from the DRAMCtrl 702, then the CDC 502 may choose to instruct DRAMCtrl 702 to abort its operation in order to execute the operation initiated by the MCH. However, the CDC 502 may also pipeline the operation so that it causes DRAMCtrl 702 to either halt or complete its current operation prior to executing that of the MCH. The CDC 502 may also instruct DRAMCtrl 702 to resume its operation once the command from MCH 510 is completed.

In accordance with one embodiment, the FlashCtrl 704 generates appropriate Flash commands for the proper read/write operations. The Cmdlnt 706 intercepts commands received from MCH 510 and generates the appropriate control information and control signals and transmit them to the appropriate FDHDIMM functional block. For example, Cmdlnt 706 issues an interrupt signal to the DRAMCtrl 702 when the MCH issues a command that collides (conflicts) with the currently executing or pending commands that DRAMCtrl 702 has initiated independently from MCH 510, thus subordinating these commands to those from the MCH. The Scheduler 708 schedules the Flash-DRAM interface operation such that there is no resource conflict in the DMgr 504. In accordance with one embodiment, the Scheduler 708 assigns time slots for the DRAMCtrl 702 and FlashCtrl 704 operation based on the current status and the pending command received or to be received from the MCH. The DMgrCtrl 710 generates and sends appropriate control information and control signals for the proper operation and control of the data transfer fabric to enable or disable data paths between Flash 506, DRAM 508, and the MCH 510.

FIG. 8A is a block diagram showing a Flash-DRAM hybrid DIMM (FDHDIMM). As seen from FIG. 8A, this Flash-DRAM hybrid DIMM requires two separate and independent address buses to separately control the address spaces: one for the Flash memory Flash 506 and the other for the DRAM memory DRAM 508. The MCH treats the DRAM 508 and Flash 506 as separate memory subsystems, for example DRAM and SSD/HD memory subsystems. The memory in each address space is controlled directly by the MCH. However, the on-DIMM data path between Flash 506 and DRAM 508 allows for direct data transfer to occur between the Flash 506 and the DRAM 508 in response to control information from Ctrl 502. In this embodiment, this data transfer mechanism provides direct support for executing commands from the MCH without having the MCH directly controlling the data transfer, and thus improving data transfer performance from Flash 506 to the DRAM 508. However, the MCH needs to manage two address spaces and two different memory protocols simultaneously. Moreover, the MCH needs to map the DRAM memory space into the Flash memory space, and the data interface time suffers due to the difference in the data access time between the Flash memory and the DRAM memory.

In accordance with one embodiment, a memory space mapping of a Flash-DRAM hybrid DIMM is shown in FIG. 8B. A memory controller of a host system (not shown) controls both of the DRAM 508 address space and the Flash 506 address space using a single unified address space. The CDC 502 receives memory access commands from the MCH and generates control information for appropriate mapping and data transfer between Flash and DRAM memory subsystem to properly carry out the memory access commands. In one embodiment, the memory controller of the host system views the large Flash memory space as a DRAM memory space, and accesses this unified memory

US 11,016,918 B2

17                                                                                   18

space with a standard DDR (double data rate) protocol used for accessing DRAM. The unified memory space in this case can exhibit overlapping memory address space between the Flash 506 and the DRAM 508. The overlapping memory address space may be used as a temporary storage or buffer for data transfer between the Flash 506 and the DRAM 508. For example, the DRAM memory space may hold a copy of data from the selected Flash memory space such that the MCH can access this data normally via DDR memory access commands. The CDC 502 controls the operation of the Flash 506 and DRAM 508 memory subsystems in response to commands received from a memory controller of a host system.

In one embodiment, the unified memory space corresponds to a contiguous address space comprising a first portion of the address space of the Flash 506 and a first portion of the address space of the DRAM 508. The first portion of the address space of the Flash 506 can be determined via a first programmable register holding a first value corresponding to the desired Flash memory size to be used. Similarly, the first portion of the address space of the DRAM 508 can be determined via a second programmable register holding a second value corresponding to the desired DRAM memory size to be used. In one embodiment, any one of the first portion of the address space of the Flash 506 and the first portion of the address space of the DRAM 508 is determined via a first value corresponding to a desired performance or memory size, the first value being received by the CDC 502 via a command sent by memory controller of the host system.

In accordance with one embodiment, a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM is shown in FIG. 9. In certain embodiments, data transfer from the Flash 506 to the DRAM 508 occurs in accordance with memory access commands which the CDC 502 receives from the memory controller of the host system. In certain embodiments, the CDC 502 controls the data transfer from the DRAM 508 to the Flash 506 so as to avoid conflict with any memory operation that is currently being executed. For example, when all the pages in a particular DRAM memory block are closed. The CDC 502 partitions the DRAM memory space into a number of blocks for the purpose of optimally supporting the desired application. The controller can configure memory space in the memory module based on at least one of one or more commands received from the MCH, instructions received from the MCH, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value. Furthermore, the block size can be configurable by the memory controller of the host system, such that the number pages in a block can be optimized to support a particular application or a task. Furthermore, the block size may be configured on-the-fly, e.g. CDC 502 can receive instruction regarding a desired block size from the memory controller via a memory command, or via a programmable value.

In certain embodiments, a memory controller can access the memory module using a standard access protocol, such as JEDEC's DDR DRAM, by sending a memory access command to the CDC 502 which in turn determines what type of a data transfer operation it is and the corresponding target address where the data information is stored, e.g. data information is stored in the DRAM 508 or Flash 506 memory subsystems. In response to a read operation, if the CDC 502 determines that data information, e.g. a page (or

block), does not reside in the DRAM 508 but resides in Flash 506, then the CDC 502 initiates and controls all necessary data transfer operations from Flash 506 to DRAM 508 and subsequently to the memory controller. In one embodiment, once the CDC 502 completes the data transfer operation of the requested data information from the Flash 506 to the DRAM 508, the CDC 502 alerts the memory controller to retrieve the data information from the DRAM 508. In on embodiment, the memory controller initiates the copying of data information from Flash 506 to DRAM 508 by writing, into a register in the CDC 502, the target Flash address along with a valid block size. The CDC 502 in turn, executes appropriate operations and generates control information to copy the data information to the DRAM 508. Consequently, the memory controller can access or retrieve the data information using standard memory access commands or protocol.

An exemplary flow chart is shown in FIG. 9, a starting step or power up 902, is followed by an initialization step 904, the memory controller initiates, at step 906, a data move from the Flash 506 to the DRAM 508 by writing target address and size, to a control register in the CDC 502, which then copies, at 908, data information from the Flash 506 to the DRAM 508 and erases the block in the Flash. Erasing the data information from Flash may be accomplished independently from (or concurrently with) other steps that CDC 502 performs in this flow chart, i.e. other steps can be executed concurrently with the Erase the Flash block step. Once the data information or a block of data information is thus moved to the DRAM 508, the memory controller can operate on this data block using standard memory access protocol or commands at 910. The CDC 502 checks, at 912, if any of the DRAM 508 blocks, or copied blocks, are closed. If the memory controller closed any open blocks in DRAM 508, then the CDC 502 initiate a Flash write to write the closed block from the DRAM 508 to the Flash 506, at 914. In addition, the memory controller, at 916, reopens the closed block that is currently being written into the Flash 506, then the CDC 502 stops the Flash write operation and erases the Flash block which was being written to, as shown at 918. Otherwise, the CDC 502 continues and completes the writing operation to the Flash at 920.

The dashed lines in FIG. 9 indicate independent or parallel activities that can be performed by the CDC 502. At any time the CDC 502 receives a DRAM load command from a memory controller which writes a Flash target address and/or block size information into the RC register(s) at 922, as described above, then the CDC 502 executes a load DRAM w/RC step 906 and initiates another branch (or a thread) of activities that includes steps 908-922. In one embodiment, the CDC 502 controls the data transfer operations between DRAM 508 and Flash 506 such that the Flash 506 is completely hidden from the memory controller. The CDC 502 monitors all memory access commands sent by the memory controller using standard DRAM protocol and appropriately configures and manipulate both Flash 506 and DRAM 508 memory subsystems to perform the requested memory access operation and thus achieve the desired results. The memory controller does not interface directly with the Flash memory subsystem. Instead, the memory controller interfaces with the CDC 502 and/or DMgr 504 as shown in FIG. 5 and FIG. 6. Moreover, the memory controller may use one or more protocol, such as DDR, DDR2, DDR3, DDR4 protocols or the like.

In accordance with one embodiment, an example of mapping a DRAM address space to Flash memory address space is shown in FIG. 10. Two sets (1002, 1004) of address

US 11,016,918 B2

19                                                                20

bits AD6 to AD17, forming a 24 bit extended memory page address, are allocated for the block address. For example, assuming a Block size of 256K Bytes, then a 24-bit block address space (using the two sets of AD6 to AD17 1002 and 1004) would enable access to 4 TB of Flash memory storage space. If a memory module has 1 GB of DRAM storage capacity, then it can hold approximately 4K Blocks of data in the DRAM memory, each Block comprise 256 K Bytes of data. The DRAM address space, corresponding to the 4K blocks, can be assigned to different virtual ranks and banks, where the number of virtual ranks and banks is configurable and can be manipulated to meet a specific design or performance needs. For example, if a 1G Bytes memory module is configured to comprise two ranks with eight banks per rank, then each bank would hold two hundred fifty (250) blocks or the equivalent of 62 M Bytes or 62K pages, where each page correspond to a 1K Bytes. Other configurations using different page, block, banks, or ranks numbers may also be used. Furthermore, an exemplary mapping of 24-bit DDR DIMM block address to Flash memory address, using Block addressing as described above, is shown in FIG. 10. The 24-bit can be decomposed into fields, such as a logical unit number LUN address 1061 field, a Block address 1051 field, a Plane address 1041, a Page address 1031, and a group of least significant address bits $A_0A_1$ 1021. The Plane address 1041 is a sub address of the block address, and it may be used to support multiple page IO so as to improve Flash memory subsystem operation. In this example, it is understood that different number of bits may be allocated to each field of the 24-bit

The CDC 502 manages the block write-back operation by queuing the blocks that are ready to be written back to the Flash memory. As described above, if any page in a queued block for a write operation is reopened, then the CDC 502 will stop the queued block write operation, and remove the block from the queue. Once all the pages in a block are closed, then the CDC 502 restarts the write-back operation and queue the block for a write operation.

In accordance with one embodiment, an exemplary read operation from Flash 506 to DRAM 508 can be performed in approximately 400 μs, while a write operation from DRAM 508 to Flash 506 can be performed in approximately 22 ms resulting in a read to write ratio of 55 to 1. Therefore, if the average time a host system's memory controller spends accessing data information in a Block of DRAM is about 22 ms (that is the duration that a Block comprises one or more pages that are open), then the block write-back operation from DRAM to Flash would not impact performance and hence the disparity between read and write access may be completely hidden from the memory controller. If the block usage time is 11 ms instead of 22 ms, then the CDC 502 control the data transfer operation between DRAM 508 and Flash 506 such that there are no more than 9 closed blocks in the queue to be written-back to the Flash memory, hence approximately an average of 100 ms can be maintained for a standard DDR DRAM operation. Moreover, the number of closed Blocks in the queue to be written-back to the Flash memory subsystem varies with the average block usage time and the desired performance for a specific host system or for a specific application running using the host system resources.

Consequently, the maximum number of closed Blocks to be written-back to Flash can be approximated to be

((# of blocks per bank)/(ratio of 'Flash_block_write-_time' to 'Flash_read_time'))*((Block usage time)/('Flash_block_write_time'))

In order to maintain less than 100 ms time period for queued write-back Blocks, then using a Flash memory subsystem having 22 ms write access time per Block would results in a maximum number of four Blocks to be queued for write operation to Flash 506. Therefore, on average approximately 88 ms (=22 ms*4) for blocks means that each bank should not have more than four Blocks that need to be written back to the Flash 506.

The above equation also indicates that bigger DRAM memory space can support shorter block usage times. For example, 2 GB of DRAM memory allows the 8 closed blocks to be written-back to Flash. The table in FIG. 11 provides an estimation of the maximum allowed closed blocks in the queue to be written back to the Flash memory for different DRAM density using various average block use time.

Certain embodiments described herein include a memory system which can communicate with a host system such as a disk controller of a computer system. The memory system can include volatile and non-volatile memory, and a controller. The controller backs up the volatile memory using the non-volatile memory in the event of a trigger condition. Trigger conditions can include, for example, a power failure, power reduction, request by the host system, etc. In order to power the system in the event of a power failure or reduction, the memory system can include a secondary power source which does not comprise a battery and may include, for example, a capacitor or capacitor array.

In certain embodiments, the memory system can be configured such that the operation of the volatile memory is not adversely affected by the non-volatile memory or by th controller when the volatile memory is interacting with the host system. For example, one or more isolation devices may isolate the non-volatile memory and the controller from the volatile memory when the volatile memory is interacting with the host system and may allow communication between the volatile memory and the non-volatile memory when the data of the volatile memory is being restored or backed-up. This configuration generally protects the operation of the volatile memory when isolated while providing backup and restore capability in the event of a trigger condition, such as a power failure.

In certain embodiments described herein, the memory system includes a power module which provides power to the various components of the memory system from different sources based on a state of the memory system in relation to a trigger condition (e.g., a power failure). The power module may switch the source of the power to the various components in order to efficiently provide power in the event of the power failure. For example, when no power failure is detected, the power module may provide power to certain components, such as the volatile memory, from system power while charging a secondary power source (e.g., a capacitor array). In the event of a power failure or other trigger condition, the power module may power the volatile memory elements using the previously charged secondary power source.

In certain embodiments, the power module. transitions relatively smoothly from powering the volatile memory with system power to powering it with the secondary power source. For example, the power system may power volatile memory with a third power source from the time the memory system detects that power failure is likely to occur until the time the memory system detects that the power failure has actually occurred.

In certain embodiments, the volatile memory system can be operated at a reduced frequency during backup and/or

US 11,016,918 B2

21 22

restore operations which can improve the efficiency of the system and save power. In some embodiments, during backup and/or restore operations, the volatile memory communicates with the non-volatile memory by writing and/or. reading data words in bit-wise slices instead of by writing entire words at once. In certain embodiments, when each slice is being written to or read from the volatile memory the unused slice(s) of volatile memory is not active, which can reduce the power consumption of the system.

In yet other embodiments, the non-volatile memory can include at least 100 percent more storage capacity than the volatile memory. This configuration can allow the memory system to efficiently handle subsequent trigger conditions.

FIG. 12 is a block diagram of an example memory system 1010 compatible with certain embodiments described herein. The memory system 1010 can be coupled to a host computer system and can include a volatile memory subsystem 1030, a non-volatile memory subsystem 1040, and a controller 1062 operatively coupled to the non-volatile memory subsystem 1040. In certain embodiments, the memory system 1010 includes at least one circuit 1052 configured to selectively operatively decouple the controller 1062 from the volatile memory subsystem 1030.

In certain embodiments, the memory system 1010 comprises a memory module. The memory system 1010 may comprise a printed-circuit board (PCB) 1020. In certain embodiments, the memory system 1010 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other volatile memory capacities are also compatible with certain embodiments described herein. In certain embodiments, the memory system 10 has a non-volatile memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or 32-GB. Other non-volatile memory capacities are also compatible with certain embodiments described herein. In addition, memory systems 1010 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, the PCB 1020 has an industry-standard form factor. For example, the PCB 1020 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 1020 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 1020 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FB-DIMM), miniDIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain preferred embodiments, the memory system 1010 is in electrical communication with the host system. In other embodiments, the memory system 1010 may communicate with a host system using some other type of communication, such as, for example, optical communication. Examples of host systems include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The memory system 1010 can be in communication with a disk controller of a computer system, for example. The PCB 1020 can comprise an interface 1022 that is configured to be in electrical communication with the host system (not shown). For example, the interface 1022 can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system. The interface 1022 of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory system 1010 and the host system. For example, the interface 1022 can comprise a standard 240-pin DDR2 edge connector.

The volatile memory subsystem 1030 comprises a plurality of volatile memory elements 1032 and the non-volatile memory subsystem 1040 comprises a plurality of non-volatile memory elements 1042. Certain embodiments described herein advantageously provide nonvolatile storage via the non-volatile memory subsystem 1040 in addition to high-performance (e.g., high speed) storage via the volatile memory subsystem 1030. In certain embodiments, the first plurality of volatile memory elements 1032 comprises two or more dynamic random-access memory (DRAM) elements. Types of DRAM elements 1032 compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). For example, in the block diagram of FIG. 12, the first memory bank 1030 comprises eight 64M×8 DDR2 SDRAM elements 1032. The volatile memory elements 1032 may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory elements 1032 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Volatile memory elements 1032 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBOA), micro-BOA (1.1,BGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

In certain embodiments, the second plurality of non-volatile memory elements 1042 comprises one or more flash memory elements. Types of flash memory elements 1042 compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC). For example, in the block diagram of FIG. 12, the second memory bank 1040 comprises 512 MB of flash memory organized as four 128 Mb×8 NAND flash memory elements 1042. In addition, nonvolatile memory elements 1042 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Non-volatile memory elements 1042 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BOA), fine-pitch BOA (FBGA), micro-BOA (POA), mini-BGA (mBGA), and chip-scale packaging (CSP).

FIG. 13 is a block diagram of an example memory module 10 with ECC (error-correcting code) having a volatile memory subsystem 1030 with nine volatile memory elements 1032 and a non-volatile memory subsystem 1040 with five non-volatile memory elements 1042 in accordance with certain embodiments described herein. The additional memory element 1032 of the first memory bank 1030 and the additional memory element 1042 of the second memory bank 1040 provide the ECC capability. In certain other embodiments, the volatile memory subsystem 1030 comprises other numbers of volatile memory elements 1032 (e.g., 2, 3, 4, 5, 6, 7, more than 9). In certain embodiments, the non-volatile memory subsystem 1040 comprises other numbers of nonvolatile memory elements 1042 (e.g., 2, 3, more than 5).

23

Referring to FIG. **12**, in certain embodiments, the logic element **1070** comprises a field-programmable gate array (FPGA). In certain embodiments, the logic element **1070** comprises an FPGA available from Lattice Semiconductor Corporation which includes an internal flash. In certain other embodiments, the logic element **1070** comprises an FPOA available from another vendor. The internal flash can improve the speed of the memory system **1010** and save physical space. Other types of logic elements **1070** compatible with certain embodiments described herein include, but are not limited to, a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, a complex programmable logic device (CPLD). In certain embodiments, the logic element **1070** is a custom device. In certain embodiments, the logic element **1070** comprises various discrete electrical elements, while in certain other embodiments, the logic element **1070** comprises one or more integrated circuits. FIG. **14** is a block diagram of an example memory module **1010** having a microcontroller unit **1060** and logic element **1070** integrated into a single controller **1062** in accordance with certain embodiments described herein. In certain embodiments, the controller **1062** includes one or more other components. For example, in one embodiment, an FPGA without an internal flash is used and the controller **1062** includes a separate flash memory component which stores configuration information to program the FPGA.

In certain embodiments, the at least one circuit **1052** comprises one or more switches coupled to the volatile memory subsystem **1030**, to the controller **1062**, and to the host computer (e.g., via the interface **1022**, as schematically illustrated by FIGS. **12-14**). The one or more switches are responsive to signals (e.g., from the controller **1062**) to selectively operatively decouple the controller **1062** from the volatile memory subsystem **1030** and to selectively operatively couple the controller **1062** to the volatile memory subsystem **1030**. In addition, in certain embodiments, the at least one circuit **1052** selectively operatively couples and decouples the volatile memory subsystem **1030** and the host system.

In certain embodiments, the volatile memory subsystem **1030** can comprise a registered DIMM subsystem comprising one or more registers **1160** and a plurality of DRAM elements **1180**, as schematically illustrated by FIG. **15A**. In certain such embodiments, the at least one circuit **1052** can comprise one or more switches **1172** coupled to the controller **1062** (e.g., logic element **1070**) and to the volatile memory subsystem **1030** which can be actuated to couple and decouple the controller **1062** to and from the volatile memory subsystem **1030**, respectively. The memory system **1010** further comprises one or more switches **1170** coupled to the one or more registers **1160** and to the plurality of DRAM elements **1180** as schematically illustrated by FIG. **15A**. The one or more switches **1170** can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem **1030** to the host system **1150**. In certain other embodiments, as schematically illustrated by FIG. **15B**, the one or more switches **1174** are also coupled to the one or more registers **1160** and to a power source **1162** for the one or more registers **1160**. The one or more switches **1174** can be selectively switched to turn power on or off to the one or more registers **1160**, thereby selectively operatively coupling the volatile memory subsystem **1030** to the host system **1150**. As schematically illustrated by FIG. **15C**, in certain embodiments the at least one circuit **1052** comprises a dynamic on-die termination (ODT) **1176** circuit of the logic element **1070**. For example, the logic element **1070**

24

can comprise a dynamic ODT circuit **1176** which selectively operatively couples and decouples the logic element **1070** to and from the volatile memory subsystem **1030**, respectively. In addition, and similar to the example embodiment of FIG. **15A** described above, the one or more switches **1170** can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem **1030** to the host system **1150**.

Certain embodiments described herein utilize the non-volatile memory subsystem **1040** as a flash "mirror" to provide backup of the volatile memory subsystem **1030** in the event of certain system conditions. For example, the non-volatile memory subsystem **1040** may backup the volatile memory subsystem **1030** in the event of a trigger condition, such as, for example, a power failure or power reduction or a request from the host system. In one embodiment, the nonvolatile memory subsystem **1040** holds intermediate data results in a noisy system environment when the host computer system is engaged in a long computation. In certain embodiments, a backup may be performed on a regular basis. For example, in one embodiment, the backup may occur every millisecond in response to a trigger condition. In certain embodiments, the trigger condition occurs when the memory system **1010** detects that the system voltage is below a certain threshold voltage. For example, in one embodiment, the threshold voltage is **1010** percent below a specified operating voltage. In certain embodiments, a trigger condition occurs when the voltage goes above a certain threshold value, such as, for example, **1010** percent above a specified operating voltage. In some embodiments, a trigger condition occurs when the voltage goes below a threshold or above another threshold. In various embodiments, a backup and/or restore operation may occur in reboot and/or non-reboot trigger conditions.

As schematically illustrated by FIGS. **12** and **13**, in certain embodiments, the controller **1062** may comprise a microcontroller unit (MCU) **1060** and a logic element **1070**. In certain embodiments, the MCU **1060** provides memory management for the non-volatile memory subsystem **1040** and controls data transfer between the volatile memory subsystem **30** and the nonvolatile memory subsystem **1040**. The MCU **1060** of certain embodiments comprises a 16-bit microcontroller, although other types of microcontrollers are also compatible with certain embodiments described herein. As schematically illustrated by FIGS. **12** and **13**, the logic element **1070** of certain embodiments is in electrical communication with the non-volatile memory subsystem **1040** and the MCU **1060**. The logic element **1070** can provide signal level translation between the volatile memory elements **1032** (e.g., 1.8V SSTL-2 for DDR2 SDRAM elements) and the non-volatile memory elements **1042** (e.g., 3V TTL for NAND flash memory elements). In certain embodiments, the logic element **1070** is also programmed to perform address/address translation between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040**. In certain preferred embodiments, 1-NAND type flash are used for the non-volatile memory elements **1042** because of their superior read speed and compact structure.

The memory system **1010** of certain embodiments is configured to be operated in at least two states. The at least two states can comprise a first state in which the controller **1062** and the non-volatile memory subsystem **1040** are operatively decoupled (e.g., isolated) from the volatile memory subsystem **1030** by the at least one circuit **1052** and a second state in which the volatile memory subsystem **1030** is operatively coupled to the controller **1062** to allow data to

US 11,016,918 B2

25

26

be communicated between the volatile memory subsystem **1030** and the nonvolatile memory subsystem **1040** via the controller **1062**. The memory system **1010** may transition from the first state to the second state in response to a trigger condition, such as when the memory system **1010** detects that there is a power interruption (e.g., power failure or reduction) or a system hang-up.

The memory system **1010** may further comprise a voltage monitor **1050**. The voltage monitor circuit **1050** monitors the voltage supplied by the host system via the interface **1022**. Upon detecting a low voltage condition (e.g., due to a power interruption to the host system), the voltage monitor circuit **1050** may transmit a signal to the controller **1062** indicative of the detected condition. The controller **1062** of certain embodiments responds to the signal from the voltage monitor circuit **1050** by transmitting a signal to the at least one circuit **1052** to operatively couple the controller to the volatile memory system **1030**, such that the memory system **1010** enters the second state. For example, the voltage monitor **1050** may send a signal to the MCU **1060** which responds by accessing the data on the volatile memory system **1030** and by executing a write cycle on the nonvolatile memory subsystem **1040**. During this write cycle, data is read from the volatile memory subsystem **1030** and is transferred to the non-volatile memory subsystem **1040** via the MCU **1060**. In certain embodiments, the voltage monitor circuit **1050** is part of the controller **1062** (e.g., part of the MCU **1060**) and the voltage monitor circuit **1050** transmits a signal to the other portions of the controller **1062** upon detecting a power threshold condition.

The isolation or operational decoupling of the volatile memory subsystem **1030** from the non-volatile memory subsystem in the first state can preserve the integrity of the operation of the memory system **1010** during periods of operation in which signals (e.g., data) are transmitted between the host system and the volatile memory subsystem **1030**. For example, in one embodiment during such periods of operation, the controller **1062** and the nonvolatile memory subsystem **1040** do not add a significant capacitive load to the volatile memory system **1030** when the memory system **1010** is in the first state. In certain such embodiments, the capacitive load of the controller **1062** and the non-volatile memory subsystem **1040** do not significantly affect the signals propagating between the volatile memory subsystem **1030** and the host system. This can be particularly advantageous in relatively high-speed memory systems where loading effects can be significant. In one preferred embodiment, the at least one circuit **1052** comprises an FSA1208 Low-Power, Eight-Port, Hi-Speed Isolation Switch from Fairchild Semiconductor. In other embodiments, the at least one circuit **1052** comprises other types of isolation devices.

Power may be supplied to the volatile memory subsystem **1030** from a first power supply (e.g., a system power supply) when the memory system **1010** is in the first state and from a second power supply **1080** when the memory system **1010** is in the second state. In certain embodiments, the memory system **1010** is in the first state when no trigger condition (e.g., a power failure) is present and the memory system **1010** enters the second state in response to a trigger condition. In certain embodiments, the memory system **1010** has a third state in which the controller **1062** is operatively decoupled from the volatile memory subsystem **1030** and power is supplied to the volatile memory subsystem **1030** from a third power supply (not shown). For example, in one embodiment the third power supply may provide power to

the volatile memory subsystem **1030** when the memory system **1010** detects that a trigger condition is likely to occur but has not yet occurred.

In certain embodiments, the second power supply **1080** does not comprise a battery. Because a battery is not used, the second power supply **1080** of certain embodiments may be relatively easy to maintain, does not generally need to be replaced, and is relatively environmentally friendly. In certain embodiments, as schematically illustrated by FIGS. **12-14**, the second power supply **1080** comprises a step-up transformer **1082**, a step-down transformer **1084**, and a capacitor bank **1086** comprising one or more capacitors (e.g., double-layer capacitors). In one example embodiment, capacitors may take about three to four minutes to charge and about two minutes to discharge. In other embodiments, the one or more capacitors may take a longer time or a shorter time to charge and/or discharge. For example, in certain embodiments, the second power supply **1080** is configured to power the volatile memory subsystem **1030** for less than thirty minutes. In certain embodiments, the second power supply **1080** may comprise a battery. For example, in certain embodiments, the second power supply **1080** comprises a battery and one or more capacitors and is configured to power the volatile memory subsystem **1030** for no more than thirty minutes.

In certain embodiments, the capacitor bank **1086** of the second power supply **1080** is charged by the first power supply while the memory system **1010** is in the first state. As a result, the second power supply **1080** is fully charged when the memory system **1010** enters the second state. The memory system **1010** and the second power supply **1080** may be located on the same printed circuit board **1020**. In other embodiments, the second power supply **1080** may not be on the same printed circuit board **1020** and may be tethered to the printed circuit board **1020**, for example.

When operating in the first state, in certain embodiments, the step-up transformer **1082** keeps the capacitor bank **1086** charged at a peak value. In certain embodiments, the step-down transformer **1084** acts as a voltage regulator to ensure that regulated voltages are supplied to the memory elements (e.g., 1.8V to the volatile DRAM elements **1032** and 3.0V to the non-volatile flash memory elements **1042**) when operating in the second state (e.g., during power down). In certain embodiments, as schematically illustrated by FIGS. **12-14**, the memory module **1010** further comprises a switch **1090** (e.g., FET switch) that switches power provided to the controller **1062**, the volatile memory subsystem **1030**, and the non-volatile memory subsystem **1040**, between the power from the second power supply **1080** and the power from the first power supply (e.g., system power) received via the interface **1022**. For example, the switch **1090** may switch from the first power supply to the second power supply **1080** when the voltage monitor **1050** detects a low voltage condition. The switch **1090** of certain embodiments advantageously ensures that the volatile memory elements **1032** and non-volatile memory elements **1042** are powered long enough for the data to be transferred from the volatile memory elements **1032** and stored in the non-volatile memory elements **1042**. In certain embodiments, after the data transfer is complete, the switch **1090** then switches back to the first power supply and the controller **1062** transmits a signal to the at least one circuit **1052** to operatively decouple the controller **1062** from the volatile memory subsystem **1030**, such that the memory system **1010** reenters the first state.

When the memory system **1010** re-enters the first state, data may be transferred back from the non-volatile memory

US 11,016,918 B2

27 28

subsystem **1040** to the volatile memory subsystem **1030** via the controller **1062**. The host system can then resume accessing the volatile memory subsystem **1030** of the memory module **1010**. In certain embodiments, after the memory system **1010** enters or re-enters the first state (e.g., after power is restored), the host system accesses the volatile memory subsystem **1030** rather than the non-volatile memory subsystem **1040** because the volatile memory elements **1032** have superior read/write characteristics. In certain embodiments, the transfer of data from the volatile memory bank **1030** to the nonvolatile memory bank **1040**, or from the non-volatile memory bank **1040** to the volatile. memory bank **1030**, takes less than one minute per GB.

In certain embodiments, the memory system **1010** protects the operation of the volatile memory when communicating with the host-system and provides backup and restore capability in the event of a trigger condition such as a power failure. In certain embodiments, the memory system **1010** copies the entire contents of the volatile memory subsystem **1030** into the nonvolatile memory subsystem **1040** on each backup operation. Moreover, in certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are copied back into the volatile memory subsystem **1030** on each restore operation. In certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are accessed for each backup and/or restore operation, such that the non-volatile memory subsystem **1040** (e.g., flash memory subsystem) is used generally uniformly across its memory space and wear-leveling is not performed by the memory system **1010**. In certain embodiments, avoiding wear-leveling can decrease cost and complexity of the memory system **1010** and can improve the performance of the memory system **1010**. In certain other embodiments, the entire contents of the volatile memory subsystem **1030** are not copied into the non-volatile memory subsystem **1040** on each backup operation, but only a partial copy is performed. In certain embodiments, other management capabilities such as bad-block management and error management for the flash memory elements of the non-volatile memory subsystem **1040** are performed in the controller **1062**.

The memory system **1010** generally operates as a write-back cache in certain embodiments. For example, in one embodiment, the host system (e.g., a disk controller) writes data to the volatile memory subsystem **1030** which then writes the data to non-volatile storage which is not part of the memory system **1010**, such as, for example, a hard disk. The disk controller may wait for an acknowledgment signal from the memory system **1010** indicating that the data has been written to the hard disk or is otherwise secure. The memory system **1010** of certain embodiments can decrease delays in the system operation by indicating that the data has been written to the hard disk before it has actually done so. In certain embodiments, the memory system **1010** will still be able to recover the data efficiently in the event of a power outage because of the backup and restore capabilities described herein. In certain other embodiments, the memory system **1010** may be operated as a write-through cache or as some other type of cache.

FIG. **16** schematically illustrates an example power module **1100** of the memory system **1010** in accordance with certain embodiments described herein. The power module **1100** provides power to the various components of the memory system **1010** using different elements based on a state of the memory system **1010** in relation to a trigger condition. In certain embodiments, the power module **1100** comprises one or more of the components described above with respect to FIG. **12**. For example, in certain embodi-

ments, the power module **1100** includes the second power supply **1080** and the switch **1090**.

The power module **1100** provides a plurality of voltages to the memory system **1010** comprising non-volatile and volatile memory subsystems **1030**, **1040**. The plurality of voltages comprises at least a first voltage **1102** and a second voltage **1104**. The power module **1100** comprises an input **1106** providing a third voltage **1108** to the power module **1100** and a voltage conversion element **1120** configured to provide the second voltage **1104** to the memory system **1010**. The power module **1100** further comprises a first power element **1130** configured to selectively provide a fourth voltage **1110** to the conversion element **1120**. In certain embodiments, the first power element **1130** comprises a pulse-width modulation power controller. For example, in one example embodiment, the first power element **1130** is configured to receive a 1.8V input system voltage as the third voltage **1108** and to output a modulated 5V output as the fourth voltage **1110**.

The power module **1100** further comprises a second power element **1140** can be configured to selectively provide a fifth voltage **1112** to the conversion element **1120**. The power module **1100** can be configured to selectively provide the first voltage **1102** to the memory system **1010** either from the conversion element **1120** or from the input **1106**.

The power module **1100** can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage **1102** is provided to the memory system **1010** from the input **1106** and the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130**. In a second state, the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130** and the first voltage **1102** is provided to the memory system **1010** from the conversion element **1120**. In the third state, the fifth voltage **1112** is provided to the conversion element **1120** from the second power element **1140** and the first voltage **1104** is provided to the memory system **1010** from the conversion element **1120**.

In certain embodiments, the power module **1100** transitions from the first state to the second state upon detecting that a trigger condition is likely to occur and transitions from the second state to the third state upon detecting that the trigger condition has occurred. For example, the power module **1100** may transition to the second state when it detects that a power failure is about to occur and transitions to the third state when it detects that the power failure has occurred. In certain embodiments, providing the first voltage **1102** in the second state from the first power element **1130** rather than from the input **1106** allows a smoother transition from the first state to the third state. For example, in certain embodiments, providing the first voltage **1102** from the first power element **1130** has capacitive and other smoothing effects. In addition, switching the point of power transition to be between the conversion element **1120** and the first and second power elements **1130**, **1140** (e.g., the sources of the pre-regulated fourth voltage **1110** in the second state and the pre-regulated fifth voltage **1112** in the third state) can smooth out potential voltage spikes.

In certain embodiments, the second power element **1140** does not comprise a battery and may comprise one or more capacitors. For example, as schematically illustrated in FIG. **16**, the second power element **1140** comprises a capacitor array **1142**, a buck-boost converter **1144** which adjusts the voltage for charging the capacitor array and a voltage/current limiter **1146** which limits the charge current to the capacitor array **1142** and stops charging the capacitor array **1142** when it has reached a certain charge voltage. In one

29

30

example embodiment, the capacitor array **1142** comprises two 50 farad capacitors capable of holding a total charge of 4.6V. For example, in one example embodiment, the buck-boost converter **1144** receives a 1.8V system voltage (first voltage **1108**) and boosts the voltage to 4.3V which is outputted to the voltage current limiter **1146**. The voltage/current limiter **1146** limits the current going to the capacitor array **1142** to 1A and stops charging the array **1142** when it is charged to 4.3V. Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the second power element **1140** may include alternative embodiments. For example, different components and/or different value components may be used. For example, in other embodiments, a pure boost converter may be used instead of a buck-boost converter. In another embodiment, only one capacitor may be used instead of a capacitor array **1142**.

The conversion element **1120** can comprise one or more buck converters and/or one or more buck-boost converters. The conversion element **1120** may comprise a plurality of sub-blocks **1122**, **1124**, **1126** as schematically illustrated by FIG. **16**, which can provide more voltages in addition to the second voltage **1104** to the memory system **1010**. The sub-blocks may comprise various converter circuits such as buck-converters, boost converters, and buck-boost converter circuits for providing various voltage values to the memory system **1010**. For example, in one embodiment, sub-block **1122** comprises a buck converter, sub-block **1124** comprises a dual buck converter, and sub-block **1126** comprises a buck-boost converter as schematically illustrated by FIG. **16**. Various other components for the sub-blocks **1122**, **1124**, **1126** of the conversion element **1120** are also compatible with certain embodiments described herein. In certain embodiments, the conversion element **1120** receives as input either the fourth voltage **1110** from the first power element **1130** or the fifth voltage **1112** from the second power element **1140**, depending on the state of the power module **1100**, and reduces the input to an appropriate amount for powering various components of the memory system. For example, the buck-converter of sub-block **1122** can provide 1.8V at 2A for about 60 seconds to the volatile memory elements **1032** (e.g., DRAM), the non-volatile memory elements **1042** (e.g., flash), and the controller **1062** (e.g., an FPGA) in one embodiment. The sub-block **1124** can provide the second voltage **1104** as well as another reduced voltage **1105** to the memory system **1010**. In one example embodiment, the second voltage **1104** is 2.5V and is used to power the at least one circuit **1052** (e.g., isolation device) and the other reduced voltage **1105** is 1.2V and is used to power the controller **1062** (e.g., FPGA). The subblock **1126** can provide yet another voltage **1107** to the memory system **1010**. For example, the voltage **1107** may be 3.3V and may be used to power both the controller **1062** and the at least one circuit **1052**.

Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the conversion element **1120** may include alternative embodiments. For example, there may be more or less sub-blocks which may comprise other types of converters (e.g., pure boost converters) or which may produce different voltage values. In one embodiment, the volatile memory elements **1032** and nonvolatile memory elements **1042** are powered using independent voltages and are not both powered using the first voltage **1102**.

FIG. **17** is a flowchart of an example method **1200** of providing a first voltage **1102** and a second voltage **1104** to a memory system **1010** including volatile and nonvolatile memory subsystems **1030**, **1040**. While the method **1200** is described herein by reference to the memory system **1010** schematically illustrated by FIGS. **12-15**, other memory systems are also compatible with embodiments of the method **1200**. During a first condition, the method **1200** comprises providing the first voltage **1102** to the memory system **1010** from an input power supply **1106** and providing the second voltage **1104** to the memory system **1010** from a first power subsystem in operational block **1210**. For example, in one embodiment, the first power subsystem comprises the first power element **1130** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, other first power subsystems are used.

The method **1200** further comprises detecting a second condition in operational block **1220**. In certain embodiments, detecting the second condition comprises detecting that a trigger condition is likely to occur. During the second condition, the method **1200** comprises providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the first power subsystem in an operational block **1230**. For example, referring to FIG. **16**, a switch **1148** can be toggled to provide the first voltage **1102** from the conversion element **1120** rather than from the input power supply.

The method **1200** further comprises charging a second power subsystem in operational block **1240**. In certain embodiments, the second power subsystem comprises the second power element **1140** or another power supply that does not comprise a battery. For example, in one embodiment, the second power subsystem comprises the second power element **1140** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, some other second power subsystem is used.

The method **1200** further comprises detecting a third condition in an operational block **1250** and during the third condition, providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the second power subsystem **1140** in an operational block **1260**. In certain embodiments, detecting the third condition comprises detecting that the trigger condition has occurred. The trigger condition may comprise various conditions described herein. In various embodiments, for example, the trigger condition comprises a power reduction, power failure, or system hang-up. The operational blocks of the method **1200** may be performed in different orders in various embodiments. For example, in certain embodiments, the second power subsystem **1140** is charged before detecting the second condition.

In certain embodiments, the memory system **1010** comprises a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040** comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system **1010** also comprises a controller **1062** operatively coupled to the volatile memory subsystem **1030** and operatively coupled to the non-volatile memory subsystem **1040**. The controller **1062** can be configured to allow data to be communicated between the volatile memory subsystem **1030** and the host system when the memory system **1010** is operating in a first state and to allow data to be communicated between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040** when the memory system **1010** is operating in a second state.

Although the memory system **1010** having extra storage capacity of the non-volatile memory subsystem **1040** has been described with respect to certain embodiments, alter-

US 11,016,918 B2

31                                                  32

native configurations exist. For example, in certain embodiments, there may be more than 100 percent more storage capacity in the non-volatile memory subsystem 1040 than in the volatile memory subsystem 1030. In various embodiments, there may be at least 200, 300, or 400 percent more storage capacity in the non-volatile memory subsystem 1040 than in the volatile memory subsystem 1030. In other embodiments, the non-volatile memory subsystem 1040 includes at least some other integer multiples of the storage capacity of the volatile memory subsystem 1030. In some embodiments, the non-volatile memory subsystem 1040 includes a non-integer multiple of the storage capacity of the volatile memory subsystem 1030. In one embodiment, the non-volatile memory subsystem 1040 includes less than 100 percent more storage capacity than does the volatile memory subsystem 1030.

The extra storage capacity of the non-volatile memory subsystem 1040 can be used to improve the backup capability of the memory system 1010. In certain embodiments in which data can only be written to portions of the non-volatile memory subsystem 1040 which do not contain data (e.g., portions which have been erased), the extra storage capacity of the nonvolatile memory subsystem 1040 allows the volatile memory subsystem 1030 to be backed up in the event of a subsequent power failure or other trigger event. For example, the extra storage capacity of the non-volatile memory subsystem 1040 may allow the memory system 1010 to backup the volatile memory subsystem 1030 efficiently in the event of multiple trigger conditions (e.g., power failures). In the event of a first power failure, for example, the data in the volatile memory system 1030 is copied to a first, previously erased portion of the nonvolatile memory subsystem 1040 via the controller 1062. Since the non-volatile memory subsystem 1040 has more storage capacity than does the volatile memory subsystem 1030, there is a second portion of the non-volatile memory subsystem 1040 which does not have data from the volatile memory subsystem 1030 copied to it and which remains free of data (e.g., erased). Once system power is restored, the controller 1062 of the memory system 1010 restores the data to the volatile memory subsystem 1030 by copying the backed-up data from the non-volatile memory subsystem 1040 back to the volatile memory subsystem 1030. After the data is restored, the memory system 1010 erases the non-volatile memory subsystem 1040. While the first portion of the non-volatile memory subsystem 1040 is being erased, it may be temporarily unaccessible.

If a subsequent power failure occurs before the first portion of the non-volatile memory subsystem 1040 is completely erased, the volatile memory subsystem 1030 can be backed-up or stored again in the second portion of the non-volatile memory subsystem 1040 as described herein. In certain embodiments, the extra storage capacity of the non-volatile memory subsystem 1040 may allow the memory system 1010 to operate more efficiently. For example, because of the extra storage capacity of the non-volatile memory subsystem 1040, the memory system 1010 can handle a higher frequency of trigger events that is not limited by the erase time of the non-volatile memory subsystem 1040.

FIG. 18 is a flowchart of an example method 1300 of controlling a memory system 1010 operatively coupled to a host system and which includes a volatile memory subsystem 1030 and a non-volatile memory subsystem 1040. In certain embodiments, the non-volatile memory subsystem 1040 comprises at least 100 percent more storage capacity than does the volatile memory subsystem 30 as described

herein. While the method 1300 is described herein by reference to the memory system 1010 schematically illustrated by FIGS. 12-14, the method 1300 can be practiced using other memory systems in accordance with certain embodiments described herein. In an operational block 1310, the method 1300 comprises communicating data between the volatile memory subsystem 1030 and the host system when the memory system 1010 is in a first mode of operation. The method 1300 further comprises storing a first copy of data from the volatile memory subsystem 1030 to the non-volatile memory subsystem 1040 at a first time when the memory system 1010 is in a second mode of operation in an operational block 1320.

In an operational block 1330, the method 1300 comprises restoring the first copy of data from the non-volatile memory subsystem 1040 to the volatile memory subsystem 1030. The method 1300 further comprises erasing the first copy of data from the non-volatile memory subsystem 1040 in an operational block 1340. The method further comprises storing a second copy of data from the volatile memory subsystem 1030 to the non-volatile memory subsystem 1040 at a second time when the memory system 1010 is in the second mode of operation in an operational block 1350. Storing the second copy begins before the first copy is completely erased from the non-volatile memory subsystem 1040.

In some embodiments, the memory system 1010 enters the second mode of operation in response to a trigger condition, such as a power failure. In certain embodiments, the first copy of data and the second copy of data are stored in separate portions of the nonvolatile memory subsystem 1040. The method 1300 can also include restoring the second copy of data from the non-volatile memory subsystem 1040 to the volatile memory subsystem 1030 in an operational block 1360. The operational blocks of method 1300 referred to herein may be performed in different orders in various embodiments. For example, in some embodiments, the second copy of data is restored to the volatile memory subsystem 1030 at operational block 1360 before the first copy of data is completely erased in the operational block 1340.

FIG. 19 schematically illustrates an example clock distribution topology 1400 of a memory system 1010 in accordance with certain embodiments described herein. The clock distribution topology 1400 generally illustrates the creation and routing of the clock signals provided to the various components of the memory system 1010. A clock source 1402 such as, for example, a 25 MHz oscillator, generates a clock signal. The clock source 1402 may feed a clock generator 1404 which provides a clock signal 1406 to the controller 1062, which may be an FPGA. In one embodiment, the clock generator 1404 generates a 125 MHz clock signal 1406. The controller 1062 receives the clock signal 1406 and uses it to clock the controller 1062 master state control logic. For example, the master state control logic may control the general operation of an FPGA controller 1062.

The clock signal 1406 can also be input into a clock divider 1410 which produces a frequency-divided version of the clock signal 1406. In an example embodiment, the clock divider 1410 is a divide by two clock divider and produces a 62.5 MHz clock signal in response to the 125 MHz clock signal 1406. A non-volatile memory phase-locked loop (PLL) block 1412 can be included (e.g., in the controller 1062) which distributes a series of clock signals to the non-volatile memory subsystem 1040 and to associated control logic. For example, a series of clock signals 1414 can

US 11,016,918 B2

33                                    34

be sent from the controller **1062** to the non-volatile memory subsystem **1040**. Another clock signal **1416** can be used by the controller logic which is dedicated to controlling the non-volatile memory subsystem **1040**. For example, the clock signal **1416** may clock the portion of the controller **1062** which is dedicated to generating address and/or control lines for the non-volatile memory subsystem **1040**. A feedback clock signal **1418** is fed back into the non-volatile memory PLL block **1412**. In one embodiment, the PLL block **1412** compares the feedback clock **1418** to the reference clock **1411** and varies the phase and frequency of its output until the reference **1411** and feedback **1418** clocks are phase and frequency matched.

A version of the clock signal **1406** such as the backup clock signal **1408** may be sent from the controller to the volatile memory subsystem **1030**. The clock signal **1408** may be, for example, a differential version of the clock signal **1406**. As described herein, the backup clock signal **1408** may be used to clock the volatile memory subsystem **1030** when the memory system **1010** is backing up the data from the volatile memory subsystem **1030** into the non-volatile memory subsystem **1040**. In certain embodiments, the backup clock signal **1408** may also be used to clock the volatile memory subsystem **1030** when the memory system **1010** is copying the backed-up data back into the volatile memory subsystem **1030** from the nonvolatile memory subsystem **1040** (also referred to as restoring the volatile memory subsystem **1030**). The volatile memory subsystem **1030** may normally be run at a higher frequency (e.g., DRAM running at 400 MHz) than the nonvolatile memory subsystem **1040** (e.g., flash memory running at 62.5 MHz) when communicating with the host system (e.g., when no trigger condition is present). However, in certain embodiments the volatile memory subsystem **1030** may be operated at a reduced frequency (e.g., at twice the frequency of the non-volatile memory subsystem **1040**) without introducing significant delay into the system during backup operation and/or restore operations. Running the volatile memory subsystem **1030** at the reduced frequency during a backup and/or restore operation may advantageously reduce overall power consumption of the memory system **1010**.

In one embodiment, the backup clock **1408** and the volatile memory system clock signal **1420** are received by a multiplexer **1422**, as schematically illustrated by FIG. **19**. The multiplexer **1422** can output either the volatile memory system clock signal **1420** or the backup clock signal **1408** depending on the backup state of the memory system **1010**. For example, when the memory system **1010** is not performing a backup or restore operation and is communicating with the host system (e.g., normal operation), the volatile memory system clock signal **1420** may be provided by the multiplexer **422** to the volatile memory PLL block **1424**. When the memory system **1010** is performing a backup (or restore) operation, the backup clock signal **1408** may be provided.

The volatile memory PLL block **1424** receives the volatile memory reference clock signal **1423** from the multiplexer **1422** and can generate a series of clock signals which are distributed to the volatile memory subsystem **1030** and associated control logic. For example, in one embodiment, the PLL block **1424** generates a series of clock signals **1426** which clock the volatile memory elements **1032**. A clock signal **1428** may be used to clock control logic associated with the volatile memory elements, such as one or more registers (e.g., the one or more registers of a registered DIMM). Another clock signal **1430** may be sent to the controller **1062**. A feedback clock signal **1432** is fed back

into the volatile memory PLL block **1424**. In one embodiment, the PLL block **1424** compares the feedback clock signal **1432** to the reference clock signal **1423** and varies the phase and frequency of its output until the reference clock signal **1423** and the feedback clock signal **1432** clocks are phase and frequency matched.

The clock signal **1430** may be used by the controller **1062** to generate and distribute clock signals which will be used by controller logic which is configured to control the volatile memory subsystem **1030**. For example, control logic in the controller **1062** may be used to control the volatile memory subsystem **1030** during a backup or restore operation. The clock signal **1430** may be used as a reference clock signal for the PLL block **1434** which can generate one or more clocks **1438** used by logic in the controller **1062**. For example, the PLL block **1434** may generate one or more clock signals **1438** used to drive logic circuitry associated with controlling the volatile memory subsystem **1030**. In certain embodiments, the PLL block **1434** includes a feedback clock signal **1436** and operates in a similar manner to other PLL blocks described herein.

The clock signal **1430** may be used as a reference clock signal for the PLL block **1440** which may generate one or more clock signals used by a sub-block **1442** to generate one or more other clock signals **1444**. In one embodiment, for example, the volatile memory subsystem **1030** comprises DDR2 SDRAM elements and the sub-block **1442** generates one or more DDR2 compatible clock signals **1444**. A feedback clock signal **1446** is fed back into the PLL block **1440**. In certain embodiments, the PLL block **1440** operates in a similar manner to other PLL blocks described herein.

While described with respect to the example embodiment of FIG. **19**, various alternative clock distribution topologies are possible. For example, one or more of the clock signals have a different frequency in various other embodiments. In some embodiments, one or more of the clocks shown as differential signals are single ended signals. In one embodiment, the volatile memory subsystem **1030** operates on the volatile memory clock signal **1420** and there is no backup clock signal **1408**. In some embodiments, the volatile memory subsystem **1030** is operated at a reduced frequency during a backup operation and not during a restore operation. In other embodiments, the volatile memory subsystem **1030** is operated at a reduced frequency during a restore operation and not during a backup operation.

FIG. **20** is a flowchart of an example method **1500** of controlling a memory system **1010** operatively coupled to a host system. Although described with respect to the memory system **1010** described herein, the method **1500** is compatible with other memory systems. The memory system **1010** may include a clock distribution topology **1400** similar to the one described above with respect to FIG. **19** or another clock distribution topology. The memory system **1010** can include a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**.

In an operational block **1510**, the method **1500** comprises operating the volatile memory subsystem **1030** at a first frequency when the memory system **1010** is in a first mode of operation in which data is communicated between the volatile memory subsystem **1030** and the host system. In an operational block **1520**, the method **1500** comprises operating the non-volatile memory subsystem **1040** at a second frequency when the memory system **1010** is in a second mode of operation in which data is communicated between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040**. The method **1500** further comprises operating the volatile memory subsystem **1030** at a

US 11,016,918 B2

35      36

third frequency in an operational block 1530 when the memory system 1010 is in the second mode of operation. In certain embodiments, the memory system 1010 is not powered by a battery when it is in the second mode of operation. The memory system 1010 may switch from the first mode of operation to the second mode of operation in response to a trigger condition. The trigger condition may be any trigger condition described herein such as, for example, a power failure condition. In certain embodiments, the second mode of operation includes both backup and restore operations as described herein. In other embodiments, the second mode of operation includes backup operations but not restore operations. In yet other embodiments, the second mode of operation includes restore operations but not backup operations.

The third frequency can be less than the first frequency. For example, the third frequency can be approximately equal to the second frequency. In certain embodiments, the reduced frequency operation is an optional mode. In yet other embodiments, the first, second and/or third frequencies are configurable by a user or by the memory system 1010.

FIG. 21 schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments 1630, 1640 of a volatile memory subsystem 1030 of a memory system 1010 to a controller 1062 of the memory system 1010. While the example of FIG. 21 shows a topology including two DRAM segments 1630, 1640 for the purposes of illustration, each address location of the volatile memory subsystem 1030 comprises more than the two segments in certain embodiments. The data lines 1632, 1642 from the first DRAM segment 1630 and the second DRAM segment 1640 of the volatile memory subsystem 1030 are coupled to switches 1650, 1652 which are coupled to the controller 1062 (e.g., logic element 1070) of the memory system 1010. The chip select lines 1634, 1644 and the self-refresh lines 1636, 1646 (e.g., CKe signals) of the first and second DRAM segments 1630, 1640, respectively, are coupled to the controller 1062. In certain embodiments, the controller 1062 comprises a buffer (not shown) which is configured to store data from the volatile memory subsystem 1030. In certain embodiments, the buffer is a first-in, first out buffer (FIFO). In certain embodiments, data slices from each DRAM segment 1630, 1640 comprise a portion of the volatile memory subsystem data bus. In one embodiment, for example, the volatile memory subsystem 1030 comprises a 72-bit data bus (e.g., each data word at each addressable location is 72 bits wide and includes, for example, 64 bits of accessible SDRAM and 8 bits of ECC), the first data slice from the first DRAM segment 1630 may comprise 40 bits of the data word, and the second data slice from the second DRAM segment 1640 may comprise the remaining 32 bits of the data word. Certain other embodiments comprise data buses and/or data slices of different sizes.

In certain embodiments, the switches 1650, 1652 can each be selectively switched to selectively operatively couple the data lines 1632, 1642, respectively from the first and second DRAM segments 1630, 1640 to the controller 1062. The chip select lines 1634, 1644 enable the first and second DRAM segments 1630, 1640, respectively, of the volatile memory subsystem 1030, and the self-refresh lines 1636, 1646 toggle the first and second DRAM segments 1630, 1640, respectively, from self-refresh mode to active mode. In certain embodiments, the first and second DRAM segments 1630, 1640 maintain stored information but are not accessible when they are in self-refresh mode, and maintain stored information and are accessible when they are in active mode.

In certain embodiments, when the memory system 1010 is backing up the volatile memory system 1030, data slices from only one of the two DRAM segments 1630, 1640 at a time are sent to the controller 1062. For example, when the first slice is being written to the controller 1062 during a back-up, the controller 1062 sends a signal via the CKe line 1636 to the first DRAM segment 1630 to put the first DRAM segment 1630 in active mode. In certain embodiments, the data slice from the first DRAM segment 1630 for multiple words (e.g., a block of words) is written to the controller 1062 before writing the second data slice from the second DRAM segment 1640 to the controller 1062. While the first data slice is being written to the controller 1062, the controller 1062 also sends a signal via the CKe line 1646 to put the second DRAM segment 1640 in self-refresh mode. Once the first data slice for one word or for a block of words is written to the controller 1062, the controller 1062 puts the first DRAM segment 1630 into self-refresh mode by sending a signal via the CKe line 1636 to the first DRAM segment 1640. The controller 1062 also puts the second DRAM segment 1640 into active mode by sending a signal via the CKe line 1646 to the DRAM segment 1640. The second slice for a word or for a block of words is written to the controller 1062. In certain embodiments, when the first and second data slices are written to the buffer in the controller 1062, the controller 1062 combines the first and second data slices 1630, 1640 into complete words or blocks of words and then writes each complete word or block of words to the non-volatile memory subsystem 1040. In certain embodiments, this process is called "slicing" the volatile memory subsystem 1030.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements 1042 write each backed-up data word to the controller 1062 which writes a first slice of the data word to the volatile memory subsystem 1030 and then a second slice of the data word to the volatile memory subsystem 1030. In certain embodiments, slicing the volatile memory subsystem 1030 during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem 1030 during a backup operation.

FIG. 22 is a flowchart of an example method 1600 of controlling a memory system 1010 operatively coupled to a host system and which includes a volatile memory subsystem 1030 and a non-volatile memory subsystem 1040. Although described with respect to the memory system 1010 described herein with respect to FIGS. 12-14 and 21, the method 1600 is compatible with other memory systems. The method 1600 comprises communicating data words between the volatile memory subsystem 1030 and the host system when the memory system 1010 is in a first mode of operation in an operational block 1610. For example, the memory system 1010 may be in the first mode of operation when no trigger condition has occurred and the memory system is not performing a backup and/or restore operation or is not being powered by a secondary power supply.

In an operational block 1620, the method further comprises transferring data words from the volatile memory subsystem 1030 to the non-volatile memory subsystem 1040 when the memory system 1010 is in a second mode of operation. In certain embodiments, each data word comprises the data stored in a particular address of the memory system 1010. The memory system 1010 may enter the second mode of operation, for example, when a trigger condition (e.g., a power failure) occurs. In certain embodiments, transferring each data word comprises storing a first

US 11,016,918 B2

37                                                                              38

portion (also referred to as a slice) of the data word in a buffer in an operational block **1622**, storing a second portion of the data word in the buffer in an operational block **1624**, and writing the entire data word from the buffer to the non-volatile memory subsystem **1040** in an operational block **1626**.

In one example embodiment, the data word may be a 72 bit data word (e.g., 64 bits of accessible SDRAM and 8 bits of ECC), the first portion (or "slice") may comprise 40 bits of the data word, and the second portion (or "slice") may comprise the remaining 32 bits of the data word. In certain embodiments, the buffer is included in the controller **1062**. For example, in one embodiment, the buffer is a first-in, first-out buffer implemented in the controller **1062** which comprises an FPGA. The method **1600** may generally be referred to as "slicing" the volatile memory during a backup operation. In the example embodiment, the process of "slicing" the volatile memory during a backup includes bringing the 32-bit slice out of self-refresh, reading a 32-bit block from the slice into the buffer, and putting the 32-bit slice back into self-refresh. The 40-bit slice is then brought out of self-refresh and a 40-bit block from the slice is read into a buffer. Each block may comprise a portion of multiple words. For example, each 32-bit block may comprise 32-bit portions of multiple 72-bit words. In other embodiments, each block comprises a portion of a single word. The 40-bit slice is then put back into self-refresh in the example embodiment. The 32-bit and 40-bit slices are then combined into a 72-bit block by the controller **1062** and ECC detection/correction is performed on each 72-bit word as it is read from the buffer and written into the non-volatile memory subsystem (e.g., flash).

In some embodiments, the entire data word may comprise more than two portions. For example, the entire data word may comprise three portions instead of two and transferring each data word further comprises storing a third portion of each data word in the buffer. In certain other embodiments, the data word may comprise more than three portions.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements **1040** write each backed-up data word to the controller **1062** which writes a first portion of the data word to the volatile memory subsystem **1030** and then a second portion of the data word to the volatile memory **1030**. In certain embodiments, slicing the volatile memory subsystem **1030** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **1030** during a backup operation.

The method **1600** can advantageously provide significant power savings and can lead to other advantages. For example, in one embodiment where the volatile memory subsystem **1030** comprises DRAM elements, only the slice of the DRAM which is currently being accessed (e.g., written to the buffer) during a backup is configured in full-operational mode. The slice or slices that are not being accessed may be put in self-refresh mode. Because DRAM in self-refresh mode uses significantly less power than DRAM in full-operational mode, the method **1600** can allow significant power savings. In certain embodiments, each slice of the DRAM includes a separate self-refresh enable (e.g., CKe) signal which allows each slice to be accessed independently.

In addition, the connection between the DRAM elements and the controller **1062** may be as large as the largest slice instead of as large as the data bus. In the example embodiment, the connection between the controller **1062** and the

DRAM may be 40 bits instead of 72 bits. As a result, pins on the controller **1062** may be used for other purposes or a smaller controller may be used due to the relatively low number of pin-outs used to connect to the volatile memory subsystem **1030**. In certain other embodiments, the full width of the data bus is connected between the volatile memory subsystem **1030** and the controller **1062** but only a portion of it is used during slicing operations. For example, in some embodiments, memory slicing is an optional mode.

While embodiments and applications have been shown and described, it would be apparent to those skilled in the art having the benefit of this disclosure that many more modifications than mentioned above are possible without departing from the inventive concepts disclosed herein. The invention, therefore, is not to be restricted except in the spirit of the appended claims.

What is claimed is:

1. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

a first buck converter configured to provide a first regulated voltage having a first voltage amplitude;

a second buck converter configured to provide a second regulated voltage having a second voltage amplitude;

a third buck converter configured to provide a third regulated voltage having a third voltage amplitude;

a converter circuit configured to provide a fourth regulated voltage having a fourth voltage amplitude; and

a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, the plurality of components comprising:

a plurality of synchronous dynamic random access memory (SDRAM) devices coupled to the first regulated voltage, and

at least one circuit coupled between a first portion of the plurality of edge connections and the plurality of SDRAM devices, the at least one circuit operable to (i) receive a first plurality of address and control signals via the first portion of the plurality of edge connections, and (ii) output a second plurality of address and control signals to the plurality of SDRAM devices, the at least one circuit coupled to both the second regulated voltage and the fourth regulated voltage, wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes.

2. The memory module of claim **1**, wherein the first and third buck converters are further configured to operate as a dual buck converter.

3. The memory module of claim **1**, wherein the first voltage amplitude is 1.8 volts.

4. The memory module of claim **1**, wherein the second, third, and fourth voltage amplitudes are 2.5 volts, 1.2 volts, and 3.3 volts, respectively.

5. The memory module of claim **1**, further comprising:

a voltage monitor circuit configured to monitor a power input voltage received via a second portion of the plurality of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the power input voltage having a voltage amplitude that is greater than a first threshold voltage.

US 11,016,918 B2

39

40

**6**. The memory module of claim **5**, wherein the voltage monitor circuit is further configured to produce the trigger signal in response to the power input voltage having a voltage amplitude that is less than a second threshold voltage.

**7**. The memory module of claim **6**, wherein the second threshold voltage corresponds to a voltage level that is ten percent less than a specified operating voltage.

**8**. The memory module of claim **1**, the plurality of components further comprising:

one or more registers coupled to one of the first, second, third and fourth regulated voltages, the one or more registers configured to register, in response to a clock, the first plurality of address and control signals, wherein the one of the first, second, third and fourth regulated voltages is selectively switched off to turn power off to the one or more registers while one or more components of the plurality of components are powered on.

**9**. The memory module of claim **5**, wherein the first threshold voltage corresponds to a voltage level that is ten percent greater than a specified operating voltage.

**10**. The memory module of claim **5**, the plurality of components further comprising:

a logic element including a non-volatile memory, the non-volatile memory is configured to store configuration information.

**11**. The memory module of claim **10**, wherein, in response to the trigger signal, the logic element writes information into the non-volatile memory.

**12**. The memory module of claim **5**, the plurality of components further comprising:

a non-volatile memory; and

a controller configured to receive the trigger signal, wherein, in response to the trigger signal, the controller performs a write operation to the non-volatile memory.

**13**. The memory module of claim **5**, wherein the power input voltage is coupled to the first, second, and third buck converters and the converter circuit.

**14**. The memory module of claim **8**, wherein, in response to selectively switching on the one of the first, second, third and fourth regulated voltages to the one or more registers, the one or more registers is configured to output the registered first plurality of address and control signals to the plurality of SDRAM devices.

**15**. The memory module of claim **1**, the plurality of components further comprising:

a logic element including one or more integrated circuits and discrete electrical elements, the one or more integrated circuit including an internal non-volatile memory, wherein the non-volatile memory is configured to store configuration information.

**16**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

first, second, and third buck converters configured to receive a pre-regulated input voltage and to produce first, second and third regulated voltages, respectively;

a converter circuit configured to reduce the pre-regulated input voltage to provide a fourth regulated voltage, wherein the first, second, third and fourth regulated voltages have first, second, third, and fourth voltage amplitudes, respectively;

a plurality of components coupled to the PCB, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices, each component of the plurality of components coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages; and

a voltage monitor circuit configured to monitor an input voltage received via a first portion of the plurality of edge connections, the voltage monitor circuit configured to produce a signal in response to the input voltage having a voltage amplitude that is greater than a first threshold voltage.

**17**. The memory module of claim **16**, wherein the second and third buck converters are configured to operate as a dual buck converter.

**18**. The memory module of claim **16**, the plurality of components further including:

a controller coupled to the voltage monitor circuit and configured to receive the signal, wherein the controller executes a write operation in response to the signal.

**19**. The memory module of claim **18**, wherein the write operation includes writing data information into non-volatile memory.

**20**. The memory module of claim **16**, wherein the plurality of SDRAM devices are configured to receive at least one of the first, second, third and fourth regulated voltages having a voltage amplitude of 1.8 volts.

**21**. The memory module of claim **16**, the plurality of components further including:

at least one circuit coupled between the interface and the plurality of SDRAM devices, the at least one circuit operable to receive a first plurality of address and control signals via a second portion of the plurality of edge connections and to output a second plurality of address and control signals to the plurality of SDRAM devices, the at least one circuit coupled to both the second regulated voltage and the fourth regulated voltage, wherein a first one of the second and fourth voltage amplitudes is less than a second one of the second and fourth voltage amplitudes.

**22**. The memory module of claim **16**, the plurality of components further including:

a logic element including an internal non-volatile memory, wherein the non-volatile memory is configured to store configuration information, wherein the configuration information is used to program the logic element.

**23**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

a plurality of components coupled to the PCB, each component of the plurality of components coupled to one or more regulated voltages of first, second, third and fourth regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices and one or more registers, the plurality of SDRAM devices coupled to the first regulated voltage, the one or more registers coupled to (i) the second regulated voltage, (ii) a portion of the plurality of edge connections, and (iii) the plurality of SDRAM devices, wherein a plu-

US 11,016,918 B2

41

rality of address and control signals are coupled to the one or more registers via the portion of the plurality of edge connections;

first, second, and third buck converters configured to provide the first, second and third regulated voltages, respectively; and

a converter circuit configured to provide the fourth regulated voltage,

wherein the second regulated voltage is configured to be selectively switched on or off to the one or more registers while at least the plurality of SDRAM devices are powered on,

wherein if the second regulated voltage is switched on while at least the plurality of SDRAM devices are powered on, the one or more registers are configured to couple the first plurality of address and control signals to the plurality of SDRAM devices, and

wherein if the second regulated voltage is switched off while the plurality of SDRAM devices are powered on, the one or more registers are configured to decouple the plurality of SDRAM devices from the first plurality of address and control signals.

24. The memory module of claim 23, further comprising:

a voltage monitor circuit configured to monitor an input voltage received from the host system via the interface, the voltage monitor circuit configured to produce a signal in response to the input voltage having a voltage amplitude that is greater than a first threshold voltage.

42

25. The memory module of claim 24, the plurality of components further including:

a controller coupled to the voltage monitor circuit and configured to receive the signal, wherein, in response to the signal, the controller executes a write operation.

26. The memory module of claim 25, wherein the write operation includes writing data information to non-volatile memory.

27. The memory module of claim 24, wherein the voltage monitor circuit is further configured to produce the signal in response to the input voltage having a voltage amplitude that is less than a second threshold voltage.

28. The memory module of claim 23, wherein the second and third buck converters are configured to operate as a dual buck converter.

29. The memory module of claim 23, wherein the plurality of SDRAM devices are configured to receive at least one of the first, second, third and fourth regulated voltages having a voltage amplitude of 1.8 volts.

30. The memory module of claim 23, wherein the first, second, and third buck converters are configured to receive a pre-regulated input voltage and to provide the first, second and third regulated voltages, respectively, and wherein the converter circuit is configured to reduce the pre-regulated voltage input to provide the fourth regulated voltage.

* * * * *

US011232054B2

## (12) United States Patent
### Chen et al.

(10) **Patent No.:** US 11,232,054 B2
(45) **Date of Patent:** *Jan. 25, 2022

(54) **FLASH-DRAM HYBRID MEMORY MODULE**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventors: **Chi-She Chen**, Walnut, CA (US);
**Jeffrey C. Solomon**, Irvine, CA (US);
**Scott H. Milton**, Irvine, CA (US);
**Jayesh Bhakta**, Cerritos, CA (US)

(73) Assignee: **NETLIST, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/328,019**

(22) Filed: **May 24, 2021**

(65) **Prior Publication Data**

US 2021/0279194 A1 Sep. 9, 2021

### Related U.S. Application Data

(63) Continuation of application No. 17/138,766, filed on Dec. 30, 2020, now Pat. No. 11,016,918, which is a
(Continued)

(51) **Int. Cl.**
*G06F 13/28* (2006.01)
*G06F 12/02* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *G06F 13/28* (2013.01); *G06F 1/185* (2013.01); *G06F 3/0613* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. G11C 7/1072; G11C 14/0018; G06F 12/0246; G06F 13/4243; G06F 13/1694;
(Continued)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,043,099 A | 6/1936 | Hanna | |
| 3,562,555 A | 2/1971 | Ahrons | |

(Continued)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| KR | 0130873 B1 | 4/1999 | |
| KR | 100606242 B1 | 7/2006 | |
| WO | 2013016723 A2 | 1/2013 | |

#### OTHER PUBLICATIONS

Microsoft Computer Dictionary Fifth Edition, 2002, 9 pages.
(Continued)

*Primary Examiner* — Hashem Farrokh
(74) *Attorney, Agent, or Firm* — Vorys, Sater, Seymour and Pease LLP

(57) **ABSTRACT**

In certain embodiments, a memory module includes a printed circuit board (PCB) having an interface that couples it to a host system for provision of power, data, address and control signals. First, second, and third buck converters receive a pre-regulated input voltage and produce first, second and third regulated voltages. A converter circuit reduces the pre-regulated input voltage to provide a fourth regulated voltage. Synchronous dynamic random access memory (SDRAM) devices are coupled to one or more regulated voltages of the first, second, third and fourth regulated voltages, and a voltage monitor circuit monitors an input voltage and produces a signal in response to the input voltage having a voltage amplitude that is greater than a threshold voltage.

**30 Claims, 22 Drawing Sheets**



US 11,232,054 B2

Page 2

### Related U.S. Application Data

continuation of application No. 15/934,416, filed on Mar. 23, 2018, now abandoned, which is a continuation of application No. 14/840,865, filed on Aug. 31, 2015, now Pat. No. 9,928,186, which is a continuation of application No. 14/489,269, filed on Sep. 17, 2014, now Pat. No. 9,158,684, which is a continuation of application No. 13/559,476, filed on Jul. 26, 2012, now Pat. No. 8,874,831, which is a continuation-in-part of application No. 12/240,916, filed on Sep. 29, 2008, now Pat. No. 8,301,833, which is a continuation of application No. 12/131,873, filed on Jun. 2, 2008, now abandoned.

(60) Provisional application No. 61/512,871, filed on Jul. 28, 2011, provisional application No. 60/941,586, filed on Jun. 1, 2007.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 13/16* | (2006.01) |
| *G06F 1/18* | (2006.01) |
| *G06F 12/06* | (2006.01) |
| *G06F 13/42* | (2006.01) |
| *G11C 7/10* | (2006.01) |
| *G11C 14/00* | (2006.01) |
| *G06F 3/06* | (2006.01) |
| *G06F 13/40* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 3/0659* (2013.01); *G06F 3/0685* (2013.01); *G06F 12/0246* (2013.01); *G06F 12/0638* (2013.01); *G06F 13/1694* (2013.01); *G06F 13/4027* (2013.01); *G06F 13/4243* (2013.01); *G11C 7/1072* (2013.01); *G11C 14/0018* (2013.01); *G06F 2212/205* (2013.01); *G06F 2212/7208* (2013.01)

(58) **Field of Classification Search**
CPC ............... G06F 3/0659; G06F 13/4027; G06F 12/0638; G06F 13/28; G06F 1/185; G06F 2212/205; G06F 2212/7208; G06F 3/0685; G06F 3/0613; Y02D 10/00
USPC ........................................................ 711/110
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,916,390 | A | 10/1975 | Chang et al. |
| 4,234,920 | A | 11/1980 | Ness et al. |
| 4,420,821 | A | 12/1983 | Hoffman |
| 4,449,205 | A | 5/1984 | Hoffman |
| 4,607,332 | A | 8/1986 | Goldberg |
| 4,658,204 | A | 4/1987 | Goodwin |
| 4,882,709 | A | 11/1989 | Wyland |
| 4,884,242 | A | 11/1989 | Lacy et al. |
| 4,965,828 | A | 10/1990 | Ergott, Jr. et al. |
| 5,430,742 | A | 7/1995 | Jeddeloh et al. |
| 5,444,664 | A | 8/1995 | Kuroda et al. |
| 5,490,155 | A | 2/1996 | Abdoo et al. |
| 5,519,663 | A | 5/1996 | Harper, Jr. et al. |
| 5,519,831 | A | 5/1996 | Holzhammer |
| 5,563,839 | A | 10/1996 | Herdt et al. |
| 5,577,213 | A | 11/1996 | Avery et al. |
| 5,619,644 | A | 4/1997 | Crockett et al. |
| 5,630,096 | A | 5/1997 | Zuravleff et al. |
| 5,675,725 | A | 10/1997 | Malcolm |
| 5,757,712 | A | 5/1998 | Nagel et al. |
| 5,799,200 | A | 8/1998 | Brant et al. |
| 5,813,029 | A | 9/1998 | Klein |
| 5,870,350 | A | 2/1999 | Bertin et al. |

| | | | |
|---|---|---|---|
| 5,874,995 | A | 2/1999 | Naimpally et al. |
| 5,890,192 | A | 3/1999 | Lee et al. |
| 5,953,215 | A | 9/1999 | Karabatsos |
| 5,991,885 | A | 11/1999 | Chang et al. |
| 6,023,421 | A | 2/2000 | Iadanza et al. |
| 6,026,465 | A | 2/2000 | Mills et al. |
| 6,065,092 | A | 5/2000 | Roy |
| 6,112,310 | A | 8/2000 | Jun et al. |
| 6,145,068 | A | 11/2000 | Lewis |
| 6,158,015 | A | 12/2000 | Klein |
| 6,199,142 | B1 | 3/2001 | Saulsbury et al. |
| 6,216,247 | B1 | 4/2001 | Creta et al. |
| 6,269,382 | B1 | 7/2001 | Cabrera et al. |
| 6,336,174 | B1 | 1/2002 | Li et al. |
| 6,336,176 | B1 | 1/2002 | Leyda et al. |
| 6,363,450 | B1 | 3/2002 | Lash et al. |
| 6,421,279 | B1 | 7/2002 | Tobita et al. |
| 6,459,647 | B1 | 10/2002 | Kengeri |
| 6,487,102 | B1 | 11/2002 | Halbert et al. |
| 6,487,623 | B1 | 11/2002 | Emerson et al. |
| 6,571,244 | B1 | 5/2003 | Larson |
| 6,614,685 | B2 | 9/2003 | Wong |
| 6,658,507 | B1 | 12/2003 | Chan |
| 6,691,209 | B1 | 2/2004 | O'connell |
| 6,693,840 | B2 | 2/2004 | Shimada et al. |
| 6,721,212 | B2 | 4/2004 | Sasaki |
| 6,721,860 | B2 | 4/2004 | Klein |
| 6,769,081 | B1 | 7/2004 | Parulkar |
| 6,799,241 | B2 | 9/2004 | Kahn et al. |
| 6,799,244 | B2 | 9/2004 | Tanaka et al. |
| 6,810,513 | B1 | 10/2004 | Vest |
| 6,816,982 | B2 | 11/2004 | Ravid |
| 6,839,774 | B1 | 1/2005 | Ahn et al. |
| 6,910,635 | B1 | 6/2005 | Miks et al. |
| 6,944,042 | B2 | 9/2005 | Komatsuzaki |
| 6,948,029 | B2 | 9/2005 | Yano |
| 6,952,368 | B2 | 10/2005 | Miura et al. |
| 7,053,470 | B1 | 5/2006 | Sellers et al. |
| 7,062,618 | B2 | 6/2006 | Tsunoda et al. |
| 7,089,412 | B2 | 8/2006 | Chen |
| 7,102,391 | B1 | 9/2006 | Sun et al. |
| 7,107,480 | B1 | 9/2006 | Moshayedi et al. |
| 7,111,142 | B2 | 9/2006 | Spencer et al. |
| 7,136,978 | B2 | 11/2006 | Miura et al. |
| 7,155,627 | B2 | 12/2006 | Matsui |
| 7,200,021 | B2 | 4/2007 | Raghuram |
| 7,234,099 | B2 | 6/2007 | Gower et al. |
| 7,353,325 | B2 | 4/2008 | Lofgren et al. |
| 7,409,491 | B2 | 8/2008 | Doblar et al. |
| 7,409,590 | B2 | 8/2008 | Moshayedi et al. |
| 7,411,859 | B2 | 8/2008 | Sohn et al. |
| 7,421,552 | B2 | 9/2008 | Long |
| 7,467,251 | B2 | 12/2008 | Park et al. |
| 7,519,754 | B2 | 4/2009 | Wang et al. |
| 7,600,142 | B2 | 10/2009 | Ichikawa |
| 7,613,877 | B2 | 11/2009 | Shimozono et al. |
| 7,716,411 | B2 | 5/2010 | Panabaker et al. |
| 7,818,488 | B2 | 10/2010 | Park et al. |
| 7,873,750 | B2 | 1/2011 | Yabuta et al. |
| 7,881,150 | B2 | 2/2011 | Solomon et al. |
| 7,952,179 | B2 | 5/2011 | Chiu et al. |
| 8,001,434 | B1 | 8/2011 | Lee et al. |
| 8,081,536 | B1 | 12/2011 | Solomon et al. |
| 8,086,955 | B2 | 12/2011 | Zhou et al. |
| 8,102,614 | B2 | 1/2012 | Song et al. |
| 8,214,616 | B2 | 7/2012 | Ware et al. |
| 8,233,303 | B2 | 7/2012 | Best et al. |
| 8,301,833 | B1 | 10/2012 | Chen et al. |
| 8,407,395 | B2 | 3/2013 | Kim et al. |
| 8,412,879 | B2 | 4/2013 | Chang et al. |
| 8,516,187 | B2 | 8/2013 | Chen et al. |
| 8,671,243 | B2 | 3/2014 | Chen et al. |
| 8,677,060 | B2 | 3/2014 | Chen et al. |
| 8,874,831 | B2 | 10/2014 | Lee et al. |
| 8,880,791 | B2 | 11/2014 | Chen et al. |
| 8,904,098 | B2 | 12/2014 | Amidi et al. |
| 8,904,099 | B2 | 12/2014 | Chen et al. |
| 9,043,677 | B2 | 5/2015 | Kong et al. |
| 9,158,684 | B2 | 10/2015 | Lee et al. |

US 11,232,054 B2

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,361,250 B2 | 6/2016 | Shan et al. | |
| 9,436,600 B2 | 9/2016 | Lee | |
| 9,921,762 B2 | 3/2018 | Amidi et al. | |
| 9,928,186 B2 | 3/2018 | Lee et al. | |
| 2002/0053944 A1 | 5/2002 | Brass et al. | |
| 2002/0083368 A1 | 6/2002 | Abe et al. | |
| 2002/0199061 A1 | 12/2002 | Friedman et al. | |
| 2003/0028733 A1 | 2/2003 | Tsunoda et al. | |
| 2003/0076726 A1 | 4/2003 | Cowles et al. | |
| 2003/0137881 A1 | 7/2003 | Sasaki | |
| 2003/0147297 A1 | 8/2003 | Shiota et al. | |
| 2003/0158995 A1 | 8/2003 | Lee et al. | |
| 2003/0204776 A1 | 10/2003 | Testin | |
| 2003/0206478 A1 | 11/2003 | Ayukawa et al. | |
| 2003/0210601 A1 | 11/2003 | Lin et al. | |
| 2004/0088508 A1 | 5/2004 | Ballard et al. | |
| 2004/0163027 A1 | 8/2004 | MacLaren et al. | |
| 2004/0190210 A1 | 9/2004 | Leete | |
| 2005/0044302 A1 | 2/2005 | Pauley et al. | |
| 2005/0060488 A1 | 3/2005 | Poechmueller | |
| 2005/0132250 A1 | 6/2005 | Hansen et al. | |
| 2005/0141273 A1 | 6/2005 | Park et al. | |
| 2005/0144418 A1 | 6/2005 | Kita | |
| 2005/0185472 A1 | 8/2005 | Randell et al. | |
| 2005/0204091 A1 | 9/2005 | Kilbuck et al. | |
| 2005/0249011 A1 | 11/2005 | Maeda | |
| 2005/0273548 A1 | 12/2005 | Roohparvar | |
| 2006/0039197 A1 | 2/2006 | Khouri et al. | |
| 2006/0069896 A1 | 3/2006 | Sanders | |
| 2006/0080515 A1 | 4/2006 | Spiers et al. | |
| 2006/0126369 A1 | 6/2006 | Raghuram | |
| 2006/0212651 A1 | 9/2006 | Ashmore et al. | |
| 2006/0294295 A1 | 12/2006 | Fukuzo | |
| 2007/0070669 A1 | 3/2007 | Tsern | |
| 2007/0136523 A1* | 6/2007 | Bonella | G06F 9/4401 711/113 |
| 2007/0147115 A1 | 6/2007 | Lin et al. | |
| 2007/0192627 A1 | 8/2007 | Oshikiri | |
| 2007/0255898 A1 | 11/2007 | Nishide et al. | |
| 2007/0276995 A1 | 11/2007 | Caulkins et al. | |
| 2007/0288683 A1 | 12/2007 | Panabaker et al. | |
| 2008/0104344 A1 | 5/2008 | Shimozono et al. | |
| 2008/0126624 A1* | 5/2008 | Prete | G11C 7/106 710/53 |
| 2008/0126690 A1 | 5/2008 | Rajan et al. | |
| 2008/0147968 A1 | 6/2008 | Lee et al. | |
| 2008/0189479 A1 | 8/2008 | Cope et al. | |
| 2008/0195806 A1 | 8/2008 | Cope | |
| 2008/0235443 A1 | 9/2008 | Chow et al. | |
| 2008/0291727 A1 | 11/2008 | Seo et al. | |
| 2009/0031099 A1 | 1/2009 | Sartore | |
| 2009/0235038 A1 | 9/2009 | Sartore | |
| 2010/0110748 A1 | 5/2010 | Best | |
| 2010/0122200 A1 | 5/2010 | Merry, Jr. et al. | |
| 2010/0274953 A1 | 10/2010 | Lee et al. | |
| 2010/0322020 A1 | 12/2010 | Kim | |
| 2011/0078496 A1 | 3/2011 | Jeddeloh | |
| 2011/0161569 A1 | 6/2011 | Shan et al. | |
| 2011/0320804 A1 | 12/2011 | Chan et al. | |
| 2012/0110417 A1 | 5/2012 | Abreu et al. | |
| 2012/0117402 A1 | 5/2012 | Machnicki et al. | |
| 2012/0204079 A1 | 8/2012 | Takefman et al. | |
| 2012/0265952 A1 | 10/2012 | Kurita | |
| 2012/0271990 A1* | 10/2012 | Chen | G06F 12/00 711/103 |
| 2012/0317433 A1 | 12/2012 | Ellis et al. | |
| 2013/0019076 A1 | 1/2013 | Amidi et al. | |
| 2013/0086309 A1 | 4/2013 | Lee et al. | |
| 2013/0254456 A1 | 9/2013 | Chen et al. | |
| 2013/0254497 A1 | 9/2013 | Chen et al. | |
| 2014/0032820 A1 | 1/2014 | Harasawa et al. | |
| 2014/0059170 A1 | 2/2014 | Gasparakis et al. | |
| 2014/0156919 A1 | 6/2014 | Chen et al. | |
| 2014/0156920 A1 | 6/2014 | Chen et al. | |
| 2015/0058701 A1 | 2/2015 | Xing et al. | |

OTHER PUBLICATIONS

Mutnuary, B. et al., "Analysis of Fully Buffered DIMM Interface in High-speed Server Applications", IBM Corp, xSeries eServer Development, 2006 Electronic Components and Technology Conferencepp. 203-208.

Notice of Allowance in U.S. Appl. No. 13/536,173, dated Jul. 2, 2013.

Notice of Allowance in U.S. Appl. No. 13/559,476, dated May 6, 2014.

Notice of Allowance in U.S. Appl. No. 13/559,476, dated Sep. 29, 2014.

Notice of Allowance in U.S. Appl. No. 13/905,048, dated Dec. 19, 2013, 8 pages.

Notice of Allowance in U.S. Appl. No. 13/905,053, dated Dec. 11, 2013.

Notice of Allowance in U.S. Appl. No. 14/173,219 dated Jul. 7, 2014.

Notice of Allowance in U.S. Appl. No. 14/489,269, dated Oct. 8, 2015.

Notice of Allowance in U.S. Appl. No. 17/138,766, dated Mar. 24, 2021, 10 pages.

Notice of Allowance, *SanDisk Corporation* v. *Netlist*, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Jul. 2, 2013, 8 pages.

Office Action dated Aug. 19, 2016 of the Chinese Patent Application No. 201280047758.X, 9 pages.

Office Action in U.S. Appl. No. 12/240,916, dated Apr. 3, 2012, pp. 1-12.

Office Action in U.S. Appl. No. 12/240,916, dated Feb. 1, 2012.

Office Action in U.S. Appl. No. 12/240,916, dated Apr. 3, 2012.

Office Action in U.S. Appl. No. 12/240,916, dated Jul. 29, 2011.

Office Action in U.S. Appl. No. 13/536,176, dated Apr. 15, 2013.

Office Action in U.S. Appl. No. 13/625,563, dated Aug. 5, 2013.

Office Action in U.S. Appl. No. 13/625,563, dated May 9, 2014.

Office Action in U.S. Appl. No. 13/905,048, dated Aug. 1, 2013.

Office Action in U.S. Appl. No. 13/905,053, dated Aug. 1, 2013.

Office Action in U.S. Appl. No. 14/173,219, dated Mar. 13, 2014.

Office Action in U.S. Appl. No. 14/173,242, dated Mar. 14, 2014.

Office Action in U.S. Appl. No. 14/302,292, dated Dec. 21, 2015.

Office Action in U.S. Appl. No. 15/934,416, dated Apr. 2, 2020, 21 pages.

Office Action in U.S. Appl. No. 15/934,416, dated Jan. 1, 2021, 17 pages.

Office Action in U.S. Appl. No. 15/934,416, dated Mar. 21, 2019, 8 pages.

Office Action in U.S. Appl. No. 15/934,416, dated Oct. 15, 2019, 13 pages.

Office Action in U.S. Appl. No. 17/138,766, dated Mar. 2, 2021, 7 pages.

Office Action in U.S. Appl. No. 12/240,916, dated Feb. 1, 2012, 14 pages.

Office Action in U.S. Appl. No. 14/173,242, dated Mar. 14, 2014, 7 pages.

Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1005 (PTAB), dated Jul. 29, 2011, 8 pages.

Office Action, U.S. Appl. No. 12/240,916, IPR2014-0099-1010 (PTAB), dated Apr. 3, 2012, 11 pages.

Office Action, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated Apr. 15, 2013, 9 pages.

Patent Owner's Demonstratives, U.S. Pat. No. 8,671,243, Case No. IPR 2017-00587-2023, (PTAB), 57 pages.

Patent Owner's Listing of New Arguments and Evidence in Petitioners' Reply, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587 (PTAB), filed Jan. 29, 2018, 6 pages.

Patent Owner's Opposition to Petitioners' Motion to Exclude, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed Apr. 2, 2018, 2017, 11 pages.

Patent Owner's Preliminary Response, U.S. Pat. No. 8,516,187, Case IPR2014-01371 (PTAB), filed Dec. 16, 2014, 66 pages.

US 11,232,054 B2

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Oct. 2, 2014, 60 pages.

Wong, A., The BIOS Optimization Guide, Adrian's Rojak Pot, Rev. 6.2, 1998-2001, 67 pages.

240pin DDR2 MetaSDRAM Registered DIMM based on 1 GB version C, Hynix Semiconductor, Product Description Rev. 0.2, Sep. 2008, 32 pages.

Advisory Action in U.S. Appl. No. 12/240,916, dated Mar. 13, 2012.

Amazon.com, Search for "memory module", downloaded Oct. 12, 2017, 6 pages.

Amendment and Reply to Office Action, *SanDisk Corporation* v. *Netlist*, U.S. Appl. No. 13/536,173, IPR2014-00982 (PTAB), dated May 21, 2013, 24 pages.

Amendment and Response to Election Restriction, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994-1004 (PTAB), dated May 20, 2011, 9 pages.

American Heritage Dictionary of the English Language, Third Ed., Houghton Mifflin Company, Boston, MA, 1996, 7 pages.

American National Standard Dictionary of Electrical and Electrical Terms, IEEE, Fourth Edition, Revised, ANS/IEEE Std 100-1988, Institute of Electrical Engineers, Nov. 3, 1988, 6 pages.

Annotated added to Russel Jacob Baker Deposition, Exhibit 1026, p. 78, U.S. Pat. No. 8,671,243, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 1 page.

Annotated added to Russel Jacob Baker Deposition, Exhibit 1027, p. 79, U.S. Pat. No. 8,671,243, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 1 page.

Annotated added to Russel Jacob Baker Deposition, Exhibit 1028, p. 79, U.S. Pat. No. 8,671,243, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 1 page.

Appeals from the USPTO, PTAB in Nos. IPR2014-00882, IPR2014-00883, IPR2014-01011, US Court of Appeals for the Federal Circuit, decided Jul. 25, 2017, 8 pages.

Bonella, R., Provisional Application for Advanced Dynamic Disk Memory Module, 53 pages.

Bruce, J., Synchronous DRAM Architectures, Organizations, and Alternate Technologies, Electrical and Computer Engineering Dept., Univ. of Maryland, Dec. 10, 2002, 22 pages.

Catsoulis, J., Designing Embedded Hardware: Create New Computers and Devices, O'Reilly Media, Inc. (2005), 67 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1024, IPR No. 2017-00587-1024(PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1033, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1034, IPR No. 2017-00587-1033 (PTAB), 2003, 8 pages.

Charles C., Multiplexers and Demultiplexers, Ex. 1035, IPR No. 2017-00587-1035 (PTAB), 2003, 8 pages.

Chiappetta, M., Kingston Launches 667-MHz DDR2 SO-DIMM Memory, Oct. 11, 2005, 3 pages.

Notice of Final Rejection, South Korea Patent Office with English Translation, 4 pages.

Notice of Submission of Opinion, South Korea Patent Office with English Translation, 6 pages.

Corrected Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, Declaration of Michael F. Heafey, IPR2014-01370 (PTAB), filed Sep. 22, 2014, 4 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Sep. 22, 2014, 67 pages.

Corrected Petition for Inter Partes Review of Claims 1-32 of U.S. Pat. No. 8,516,187, Declaration of Dr. Nader Bagherzadeh, IPR2014-01371 (PTAB), filed Sep. 22, 2014, 306 pages.

Data Sheet, 74F257A Quad 2-line to 1-line selector/multiplexer, non-inverting (3-State), Product specification, IC15 Data Handbook Mar. 31, 1995, 10 pages.

David, H. et al., Fully Buffered DIMM (FB-DIMM) Design Considerations, Intel Developer Forum, Intel Corp., Feb. 18, 2004, 36 pages.

Decision Denying Institution of Inter Partes Review, U.S. Pat. No. 8,301,833, Case IPR2017-00649-7 (PTAB), Paper 7, entered Jul. 24, 2017, 17 pages.

Decision Denying Institution of Inter Partes Review, U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), Paper 12, entered Mar. 13, 2015, 22 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist, Inc.*, U.S. Pat. No. 8,301,833, IPR2014-00994 (PTAB), Paper 8, dated Dec. 16, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *SanDisk Corporation* v. *Netlist*, U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), Paper 9, dated Dec. 22, 2014, 16 pages.

Decision Denying Institution of Inter Partes Review, *Smart Modular Tech* v *Netlist Inc.*, U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), Paper 13, entered Mar. 13, 2015, 19 pages.

Decision Instituting Inter Partes Review, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-7(PTAB), Paper No. 7, entered Jun. 22, 2017, 40 pages.

Decision Instituting Inter Partes Review, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-7(PTAB), Paper No. 7, entered Jul. 21, 2017, 29 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,874,831, Case IPR2017-00692-2016 (PTAB), filed Nov. 10, 2017, 72 pages.

Declaration of R. Jacob Baker, U.S. Pat. No. 8,671,243, Case IPR2017-00587-2016 (PTAB), filed Oct. 13, 2019, 109 pages.

Declaration of Dr. Nader Bagherzadeh, U.S. Pat. No. 8,516,187, IPR2014-01371 (PTAB), filed Sep. 22, 2014, 306 pages.

Declaration of Jeff McMullen, *Netlist, Inc.* v. *Diablo Technologies, Inc.*, Case No. 4: I 3-CV-05889-YGR (NDCA), Document 362-1, filed Sep. 5, 2018, 3 pages.

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,301,833, IPR2014-00994-1020 (PTAB), filed Sep. 29, 2008, 215 pages.

Declaration of Paul Min, In Inter Partes Review of U.S. Pat. No. 8,516,187, IPR2014-00982-1013 (PTAB), filed Jun. 28, 2012, pp. 240.

Declaration of Ron Maltiel, U.S. Pat. No. 8,671,243, No. IPR2017-00587-1003 (PTAB), filed May 29, 2013, 131 pages.

Declaration of Ron Maltiel, U.S. Pat. No. 8,874,831, No. IPR2017-00692-1003 (PTAB), filed Jul. 26, 2012 29, 172 pages.

Declaration of Steven J. Corr, *Netlist, Inc.* v. *SMART Storage Systems, Inc., et al.*, Case 4:13-cv-05889-YGR (NDCA), Document 305-8, filed Mar. 10, 2015, 3 pages.

Deposition of Baker, Exhibit 1030, p. 78, U.S. Pat. No. 8,671,243, *SK hynix Inc., et al.* v. *Netlist, Inc.*, Case No. IPR-2017-00587 (PTAB), filed Dec. 18, 2017, 268 pages.

Deposition of Ron Maltiel, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-2010 (PTAB), dated Sep. 27, 2017, 155 pages.

*Netlist* v *Smart Storage System and Diablo Technologies*, Inc.'s Invalidity Contentions, Case No. 13-CV-05889 YGR, dated Jun. 6, 2014, 109 pages.

Drawing by R. Jacob Bake regarding Address of Dram and Flash, U.S. Pat. No. 8,671,243, Case IPR2017-00587-1023 (PTAB), filed Dec. 18, 2017, 1 page.

Elmhurst, D. et al., A 1.8-V 128-Mb 125-MHz Multilevel Cell Flash Memory With Flexible Read While Write, IEEE Journal of Solid-State Circuits, vol. 38, No. 11, Nov. 2003, 5 pages.

Ex. 1004—IPR2017-00587 Ron Maltiel CV, 7 pages.

Exhibit 1: Claim Chart Comparing Netlist's U.S. Pat. No. 8,001,434 to Smart Storage Ulltradimm, Case4:13-cv-05889-YGR Document 193-1, filed Apr. 10, 2014, 21 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-3, filed Mar. 17, 2015, 23 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-4, filed Mar. 17, 2015, 20 pages.

Exhibit, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-5, filed Mar. 17, 2015, 28 pages.

US 11,232,054 B2

Page 5

(56)         **References Cited**

OTHER PUBLICATIONS

Exhibit 12, Decision Denying Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case No. 4:13-cv-05889-YGR Document 309-7, filed Mar. 17, 2015, 17 pages.

Exhibit 9, Email from Defendant's Counsel, *Netlist* v. *Smart Storage Systems, Inc. et al.*, Case 4:13-cv-05889-YGR Document 305-17, filed Mar. 10, 2015, 6 pages.

Exhibit, Institution of Inter Partes Review, *Sandisk Corporation* v. *Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 316-9, filed Mar. 24, 2015, 29 pages.

Exhibit, Institution of Inter Partes Review, *Smart Modular Technologies, Inc.* v. *Netlist, Inc.*, Case 4:13-cv-05889-YGR Document 309-1, filed Mar. 17, 2015, 22 pages.

Exhibit, Letter from Defendant's Counsel, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 305-16, filed Mar. 10, 2015, 3 pages.

Exhibit, Letter sent via email on Dec. 6, 2013, Case 4:13-cv-03901-YGR Document 53-2, filed Jan. 6, 2014.

Exhibit, Order Denying Defendant's Motion to Stay Pending Inter Partes Review (Doc.59), *The Procter and Gamble Company* v. *Team Technologies, Inc, et al.*, Case 4:13-cv-05889-YGR Document 316-6, filed Mar. 24, 2015, 10 pages.

Exhibit, Patent Public Advisory Committee Quarterly Meeting, Appeals Statistics USPTO, Case No. 4:13-cv-05889-YGR Document 309-8, filed Mar. 17, 2015, 23 pages.

Exhibit, Reporter's Transcript of Proceedings, *Netlist, Inc* v. *Smart Modular Technologies, Inc., et al.*, Case 4:13-cv-05889-YGR Document 316-3, filed Mar. 24, 2015, 15 pages.

Exhibit, Transcript of Official Electronic Sound Recording Proceeding, *Netlist* v. *Smart Modular Technologies, Inc, et al.*, Case 4:13-cv-05889-YGR Document 305-7, filed Mar. 10, 2015, 10 pages.

Hasan, J. et al. Efficient Use of Memory Bandwidth to Improve Network Processor Throughput, Proceedings of the 30th Annual International Symposium on Computer Architecture (ISCA'03), IEEE, 2003, 12 pages.

Horowitz, P. et al., "The Art of Electronics", Cambridge University Press 2nd Ed. 1989, pp. 471, 495-496.

Innis, J., "MPC8560 PowerQUICC III Compact Flash Interface Design", Freescale Semiconductor, Inc., 2004-2006, pp. 1-23.

Intel 1.8 Volt Intel StrataFlash Wireless Memory (L18), 2003, 100 pages.

Inter Partes Review No. IPR2017-00692 (PTAB), U.S. Pat. No. 8,874,831, filed Jul. 26, 2012, 78 pages.

JEDEC Definition of DIMM, Exhibit 1029, IPR No. 2017-00587, Dec. 18, 2017, 2 pages.

JEDEC Global Standard for the Microelectronics Industry, Why JEDEC Standards Matter, 2014, 1 page.

JEDEC Standard No. 21-C (Release 17), Annex J: Serial Presence Detects for DDR2 SDRAM (Revision 1.3), 60 pages.

JEDEC Standard, Double Data Rate (DDR): SDRAM Specification: JESD79C (Revision JESD79B), Mar. 2003, pp. 1-75.

JEDEC Standard, FBDIMM Specification: DDR2 SDRAM Fully Buffered DIMM (FBDIMM) Design Specification: JESD205, JEDEC Solid State Tech. Assoc., Mar. 2007, 129 pages.

Patent Owner's Preliminary Response, *SanDisk Corporation* v. *Netlist*, U.S. Pat. No. 8,516,187, IPR2014-00982 (PTAB), dated Sep. 26, 2014, 57 pages.

Patent Owner's Preliminary Response, *SK hynix Inc., et al.,* v. *Netlist*, U.S. Pat. No. 8,301,833, Case No. IPR2017-00649 (PTAB), filed May 1, 2017, 67 pages.

Patent Owner's Preliminary Response, *SK hynix Inc., et al.,* v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), filed May 1, 2017, 48 pages.

Patent Owner's Preliminary Response, *Smart Modular Tech* v *Netlist Inc.*, U.S. Pat. No. 8,301,833, Case IPR2014-01370 (PTAB), filed Dec. 16, 2014, 66 pages.

Patent Owner's Response, U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-12 (PTAB), filed Oct. 13, 2017, 80 pages.

Patent Owner's Response, *SK hynix Inc., et al.,* v. *Netlist*, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692-12 (PTAB), filed Nov. 10, 2017, 77 pages.

Patterson et al., "Computer Organization & Design: The Hardware/Software Interface" Morgan Kaufmann Publishers, Inc. (1998), 71 pages.

Petition for Inter Partes Review of Claims 1-30 of U.S. Pat. No. 8,301,833, IPR2014-01370 (PTAB), filed Aug. 22, 2014, 68 pages.

Petition for Inter Partes Review of U.S. Pat. No. 8,301,833, filed Sep. 29, 2008.

Petition for Inter Partes Review of U.S. Pat. No. 8,671,243, Case No. IPR2017-00587-1(PTAB), May 29, 2013, 82 pages.

Petitioners Demonstratives, *SK hynix Inc., et al.,* v. *Netlist, Inc.*, U.S. Pat. No. 8,671,243, IPR2017-00587-1037, 89 pages.

Petitioners' Reply to Patent Owner's Response, Inter Partes Review No. IPR2017-00587-16, U.S. Pat. No. 8,671,243, Filed Jan. 12, 2018, 38 pages.

Petitioners' Reply, U.S. Pat. No. 8,874,831, Case No. IPR2017-00692 (PTAB), Paper No. 15, filed Mar. 2, 2018, 35 pages.

Provisional Application for Advance Dynamic Disk Memory Module, Specification, *SK hynix Inc., V. Netlist, Inc.*, Case No. IPR2017-00649-1006 (PTAB), dated Dec. 8, 2005, 53 pages.

Supplemental Declaration of Daniel E. Alberti in Response to Court Order in Support of Motion to Withdraw as Counsel of Record, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 362, filed Sep. 5, 2018, 3 pages.

Supplemental Declaration of Ronald H. Spuhler, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 305-1, filed Mar. 10, 2015, 2 pages.

Supplemental Declaration of Steven J. Corr, *Netlist* v. *Smart Storage Systems, Inc. et. al.*, Case 4:13-cv-05889-YGR Document 309, filed Mar. 17, 2015, 3 pages.

Switches—D&T Online, Switches, http://wiki.dtonline.org, Exhibit 1022, Case No. IPR2017-00587, accessed Oct. 13, 2017, 3 pages.

U.S. Office Action in U.S. Appl. No. 13/536,173, dated Apr. 15, 2013, pp. 1-10.

U.S. Appl. No. 12/240,916, Case No. IPR2017-00692-2018 (PTAB), dated Sep. 29, 2008, 52 pages.

Webster's II New College Dictionary, Houghton Mifflin Company, Boston, MA, 2001, pp. 257, 259; 1114,1115, Exhibit 1017, IPR2014-01370 (PTAB), *Smart Modular Tech* v *Netlist Inc*, U.S. Pat. No. 8,301,833, Sep. 22, 2014, 5 pages.

Ian R. Sinclair and John Dunton, Practical Electronics Handbook, Sixth Edition 2007, ELSEVIER, <http://al-marefah.blogspot.com>, retrieved from the Internet Nov. 18, 2021.

* cited by examiner



*FIG. 1*
*(PRIOR ART)*



*FIG. 3A*

Spansion EcoRAM Configurations _____

256GB Spansion EcoRAM Solution — Single Accelerator



256GB Single Accelerator Spansion EcoRAM Solution

256GB Spansion EcoRAM Solution — Dual Accelerator



256GB Single Accelerator Spansion EcoRAM Solution

# FIG. 2
# (PRIOR ART)



# FIG. 4B



FIG. 3B



FIG. 4A



**FIG. 5A**



**FIG. 6**



FIG. 5B



**FIG. 7**



**FIG. 8A**



FIG. 8B



**FIG. 9**



Mapping MCH DDR DIMM page
address to Flash memory



## FIG. 10

| DRAM density (GB) | # of blocks per bank | Flash wr-time to rd-time ratio | Avg block use time (sec) | Flash write time (sec) | Max allowed Closed Blk in queue to be written back to Flash |
|---|---|---|---|---|---|
| 1 | 250 | 55 | 1.00E-03 | 2.00E-02 | 0 |
| 1 | 250 | 55 | 1.00E-02 | 2.00E-02 | 2 |
| 1 | 250 | 55 | 2.00E-02 | 2.00E-02 | 5 |
| 1 | 250 | 55 | 5.00E-02 | 2.00E-02 | 11 |
| 2 | 500 | 55 | 1.00E-03 | 2.00E-02 | 0 |
| 2 | 500 | 55 | 1.00E-02 | 2.00E-02 | 5 |
| 2 | 500 | 55 | 2.00E-02 | 2.00E-02 | 9 |
| 2 | 500 | 55 | 5.00E-02 | 2.00E-02 | 23 |
| 4 | 1000 | 55 | 1.00E-03 | 2.00E-02 | 1 |
| 4 | 1000 | 55 | 1.00E-02 | 2.00E-02 | 9 |
| 4 | 1000 | 55 | 2.00E-02 | 2.00E-02 | 18 |
| 4 | 1000 | 55 | 5.00E-02 | 2.00E-02 | 45 |

*FIG. 11*

Case: 24-2281    Document: 23    Page: 186    Filed: 01/28/2025



FIG. 12

Case: 24-2281     Document: 23     Page: 187     Filed: 01/28/2025



FIG. 13

Case: 24-2281     Document: 23     Page: 188     Filed: 01/28/2025



FIG. 14

Appx0128

Case: 24-2281 Document: 23 Page: 189 Filed: 01/28/2025



FIG. 15A

FIG. 15B



FIG. 15C

Case: 24-2281     Document: 23     Page: 191     Filed: 01/28/2025



FIG. 16

Case: 24-2281        Document: 23        Page: 192        Filed: 01/28/2025



*1200*

*1210* Provide first voltage from input power supply and second voltage from first power subsystem

*1220* Second condition detected?

No

Yes

*1230* Provide first voltage and second voltage from first power subsystem

No

*1240* Charge second power subsystem

*1250* Third condition detected?

Yes

*1260* Provide first voltage and second voltage from second power subsystem

*FIG. 17*

Case: 24-2281        Document: 23        Page: 193        Filed: 01/28/2025



FIG. 18

Case: 24-2281   Document: 23   Page: 194   Filed: 01/28/2025



*FIG. 19*

Case: 24-2281    Document: 23    Page: 195    Filed: 01/28/2025



*FIG. 20*

Appx0135

Case: 24-2281    Document: 23    Page: 196    Filed: 01/28/2025



FIG. 21

Case: 24-2281     Document: 23     Page: 197     Filed: 01/28/2025



*1600*

*1610*
Communicate data words between volatile memory and host system in first mode

*1620*
Transfer data words from volatile memory system to non-volatile memory system

*1622* — Store first slice of data word in buffer

*1624* — Store second slice of data word in buffer

*1626* — Write entire data word from buffer to non-volatile memory

*FIG. 22*

US 11,232,054 B2

## 1
### FLASH-DRAM HYBRID MEMORY MODULE

#### PRIORITY CLAIM

This application is a continuation of U.S. patent application Ser. No. 17/138,766, filed Dec. 30, 2020, titled "Flash-Dram Hybrid Memory", now U.S. Pat. No. 11,016,918, which is a continuation of U.S. patent application Ser. No. 15/934,416, filed Mar. 23, 2018, titled "Flash-Dram Hybrid Memory Module," which is a continuation of U.S. patent application Ser. No. 14/840,865, filed Aug. 31, 2015, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,928,186, which is a continuation of U.S. patent application Ser. No. 14/489,269, filed Sep. 17, 2014, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 9,158,684, which is a continuation of U.S. patent application Ser. No. 13/559,476, filed Jul. 26, 2012, titled "Flash-Dram Hybrid Memory Module," now U.S. Pat. No. 8,874,831, which claims the benefit of U. S. Provisional Patent Application No. 61/512,871, filed Jul. 28, 2011, and is a continuation-in-part of U.S. patent application Ser. No. 12/240,916, filed Sep. 29, 2008, titled "Non-Volatile Memory Module," now U.S. Pat. No. 8,301,833, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, which claims the benefit of U. S. Provisional Patent Application No. 60/941,586, filed Jun. 1, 2007, the contents of all of which are incorporated herein by reference in their entirety.

This application may be considered related to U.S. patent application Ser. No. 14/173,242, titled "Isolation Switching For Backup Of Registered Memory," filed Feb. 5, 2014, which is a continuation of U.S. patent application Ser. No. 13/905,053, titled "Isolation Switching For Backup Of Registered Memory," filed May 29, 2013, now U.S. Pat. No. 8,677,060, issued Mar. 18, 2014, which is a continuation of U.S. patent application Ser. No. 13/536,173, titled "Data Transfer Scheme For Non-Volatile Memory Module," filed Jun. 28, 2012, now U.S. Pat. No. 8,516,187, issued Aug. 20, 2013, which is a divisional of U.S. patent application Ser. No. 12/240,916, titled "Non-Volatile Memory Module," filed Sep. 29, 2008, now U.S. Pat. No. 8,301,833, issued Oct. 30, 2012, which is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, now abandoned, which claims the benefit of U.S. Provisional Application No. 60/941,586, filed Jun. 1, 2007, the contents of which are incorporated by reference herein in their entirety.

This application may also be considered related to U.S. patent application Ser. No. 15/000,834, filed Jan. 19, 2016 (abandoned), which is a continuation of U.S. patent application Ser. No. 14/489,332, filed Sep. 17, 2014, now U.S. Pat. No. 9,269,437, which is a continuation of U.S. patent application Ser. No. 14/173,219, filed Feb. 5, 2014, now U.S. Pat. No. 8,904,099, which is a continuation of U.S. patent application Ser. No. 13/905,048, filed May 29, 2013, now U.S. Pat. No. 6,671,243, which is a continuation U.S. patent application Ser. No. 13/536,173 above.

This application may also be considered related to U.S. patent application Ser. No. 15/924,866, (abandoned), which is a continuation of U.S. patent application Ser. No. 14/489,281, filed Sep. 17, 2014, now U.S. Pat. No. 9,921,762, which is a continuation of U.S. patent application Ser. No. 13/625,563, filed Sep. 24, 2012, now U.S. Pat. No. 8,904,098, which claims the benefit of U.S. Provisional Application No. 61/583,775, filed Sep. 23, 2011.

#### TECHNICAL FIELD

The present disclosure relates generally to computer memory devices, and more particularly, to devices that employ different types of memory devices such as combinations of Flash and random access memories.

#### BACKGROUND

As technology advances and the usage of portable computing devices, such as tablet notebook computers, increases, more data needs to be transferred among data centers and to/from end users. In many cases, data centers are built by clustering multiple servers that are networked to increase performance.

Although there are many types of networked servers that are specific to the types applications envisioned, the basic concept is generally to increase server performance by dynamically allocating computing and storage resources. In recent years, server technology has evolved to be specific to particular applications such as 'finance transactions' (for example, point-of-service, inter-bank transaction, stock market transaction), 'scientific computation' (for example, fluid dynamic for automobile and ship design, weather prediction, oil and gas expeditions), 'medical diagnostics' (for example, diagnostics based on the fuzzy logic, medical data processing), 'simple information sharing and searching' (for example, web search, retail store website, company home page), 'email' (information distribution and archive), 'security service', 'entertainment' (for example, video-on-demand), and so on. However, all of these applications suffer from the same information transfer bottleneck due to the inability of a high speed CPU (central processing unit) to efficiently transfer data in and out of relatively slower speed storage or memory subsystems, particularly since data transfers typically pass through the CPU input/output (I/O) channels.

The data transfer limitations by the CPU are exemplified by the arrangement shown in FIG. **1**, and apply to data transfers between main storage (for example the hard disk (HD) or solid state drive (SSD) and the memory subsystems (for example DRAM DIMM (Dynamic Random Access Memory Dual In-line Memory Module) connected to the front side bus (FSB)). In arrangements such as that of FIG. **1**, the SSD/HD and DRAM DIMM of a conventional memory arrangement are connected to the CPU via separate memory control ports (not shown). FIG. **1** specifically shows, through the double-headed arrow, the data flow path between the computer or server main storage (SSD/HD) to the DRAM DIMMs. Since the SSD/HD data I/O and the DRAM DIMM data I/O are controlled by the CPU, the CPU needs to allocate its process cycles to control these I/Os, which may include the IRQ (Interrupt Request) service which the CPU performs periodically. As will be appreciated, the more time a CPU allocates to controlling the data transfer traffic, the less time the CPU has to perform other tasks. Therefore, the overall performance of a server will deteriorate with the increased amount of time the CPU has to expend in performing data transfer.

There have been various approaches to increase the data transfer throughput rates from/to the main storage, such as SSD/HD, to local storage, such as DRAM DIMM. In one example as illustrated in FIG. **2**, EcoRAM™ developed by Spansion provides a storage SSD based system that assumes a physical form factor of a DIMM. The EcoRAM™ is populated with Flash memories and a relatively small memory capacity using DRAMs which serve as a data buffer. This arrangement is capable of delivering higher throughput rate than a standard SSD based system since the EcoRAM™ is connected to the CPU (central processing unit) via a high speed interface, such as the HT (Hyper

US 11,232,054 B2

3

Transport) interface, while an SSD/HD is typically connected via SATA (serial AT attachment), USB (universal serial bus), or PCI Express (peripheral component interface express). For example, the read random access throughput rate of EcoRAM™ is near 3 GB/s compared with 400 MB/s for a NAND SSD memory subsystem using the standard PCI Express-based. This is a 7.5× performance improvement. However, the performance improvement for write random access throughput rate is less than 2× (197 MBs for the EcoRAM vs. 104 MBs for NAND SSD). This is mainly due to the fact that the write speed is cannot be faster than the NAND Flash write access time. FIG. 2 is an example of EcoRAM™ using SSD with the form factor of a standard DIMM such that it can be connected to the FSB (front side bus). However, due to the interface protocol difference between DRAM and Flash, an interface device, EcoRAM Accelerator™), which occupies one of the server's CPU sockets is used, and hence further reducing server's performance by reducing the number of available CPU sockets available, and in turn reducing the overall computation efficiency. The server's performance will further suffer due to the limited utilization of the CPU bus due to the large difference in the data transfer throughput rate between read and write operations.

The EcoRAM™ architecture enables the CPU to view the Flash DIMM controller chip as another processor with a large size of memory available for CPU access.

In general, the access speed of a Flash based system is limited by four items: the read/write speed of the Flash memory, the CPU's FSB bus speed and efficiency, the Flash DIMM controller's inherent latency, and the HT interconnect speed and efficiency which is dependent on the HT interface controller in the CPU and Flash DIMM controller chip.

The published results indicate that these shortcomings are evident in that the maximum throughput rate is 1.56 GB s for the read operation and 104 MBs for the write operation. These access rates are 25% of the DRAM read access speed, and 1.7% of the DRAM access speed at 400 MHz operation. The disparity in the access speed (15 to 1) between the read operation and write operation highlight a major disadvantage of this architecture. The discrepancy of the access speed between this type of architecture and JEDEC standard DRAM DIMM is expected to grow wider as the DRAM memory technology advances much faster than the Flash memory.

Certain types of memory modules comprise a plurality of dynamic random-access memory (DRAM) devices mounted on a printed circuit board (PCB). These memory modules are typically mounted in a memory slot or socket of a computer system (e.g., a server system or a personal computer) and are accessed by the computer system to provide volatile memory to the computer system.

Volatile memory generally maintains stored information only when it is powered. Batteries have been used to provide power to volatile memory during power failures or interruptions. However, batteries may require maintenance, may need to be replaced, are not environmentally friendly, and the status of batteries can be difficult to monitor.

Non-volatile memory can generally maintain stored information while power is not applied to the non-volatile memory. In certain circumstances, it can therefore be useful to backup volatile memory using non-volatile memory.

OVERVIEW

Described herein is a memory module couplable to a memory controller of a host system. The memory module

4

includes a non-volatile memory subsystem, a data manager coupled to the non-volatile memory subsystem, a volatile memory subsystem coupled to the data manager and operable to exchange data with the non-volatile memory subsystem by way of the data manager, and a controller operable to receive commands from the memory controller and to direct (i) operation of the non-volatile memory subsystem, (ii) operation of the volatile memory subsystem, and (iii) transfer of data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one received command from the memory controller.

Also described herein is a method for managing a memory module by a memory controller, the memory module including volatile and non-volatile memory subsystems. The method includes receiving control information from the memory controller, wherein the control information is received using a protocol of the volatile memory subsystem. The method further includes identifying a data path to be used for transferring data to or from the memory module using the received control information, and using a data manager and a controller of the memory module to transfer data between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on at least one of the received control information and the identified data path.

Also described herein is a memory module wherein the data manager is operable to control one or more of data flow rate, data transfer size, data buffer size, data error monitoring, and data error correction in response to receiving at least one of a control signal and control information from the controller.

Also described herein is a memory module wherein the data manager controls data traffic between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on instructions received from the controller.

Also described herein is a memory module wherein data traffic control relates to any one or more of data flow rate, data transfer size, data buffer size, data transfer bit width, formatting information, direction of data flow, and the starting time of data transfer.

Also described herein is a memory module wherein the controller configures at least one of a first memory address space of the volatile memory subsystem and a second memory address space of the non-volatile memory subsystem in response to at least one of a received command from the memory controller and memory address space initialization information of the memory module.

Also described herein is a memory module wherein the data manager is configured as a bi-directional data transfer fabric having two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a memory module wherein the non-volatile memory subsystem comprises flash memory.

Also described herein is a memory module wherein at least one set of data ports is operated by the data manager to

US 11,232,054 B2

5

independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a memory module wherein the data manager and controller are configured to effect data transfer between the memory controller and the non-volatile memory subsystem in response to memory access commands received by the controller from the memory controller.

Also described herein is a memory module wherein the volatile memory subsystem is operable as a buffer for the data transfer between the memory controller and non-volatile memory.

Also described herein is a memory module wherein the data manager further includes a data format module configured to format data to be transferred between any two or more of the memory controller, the volatile memory subsystem, and the non-volatile memory subsystem based on control information received from the controller.

Also described herein is a memory module wherein the data manager further includes a data buffer for buffering data delivered to or from the non-volatile memory subsystem.

Also described herein is a memory module wherein the controller is operable to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a memory module wherein the controller is configured to effect operation with the host system in accordance with a prescribed protocol.

Also described herein is a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a memory module wherein the controller is operable to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a memory module wherein the controller is operable to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a memory module wherein the controller includes a volatile memory control module, a non-volatile memory control module, data manager control module, a command interpreter module, and a scheduler module.

Also described herein is a memory module wherein commands from the volatile memory control module to the volatile memory subsystem are subordinated to commands from the memory controller to the controller.

6

Also described herein is a memory module wherein the controller effects pre-fetching of data from the non-volatile to the volatile memory.

Also described herein is a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a memory module wherein the controller is operable to initiate a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a memory module wherein, if the closed block is re-opened, the controller is operable to abort the copy operation and to erase the target block from the non-volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the transfer of data includes a bidirectional transfer of data between the non-volatile and the volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising operating the data manager to control one or more of data flow rate, data transfer size, data width size, data buffer size, data error monitoring, data error correction, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module further comprising operating the data manager to control data traffic between the memory controller and at least one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein data traffic control relates to any one or more of data transfer size, formatting information, direction of data flow, and the starting time of the transfer of data.

Also described herein is a method for managing a memory module wherein data traffic control by the data manager is based on instructions received from the controller.

Also described herein is a method for managing a memory module further comprising operating the data manager as a bi-directional data transfer fabric with two or more sets of data ports coupled to any one of the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module wherein at least one of the volatile and non-volatile memory subsystems comprises one or more memory segments.

Also described herein is a method for managing a memory module wherein each memory segment comprises at least one memory circuit, memory device, or memory die.

Also described herein is a method for managing a memory module wherein the volatile memory subsystem comprises DRAM memory.

Also described herein is a method for managing a memory module wherein the non-volatile memory subsystem comprises Flash memory.

Also described herein is a method for managing a memory module further comprising operating the data ports to independently and/or concurrently transfer data to or from one or more memory segments of the volatile or non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising directing transfer of data bi-directionally between the volatile and non-volatile memory subsystems using the data manager and in response to memory access commands received by the controller from the memory controller.

US 11,232,054 B2

7

Also described herein is a method for managing a memory module further comprising buffering the data transferred between the memory controller and non-volatile memory subsystem using the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising using the controller to perform one or more of memory address translation, memory address mapping, address domain conversion, memory access control, data error correction, and data width modulation between the volatile and non-volatile memory subsystems.

Also described herein is a method for managing a memory module further comprising using the controller to effect communication with a host system by the volatile memory subsystem in accordance with a prescribed protocol.

Also described herein is a method for managing a memory module wherein the prescribed protocol is selected from one or more of DDR, DDR2, DDR3, and DDR4 protocols.

Also described herein is a method for managing a memory module further comprising using the controller to configure memory space in the memory module based on at least one of a command received from the memory controller, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value.

Also described herein is a method for managing a memory module wherein the controller configures the memory space of the memory module using at least a first portion of the volatile memory subsystem and a first portion of the non-volatile memory subsystem, and the controller presents a unified memory space to the memory controller.

Also described herein is a method for managing a memory module wherein the controller configures the memory space in the memory module using partitioning instructions that are application-specific.

Also described herein is a method for managing a memory module further comprising using the controller to copy booting information from the non-volatile to the volatile memory subsystem during power up.

Also described herein is a method for managing a memory module wherein the controller includes a volatile memory control module, the method further comprising generating commands by the volatile memory control module in response to commands from the memory controller, and transmitting the generated commands to the volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising pre-fetching of data from the non-volatile memory subsystem to the volatile memory subsystem.

Also described herein is a method for managing a memory module wherein the pre-fetching is initiated by the memory controller writing an address of requested data into a register of the controller.

Also described herein is a method for managing a memory module further comprising initiating a copy operation of data of a closed block in the volatile memory subsystem to a target block in the non-volatile memory subsystem.

Also described herein is a method for managing a memory module further comprising aborting the copy operation when the closed block of the volatile memory subsystem is re-opened, and erasing the target block in the non-volatile memory subsystem.

8

Also described herein is a memory system having a volatile memory subsystem, a non-volatile memory subsystem, a controller coupled to the non-volatile memory subsystem, and a circuit coupled to the volatile memory subsystem, to the controller, and to a host system. In a first mode of operation, the circuit is operable to selectively isolate the controller from the volatile memory subsystem, and to selectively couple the volatile memory subsystem to the host system to allow data to be communicated between the volatile memory subsystem and the host system. In a second mode of operation, the circuit is operable to selectively couple the controller to the volatile memory subsystem to allow data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem using the controller, and the circuit is operable to selectively isolate the volatile memory subsystem from the host system.

Also described herein is a method for operating a memory system. The method includes coupling a circuit to a host system, a volatile memory subsystem, and a controller, wherein the controller is coupled to a non-volatile memory subsystem. In a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, the circuit is used to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, the circuit is used to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

Also described herein is a nontransitory computer readable storage medium storing one or more programs configured to be executed by one or more computing devices. The programs, when executing on the one or more computing devices, cause a circuit that is coupled to a host system, to a volatile memory subsystem, and to a controller that is coupled to a nonvolatile memory subsystem, to perform a method in which, in a first mode of operation that allows data to be communicated between the volatile memory subsystem and the host system, operating the circuit to (i) selectively isolate the controller from the volatile memory subsystem, and (ii) selectively couple the volatile memory subsystem to the host system. In a second mode of operation that allows data to be communicated between the volatile memory subsystem and the nonvolatile memory subsystem via the controller, operating the circuit to (i) selectively couple the controller to the volatile memory subsystem, and (ii) selectively isolate the volatile memory subsystem from the host system.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated into and constitute a part of this specification, illustrate one or more examples of embodiments and, together with the description of example embodiments, serve to explain the principles and implementations of the embodiments.

In the drawings:

FIG. 1 is a block diagram illustrating the path of data transfer, via a CPU, of a conventional memory arrangement;

FIG. 2 is a block diagram of a known EcoRAM™ architecture;

FIGS. 3A and 3B are block diagrams of a non-volatile memory DIMM or NVDIMM;

FIGS. 4A and 4B are block diagrams of a Flash-DRAM hybrid DIMM or FDHDIMM;

US 11,232,054 B2

9 10

FIG. **5**A is a block diagram of a memory module **500** in accordance with certain embodiments described herein;

FIG. **5**B is a block diagram showing some functionality of a memory module such as that shown in FIG. **5**A;

FIG. **6** is a block diagram showing some details of the data manager (DMgr);

FIG. **7** is a functional block diagram of the on-module controller (CDC);

FIG. **8**A is a block diagram showing more details of the prior art Flash-DRAM hybrid DIMM (FDHDIMM) of FIGS. **4**A and **4**B;

FIG. **8**B is a block diagram of a Flash-DRAM hybrid DIMM (FDHDIMM) in accordance with certain embodiments disclosed herein;

FIG. **9** is a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM;

FIG. **10** is a block diagram showing an example of mapping of DRAM address space to Flash memory address space; and

FIG. **11** is a table showing estimates of the maximum allowed closed blocks in a queue to be written back to Flash memory for different DRAM densities using various average block use time.

FIG. **12** is a block diagram of an example memory system compatible with certain embodiments described herein.

FIG. **13** is a block diagram of an example memory module with ECC (error-correcting code) having a volatile memory subsystem with nine volatile memory elements and a non-volatile memory subsystem with five non-volatile memory elements in accordance with certain embodiments described herein.

FIG. **14** is a block diagram of an example memory module having a microcontroller unit and logic element integrated into a single device in accordance with certain embodiments described herein.

FIGS. **15**A-**15**C schematically illustrate example embodiments of memory systems having volatile memory subsystems comprising registered dual in-line memory modules in accordance with certain embodiments described herein.

FIG. **16** schematically illustrates an example power module of a memory system in accordance with certain embodiments described herein.

FIG. **17** is a flowchart of an example method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems.

FIG. **18** is a flowchart of an example method of controlling a memory system operatively coupled to a host system and which includes at least 100 percent more storage capacity in non-volatile memory than in volatile memory.

FIG. **19** schematically illustrates an example clock distribution topology of a memory system in accordance with certain embodiments described herein.

FIG. **20** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including operating a volatile memory subsystem at a reduced rate in a back-up mode.

FIG. **21** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments of a volatile memory subsystem of a memory system to a controller of the memory system.

FIG. **22** is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including backing up and/or restoring a volatile memory subsystem in slices.

## DESCRIPTION OF EXAMPLE EMBODIMENTS

Example embodiments are described herein in the context of a system of computers, servers, controllers, memory modules, hard disk drives and software. Those of ordinary skill in the art will realize that the following description is illustrative only and is not intended to be in any way limiting. Other embodiments will readily suggest themselves to such skilled persons having the benefit of this disclosure. Reference will now be made in detail to implementations of the example embodiments as illustrated in the accompanying drawings. The same reference indicators will be used to the extent possible throughout the drawings and the following description to refer to the same or like items.

In the interest of clarity, not all of the routine features of the implementations described herein are shown and described. It will, of course, be appreciated that in the development of any such actual implementation, numerous implementation-specific decisions must be made in order to achieve the developer's specific goals, such as compliance with application- and business-related constraints, and that these specific goals will vary from one implementation to another and from one developer to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking of engineering for those of ordinary skill in the art having the benefit of this disclosure.

In accordance with this disclosure, the components, process steps, and/or data structures described herein may be implemented using various types of operating systems, computing platforms, computer programs, and/or general purpose machines. In addition, those of ordinary skill in the art will recognize that devices of a less general purpose nature, such as hardwired devices, field programmable gate arrays (FPGAs), application specific integrated circuits (ASICs), or the like, may also be used without departing from the scope and spirit of the inventive concepts disclosed herein. Where a method comprising a series of process steps is implemented by a computer or a machine and those process steps can be stored as a series of instructions readable by the machine, they may be stored on a tangible medium such as a computer memory device (e.g., ROM (Read Only Memory), PROM (Programmable Read Only Memory), EEPROM (Electrically Eraseable Programmable Read Only Memory), Flash memory, Jump Drive, and the like), magnetic storage medium (e.g., tape, magnetic disk drive, and the like), optical storage medium (e.g., CD-ROM, DVD-ROM, paper card, paper tape and the like) and other types of program memory.

The term "exemplary" where used herein is intended to mean "serving as an example, instance or illustration." Any embodiment described herein as "exemplary" is not necessarily to be construed as preferred or advantageous over other embodiments.

Disclosed herein are arrangements for improving memory access rates and addressing the high disparity (15 to 1 ratio) between the read and write data throughput rates. In one arrangement, a Flash-DRAM-hybrid DIMM (FDHDIMM) with integrated Flash and DRAM is used. Methods for controlling such an arrangement are described.

In certain embodiments, the actual memory density (size or capacity) of the DIMM and/or the ratio of DRAM memory to Flash memory are configurable for optimal use with a particular application (for example, POS, inter-bank transaction, stock market transaction, scientific computation such as fluid dynamics for automobile and ship design, weather prediction, oil and gas expeditions, medical diagnostics such as diagnostics based on the fuzzy logic, medical data processing, simple information sharing and searching such as web search, retail store website, company home

US 11,232,054 B2

11 12

page, email or information distribution and archive, security service, and entertainment such as video-on-demand).

In certain embodiments, the device contains a high density Flash memory with a low density DRAM, wherein the DRAM is used as a data buffer for read/write operation. The Flash serves as the main memory. Certain embodiments described herein overcome the needs of having a long separation period between an Activate command (may be referred to as RAS) and a corresponding read or write command (may be referred to as first CAS command).

In accordance with one embodiment, described with reference to FIGS. 3A and 3B, a memory system 300 includes a non-volatile (for example Flash) memory subsystem 302 and a volatile (for example DRAM) memory subsystem 304. The examples of FIGS. 3A and 3B are directed to architectures of a non-volatile DIMM (NVDIMM) NVDIMM system that may use a power subsystem (not shown) that can include a battery or a capacitor as a means for energy storage to copy DRAM memory data into Flash memory when power loss occurs, is detected, or is anticipated to occur during operation. When normal power is restored, a restore NVDIMM operation is initiated and the data stored in the Flash memory is properly restored to the DRAM memory. In this architecture, the density of the Flash is about the same as the DRAM memory size or within a few multiples, although in some applications it may be higher. This type of architecture may also be used to provide non-volatile storage that is connected to the FSB (front side bus) to support RAID (Redundant Array of Independent Disks) based systems or other type of operations. An NVDIMM controller 306 receives and interprets commands from the system memory controller hub (MCH). The NVDIMM controller 306 control the NVDIMM DRAM and Flash memory operations. In FIG. 3A, the DRAM 304 communicates data with the MCH, while an internal bus 308 is used for data transfer between the DRAM and Flash memory subsystems. In FIG. 3B, the NVDIMM controller 306' of NVDIMM 300' monitors events or commands and enables data transfer to occur in a first mode between the DRAM 304' and Flash 302' or in a second mode between the DRAM and the MCH.

In accordance with one embodiment, a general architecture for a Flash and DRAM hybrid DIMM (FDHDIMM) system 400 is shown in FIG. 4A. The FDHDIMM interfaces with an MCH (memory controller hub) to operate and behave as a high density DIMM, wherein the MCH interfaces with the non-volatile memory subsystem (for example Flash) 402 is controlled by an FDHDIMM controller 404. Although the MCH interfaces with the Flash via the FDHDIMM controller, the FDHDIMM overall performance is governed by the Flash access time. The volatile memory subsystem (for example DRAM) 406 is primarily used as a data buffer or a temporary storage location such that data from the Flash memory 402 is transferred to the DRAM 406 at the Flash access speed, and buffered or collected into the DRAM 406, which then transfers the buffered data to the MCH based on the access time of DRAM. Similarly, when the MCH transfers data to the DRAM 406, the FDHDIMM controller 404 manages the data transfer from the DRAM 406 to the Flash 402. Since the Flash memory access speed (both read and write) is relatively slower than DRAM, (e.g. for example a few hundred microseconds for read access), the average data throughput rate of FDHDIMM 400 is limited by the Flash access speed. The DRAM 406 serves as a data buffer stage that buffers the MCH read or write data. Thus, the DRAM 406 serves as a temporary storage for the data to be transferred from/to the Flash 402. Furthermore, in accordance with one embodiment, the MCH recognizes the

physical density of an FDHDIMM operating as a high density DIMM as the density of Flash alone.

In accordance with one embodiment, a read operation can be performed by the MCH by sending an activate command (may be simply referred to as RAS, or row address strobe) to the FDHDIMM 400 to conduct a pre-fetch read data operation from the Flash 402 to the DRAM 406, with the pre-fetch data size being for example a page (1 KB or 2 KB, or may be programmable to any size). The MCH then sends a read command (may be simply referred to as CAS, or column address strobe) to read the data out input of the DRAM. In this embodiment, the data transfer from Flash to DRAM occurs at Flash access speed rates, while data transfer from DRAM to MCH occurs at DRAM access speed rates. In this example, data latency and throughput rates are the same as any DRAM operation as long as the read operations are executed onto the pages that were opened with the activate command previously sent to pre-fetch data from the Flash to DRAM. Thus, a longer separation time period between the RAS (e.g. Activate command) and the first CAS (column address strobe e.g. read or write command) is required to account for the time it takes to pre-fetch data from the Flash to DRAM.

An example of FDHDIMM operating as a DDR DIMM with SSD is shown in FIG. 4B, wherein the FDHDIMM 400' supports two different interface interpretations to the MCH. In the first interface interpretation, the MCH views the FDHDIMM 400' as a combination of DRAM DIMM and SSD (not illustrated). In this mode the MCH needs to manage two address spaces, one for the DRAMs 402' and one for the Flash 404'. The MCH is coupled to, and controls, both of the DRAM and Flash memory subsystems. One advantage of this mode is that the CPU does not need to be in the data path when data is moved from DRAM to Flash or from Flash to DRAM. In the second interface interpretation, the MCH views the FDHDIMM 400' as an on-DIMM Flash with the SSD in an extended memory space that is behind the DRAM space. Thus, in this mode, the MCH physically fetches data from the SSD to the DDR DRAM and then the DRAM sends the data to the MCH. Since all data movement occurs on the FDHDIMM, this mode will provide better performance than if the data were to be moved through or via the CPU.

In accordance with one embodiment and as shown in FIG. 4B, the FDHDIMM 400' receives control signals 408 from the MCH, where the control signals may include one or more control signals specifically for the DRAM 402' operation and one or more control signals specifically for the Flash 404' operation. In this embodiment, the MCH or CPU is coupled to the FDHDIMM via a single data bus interface 410 which couples the MCH to the DRAM.

FIGS. 5A and 5B are block diagrams of a memory module 500 that is couplable to a host system (not shown). The host system may be a server or any other system comprising a memory system controller or an MCH for providing and controlling the read/write access to one or more memory systems, wherein each memory system may include a plurality of memory subsystems, a plurality of memory devices, or at least one memory module. The term "read/write access" means the ability of the MCH to interface with a memory system or subsystem in order to write data into it or read data from it, depending on the particular requirement at a particular time.

In certain embodiments, memory module 500 is a Flash-DRAM hybrid memory subsystem which may be integrated with other components of a host system. In certain embodiments, memory module 500 is a Flash-DRAM hybrid

13

memory module that has the DIMM (dual-inline memory module) form factor, and may be referred to as a FDHDIMM, although it is to be understood that in both structure and operation it may be different from the FDHDIMM discussed above and described with reference to FIGS. **4**A and **4**B. Memory module **500** includes two on-module intermediary components: a controller and a data manager. These on-module intermediary components may be physically separate components, circuits, or modules, or they may be integrated onto a single integrated circuit or device, or integrated with other memory devices, for example in a three dimensional stack, or in any one of several other possible expedients for integration known to those skilled in the art to achieve a specific design, application, or economic goal. In the case of a DIMM, these on-module intermediary components are an on-DIMM Controller (CDC) **502** and an on-DIMM data manager (DMgr) **504**. While the DIMM form factor will predominate the discussion herein, it should be understood that this is for illustrative purposes only and memory systems using other form factors are contemplated as well. CDC **502** and data manager DMgr **504** are operative to manage the interface between a non-volatile memory subsystem such as a Flash **506**, a volatile memory subsystem such as a DRAM **508**, and a host system represented by MCH **510**.

In certain embodiments, CDC **502** controls the read/write access to/from Flash memory **506** from/to DRAM memory **508**, and to/from DRAM memory from/to MCH **510**. Read/write access between DRAM **508**, Flash **506** and MCH **510** may be referred to herein generally as communication, wherein control and address information C/A **560** is sent from MCH **510** to CDC **502**, and possible data transfers follow as indicated by Data **550**, Data **555**, and/or Data **556**. In certain embodiments, the CDC **502** performs specific functions for memory address transformation, such as address translation, mapping, or address domain conversion, Flash access control, data error correction, manipulation of data width or data formatting or data modulation between the Flash memory and DRAM, and so on. In certain embodiments, the CDC **502** ensures that memory module **500** provides transparent operation to the MCH in accordance with certain industry standards, such as DDR, DDR2, DDR3, DDR4 protocols. In the arrangement shown in FIGS. **5**A and **5**B, there is no direct access from the MCH **510** to the Flash **506** memory subsystem. Thus in accordance with certain embodiments, the Flash access speed has minimal impact on the overall FDHDIMM access speed. In the schematic illustration of FIG. **5**B and in accordance with one embodiment, the CDC controller **502** receives standard DDR commands from the MCH, interprets, and produces commands and/or control signals to control the operation of the Data manager (DMgr), the Flash memory and the DRAM memory. The DMgr controls the data path routing amongst DRAMs, Flash and MCH, as detailed below. The data path routing control signals are independently operated without any exclusivity.

An exemplary role of DMgr **504** is described with reference to FIG. **6**. In certain embodiments and in response to communication from CDC **502**, DMgr **504** provides a variety of functions to control data flow rate, data transfer size, data buffer size, data error monitoring or data error correction. For example, these functions or operations can be performed on-the-fly (while data is being transferred via the DMgr **504**) or performed on buffered or stored data in DRAM or a buffer. In addition, one role of DMgr **504** is to provide interoperability among various memory subsystems or components and/or MCH **510**.

14

In one embodiment, an exemplary host system operation begins with initialization. The CDC **502** receives a first command from the MCH **510** to initialize FDHDIMM **500** using a certain memory space. The memory space as would be controlled by MCH **510** can be configured or programmed during initialization or after initialization has completed. The MCH **510** can partition or parse the memory space in various ways that are optimized for a particular application that the host system needs to run or execute. In one embodiment, the CDC **502** maps the actual physical Flash **506** and DRAM **508** memory space using the information sent by MCH **510** via the first command. In one embodiment, the CDC **502** maps the memory address space of any one of the Flash **506** and DRAM **508** memory subsystems using memory address space information that is received from the host system, stored in a register within FDHDIMM **500**, or stored in a memory location of a non-volatile memory subsystem, for example a portion of Flash **506** or a separate non-volatile memory subsystem. In one embodiment, the memory address space information corresponds to a portion of initialization information of the FDHDIMM **500**.

In one embodiment, MCH **510** may send a command to restore a certain amount of data information from Flash **506** to DRAM **508**. The CDC **502** provides control information to DMgr **504** to appropriately copy the necessary information from Flash **506** to the DRAM **508**. This operation can provide support for various host system booting operations and/or a special host system power up operation.

In one embodiment, MCH **510** sends a command which may include various fields comprising control information regarding data transfer size, data format options, and/or startup time. CDC **502** receives and interprets the command and provides control signals to DMgr **504** to control the data traffic between the Flash **506**, the DRAM **508**, and the MCH **510**. For example, DMgr **504** receives the data transfer size, formatting information, direction of data flow (via one or more multiplexers such as **611**, **612**, **621**, **622** as detailed below), and the starting time of the actual data transfer from CDC **502**. DMgr **504** may also receive additional control information from the CDC **502** to establish a data flow path and/or to correctly establish the data transfer fabric. In certain embodiments, DMgr **504** also functions as a bidirectional data transfer fabric. For example, DMgr **504** may have more than 2 sets of data ports facing the Flash **506** and the DRAM **508**. Multiplexers **611** and **612** provide controllable data paths from any one of the DRAMs **508(1)** and **508(2)** (DRAM-A and DRAM-B) to any one of the MCH **510** and the Flash **506**. Similarly multiplexers **621** and **622** provide controllable data paths from any one of the MCH and the Flash memory to any one of the DRAMs **508(1)** and **508(2)** (DRAM-A and DRAM-B). In one embodiment, DRAM **508(1)** is a segment of DRAM **508**, while in other embodiments, DRAM **508(1)** is a separate DRAM memory subsystem. It will be understood that each memory segment can comprise one or more memory circuits, a memory devices, and/or memory integrated circuits. Of course other configurations for DRAM **508** are possible, and other data transfer fabrics using complex data paths and suitable types of multiplexing logic are contemplated.

In accordance with one embodiment, the two sets of multiplexors **611**, **612** and **621**, **622** allow independent data transfer to Flash **506** from DRAM-A **508(1)** and DRAM-B **508(2)**. For example, in response to one or more control signals or a command from CDC **502**, DMgr **504** can transfer data from DRAM-A **508(1)** to MCH **510**, via multiplexer **611**, at the same time as from DRAM-B **508(2)**

US 11,232,054 B2

15                                                                16

to the Flash 506, via multiplexer 612; or data is transferred from DRAM-B 508(2) to MCH 510, via multiplexer 611, and simultaneously data is transferred from the Flash 506 to DRAM-A 508(1), via multiplexer 621. Further, in the same way that data can be transferred to or from the DRAM in both device-wide or segment-by-segment fashion, data can be transferred to or from the flash memory in device-wide or segment-by-segment fashion, and the flash memory can be addressed and accessed accordingly.

In accordance with one embodiment the illustrated arrangement of data transfer fabric of DMgr 504 also allows the CDC 502 to control data transfer from the Flash memory to the MCH by buffering the data from the Flash 506 using a buffer 602, and matching the data rate and/or data format of MCH 510. The buffer 602 is shown in FIG. 6 as a portion of a data format module 604; however, buffer 602 may also be a distributed buffer such that one buffer is used for each one of the set of multiplexer logic elements shown as multiplexers 611, 612, 621, and 622. Various buffer arrangements may be used, such as a programmable size buffer to meet the requirement of a given system design requirement, for example the disparity between read/write access time; or overall system performance, for example latency. In certain embodiments, the buffer 604 may introduce one or more clock cycle delays into a data communication path between MCH 510, DRAM 508, and Flash 506.

In certain embodiments, data format module 604 contains a data formatting subsystem (not shown) to enable DMgr 504 to format and perform data transfer in accordance with control information received from CDC 502. Data buffer 604 of data format module 602, discussed above, also supports a wide data bus 606 coupled to the Flash memory 506 operating at a first frequency, while receiving data from DRAM 508 using a relatively smaller width data bus 608 operating at a second frequency, the second frequency being larger than the first frequency in certain embodiments. The buffer 602 is designed to match the data flow rate between the DRAM 508 and the Flash 506.

A register 690 provides the ability to register commands received from MCH 510 via C/A 560 (FIG. 5A). The register 690 may communicate these commands to CDC 502 and/or to the DRAM 508 and/or Flash 506. The register 690 communicates these registered commands to CDC 502 for processing. The register 690 may also include multiple registers (not shown), such that it can provide the ability to register multiple commands, a sequence of commands, or provide a pipeline delay stage for buffering and providing a controlled execution of certain commands received form MCH 510.

In certain embodiments, the register 690 may register commands from MCH 510 and transmit the registered commands to DRAM 508 and/or Flash 506 memory subsystems. In certain embodiments, the CDC 502 monitors commands received from MCH 510, via control and address bus C/A 560, and provides appropriate control information to DMgr 504, DRAM 508, or Flash 506 to execute these commands and perform data transfer operations between MCH 510 and FDHDIMM 500 via MCH data bus 610.

FIG. 7 illustrates a functional block diagram of the CDC 502. In certain embodiments, the major functional blocks of the CDC 502 are a DRAM control block DRAMCtrl 702, Flash control block FlashCtrl 704, MCH command interpreter CmdInt 706, DRAM-Flash interface scheduler Scheduler 708, and DMgr control block (DMgrCtrl) 710.

In accordance with one embodiment, DRAMCtrl 702 generates DRAM commands that are independent from the commands issued by the MCH 510. In accordance with one embodiment, when the MCH 510 initiates a read/write operation from/to the same DRAM 508 that is currently executing a command from the DRAMCtrl 702, then the CDC 502 may choose to instruct DRAMCtrl 702 to abort its operation in order to execute the operation initiated by the MCH. However, the CDC 502 may also pipeline the operation so that it causes DRAMCtrl 702 to either halt or complete its current operation prior to executing that of the MCH. The CDC 502 may also instruct DRAMCtrl 702 to resume its operation once the command from MCH 510 is completed.

In accordance with one embodiment, the FlashCtrl 704 generates appropriate Flash commands for the proper read/write operations. The CmdInt 706 intercepts commands received from MCH 510 and generates the appropriate control information and control signals and transmit them to the appropriate FDHDIMM functional block. For example, CmdInt 706 issues an interrupt signal to the DRAMCtrl 702 when the MCH issues a command that collides (conflicts) with the currently executing or pending commands that DRAMCtrl 702 has initiated independently from MCH 510, thus subordinating these commands to those from the MCH. The Scheduler 708 schedules the Flash-DRAM interface operation such that there is no resource conflict in the DMgr 504. In accordance with one embodiment, the Scheduler 708 assigns time slots for the DRAMCtrl 702 and FlashCtrl 704 operation based on the current status and the pending command received or to be received from the MCH. The DMgrCtrl 710 generates and sends appropriate control information and control signals for the proper operation and control of the data transfer fabric to enable or disable data paths between Flash 506, DRAM 508, and the MCH 510.

FIG. 8A is a block diagram showing a Flash-DRAM hybrid DIMM (FDHDIMM). As seen from FIG. 8A, this Flash-DRAM hybrid DIMM requires two separate and independent address buses to separately control the address spaces: one for the Flash memory Flash 506 and the other for the DRAM memory DRAM 508. The MCH treats the DRAM 508 and Flash 506 as separate memory subsystems, for example DRAM and SSD/HD memory subsystems. The memory in each address space is controlled directly by the MCH. However, the on-DIMM data path between Flash 506 and DRAM 508 allows for direct data transfer to occur between the Flash 506 and the DRAM 508 in response to control information from Ctrl 502. In this embodiment, this data transfer mechanism provides direct support for executing commands from the MCH without having the MCH directly controlling the data transfer, and thus improving data transfer performance from Flash 506 to the DRAM 508. However, the MCH needs to manage two address spaces and two different memory protocols simultaneously. Moreover, the MCH needs to map the DRAM memory space into the Flash memory space, and the data interface time suffers due to the difference in the data access time between the Flash memory and the DRAM memory.

In accordance with one embodiment, a memory space mapping of a Flash-DRAM hybrid DIMM is shown in FIG. 8B. A memory controller of a host system (not shown) controls both of the DRAM 508 address space and the Flash 506 address space using a single unified address space. The CDC 502 receives memory access commands from the MCH and generates control information for appropriate mapping and data transfer between Flash and DRAM memory subsystem to properly carry out the memory access commands. In one embodiment, the memory controller of the host system views the large Flash memory space as a DRAM memory space, and accesses this unified memory

US 11,232,054 B2

17

space with a standard DDR (double data rate) protocol used for accessing DRAM. The unified memory space in this case can exhibit overlapping memory address space between the Flash **506** and the DRAM **508**. The overlapping memory address space may be used as a temporary storage or buffer for data transfer between the Flash **506** and the DRAM **508**. For example, the DRAM memory space may hold a copy of data from the selected Flash memory space such that the MCH can access this data normally via DDR memory access commands. The CDC **502** controls the operation of the Flash **506** and DRAM **508** memory subsystems in response to commands received from a memory controller of a host system.

In one embodiment, the unified memory space corresponds to a contiguous address space comprising a first portion of the address space of the Flash **506** and a first portion of the address space of the DRAM **508**. The first portion of the address space of the Flash **506** can be determined via a first programmable register holding a first value corresponding to the desired Flash memory size to be used. Similarly, the first portion of the address space of the DRAM **508** can be determined via a second programmable register holding a second value corresponding to the desired DRAM memory size to be used. In one embodiment, any one of the first portion of the address space of the Flash **506** and the first portion of the address space of the DRAM **508** is determined via a first value corresponding to a desired performance or memory size, the first value being received by the CDC **502** via a command sent by memory controller of the host system.

In accordance with one embodiment, a flow diagram directed to the transfer of data from Flash memory to DRAM memory and vice versa in an exemplary FDHDIMM is shown in FIG. **9**. In certain embodiments, data transfer from the Flash **506** to the DRAM **508** occurs in accordance with memory access commands which the CDC **502** receives from the memory controller of the host system. In certain embodiments, the CDC **502** controls the data transfer from the DRAM **508** to the Flash **506** so as to avoid conflict with any memory operation that is currently being executed. For example, when all the pages in a particular DRAM memory block are closed. The CDC **502** partitions the DRAM memory space into a number of blocks for the purpose of optimally supporting the desired application. The controller can configure memory space in the memory module based on at least one of one or more commands received from the MCH, instructions received from the MCH, a programmable value written into a register, a value corresponding to a first portion of the volatile memory subsystem, a value corresponding to a first portion of the non-volatile memory subsystem, and a timing value. Furthermore, the block size can be configurable by the memory controller of the host system, such that the number pages in a block can be optimized to support a particular application or a task. Furthermore, the block size may be configured on-the-fly, e.g. CDC **502** can receive instruction regarding a desired block size from the memory controller via a memory command, or via a programmable value.

In certain embodiments, a memory controller can access the memory module using a standard access protocol, such as JEDEC's DDR DRAM, by sending a memory access command to the CDC **502** which in turn determines what type of a data transfer operation it is and the corresponding target address where the data information is stored, e.g. data information is stored in the DRAM **508** or Flash **506** memory subsystems. In response to a read operation, if the CDC **502** determines that data information, e.g. a page (or

18

block), does not reside in the DRAM **508** but resides in Flash **506**, then the CDC **502** initiates and controls all necessary data transfer operations from Flash **506** to DRAM **508** and subsequently to the memory controller. In one embodiment, once the CDC **502** completes the data transfer operation of the requested data information from the Flash **506** to the DRAM **508**, the CDC **502** alerts the memory controller to retrieve the data information from the DRAM **508**. In on embodiment, the memory controller initiates the copying of data information from Flash **506** to DRAM **508** by writing, into a register in the CDC **502**, the target Flash address along with a valid block size. The CDC **502** in turn, executes appropriate operations and generates control information to copy the data information to the DRAM **508**. Consequently, the memory controller can access or retrieve the data information using standard memory access commands or protocol.

An exemplary flow chart is shown in FIG. **9**, a starting step or power up **902**, is followed by an initialization step **904**, the memory controller initiates, at step **906**, a data move from the Flash **506** to the DRAM **508** by writing target address and size, to a control register in the CDC **502**, which then copies, at **908**, data information from the Flash **506** to the DRAM **508** and erases the block in the Flash. Erasing the data information from Flash may be accomplished independently from (or concurrently with) other steps that CDC **502** performs in this flow chart, i.e. other steps can be executed concurrently with the Erase the Flash block step. Once the data information or a block of data information is thus moved to the DRAM **508**, the memory controller can operate on this data block using standard memory access protocol or commands at **910**. The CDC **502** checks, at **912**, if any of the DRAM **508** blocks, or copied blocks, are closed. If the memory controller closed any open blocks in DRAM **508**, then the CDC **502** initiate a Flash write to write the closed block from the DRAM **508** to the Flash **506**, at **914**. In addition, the memory controller, at **916**, reopens the closed block that is currently being written into the Flash **506**, then the CDC **502** stops the Flash write operation and erases the Flash block which was being written to, as shown at **918**. Otherwise, the CDC **502** continues and completes the writing operation to the Flash at **920**.

The dashed lines in FIG. **9** indicate independent or parallel activities that can be performed by the CDC **502**. At any time the CDC **502** receives a DRAM load command from a memory controller which writes a Flash target address and/or block size information into the RC register(s) at **922**, as described above, then the CDC **502** executes a load DRAM w/RC step **906** and initiates another branch (or a thread) of activities that includes steps **908-922**. In one embodiment, the CDC **502** controls the data transfer operations between DRAM **508** and Flash **506** such that the Flash **506** is completely hidden from the memory controller. The CDC **502** monitors all memory access commands sent by the memory controller using standard DRAM protocol and appropriately configures and manipulate both Flash **506** and DRAM **508** memory subsystems to perform the requested memory access operation and thus achieve the desired results. The memory controller does not interface directly with the Flash memory subsystem. Instead, the memory controller interfaces with the CDC **502** and/or DMgr **504** as shown in FIG. **5** and FIG. **6**. Moreover, the memory controller may use one or more protocol, such as DDR, DDR2, DDR3, DDR4 protocols or the like.

In accordance with one embodiment, an example of mapping a DRAM address space to Flash memory address space is shown in FIG. **10**. Two sets (**1002**, **1004**) of address

US 11,232,054 B2

19                                                                                                    20

bits AD6 to AD17, forming a 24 bit extended memory page address, are allocated for the block address. For example, assuming a Block size of 256K Bytes, then a 24-bit block address space (using the two sets of AD6 to AD17 1002 and 1004) would enable access to 4 TB of Flash memory storage space. If a memory module has 1 GB of DRAM storage capacity, then it can hold approximately 4K Blocks of data in the DRAM memory, each Block comprise 256 K Bytes of data. The DRAM address space, corresponding to the 4K blocks, can be assigned to different virtual ranks and banks, where the number of virtual ranks and banks is configurable and can be manipulated to meet a specific design or performance needs. For example, if a 1G Bytes memory module is configured to comprise two ranks with eight banks per rank, then each bank would hold two hundred fifty (250) blocks or the equivalent of 62 M Bytes or 62K pages, where each page correspond to a 1K Bytes. Other configurations using different page, block, banks, or ranks numbers may also be used. Furthermore, an exemplary mapping of 24-bit DDR DIMM block address to Flash memory address, using Block addressing as described above, is shown in FIG. 10. The 24-bit can be decomposed into fields, such as a logical unit number LUN address 1061 field, a Block address 1051 field, a Plane address 1041, a Page address 1031, and a group of least significant address bits $A_0A_1$ 1021. The Plane address 1041 is a sub address of the block address, and it may be used to support multiple page IO so as to improve Flash memory subsystem operation. In this example, it is understood that different number of bits may be allocated to each field of the 24-bit

The CDC 502 manages the block write-back operation by queuing the blocks that are ready to be written back to the Flash memory. As described above, if any page in a queued block for a write operation is reopened, then the CDC 502 will stop the queued block write operation, and remove the block from the queue. Once all the pages in a block are closed, then the CDC 502 restarts the write-back operation and queue the block for a write operation.

In accordance with one embodiment, an exemplary read operation from Flash 506 to DRAM 508 can be performed in approximately 400 μs, while a write operation from DRAM 508 to Flash 506 can be performed in approximately 22 ms resulting in a read to write ratio of 55 to 1. Therefore, if the average time a host system's memory controller spends accessing data information in a Block of DRAM is about 22 ms (that is the duration that a Block comprises one or more pages that are open), then the block write-back operation from DRAM to Flash would not impact performance and hence the disparity between read and write access may be completely hidden from the memory controller. If the block usage time is 11 ms instead of 22 ms, then the CDC 502 control the data transfer operation between DRAM 508 and Flash 506 such that there are no more than 9 closed blocks in the queue to be written-back to the Flash memory, hence approximately an average of 100 ms can be maintained for a standard DDR DRAM operation. Moreover, the number of closed Blocks in the queue to be written-back to the Flash memory subsystem varies with the average block usage time and the desired performance for a specific host system or for a specific application running using the host system resources.

Consequently, the maximum number of closed Blocks to be written-back to Flash can be approximated to be

((#of blocks per bank)/(ratio of 'Flash_block_write_time' to 'Flash_read_time'))*((Block usage time)/('Flash_block_write_time'))

In order to maintain less than 100 ms time period for queued write-back Blocks, then using a Flash memory subsystem having 22 ms write access time per Block would results in a maximum number of four Blocks to be queued for write operation to Flash 506. Therefore, on average approximately 88 ms (=22 ms*4) for blocks means that each bank should not have more than four Blocks that need to be written back to the Flash 506.

The above equation also indicates that bigger DRAM memory space can support shorter block usage times. For example, 2 GB of DRAM memory allows the 8 closed blocks to be written-back to Flash. The table in FIG. 11 provides an estimation of the maximum allowed closed blocks in the queue to be written back to the Flash memory for different DRAM density using various average block use time.

Certain embodiments described herein include a memory system which can communicate with a host system such as a disk controller of a computer system. The memory system can include volatile and non-volatile memory, and a controller. The controller backs up the volatile memory using the non-volatile memory in the event of a trigger condition. Trigger conditions can include, for example, a power failure, power reduction, request by the host system, etc. In order to power the system in the event of a power failure or reduction, the memory system can include a secondary power source which does not comprise a battery and may include, for example, a capacitor or capacitor array.

In certain embodiments, the memory system can be configured such that the operation of the volatile memory is not adversely affected by the non-volatile memory or by the controller when the volatile memory is interacting with the host system. For example, one or more isolation devices may isolate the non-volatile memory and the controller from the volatile memory when the volatile memory is interacting with the host system and may allow communication between the volatile memory and the non-volatile memory when the data of the volatile memory is being restored or backed-up. This configuration generally protects the operation of the volatile memory when isolated while providing backup and restore capability in the event of a trigger condition, such as a power failure.

In certain embodiments described herein, the memory system includes a power module which provides power to the various components of the memory system from different sources based on a state of the memory system in relation to a trigger condition (e.g., a power failure). The power module may switch the source of the power to the various components in order to efficiently provide power in the event of the power failure. For example, when no power failure is detected, the power module may provide power to certain components, such as the volatile memory, from system power while charging a secondary power source (e.g., a capacitor array). In the event of a power failure or other trigger condition, the power module may power the volatile memory elements using the previously charged secondary power source.

In certain embodiments, the power module. transitions relatively smoothly from powering the volatile memory with system power to powering it with the secondary power source. For example, the power system may power volatile memory with a third power source from the time the memory system detects that power failure is likely to occur until the time the memory system detects that the power failure has actually occurred.

In certain embodiments, the volatile memory system can be operated at a reduced frequency during backup and/or

21
22

restore operations which can improve the efficiency of the system and save power. In some embodiments, during backup and/or restore operations, the volatile memory communicates with the non-volatile memory by writing and/or reading data words in bit-wise slices instead of by writing entire words at once. In certain embodiments, when each slice is being written to or read from the volatile memory the unused slice(s) of volatile memory is not active, which can reduce the power consumption of the system.

In yet other embodiments, the non-volatile memory can include at least 100 percent more storage capacity than the volatile memory. This configuration can allow the memory system to efficiently handle subsequent trigger conditions.

FIG. 12 is a block diagram of an example memory system 1010 compatible with certain embodiments described herein. The memory system 1010 can be coupled to a host computer system and can include a volatile memory subsystem 1030, a non-volatile memory subsystem 1040, and a controller 1062 operatively coupled to the non-volatile memory subsystem 1040. In certain embodiments, the memory system 1010 includes at least one circuit 1052 configured to selectively operatively decouple the controller 1062 from the volatile memory subsystem 1030.

In certain embodiments, the memory system 1010 comprises a memory module. The memory system 1010 may comprise a printed-circuit board (PCB) 1020. In certain embodiments, the memory system 1010 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other volatile memory capacities are also compatible with certain embodiments described herein. In certain embodiments, the memory system 10 has a non-volatile memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or 32-GB. Other non-volatile memory capacities are also compatible with certain embodiments described herein. In addition, memory systems 1010 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, the PCB 1020 has an industry-standard form factor. For example, the PCB 1020 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 1020 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 1020 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FB-DIMM), miniDIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain preferred embodiments, the memory system 1010 is in electrical communication with the host system. In other embodiments, the memory system 1010 may communicate with a host system using some other type of communication, such as, for example, optical communication. Examples of host systems include, but are not limited to, blade servers, 1 U servers, personal computers (PCs), and other applications in which space is constrained or limited. The memory system 1010 can be in communication with a disk controller of a computer system, for example. The PCB 1020 can comprise an interface 1022 that is configured to be in electrical communication with the host system (not shown). For example, the interface 1022 can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system. The interface 1022 of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory system 1010 and the host system. For example, the interface 1022 can comprise a standard 240-pin DDR2 edge connector.

The volatile memory subsystem 1030 comprises a plurality of volatile memory elements 1032 and the non-volatile memory subsystem 1040 comprises a plurality of non-volatile memory elements 1042. Certain embodiments described herein advantageously provide nonvolatile storage via the non-volatile memory subsystem 1040 in addition to high-performance (e.g., high speed) storage via the volatile memory subsystem 1030. In certain embodiments, the first plurality of volatile memory elements 1032 comprises two or more dynamic random-access memory (DRAM) elements. Types of DRAM elements 1032 compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). For example, in the block diagram of FIG. 12, the first memory bank 1030 comprises eight 64M×8 DDR2 SDRAM elements 1032. The volatile memory elements 1032 may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory elements 1032 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Volatile memory elements 1032 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBOA), micro-BOA (1.1, BGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

In certain embodiments, the second plurality of non-volatile memory elements 1042 comprises one or more flash memory elements. Types of flash memory elements 1042 compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC). For example, in the block diagram of FIG. 12, the second memory bank 1040 comprises 512 MB of flash memory organized as four 128 Mb×8 NAND flash memory elements 1042. In addition, nonvolatile memory elements 1042 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Non-volatile memory elements 1042 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BOA), fine-pitch BOA (FBGA), micro-BOA (POA), mini-BGA (mBGA), and chip-scale packaging (CSP).

FIG. 13 is a block diagram of an example memory module 10 with ECC (error-correcting code) having a volatile memory subsystem 1030 with nine volatile memory elements 1032 and a non-volatile memory subsystem 1040 with five non-volatile memory elements 1042 in accordance with certain embodiments described herein. The additional memory element 1032 of the first memory bank 1030 and the additional memory element 1042 of the second memory bank 1040 provide the ECC capability. In certain other embodiments, the volatile memory subsystem 1030 comprises other numbers of volatile memory elements 1032 (e.g., 2, 3, 4, 5, 6, 7, more than 9). In certain embodiments, the non-volatile memory subsystem 1040 comprises other numbers of nonvolatile memory elements 1042 (e.g., 2, 3, more than 5).

US 11,232,054 B2

23 24

Referring to FIG. 12, in certain embodiments, the logic element 1070 comprises a field-programmable gate array (FPGA). In certain embodiments, the logic element 1070 comprises an FPGA available from Lattice Semiconductor Corporation which includes an internal flash. In certain other embodiments, the logic element 1070 comprises an FPOA available from another vendor. The internal flash can improve the speed of the memory system 1010 and save physical space. Other types of logic elements 1070 compatible with certain embodiments described herein include, but are not limited to, a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, a complex programmable logic device (CPLD). In certain embodiments, the logic element 1070 is a custom device. In certain embodiments, the logic element 1070 comprises various discrete electrical elements, while in certain other embodiments, the logic element 1070 comprises one or more integrated circuits. FIG. 14 is a block diagram of an example memory module 1010 having a microcontroller unit 1060 and logic element 1070 integrated into a single controller 1062 in accordance with certain embodiments described herein. In certain embodiments, the controller 1062 includes one or more other components. For example, in one embodiment, an FPGA without an internal flash is used and the controller 1062 includes a separate flash memory component which stores configuration information to program the FPGA.

In certain embodiments, the at least one circuit 1052 comprises one or more switches coupled to the volatile memory subsystem 1030, to the controller 1062, and to the host computer (e.g., via the interface 1022, as schematically illustrated by FIGS. 12-14). The one or more switches are responsive to signals (e.g., from the controller 1062) to selectively operatively decouple the controller 1062 from the volatile memory subsystem 1030 and to selectively operatively couple the controller 1062 to the volatile memory subsystem 1030. In addition, in certain embodiments, the at least one circuit 1052 selectively operatively couples and decouples the volatile memory subsystem 1030 and the host system.

In certain embodiments, the volatile memory subsystem 1030 can comprise a registered DIMM subsystem comprising one or more registers 1160 and a plurality of DRAM elements 1180, as schematically illustrated by FIG. 15A. In certain such embodiments, the at least one circuit 1052 can comprise one or more switches 1172 coupled to the controller 1062 (e.g., logic element 1070) and to the volatile memory subsystem 1030 which can be actuated to couple and decouple the controller 1062 to and from the volatile memory subsystem 1030, respectively. The memory system 1010 further comprises one or more switches 1170 coupled to the one or more registers 1160 and to the plurality of DRAM elements 1180 as schematically illustrated by FIG. 15A. The one or more switches 1170 can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem 1030 to the host system 1150. In certain other embodiments, as schematically illustrated by FIG. 15B, the one or more switches 1174 are also coupled to the one or more registers 1160 and to a power source 1162 for the one or more registers 1160. The one or more switches 1174 can be selectively switched to turn power on or off to the one or more registers 1160, thereby selectively operatively coupling the volatile memory subsystem 1030 to the host system 1150. As schematically illustrated by FIG. 15C, in certain embodiments the at least one circuit 1052 comprises a dynamic on-die termination (ODT) 1176 circuit of the logic element 1070. For example, the logic element 1070

can comprise a dynamic ODT circuit 1176 which selectively operatively couples and decouples the logic element 1070 to and from the volatile memory subsystem 1030, respectively. In addition, and similar to the example embodiment of FIG. 15A described above, the one or more switches 1170 can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem 1030 to the host system 1150.

Certain embodiments described herein utilize the non-volatile memory subsystem 1040 as a flash "mirror" to provide backup of the volatile memory subsystem 1030 in the event of certain system conditions. For example, the non-volatile memory subsystem 1040 may backup the volatile memory subsystem 1030 in the event of a trigger condition, such as, for example, a power failure or power reduction or a request from the host system. In one embodiment, the nonvolatile memory subsystem 1040 holds intermediate data results in a noisy system environment when the host computer system is engaged in a long computation. In certain embodiments, a backup may be performed on a regular basis. For example, in one embodiment, the backup may occur every millisecond in response to a trigger condition. In certain embodiments, the trigger condition occurs when the memory system 1010 detects that the system voltage is below a certain threshold voltage. For example, in one embodiment, the threshold voltage is 10 percent below a specified operating voltage. In certain embodiments, a trigger condition occurs when the voltage goes above a certain threshold value, such as, for example, 10 percent above a specified operating voltage. In some embodiments, a trigger condition occurs when the voltage goes below a threshold or above another threshold. In various embodiments, a backup and/or restore operation may occur in reboot and/or non-reboot trigger conditions.

As schematically illustrated by FIGS. 12 and 13, in certain embodiments, the controller 1062 may comprise a microcontroller unit (MCU) 1060 and a logic element 1070. In certain embodiments, the MCU 1060 provides memory management for the non-volatile memory subsystem 1040 and controls data transfer between the volatile memory subsystem 30 and the nonvolatile memory subsystem 1040. The MCU 1060 of certain embodiments comprises a 16-bit microcontroller, although other types of microcontrollers are also compatible with certain embodiments described herein. As schematically illustrated by FIGS. 12 and 13, the logic element 1070 of certain embodiments is in electrical communication with the non-volatile memory subsystem 1040 and the MCU 1060. The logic element 1070 can provide signal level translation between the volatile memory elements 1032 (e.g., 1.8V SSTL-2 for DDR2 SDRAM elements) and the non-volatile memory elements 1042 (e.g., 3V TTL for NAND flash memory elements). In certain embodiments, the logic element 1070 is also programmed to perform address/address translation between the volatile memory subsystem 1030 and the non-volatile memory subsystem 1040. In certain preferred embodiments, 1-NAND type flash are used for the non-volatile memory elements 1042 because of their superior read speed and compact structure.

The memory system 1010 of certain embodiments is configured to be operated in at least two states. The at least two states can comprise a first state in which the controller 1062 and the non-volatile memory subsystem 1040 are operatively decoupled (e.g., isolated) from the volatile memory subsystem 1030 by the at least one circuit 1052 and a second state in which the volatile memory subsystem 1030 is operatively coupled to the controller 1062 to allow data to

25

be communicated between the volatile memory subsystem **1030** and the nonvolatile memory subsystem **1040** via the controller **1062**. The memory system **1010** may transition from the first state to the second state in response to a trigger condition, such as when the memory system **1010** detects that there is a power interruption (e.g., power failure or reduction) or a system hang-up.

The memory system **1010** may further comprise a voltage monitor **1050**. The voltage monitor circuit **1050** monitors the voltage supplied by the host system via the interface **1022**. Upon detecting a low voltage condition (e.g., due to a power interruption to the host system), the voltage monitor circuit **1050** may transmit a signal to the controller **1062** indicative of the detected condition. The controller **1062** of certain embodiments responds to the signal from the voltage monitor circuit **1050** by transmitting a signal to the at least one circuit **1052** to operatively couple the controller to the volatile memory system **1030**, such that the memory system **1010** enters the second state. For example, the voltage monitor **1050** may send a signal to the MCU **1060** which responds by accessing the data on the volatile memory system **1030** and by executing a write cycle on the nonvolatile memory subsystem **1040**. During this write cycle, data is read from the volatile memory subsystem **1030** and is transferred to the non-volatile memory subsystem **1040** via the MCU **1060**. In certain embodiments, the voltage monitor circuit **1050** is part of the controller **1062** (e.g., part of the MCU **1060**) and the voltage monitor circuit **1050** transmits a signal to the other portions of the controller **1062** upon detecting a power threshold condition.

The isolation or operational decoupling of the volatile memory subsystem **1030** from the non-volatile memory subsystem in the first state can preserve the integrity of the operation of the memory system **1010** during periods of operation in which signals (e.g., data) are transmitted between the host system and the volatile memory subsystem **1030**. For example, in one embodiment during such periods of operation, the controller **1062** and the nonvolatile memory subsystem **1040** do not add a significant capacitive load to the volatile memory system **1030** when the memory system **1010** is in the first state. In certain such embodiments, the capacitive load of the controller **1062** and the non-volatile memory subsystem **1040** do not significantly affect the signals propagating between the volatile memory subsystem **1030** and the host system. This can be particularly advantageous in relatively high-speed memory systems where loading effects can be significant. In one preferred embodiment, the at least one circuit **1052** comprises an FSA1208 Low-Power, Eight-Port, Hi-Speed Isolation Switch from Fairchild Semiconductor. In other embodiments, the at least one circuit **1052** comprises other types of isolation devices.

Power may be supplied to the volatile memory subsystem **1030** from a first power supply (e.g., a system power supply) when the memory system **1010** is in the first state and from a second power supply **1080** when the memory system **1010** is in the second state. In certain embodiments, the memory system **1010** is in the first state when no trigger condition (e.g., a power failure) is present and the memory system **1010** enters the second state in response to a trigger condition. In certain embodiments, the memory system **1010** has a third state in which the controller **1062** is operatively decoupled from the volatile memory subsystem **1030** and power is supplied to the volatile memory subsystem **1030** from a third power supply (not shown). For example, in one embodiment the third power supply may provide power to

26

the volatile memory subsystem **1030** when the memory system **1010** detects that a trigger condition is likely to occur but has not yet occurred.

In certain embodiments, the second power supply **1080** does not comprise a battery. Because a battery is not used, the second power supply **1080** of certain embodiments may be relatively easy to maintain, does not generally need to be replaced, and is relatively environmentally friendly. In certain embodiments, as schematically illustrated by FIGS. **12-14**, the second power supply **1080** comprises a step-up transformer **1082**, a step-down transformer **1084**, and a capacitor bank **1086** comprising one or more capacitors (e.g., double-layer capacitors). In one example embodiment, capacitors may take about three to four minutes to charge and about two minutes to discharge. In other embodiments, the one or more capacitors may take a longer time or a shorter time to charge and/or discharge. For example, in certain embodiments, the second power supply **1080** is configured to power the volatile memory subsystem **1030** for less than thirty minutes. In certain embodiments, the second power supply **1080** may comprise a battery. For example, in certain embodiments, the second power supply **1080** comprises a battery and one or more capacitors and is configured to power the volatile memory subsystem **1030** for no more than thirty minutes.

In certain embodiments, the capacitor bank **1086** of the second power supply **1080** is charged by the first power supply while the memory system **1010** is in the first state. As a result, the second power supply **1080** is fully charged when the memory system **1010** enters the second state. The memory system **1010** and the second power supply **1080** may be located on the same printed circuit board **1020**. In other embodiments, the second power supply **1080** may not be on the same printed circuit board **1020** and may be tethered to the printed circuit board **1020**, for example.

When operating in the first state, in certain embodiments, the step-up transformer **1082** keeps the capacitor bank **1086** charged at a peak value. In certain embodiments, the step-down transformer **1084** acts as a voltage regulator to ensure that regulated voltages are supplied to the memory elements (e.g., 1.8V to the volatile DRAM elements **1032** and 3.0V to the non-volatile flash memory elements **1042**) when operating in the second state (e.g., during power down). In certain embodiments, as schematically illustrated by FIGS. **12-14**, the memory module **1010** further comprises a switch **1090** (e.g., FET switch) that switches power provided to the controller **1062**, the volatile memory subsystem **1030**, and the non-volatile memory subsystem **1040**, between the power from the second power supply **1080** and the power from the first power supply (e.g., system power) received via the interface **1022**. For example, the switch **1090** may switch from the first power supply to the second power supply **1080** when the voltage monitor **1050** detects a low voltage condition. The switch **1090** of certain embodiments advantageously ensures that the volatile memory elements **1032** and non-volatile memory elements **1042** are powered long enough for the data to be transferred from the volatile memory elements **1032** and stored in the non-volatile memory elements **1042**. In certain embodiments, after the data transfer is complete, the switch **1090** then switches back to the first power supply and the controller **1062** transmits a signal to the at least one circuit **1052** to operatively decouple the controller **1062** from the volatile memory subsystem **1030**, such that the memory system **1010** reenters the first state.

When the memory system **1010** re-enters the first state, data may be transferred back from the non-volatile memory

US 11,232,054 B2

27

subsystem **1040** to the volatile memory subsystem **1030** via the controller **1062**. The host system can then resume accessing the volatile memory subsystem **1030** of the memory module **1010**. In certain embodiments, after the memory system **1010** enters or re-enters the first state (e.g., after power is restored), the host system accesses the volatile memory subsystem **1030** rather than the non-volatile memory subsystem **1040** because the volatile memory elements **1032** have superior read/write characteristics. In certain embodiments, the transfer of data from the volatile memory bank **1030** to the nonvolatile memory bank **1040**, or from the non-volatile memory bank **1040** to the volatile. memory bank **1030**, takes less than one minute per GB.

In certain embodiments, the memory system **1010** protects the operation of the volatile memory when communicating with the host-system and provides backup and restore capability in the event of a trigger condition such as a power failure. In certain embodiments, the memory system **1010** copies the entire contents of the volatile memory subsystem **1030** into the nonvolatile memory subsystem **1040** on each backup operation. Moreover, in certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are copied back into the volatile memory subsystem **1030** on each restore operation. In certain embodiments, the entire contents of the non-volatile memory subsystem **1040** are accessed for each backup and/or restore operation, such that the non-volatile memory subsystem **1040** (e.g., flash memory subsystem) is used generally uniformly across its memory space and wear-leveling is not performed by the memory system **1010**. In certain embodiments, avoiding wear-leveling can decrease cost and complexity of the memory system **1010** and can improve the performance of the memory system **1010**. In certain other embodiments, the entire contents of the volatile memory subsystem **1030** are not copied into the non-volatile memory subsystem **1040** on each backup operation, but only a partial copy is performed. In certain embodiments, other management capabilities such as bad-block management and error management for the flash memory elements of the non-volatile memory subsystem **1040** are performed in the controller **1062**.

The memory system **1010** generally operates as a write-back cache in certain embodiments. For example, in one embodiment, the host system (e.g., a disk controller) writes data to the volatile memory subsystem **1030** which then writes the data to non-volatile storage which is not part of the memory system **1010**, such as, for example, a hard disk. The disk controller may wait for an acknowledgment signal from the memory system **1010** indicating that the data has been written to the hard disk or is otherwise secure. The memory system **1010** of certain embodiments can decrease delays in the system operation by indicating that the data has been written to the hard disk before it has actually done so. In certain embodiments, the memory system **1010** will still be able to recover the data efficiently in the event of a power outage because of the backup and restore capabilities described herein. In certain other embodiments, the memory system **1010** may be operated as a write-through cache or as some other type of cache.

FIG. **16** schematically illustrates an example power module **1100** of the memory system **1010** in accordance with certain embodiments described herein. The power module **1100** provides power to the various components of the memory system **1010** using different elements based on a state of the memory system **1010** in relation to a trigger condition. In certain embodiments, the power module **1100** comprises one or more of the components described above with respect to FIG. **12**. For example, in certain embodi-

28

ments, the power module **1100** includes the second power supply **1080** and the switch **1090**.

The power module **1100** provides a plurality of voltages to the memory system **1010** comprising non-volatile and volatile memory subsystems **1030**, **1040**. The plurality of voltages comprises at least a first voltage **1102** and a second voltage **1104**. The power module **1100** comprises an input **1106** providing a third voltage **1108** to the power module **1100** and a voltage conversion element **1120** configured to provide the second voltage **1104** to the memory system **1010**. The power module **1100** further comprises a first power element **1130** configured to selectively provide a fourth voltage **1110** to the conversion element **1120**. In certain embodiments, the first power element **1130** comprises a pulse-width modulation power controller. For example, in one example embodiment, the first power element **1130** is configured to receive a 1.8V input system voltage as the third voltage **1108** and to output a modulated 5V output as the fourth voltage **1110**.

The power module **1100** further comprises a second power element **1140** can be configured to selectively provide a fifth voltage **1112** to the conversion element **1120**. The power module **1100** can be configured to selectively provide the first voltage **1102** to the memory system **1010** either from the conversion element **1120** or from the input **1106**.

The power module **1100** can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage **1102** is provided to the memory system **1010** from the input **1106** and the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130**. In a second state, the fourth voltage **1110** is provided to the conversion element **1120** from the first power element **1130** and the first voltage **1102** is provided to the memory system **1010** from the conversion element **1120**. In the third state, the fifth voltage **1112** is provided to the conversion element **1120** from the second power element **1140** and the first voltage **1104** is provided to the memory system **1010** from the conversion element **1120**.

In certain embodiments, the power module **1100** transitions from the first state to the second state upon detecting that a trigger condition is likely to occur and transitions from the second state to the third state upon detecting that the trigger condition has occurred. For example, the power module **1100** may transition to the second state when it detects that a power failure is about to occur and transitions to the third state when it detects that the power failure has occurred. In certain embodiments, providing the first voltage **1102** in the second state from the first power element **1130** rather than from the input **1106** allows a smoother transition from the first state to the third state. For example, in certain embodiments, providing the first voltage **1102** from the first power element **1130** has capacitive and other smoothing effects. In addition, switching the point of power transition to be between the conversion element **1120** and the first and second power elements **1130**, **1140** (e.g., the sources of the pre-regulated fourth voltage **1110** in the second state and the pre-regulated fifth voltage **1112** in the third state) can smooth out potential voltage spikes.

In certain embodiments, the second power element **1140** does not comprise a battery and may comprise one or more capacitors. For example, as schematically illustrated in FIG. **16**, the second power element **1140** comprises a capacitor array **1142**, a buck-boost converter **1144** which adjusts the voltage for charging the capacitor array and a voltage/current limiter **1146** which limits the charge current to the capacitor array **1142** and stops charging the capacitor array **1142** when it has reached a certain charge voltage. In one

29

30

example embodiment, the capacitor array **1142** comprises two 50 farad capacitors capable of holding a total charge of 4.6V. For example, in one example embodiment, the buck-boost converter **1144** receives a 1.8V system voltage (first voltage **1108**) and boosts the voltage to 4.3V which is outputted to the voltage current limiter **1146**. The voltage/current limiter **1146** limits the current going to the capacitor array **1142** to 1 A and stops charging the array **1142** when it is charged to 4.3V. Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the second power element **1140** may include alternative embodiments. For example, different components and/or different value components may be used. For example, in other embodiments, a pure boost converter may be used instead of a buck-boost converter. In another embodiment, only one capacitor may be used instead of a capacitor array **1142**.

The conversion element **1120** can comprise one or more buck converters and/or one or more buck-boost converters. The conversion element **1120** may comprise a plurality of sub-blocks **1122**, **1124**, **1126** as schematically illustrated by FIG. **16**, which can provide more voltages in addition to the second voltage **1104** to the memory system **1010**. The sub-blocks may comprise various converter circuits such as buck-converters, boost converters, and buck-boost converter circuits for providing various voltage values to the memory system **1010**. For example, in one embodiment, sub-block **1122** comprises a buck converter, sub-block **1124** comprises a dual buck converter, and sub-block **1126** comprises a buck-boost converter as schematically illustrated by FIG. **16**. Various other components for the sub-blocks **1122**, **1124**, **1126** of the conversion element **1120** are also compatible with certain embodiments described herein. In certain embodiments, the conversion element **1120** receives as input either the fourth voltage **1110** from the first power element **1130** or the fifth voltage **1112** from the second power element **1140**, depending on the state of the power module **1100**, and reduces the input to an appropriate amount for powering various components of the memory system. For example, the buck-converter of sub-block **1122** can provide 1.8V at 2 A for about 60 seconds to the volatile memory elements **1032** (e.g., DRAM), the non-volatile memory elements **1042** (e.g., flash), and the controller **1062** (e.g., an FPGA) in one embodiment. The sub-block **1124** can provide the second voltage **1104** as well as another reduced voltage **1105** to the memory system **1010**. In one example embodiment, the second voltage **1104** is 2.5V and is used to power the at least one circuit **1052** (e.g., isolation device) and the other reduced voltage **1105** is 1.2V and is used to power the controller **1062** (e.g., FPGA). The subblock **1126** can provide yet another voltage **1107** to the memory system **1010**. For example, the voltage **1107** may be 3.3V and may be used to power both the controller **1062** and the at least one circuit **1052**.

Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the conversion element **1120** may include alternative embodiments. For example, there may be more or less sub-blocks which may comprise other types of converters (e.g., pure boost converters) or which may produce different voltage values. In one embodiment, the volatile memory elements **1032** and nonvolatile memory elements **1042** are powered using independent voltages and are not both powered using the first voltage **1102**.

FIG. **17** is a flowchart of an example method **1200** of providing a first voltage **1102** and a second voltage **1104** to a memory system **1010** including volatile and nonvolatile memory subsystems **1030**, **1040**. While the method **1200** is described herein by reference to the memory system **1010** schematically illustrated by FIGS. **12-15**, other memory systems are also compatible with embodiments of the method **1200**. During a first condition, the method **1200** comprises providing the first voltage **1102** to the memory system **1010** from an input power supply **1106** and providing the second voltage **1104** to the memory system **1010** from a first power subsystem in operational block **1210**. For example, in one embodiment, the first power subsystem comprises the first power element **1130** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, other first power subsystems are used.

The method **1200** further comprises detecting a second condition in operational block **1220**. In certain embodiments, detecting the second condition comprises detecting that a trigger condition is likely to occur. During the second condition, the method **1200** comprises providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the first power subsystem in an operational block **1230**. For example, referring to FIG. **16**, a switch **1148** can be toggled to provide the first voltage **1102** from the conversion element **1120** rather than from the input power supply.

The method **1200** further comprises charging a second power subsystem in operational block **1240**. In certain embodiments, the second power subsystem comprises the second power element **1140** or another power supply that does not comprise a battery. For example, in one embodiment, the second power subsystem comprises the second power element **1140** and the voltage conversion element **1120** described above with respect to FIG. **16**. In other embodiments, some other second power subsystem is used.

The method **1200** further comprises detecting a third condition in an operational block **1250** and during the third condition, providing the first voltage **1102** and the second voltage **1104** to the memory system **1010** from the second power subsystem **1140** in an operational block **1260**. In certain embodiments, detecting the third condition comprises detecting that the trigger condition has occurred. The trigger condition may comprise various conditions described herein. In various embodiments, for example, the trigger condition comprises a power reduction, power failure, or system hang-up. The operational blocks of the method **1200** may be performed in different orders in various embodiments. For example, in certain embodiments, the second power subsystem **1140** is charged before detecting the second condition.

In certain embodiments, the memory system **1010** comprises a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040** comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system **1010** also comprises a controller **1062** operatively coupled to the volatile memory subsystem **1030** and operatively coupled to the non-volatile memory subsystem **1040**. The controller **1062** can be configured to allow data to be communicated between the volatile memory subsystem **1030** and the host system when the memory system **1010** is operating in a first state and to allow data to be communicated between the volatile memory subsystem **1030** and the non-volatile memory subsystem **1040** when the memory system **1010** is operating in a second state.

Although the memory system **1010** having extra storage capacity of the non-volatile memory subsystem **1040** has been described with respect to certain embodiments, alter-

US 11,232,054 B2

31                                                            32

native configurations exist. For example, in certain embodiments, there may be more than 100 percent more storage capacity in the non-volatile memory subsystem **1040** than in the volatile memory subsystem **1030**. In various embodiments, there may be at least 200, 300, or 400 percent more storage capacity in the non-volatile memory subsystem **1040** than in the volatile memory subsystem **1030**. In other embodiments, the non-volatile memory subsystem **1040** includes at least some other integer multiples of the storage capacity of the volatile memory subsystem **1030**. In some embodiments, the non-volatile memory subsystem **1040** includes a non-integer multiple of the storage capacity of the volatile memory subsystem **1030**. In one embodiment, the non-volatile memory subsystem **1040** includes less than 100 percent more storage capacity than does the volatile memory subsystem **1030**.

The extra storage capacity of the non-volatile memory subsystem **1040** can be used to improve the backup capability of the memory system **1010**. In certain embodiments in which data can only be written to portions of the non-volatile memory subsystem **1040** which do not contain data (e.g., portions which have been erased), the extra storage capacity of the nonvolatile memory subsystem **1040** allows the volatile memory subsystem **1030** to be backed up in the event of a subsequent power failure or other trigger event. For example, the extra storage capacity of the non-volatile memory subsystem **1040** may allow the memory system **1010** to backup the volatile memory subsystem **1030** efficiently in the event of multiple trigger conditions (e.g., power failures). In the event of a first power failure, for example, the data in the volatile memory system **1030** is copied to a first, previously erased portion of the nonvolatile memory subsystem **1040** via the controller **1062**. Since the non-volatile memory subsystem **1040** has more storage capacity than does the volatile memory subsystem **1030**, there is a second portion of the non-volatile memory subsystem **1040** which does not have data from the volatile memory subsystem **1030** copied to it and which remains free of data (e.g., erased). Once system power is restored, the controller **1062** of the memory system **1010** restores the data to the volatile memory subsystem **1030** by copying the backed-up data from the non-volatile memory subsystem **40** back to the volatile memory subsystem **1030**. After the data is restored, the memory system **1010** erases the non-volatile memory subsystem **1040**. While the first portion of the non-volatile memory subsystem **1040** is being erased, it may be temporarily unaccessible.

If a subsequent power failure occurs before the first portion of the non-volatile memory subsystem **1040** is completely erased, the volatile memory subsystem **1030** can be backed-up or stored again in the second portion of the non-volatile memory subsystem **1040** as described herein. In certain embodiments, the extra storage capacity of the non-volatile memory subsystem **1040** may allow the memory system **1010** to operate more efficiently. For example, because of the extra storage capacity of the non-volatile memory subsystem **1040**, the memory system **1010** can handle a higher frequency of trigger events that is not limited by the erase time of the non-volatile memory subsystem **1040**.

FIG. **18** is a flowchart of an example method **1300** of controlling a memory system **1010** operatively coupled to a host system and which includes a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**. In certain embodiments, the non-volatile memory subsystem **1040** comprises at least 100 percent more storage capacity than does the volatile memory subsystem **30** as described

herein. While the method **1300** is described herein by reference to the memory system **1010** schematically illustrated by FIGS. **12-14**, the method **1300** can be practiced using other memory systems in accordance with certain embodiments described herein. In an operational block **1310**, the method **1300** comprises communicating data between the volatile memory subsystem **1030** and the host system when the memory system **1010** is in a first mode of operation. The method **1300** further comprises storing a first copy of data from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** at a first time when the memory system **1010** is in a second mode of operation in an operational block **1320**.

In an operational block **1330**, the method **1300** comprises restoring the first copy of data from the non-volatile memory subsystem **1040** to the volatile memory subsystem **1030**. The method **1300** further comprises erasing the first copy of data from the non-volatile memory subsystem **1040** in an operational block **1340**. The method further comprises storing a second copy of data from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** at a second time when the memory system **1010** is in the second mode of operation in an operational block **1350**. Storing the second copy begins before the first copy is completely erased from the non-volatile memory subsystem **1040**.

In some embodiments, the memory system **1010** enters the second mode of operation in response to a trigger condition, such as a power failure. In certain embodiments, the first copy of data and the second copy of data are stored in separate portions of the nonvolatile memory subsystem **1040**. The method **1300** can also include restoring the second copy of data from the non-volatile memory subsystem **1040** to the volatile memory subsystem **1030** in an operational block **1360**. The operational blocks of method **1300** referred to herein may be performed in different orders in various embodiments. For example, in some embodiments, the second copy of data is restored to the volatile memory subsystem **1030** at operational block **1360** before the first copy of data is completely erased in the operational block **1340**.

FIG. **19** schematically illustrates an example clock distribution topology **1400** of a memory system **1010** in accordance with certain embodiments described herein. The clock distribution topology **1400** generally illustrates the creation and routing of the clock signals provided to the various components of the memory system **1010**. A clock source **1402** such as, for example, a 25 MHz oscillator, generates a clock signal. The clock source **1402** may feed a clock generator **1404** which provides a clock signal **1406** to the controller **1062**, which may be an FPGA. In one embodiment, the clock generator **1404** generates a 125 MHz clock signal **1406**. The controller **1062** receives the clock signal **1406** and uses it to clock the controller **1062** master state control logic. For example, the master state control logic may control the general operation of an FPGA controller **1062**.

The clock signal **1406** can also be input into a clock divider **1410** which produces a frequency-divided version of the clock signal **1406**. In an example embodiment, the clock divider **1410** is a divide by two clock divider and produces a 62.5 MHz clock signal in response to the 125 MHz clock signal **1406**. A non-volatile memory phase-locked loop (PLL) block **1412** can be included (e.g., in the controller **1062**) which distributes a series of clock signals to the non-volatile memory subsystem **1040** and to associated control logic. For example, a series of clock signals **1414** can

33

be sent from the controller 1062 to the non-volatile memory subsystem 1040. Another clock signal 1416 can be used by the controller logic which is dedicated to controlling the non-volatile memory subsystem 1040. For example, the clock signal 1416 may clock the portion of the controller 1062 which is dedicated to generating address and/or control lines for the non-volatile memory subsystem 1040. A feedback clock signal 1418 is fed back into the non-volatile memory PLL block 1412. In one embodiment, the PLL block 1412 compares the feedback clock 1418 to the reference clock 1411 and varies the phase and frequency of its output until the reference 1411 and feedback 1418 clocks are phase and frequency matched.

A version of the clock signal 1406 such as the backup clock signal 1408 may be sent from the controller to the volatile memory subsystem 1030. The clock signal 1408 may be, for example, a differential version of the clock signal 1406. As described herein, the backup clock signal 1408 may be used to clock the volatile memory subsystem 1030 when the memory system 1010 is backing up the data from the volatile memory subsystem 1030 into the non-volatile memory subsystem 1040. In certain embodiments, the backup clock signal 1408 may also be used to clock the volatile memory subsystem 1030 when the memory system 1010 is copying the backed-up data back into the volatile memory subsystem 1030 from the nonvolatile memory subsystem 1040 (also referred to as restoring the volatile memory subsystem 1030). The volatile memory subsystem 1030 may normally be run at a higher frequency (e.g., DRAM running at 400 MHz) than the nonvolatile memory subsystem 1040 (e.g., flash memory running at 62.5 MHz) when communicating with the host system (e.g., when no trigger condition is present). However, in certain embodiments the volatile memory subsystem 1030 may be operated at a reduced frequency (e.g., at twice the frequency of the non-volatile memory subsystem 1040) without introducing significant delay into the system during backup operation and/or restore operations. Running the volatile memory subsystem 1030 at the reduced frequency during a backup and/or restore operation may advantageously reduce overall power consumption of the memory system 1010.

In one embodiment, the backup clock 1408 and the volatile memory system clock signal 1420 are received by a multiplexer 1422, as schematically illustrated by FIG. 19. The multiplexer 1422 can output either the volatile memory system clock signal 1420 or the backup clock signal 1408 depending on the backup state of the memory system 1010. For example, when the memory system 1010 is not performing a backup or restore operation and is communicating with the host system (e.g., normal operation), the volatile memory system clock signal 1420 may be provided by the multiplexer 422 to the volatile memory PLL block 1424. When the memory system 1010 is performing a backup (or restore) operation, the backup clock signal 1408 may be provided.

The volatile memory PLL block 1424 receives the volatile memory reference clock signal 1423 from the multiplexer 1422 and can generate a series of clock signals which are distributed to the volatile memory subsystem 1030 and associated control logic. For example, in one embodiment, the PLL block 1424 generates a series of clock signals 1426 which clock the volatile memory elements 1032. A clock signal 1428 may be used to clock control logic associated with the volatile memory elements, such as one or more registers (e.g., the one or more registers of a registered DIMM). Another clock signal 1430 may be sent to the controller 1062. A feedback clock signal 1432 is fed back

34

into the volatile memory PLL block 1424. In one embodiment, the PLL block 1424 compares the feedback clock signal 1432 to the reference clock signal 1423 and varies the phase and frequency of its output until the reference clock signal 1423 and the feedback clock signal 1432 clocks are phase and frequency matched.

The clock signal 1430 may be used by the controller 1062 to generate and distribute clock signals which will be used by controller logic which is configured to control the volatile memory subsystem 1030. For example, control logic in the controller 1062 may be used to control the volatile memory subsystem 1030 during a backup or restore operation. The clock signal 1430 may be used as a reference clock signal for the PLL block 1434 which can generate one or more clocks 1438 used by logic in the controller 1062. For example, the PLL block 1434 may generate one or more clock signals 1438 used to drive logic circuitry associated with controlling the volatile memory subsystem 1030. In certain embodiments, the PLL block 1434 includes a feedback clock signal 1436 and operates in a similar manner to other PLL blocks described herein.

The clock signal 1430 may be used as a reference clock signal for the PLL block 1440 which may generate one or more clock signals used by a sub-block 1442 to generate one or more other clock signals 1444. In one embodiment, for example, the volatile memory subsystem 1030 comprises DDR2 SDRAM elements and the sub-block 1442 generates one or more DDR2 compatible clock signals 1444. A feedback clock signal 1446 is fed back into the PLL block 1440. In certain embodiments, the PLL block 1440 operates in a similar manner to other PLL blocks described herein.

While described with respect to the example embodiment of FIG. 19, various alternative clock distribution topologies are possible. For example, one or more of the clock signals have a different frequency in various other embodiments. In some embodiments, one or more of the clocks shown as differential signals are single ended signals. In one embodiment, the volatile memory subsystem 1030 operates on the volatile memory clock signal 1420 and there is no backup clock signal 1408. In some embodiments, the volatile memory subsystem 1030 is operated at a reduced frequency during a backup operation and not during a restore operation. In other embodiments, the volatile memory subsystem 1030 is operated at a reduced frequency during a restore operation and not during a backup operation.

FIG. 20 is a flowchart of an example method 1500 of controlling a memory system 1010 operatively coupled to a host system. Although described with respect to the memory system 1010 described herein, the method 1500 is compatible with other memory systems. The memory system 1010 may include a clock distribution topology 1400 similar to the one described above with respect to FIG. 19 or another clock distribution topology. The memory system 1010 can include a volatile memory subsystem 30 and a non-volatile memory subsystem 1040.

In an operational block 1510, the method 1500 comprises operating the volatile memory subsystem 1030 at a first frequency when the memory system 1010 is in a first mode of operation in which data is communicated between the volatile memory subsystem 1030 and the host system. In an operational block 1520, the method 1500 comprises operating the non-volatile memory subsystem 1040 at a second frequency when the memory system 1010 is in a second mode of operation in which data is communicated between the volatile memory subsystem 1030 and the non-volatile memory subsystem 1040. The method 1500 further comprises operating the volatile memory subsystem 1030 at a

35

third frequency in an operational block **1530** when the memory system **1010** is in the second mode of operation. In certain embodiments, the memory system **1010** is not powered by a battery when it is in the second mode of operation. The memory system **1010** may switch from the first mode of operation to the second mode of operation in response to a trigger condition. The trigger condition may be any trigger condition described herein such as, for example, a power failure condition. In certain embodiments, the second mode of operation includes both backup and restore operations as described herein. In other embodiments, the second mode of operation includes backup operations but not restore operations. In yet other embodiments, the second mode of operation includes restore operations but not backup operations.

The third frequency can be less than the first frequency. For example, the third frequency can be approximately equal to the second frequency. In certain embodiments, the reduced frequency operation is an optional mode. In yet other embodiments, the first, second and/or third frequencies are configurable by a user or by the memory system **1010**.

FIG. **21** schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments **1630**, **1640** of a volatile memory subsystem **1030** of a memory system **1010** to a controller **1062** of the memory system **1010**. While the example of FIG. **21** shows a topology including two DRAM segments **1630**, **1640** for the purposes of illustration, each address location of the volatile memory subsystem **1030** comprises more than the two segments in certain embodiments. The data lines **1632**, **1642** from the first DRAM segment **1630** and the second DRAM segment **1640** of the volatile memory subsystem **1030** are coupled to switches **1650**, **1652** which are coupled to the controller **1062** (e.g., logic element **1070**) of the memory system **1010**. The chip select lines **1634**, **1644** and the self-refresh lines **1636**, **1646** (e.g., CKe signals) of the first and second DRAM segments **1630**, **1640**, respectively, are coupled to the controller **1062**. In certain embodiments, the controller **1062** comprises a buffer (not shown) which is configured to store data from the volatile memory subsystem **1030**. In certain embodiments, the buffer is a first-in, first out buffer (FIFO). In certain embodiments, data slices from each DRAM segment **1630**, **1640** comprise a portion of the volatile memory subsystem data bus. In one embodiment, for example, the volatile memory subsystem **1030** comprises a 72-bit data bus (e.g., each data word at each addressable location is 72 bits wide and includes, for example, 64 bits of accessible SDRAM and 8 bits of ECC), the first data slice from the first DRAM segment **1630** may comprise 40 bits of the data word, and the second data slice from the second DRAM segment **1640** may comprise the remaining 32 bits of the data word. Certain other embodiments comprise data buses and/or data slices of different sizes.

In certain embodiments, the switches **1650**, **1652** can each be selectively switched to selectively operatively couple the data lines **1632**, **1642**, respectively from the first and second DRAM segments **1630**, **1640** to the controller **1062**. The chip select lines **1634**, **1644** enable the first and second DRAM segments **1630**, **1640**, respectively, of the volatile memory subsystem **1030**, and the self-refresh lines **1636**, **1646** toggle the first and second DRAM segments **1630**, **1640**, respectively, from self-refresh mode to active mode. In certain embodiments, the first and second DRAM segments **1630**, **1640** maintain stored information but are not accessible when they are in self-refresh mode, and maintain stored information and are accessible when they are in active mode.

36

In certain embodiments, when the memory system **1010** is backing up the volatile memory system **1030**, data slices from only one of the two DRAM segments **1630**, **1640** at a time are sent to the controller **1062**. For example, when the first slice is being written to the controller **1062** during a back-up, the controller **1062** sends a signal via the CKe line **1636** to the first DRAM segment **1630** to put the first DRAM segment **1630** in active mode. In certain embodiments, the data slice from the first DRAM segment **1630** for multiple words (e.g., a block of words) is written to the controller **1062** before writing the second data slice from the second DRAM segment **1640** to the controller **1062**. While the first data slice is being written to the controller **1062**, the controller **1062** also sends a signal via the CKe line **1646** to put the second DRAM segment **1640** in self-refresh mode. Once the first data slice for one word or for a block of words is written to the controller **1062**, the controller **1062** puts the first DRAM segment **1630** into self-refresh mode by sending a signal via the CKe line **1636** to the first DRAM segment **1640**. The controller **1062** also puts the second DRAM segment **1640** into active mode by sending a signal via the CKe line **1646** to the DRAM segment **1640**. The second slice for a word or for a block of words is written to the controller **1062**. In certain embodiments, when the first and second data slices are written to the buffer in the controller **1062**, the controller **1062** combines the first and second data slices **1630**, **1640** into complete words or blocks of words and then writes each complete word or block of words to the non-volatile memory subsystem **1040**. In certain embodiments, this process is called "slicing" the volatile memory subsystem **1030**.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements **1042** write each backed-up data word to the controller **1062** which writes a first slice of the data word to the volatile memory subsystem **1030** and then a second slice of the data word to the volatile memory subsystem **1030**. In certain embodiments, slicing the volatile memory subsystem **1030** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **1030** during a backup operation.

FIG. **22** is a flowchart of an example method **1600** of controlling a memory system **1010** operatively coupled to a host system and which includes a volatile memory subsystem **1030** and a non-volatile memory subsystem **1040**. Although described with respect to the memory system **1010** described herein with respect to FIGS. **12-14** and **21**, the method **1600** is compatible with other memory systems. The method **1600** comprises communicating data words between the volatile memory subsystem **1030** and the host system when the memory system **1010** is in a first mode of operation in an operational block **1610**. For example, the memory system **1010** may be in the first mode of operation when no trigger condition has occurred and the memory system is not performing a backup and/or restore operation or is not being powered by a secondary power supply.

In an operational block **1620**, the method further comprises transferring data words from the volatile memory subsystem **1030** to the non-volatile memory subsystem **1040** when the memory system **1010** is in a second mode of operation. In certain embodiments, each data word comprises the data stored in a particular address of the memory system **1010**. The memory system **1010** may enter the second mode of operation, for example, when a trigger condition (e.g., a power failure) occurs. In certain embodiments, transferring each data word comprises storing a first

US 11,232,054 B2

37            38

portion (also referred to as a slice) of the data word in a buffer in an operational block **1622**, storing a second portion of the data word in the buffer in an operational block **1624**, and writing the entire data word from the buffer to the non-volatile memory subsystem **1040** in an operational block **1626**.

In one example embodiment, the data word may be a 72 bit data word (e.g., 64 bits of accessible SDRAM and 8 bits of ECC), the first portion (or "slice") may comprise 40 bits of the data word, and the second portion (or "slice") may comprise the remaining 32 bits of the data word. In certain embodiments, the buffer is included in the controller **1062**. For example, in one embodiment, the buffer is a first-in, first-out buffer implemented in the controller **1062** which comprises an FPGA. The method **1600** may generally be referred to as "slicing" the volatile memory during a backup operation. In the example embodiment, the process of "slicing" the volatile memory during a backup includes bringing the 32-bit slice out of self-refresh, reading a 32-bit block from the slice into the buffer, and putting the 32-bit slice back into self-refresh. The 40-bit slice is then brought out of self-refresh and a 40-bit block from the slice is read into a buffer. Each block may comprise a portion of multiple words. For example, each 32-bit block may comprise 32-bit portions of multiple 72-bit words. In other embodiments, each block comprises a portion of a single word. The 40-bit slice is then put back into self-refresh in the example embodiment. The 32-bit and 40-bit slices are then combined into a 72-bit block by the controller **1062** and ECC detection/correction is performed on each 72-bit word as it is read from the buffer and written into the non-volatile memory subsystem (e.g., flash).

In some embodiments, the entire data word may comprise more than two portions. For example, the entire data word may comprise three portions instead of two and transferring each data word further comprises storing a third portion of each data word in the buffer. In certain other embodiments, the data word may comprise more than three portions.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the nonvolatile memory elements **1040** write each backed-up data word to the controller **1062** which writes a first portion of the data word to the volatile memory subsystem **1030** and then a second portion of the data word to the volatile memory **1030**. In certain embodiments, slicing the volatile memory subsystem **1030** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **1030** during a backup operation.

The method **1600** can advantageously provide significant power savings and can lead to other advantages. For example, in one embodiment where the volatile memory subsystem **1030** comprises DRAM elements, only the slice of the DRAM which is currently being accessed (e.g., written to the buffer) during a backup is configured in full-operational mode. The slice or slices that are not being accessed may be put in self-refresh mode. Because DRAM in self-refresh mode uses significantly less power than DRAM in full-operational mode, the method **1600** can allow significant power savings. In certain embodiments, each slice of the DRAM includes a separate self-refresh enable (e.g., CKe) signal which allows each slice to be accessed independently.

In addition, the connection between the DRAM elements and the controller **1062** may be as large as the largest slice instead of as large as the data bus. In the example embodiment, the connection between the controller **1062** and the

DRAM may be 40 bits instead of 72 bits. As a result, pins on the controller **1062** may be used for other purposes or a smaller controller may be used due to the relatively low number of pin-outs used to connect to the volatile memory subsystem **1030**. In certain other embodiments, the full width of the data bus is connected between the volatile memory subsystem **1030** and the controller **1062** but only a portion of it is used during slicing operations. For example, in some embodiments, memory slicing is an optional mode.

While embodiments and applications have been shown and described, it would be apparent to those skilled in the art having the benefit of this disclosure that many more modifications than mentioned above are possible without departing from the inventive concepts disclosed herein. The invention, therefore, is not to be restricted except in the spirit of the appended claims.

What is claimed is:

1. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system, the interface including a plurality of edge connections configured to couple power, data, address and control signals between the memory module and the host system;

a voltage conversion circuit coupled to the PCB and configured to provide at least three regulated voltages, wherein the voltage conversion circuit includes at least three buck converters each of which is configured to produce a regulated voltage of the at least three regulated voltages;

a plurality of components coupled to the PCB, each component of the plurality of components coupled to at least one regulated voltage of the at least three regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices and a first circuit that is coupled to the plurality of SDRAM devices and to a first set of edge connections of the plurality of edge connections, wherein the first circuit is coupled to first and second regulated voltages of the at least three regulated voltages, and wherein the plurality of SDRAM devices are coupled to the first regulated voltage of the at least three regulated voltages.

2. The memory module of claim **1**, wherein the first regulated voltage has a first voltage amplitude, and the second regulated voltage has a second voltage amplitude; and wherein a first one of the first and second voltage amplitudes is less than a second one of the first and second voltage amplitudes.

3. The memory module of claim **1**, wherein a third regulated voltage of the at least three regulated voltages has a voltage amplitude of 1.8 volts.

4. The memory module of claim **1**, further comprising:

a voltage monitor circuit coupled to the PCB and to a second set of edge connections of the plurality of edge connections, the voltage monitor circuit configured to monitor an input voltage received from the second set of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the input voltage having a voltage amplitude below a predetermined threshold voltage, wherein the memory module transitions from a first operable state to a second operable state in response to the trigger signal.

5. The memory module of claim **4**, further comprising:

a controller coupled to the voltage monitor circuit; wherein, in response to the trigger signal, the controller

US 11,232,054 B2

<div style="display:flex">
<div>

**39**

is configured to perform one or more operations including a write operation to transfer data to non-volatile memory.

**6**. The memory module of claim **1**, further comprising:

a voltage monitor circuit coupled to the PCB and to a second set of edge connections of the plurality of edge connections, the voltage monitor circuit configured to monitor an input voltage received from the second set of edge connections, the voltage monitor circuit configured to produce a trigger signal in response to the input voltage having a voltage amplitude above a predetermined threshold voltage, wherein the memory module transitions from a first operable state to a second operable state in response to the trigger signal.

**7**. The memory module of claim **6**, further comprising:

a controller coupled to the voltage monitor circuit; wherein, in response to the trigger signal, the controller is configured to perform one or more operations including a write operation to transfer data to non-volatile memory.

**8**. The memory module of claim **1**, further comprising:

a controller coupled to the PCB, the controller including a voltage monitor circuit configured to monitor an input voltage received from a second set of edge connections of the plurality of edge connections, wherein, in response to the voltage monitor circuit detecting a power threshold condition, the voltage monitor circuit transmits a signal to one or more portions of the controller.

**9**. The memory module of claim **8**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting an amplitude of the input voltage being above a first predetermined threshold voltage, and wherein the first predetermined threshold voltage is above a specified operating voltage.

**10**. The memory module of claim **9**, wherein the first predetermined threshold voltage is ten percent above the specified operating voltage.

**11**. The memory module of claim **9**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting an amplitude of the input voltage being below a second predetermined threshold voltage, wherein the second predetermined threshold voltage is below the specified operating voltage, and wherein the memory module transitions from a first operable state to a second operable state in response to the signal.

**12**. The memory module of claim **11**, wherein the second predetermined threshold voltage is ten percent below the specified operating voltage.

**13**. The memory module of claim **8**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting a power reduction condition or a low voltage condition of the input voltage.

**14**. The memory module of claim **8**, wherein the voltage monitor circuit detecting a power threshold condition includes the voltage monitor circuit detecting a request by the host system.

**15**. The memory module of claim **1**, wherein two of the at least three buck converters are configured to operate as a dual-buck converter.

**16**. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system;

a voltage conversion circuit coupled to the PCB and configured to provide a plurality of regulated voltages,

</div>
<div>

**40**

wherein the voltage conversion circuit includes three buck converters each of which is configured to produce a regulated voltage of the plurality of regulated voltages;

a plurality of components coupled to the PCB, each component of the plurality of components coupled to at least one regulated voltage of the plurality of regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices, the plurality of SDRAM devices coupled to a first regulated voltage of the plurality of regulated voltages; and

a controller coupled to the PCB, the controller including a voltage monitor circuit coupled to an input voltage received from the host system via the interface, the voltage monitor circuit configured to detect an amplitude change in the input voltage, wherein, in response to the voltage monitor detecting an amplitude change in the input voltage, the memory module transitions from a first operable state to a second operable state.

**17**. The memory module of claim **16**, wherein the voltage monitor circuit is configured to detect the input voltage being above a first predetermined threshold voltage and to detect the input voltage being below a second predetermined threshold voltage.

**18**. The memory module of claim **16**, wherein, in the first operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a first pre-regulated voltage, and wherein, in the second operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a second pre-regulated voltage.

**19**. The memory module of claim **18**, wherein, in the first operable state, the first pre-regulated voltage is supplied to the voltage conversion circuit via a circuit, and wherein, in the second operable state, the second pre-regulated voltage is supplied to the voltage conversion circuit via the circuit.

**20**. The memory module of claim **19**, wherein the circuit includes a first diode having a first input and a first output, the first input is coupled to the first pre-regulated voltage and the first output is coupled to the voltage conversion circuit, and wherein the circuit includes a second diode having a second input and a second output, the second input is coupled to the second pre-regulated voltage and the second output is coupled to the first output and to the voltage conversion circuit.

**21**. The memory module of claim **16**, further comprising:

a first circuit having a first input, a second input and an output, the first input coupled to a first pre-regulated voltage, the second input coupled to a second pre-regulated voltage, the output coupled to the voltage conversion circuit, wherein the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a supply voltage, wherein, in the first operable state, the first circuit provides the supply voltage to the voltage conversion circuit via the output using the first pre-regulated voltage, and wherein, in the second state, the first circuit provides the supply voltage to the voltage conversion circuit via the output using the second pre-regulated voltage.

**22**. The memory module of claim **21**, wherein the first circuit includes a first diode coupled between the first input and the output and a second diode coupled between the second input and the output.

**23**. The memory module of claim **16**, wherein the voltage monitor circuit is configured to produce a trigger signal in response to detecting an amplitude change in the input

</div>
</div>

US 11,232,054 B2

41                                                  42

voltage; and wherein, in response to the trigger signal, the controller is configured to perform one or more operations including a write operation to transfer data to non-volatile memory.

24. A memory module comprising:

a printed circuit board (PCB) having an interface configured to fit into a corresponding slot connector of a host system;

a voltage conversion circuit configured to provide a plurality of regulated voltages, wherein the voltage conversion circuit includes three buck converters each of which is configured to produce a regulated voltage of the plurality of regulated voltages;

a plurality of components each coupled to at least one regulated voltage of the plurality of regulated voltages, the plurality of components including a plurality of synchronous dynamic random access memory (SDRAM) devices, wherein the plurality of SDRAM devices are coupled to a first regulated voltage of the plurality of regulated voltages; and

a controller including a voltage monitor circuit coupled to an input voltage received from the host system via the interface of the PCB, the voltage monitor circuit configured to monitor the input voltage, wherein the controller is configured to perform one or more operations in response to the voltage monitor circuit detecting an amplitude change in the input voltage, and wherein the one or more operations include a write operation to transfer data into non-volatile memory.

25. The memory module of claim 24, wherein, in response to the voltage monitor circuit detecting an amplitude change in the input voltage, the memory module transitions from a first operable state to a second operable state.

26. The memory module of claim 25, wherein, in the first operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a first pre-regulated voltage, and wherein, in the second operable state, the voltage conversion circuit provides the first regulated voltage to the plurality of SDRAM devices using a second pre-regulated voltage.

27. The memory module of claim 26, wherein the first pre-regulated voltage is coupled to the voltage conversion circuit via a first diode.

28. The memory module of claim 27, wherein the second pre-regulated voltage is coupled to the voltage conversion circuit via a second diode.

29. The memory module of claim 24, wherein the voltage monitor circuit is configured to detect the input voltage being above a first predetermined threshold voltage or below a second predetermined threshold voltage.

30. The memory module of claim 29, wherein the first predetermined threshold voltage is above a specified operating voltage, and the second predetermined threshold voltage is below the specified operating voltage.

*    *    *    *    *

# CERTIFICATE OF COMPLIANCE

I certify that this Brief complies the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules. The Brief contains 10,189 words, excluding the parts of the Brief exempted by the relevant Federal Rules of Appellate Procedure and Federal Circuit Rules. The Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

January 28, 2025                     /s/ Michael Harbour
                                     Michael Harbour
                                     *Counsel for Defendant-Appellant*
                                     *Netlist, Inc.*